# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
NASSAU COUNTY

----------------------------------------------------------------------X    Index No. _____/2016

ROSALIE ROMANO; PATRICIA GLUECKERT;
WILLIAM P. GLUECKERT; FRANCISCO
PASTOLERO and MARIA SPICER; JOHN VARGHESE;          Trial by jury is desired in the
JAYNE MANN; DENISE FLORIO; ROSS MEADOW              County of Nassau
and ARLENE MEADOW; JACOB KHOLODNY and
BELLA KHOLODNY; FLO RAUCCI; and DANIEL              VERIFIED CLASS ACTION
GALLANTE and JENNIFER GALLANTE, individually        COMPLAINT
and on behalf of all others similarly situated,

                                          *Plaintiffs,*

-*against* -

NORTHROP GRUMMAN CORPORATION and
NORTHROP GRUMMAN SYSTEMS CORPORATION,

                                          *Defendants.*

----------------------------------------------------------------------X

Plaintiffs ROSALIE ROMANO; PATRICIA GLUECKERT; WILLIAM P.

GLUECKERT; FRANCISCO PASTOLERO and MARIA SPICER; JOHN VARGHESE;

JAYNE MANN; DENISE FLORIO; ROSS MEADOW and ARLENE MEADOW; JACOB

KHOLODNY and BELLA KHOLODNY; FLO RAUCCI; and DANIEL GALLANTE and

JENNIFER GALLANTE, individually and on behalf of all others similarly situated,

("Plaintiffs"), individually and on behalf of the thousands of Bethpage, NY ("Bethpage")

residents (the "Class" or "Class Members") through their attorneys, NAPOLI SHKOLNIK PLLC

complaining of NORTHROP GRUMMAN CORPORATION, NORTHROP GRUMMAN

SYSTEMS CORPORATION ("Defendants"), allege the following upon information and belief,

except as to the allegations, which pertain to the Plaintiffs and the Class, which are alleged upon

personal knowledge.  Plaintiffs' information and belief are based upon; *inter alia*, the

investigation made by and through their attorneys.  Plaintiffs, by and through their attorneys as

and for their complaint, hereby allege:

## INTRODUCTION

1.      Plaintiffs and the Class are all individuals who are and/or were residents and/or property owners of/in the Bethpage area of Nassau County, New York.  Plaintiffs and the Class, at the time of sustaining the injuries complained of herein, have been the owners and/or occupants of certain real property consisting of various lands and various types of residences located in Nassau County, New York that are located near the real property and facilities of approximately 635 acres in the East-Central Nassau County, formerly known as the Grumman Aerospace-Bethpage Facility Site, and including the Northrop Grumman – Bethpage Facility, the Naval Weapons Industrial Reserve Plant – Bethpage ("NWIRP"), and the Grumman Steel Los Site (collectively, "the Site").

2.      Upon information and belief, Grumman Aeronautical Engineering was incorporated in New York in 1929 and changed its name to "Grumman Corporation" in 1969. Grumman Corporation's headquarters were in Bethpage, New York.  Grumman Aerospace Corporation was a subsidiary of Grumman Corporation, with its principal place of business in Bethpage, New York.  Collectively, Grumman Corporation and Grumman Aerospace Corporation are referred to as "Grumman."

3.      In 1994, Grumman was acquired by Northrop Corporation.  The two companies merged in 1995 to become Northrop Grumman Corporation ("NG").  Over its almost six decade existence, Grumman, an airplane, weapons and satellite manufacturer with significant U.S. Department of Defense contracts, generated, stored, and disposed of toxic contaminants and manufacturing byproducts such as arsenic, cadmium, chromium, lead, mercury, polychlorinated biphenyls ("PCBs"), metals, and volatile organic compounds ("VOCs") at its facilities and at landfills used by multiple parties to dispose of wastes, including Grumman, as part of its routine and ordinary course of business.  These practices resulted in extensive pollution at or emanating

2

from Grumman's facilities identified in this Complaint (the "Site"), and which is presently injuring Plaintiffs and the Class.

4.      Due to the negligent, willful, and/or wanton actions of the Defendants, an unknown quantity of toxic chemicals, toxic contaminants and industrial solvents, including but not limited to VOCs such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride (collectively, the "Contaminants") have been spilled at the Site and created a massive migrating plume of contaminants now polluting the sole source aquifer in the area of the Site relied upon by Plaintiffs and the Class, and injuring Plaintiffs' and the Class Members' person and real property.

5.      Since 2005, there has been an ongoing investigation of the contamination plume emanating from the former Grumman Settling Ponds, now known as the Bethpage Community Park, designated as Operating Unit 3 ("OU-3").  During the ongoing investigation of the plume, Defendants, the New York State Department of Environmental Conservation ("NYSDEC"), and the U.S. Navy expressed their belief that they possessed a good understanding of the scope of the contamination plume emanating from the Site.

6.      However, the plume's presence resulted in the migration of the contaminants onto Plaintiffs' and Class Members' properties, causing Plaintiffs and the Class to suffer ongoing injuries, including significant health impairments and damages to their personal properties, as well as the contaminant's damaging effect to their future health concerns.

7.      This Complaint states individual claims based on negligence, abnormally dangerous activity and absolute and strict liability, trespass, nuisance, and class claims for medical monitoring and property damages.

3

## JURISDICTION

8.      This Court has personal jurisdiction over the Defendants as each of them is doing business in New York and owns property in New York such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this state.

## VENUE

9.      This case is properly venued in this Court pursuant to CPLR 503(a), due to the residence of Plaintiffs and the Class because they reside in Nassau County.

10.      This case is properly venued in this Court because Defendants Northrop Grumman Corporation ("NG") and Northrop Grumman Systems Corporation ("NGSC") or their predecessors owned and/or operated the Site at the time of the disposal and/or release of hazardous and toxic substances.

11.      This case is properly venued in this Court because the actions of the Defendants NG and NGSC or their predecessors, and the injuries and damages alleged herein all occurred in the County of Nassau, New York.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

12.      This is an action brought by and on behalf of Plaintiffs arising out of the prior and continuing release, discharge, and deposit of toxic and hazardous substances and contaminants into Plaintiffs' neighborhood and onto Plaintiffs' properties and persons, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

### _The Contaminants_

13.      As used herein, TCE shall include all of its trade names including but not limited to Acetylene, Anameth, Benzinol, Pholex and any of its degradation breakdown products.

4

14.     TCE is a colorless, volatile, man-made liquid chemical that is used by industry as, among other things, a solvent to remove grease from metal parts.  TCE can be released into the air, water, and soil and places where it is produced or used.  The United States Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") classify TCE as a human carcinogen.

15.     TCE can enter groundwater systems through improper disposals or leaks into the ground.  TCE is highly mobile once it enters the soil and will result in substantial percolation into groundwater aquifers.  TCE can remain in groundwater for long periods of time since it is not able to readily evaporate from groundwater.

16.     TCE is extremely toxic to humans, even at low concentrations.  TCE can enter the body from the air, water, or soil.  Acute exposure to TCE has been shown to affect the central nervous system, liver, and kidneys in humans.  Chronic exposure to TCE may cause liver and kidney damage, impaired immune system function, and impaired fetal development in pregnant women.  TCE is "toxic by inhalation, by prolonged or repeated contact with the skin or mucous membrane, or when taken by mouth."

17.     PCBs are an odorless group of volatile synthetic organic chemicals and are either oily liquids or solids.  PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components, known as congeners, as well as impurities.

18.     A manufacturing ban for PCBs in the United States took effect in 1979 because there was evidence that PCBs build up in the environment and may cause harmful effects.

19.     Once released into the environment, PCBs do not readily break down and therefore remain for long periods of time cycling between air, water, and soil.  PCBs can be

5

carried long distances and have been found in snow and sea water in areas far away from where they were released into the environment.

20.     PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune system, reproductive system, nervous system, and endocrine system.

21.     Upon information and belief, Grumman began using TCE and PCBs at the Site in the 1940s.

22.     2-butanone (Methyl ethyl ketone) is a colorless and volatile liquid used as a solvent and an additive for making other chemicals.

23.     As used herein, tetrachloroethylene shall include all of its trade names including but not limited to PERC, tetrachloroethylene, perchloroethylene, and PCE, and any of its degradation breakdown products.

24.     PERC is a manufactured chemical that is widely used for degreasing metal parts and in manufacturing other chemicals.

25.     In humans, PERC is known to affect the central nervous system, the liver, kidneys, blood, immune system, and the reproductive system.

26.     Epidemiological studies provide a pattern of evidence for a positive association between PERC exposure in the workplace and several types of cancer, specifically bladder cancer, non-Hodgkin lymphoma, and multiple myeloma.

27.     As used herein, 1,1,1-Trichloroethane shall include all of its trade names including but not limited to methylchloroform, methyltrichloromethane, trichloromethylmethane, and trichloromethane.

28.     1,1,1-Trichloroethane was often used as a solvent to dissolve other substances, such as glues and paints, and to remove oil or grease from manufactured parts.

29.     1,1,1-Trichloroethane in groundwater can evaporate and pass through soil as a gas and finally be released to the air.

30.     As used herein, 2-hexanone shall include all of its trade names including but not limited to methyl n-butyl ketone and MBK.

31.      2-hexanone is a clear colorless liquid that when in liquid form, evaporates into the air as a vapor.

32.     2-hexanone was formerly used in paint and paint thinner and in various chemical substances.  However, since it was found to have harmful health effects, it is no longer made in the United States, and its uses have been restricted.

33.     2-Hexanone can enter humans when breathing its vapors, eating food or drinking water that contains it, or coming in contact with it through the skin.

34.     As used herein, Carbon tetrachloride shall include all of its trade names including but not limited to carbon chloride, methane tetrachloride, perchloromethane, tetrachloroethane, or benziform.

35.     Carbon tetrachloride is a manufactured chemical that does not occur naturally and Carbon tetrachloride was used as a cleaning fluid and degreasing agent, in fire extinguishers, and in spot removers.  Because of its harmful effects, these uses are now banned and it is only used in some industrial applications.

36.     Carbon tetrachloride is known to affect the cardiovascular, hepatic, and nervous systems in humans.

7

37.     Carbon tetrachloride can be trapped in groundwater for long periods of time, and will eventually evaporate into the air.  Carbon tetrachloride does not generally stick to soil particles.

38.     After exposure to high levels of carbon tetrachloride, the nervous system, including the brain, is affected.  Such exposure can be fatal.

39.     Upon information and belief, all the above-referenced contaminants, and their derivatives, in amounts and concentrations above State and Federal residential and industrial safety levels, were and continue to be released, discharged, and disbursed throughout the neighborhood from the Site.

### *Defendants' Ownership and Use of the Site*

40.     Defendants owned and/or operated facilities on approximately 600 acres in east central Nassau County, formerly known as the Grumman Aerospace-Bethpage Facility Site, and including the Northrop Grumman – Bethpage Facility, the Naval Weapons Industrial Reserve Plant – Bethpage ("NWIRP"), and the Grumman Steel Los Site (collectively "the Site"), from which hazardous substances were released which are now contaminating and/or threatening to contaminate Plaintiffs' and Class Members' person and real property.

41.     Grumman began operations at the Site in Bethpage, New York in the late 1920s – early 1930s.  The Site location is situated in close proximity to nearby homes.

42.     Throughout its operations, Defendant used, stored and disposed of various hazardous wastes and solvents from industrial processes directly into the environment.  These wastes included VOCs, such as TCE.  Upon information and belief, Defendant's operations also would have included the use, storage and disposal of radioactive materials, including radium, perchlorate, and disposal of other industrial solvents, including but not limited to 2-butanone, 2-hexanone, and 1,1,1-Trichloroethane.

8

43.     Grumman manufactured and tested airplanes, weapons and satellites at the Bethpage Facility.  Upon information and belief, in connection with its operations, it used, stored and disposed of various contaminants and solvents at the Site, including but not limited to VOCs (one of which, TCE, was used as a degreaser for metal parts), PCBs, and others.

44.     Upon information and belief, NGSC ceased all manufacturing operations at the Site in approximately 1996.

45.     Upon information and belief, Grumman's use and storage of VOCs at the Site, including TCE, occurred primarily at Plants # 1, #2, #3, #5 and #12 within the Site.

46.     Upon information and belief, Plants #1, #2, and #3 each contained a form of vapor degreaser that used the contaminant TCE.

47.     Upon information and belief, at least eight (8) TCE degreasers operated at Plant #2 from the 1960s through the mid-1990s; at least six (6) TCE degreasers operated at Plant #3 at various times spanning the 1960s through the 1980s; at least one (1) TCE degreaser operated at Plant #5 between the 1960s and two (2) in the 1970s; and Plant #2 also used degreasers outfitted with spray wands that used TCE.

48.     Spray wands were used to degrease large parts, such as wings of planes.  To perform this task with a spray wand, a Grumman operator would have to stand on a platform along the degreaser's side.

49.     Grumman's operations at the Site included painting airplanes.  There were paint shops on the grounds of the Bethpage Facility for this purpose.  TCE was used to clean the paint guns used in the paint booths.  To do this, the paint gun would be aimed at the paint curtain and discharged.

50.     A "waterfall" in a paint shop was intended to keep sprayed paint from escaping. Water circulated through a closed system and cascaded down the sides of the paint shop to catch paint overspray; water also circulated through troughs on the floor of the paint shop and then back through the waterfalls.

51.     The paint shop consisted of one room and three waterfalls.  Grumman's practice was to clean each spray booth re-circulating tank weekly.  Water residue would be pumped to a tank truck and taken to Grumman's on-site waste treatment Plant – the toxic wastewater treatment sludge generated at the Grumman Aircraft Engineering Corporation Plant #2 Industrial Wastewater Treatment Facility ("Plant #2") was transported to the Park property and placed in one of two sludge drying beds.

52.     The wastewater treated at the Plant #2 Industrial Wastewater Treatment Facility resulted from metal finishing operations conducted at both Plant #2 and Plant #3 at the NWIRP property.

53.     The area where the sludge drying beds were located was enclosed by a chain-link fence, which was secured by a locked gate.  This fenced area is visible in available aerial photographs dated between the 1950s and 1962, when the property was transferred to the Town of Oyster Bay.

54.     Spent rags generated during the wipe-down process of a paint booth water curtain located at Plant #2 were transported to the fenced-in area of the Park property where they were emptied into a pit located on the property.  Used oil may have also been discarded in the pit through these actions.  Upon information and belief, these actions caused or contributed to the groundwater contamination plumes presently injuring Plaintiffs and the Class.

10

55.     Upon information and belief, Plant #2 had a system to distill TCE.  This system was contaminated with oil since it had been repeatedly used in degreasers and for cleaning, all so Defendants could reuse the expended TCE.

56.     Grumman dug "recharge basins" directly into the ground throughout the Bethpage Facility, which it used at least in part to dispose of wastewaters.  The discharge basins were designed to allow the wastewater to infiltrate back into the ground and return to the groundwater supply relied upon by Plaintiffs and the Class, creating the ongoing contaminant plume and soil and vapor contamination.

57.     Upon information and belief, there were at least a dozen recharge basins across the Bethpage Facility at various points in its operational history.

58.     When the discharge basins became clogged and water could no longer percolate into the ground, Grumman would run bulldozers to scrape the basins.  The contaminated and noxious scrapings obtained from these discharge basins were then used to fill in other low-lying areas on the premises of the Bethpage Facility.

59.     Upon information and belief, starting in or about 1970, Grumman used a 4,000-gallon aboveground tank at Plant #2 to store TCE.  At some point, Grumman discovered that the tank was leaking and had it replaced.  It is unknown how long TCE had been leaking into the ground before the leak was discovered, but Grumman was aware of an unexplained "loss" of TCE for an estimated two or three years prior to discovery of the leak.

60.     Upon information and belief, after an uncontrolled quantity of TCE was discharged into the soil, Grumman finally replaced Plant #2's leaking tank and discovered the bottom of the tank was already rotten.

11

61.     Upon information and belief, toxic PCB-containing fluid was released into the storm water system *via* floor drains in Plant #3.  The piping in the floor drains led the harmful PCB releases to the storm drains, which carried into the leaching pools Grumman had constructed, and ultimately led to the recharge basins, and finally, into the groundwater.

**_Bethpage Community Park and Former Grumman Settling Ponds_**

62.     The land that comprises the current Bethpage Community Park originally was primarily farmland and was purchased by the Grumman Aircraft Engineering Corporation, a predecessor of Northrop Grumman in 1941.

63.     In October of 1962, Grumman Aircraft Engineering Corporation donated approximately 18 acres of its land near the intersection of Stewart Avenue and Cherry Avenue in Bethpage, New York, to the Town of Oyster Bay, for use as parkland.  This land is now known as the Bethpage Community Park ("the Park").  Shortly thereafter, the Park as it appears today was constructed on the property, and is accessible to community residents year round.  The Park contains a ball field area, an active storm water recharge basin, a parking area, the Town Ice Skating Rink, and the Town Pool.

64.     Within the Park, the ball field area was built over the location of the "Former Grumman Settling Ponds."  The Former Grumman Settling Ponds represent approximately 3.75 acres located within the 18 acre Bethpage Community Park.

65.     From approximately 1949 through 1962, Defendant utilized the Former Grumman Settling Ponds area to dispose of various wastes generated by industrial operations at the Site, including chromium, PCBs and VOCs used for cleaning or degreasing machinery or fabricated parts.  These actions resulted in the release of PCBs into the surrounding soil within the Park at levels exceeding the 50 parts per million ("ppm") threshold established by the EPA.

12

66.     NGSC remains the current owner of the Grumman Access Road, a closed private road in the vicinity of the Park associated with the former Plant.

### *OU-1, OU-2, and OU-3 Plumes*

67.     Upon information and belief, Grumman had several wells at the Site from which water was pumped for human consumption and for industrial purposes at the Site.

68.     In 1983, the Grumman Aerospace-Bethpage Facility Site was listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State.

69.     In 1989, Northrop Grumman signed a Remedial Investigation/Feasibility Study Order on Consent for Operable Unit 1 ("OU-1") and Operable Unit 2 ("OU-2").

70.     OU-1 encompasses the former manufacturing Plant area and includes three groundwater extraction wells which remove contaminated groundwater from the Site and pump it through an air stripping treatment system for the removal of VOCs.

71.     OU-2 consists of an extremely large groundwater contamination plume that is approximately 4.5 miles long and 3.5 miles wide, and is continuously moving south-southeast. The source area of the OU-2 plume originates from both the NWIRP and Northrup Grumman properties, with VOCs present at different concentrations and different depths.  OU-2 includes a network of monitoring wells which are used to monitor the off-site contamination plume.

72.     On or about October 25, 1990, Grumman entered into a binding consent order with NYSDEC that required Grumman to conduct the investigation and study at the Bethpage Facility.

73.     On March 9, 1992, Northrop Grumman signed an Order on Consent with the State of New York to perform a remedial investigation and feasibility study at the Site.

13

74.     In March and July of 1995, New York State executed Records of Decision ("ROD") for the Northrop Grumman and NWIRP Sites concerning on-site soil contamination in OU-1.

75.     In March of 2001, the NYSDEC issued a ROD for OU-2, which provided for wellhead treatment at impacted public water supply wells, boundary monitoring of the plume, and the contingency for additional wellhead treatment should other wells be affected.

76.     These RODs set forth remedial measures Grumman was required to implement to cure findings of environmental conditions in or around the Bethpage Facility.

77.     In March of 2002, Grumman retained the firm Dvirka and Bartilucci Consulting Engineers to conduct a soil sampling program solely within the Bethpage Community Park.  The analytical results of the 60 soil samples taken in the Park indicated levels of PCBs exceeding the NYSDEC's SCO standard.

78.     In July of 2005, Northrop Grumman Systems signed a Remedial Investigation and Feasibility Study Order on Consent for the Former Grumman Settling Ponds, Adjacent Areas of the Bethpage Community Park, and the Grumman Access Road, collectively known as OU-3. OU-3 is located on the Long Island glacial sand deposits which have been designated as a sole source aquifer.

79.     The groundwater table at the Site is located at a depth ranging from 50 to 55 feet below ground surface ("bgs") in the Upper Glacial Formation.  The groundwater flow direction is primarily horizontal with a downward component to the south-southeast in and around OU-3.

80.     Groundwater migration from the OU-3 area has resulted in a significant off-site groundwater plume which has impacted both the Upper Glacial and Magothy Formations.  As the OU-3 groundwater plume leaves the site, as a distinct plume, it becomes comingled with the larger

14

OU-2 Grumman/NWIRP groundwater plume.  While generally comingled at depths of less than 400 feet, the OU-3 plume continues deeper than the OU-2 plume, extending to a depth of at least 550 feet below ground surface.

81.     The OU-3 plume, within the area-wide OU-2 plume, is deeper, narrower, varied in width and is a more concentrated.  This plume has VOC levels ranging from 5 ppb to 10 ppb, and extends approximately 5,400 feet down gradient of the Park boundary.  Within the OU-3 plume an area of elevated concentrations, or "hotspot", plume of VOCs has been identified approaching the Bethpage Water District No. 4 well field.

82.     To address the contamination comprising OU-3, specifically the Park, the Town of Oyster Bay excavated and disposed of approximately 175,000 cubic yards of contaminated soil.

83.     Upon information and belief, in a 2012 letter from Northrop to Travelers Insurance Company, Northrop estimated that it had spent $40,600,000 to date, but stated that those estimates did "not take into account all potential cost[] contingencies." Among these costs were those related to the installation of a soil vapor extraction system and an on-site containment system that Grumman continues to presently operate.

84.     The soil vapor extraction system was specifically "designed to remove the TCE in unsaturated soils" from a TCE "source area which was found adjacent to Plant 2."  Upon information and belief, by the mid-1990s, Grumman had entered into an informal "handshake agreement" with the U.S. Navy relating to allocation of costs regarding the Bethpage Facility remediation and cleanup.

85.     The southeastern portion of the Park in OU-3 was utilized as a wastewater discharge recharge area, sludge drying bed area, and fire training facility where waste oil and jet

fuel were ignited and extinguished.  Upon information and belief, these actions caused or contributed to the current soil and vapor contamination injuring Plaintiffs and the Class. As a result of Defendants' willful and reckless operations at the site, there is a large plume of groundwater contaminants, including TCE, in the Bethpage Area extending beyond the boundaries of the Site, impacting more than 2,000 acres, including Plaintiffs' and Class Members' property.  The plume has migrated onto Plaintiffs' and Class Members' properties, causing contaminants including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride, to contaminate the soil, properties, and homes of the Plaintiffs and Class, resulting in personal injury and property damage.

86.     To date, Defendants do not know the extent or complete vertical or horizontal lineation of the contamination that exists from the Site.

87.     The contaminants and hazardous substances from the property have been released, dispersed or otherwise discharged via groundwater, air and other manners onto the Plaintiffs properties and persons. This continues to this day.

### *Public Notice of the Cancer Outbreak in Bethpage*

88.     In 2009, The New York State Department of Health (NYSDOH) began a study of cancers occurring among people living in a small area directly east of the NWIRP (Naval Weapons Industrial Reserve Plant) site or directly south of the former Grumman site in Bethpage (hereinafter the "NYSDOH Cancer Study").

89.     The NYSDOH Cancer Study was not made public until 2012, and was very limited in scope.  The study looked at cancers occurring among people living in two areas – a one-block

area directly east of the NWIRP (bounded by 11th St., Sycamore Ave., 10th St. and Maple Ave.) where measurements had shown elevated levels of contaminants from the site in the air inside some of the homes, and a 19-block area surrounding that block and bordering the Grumman site.

90.    While the NYSDOH Cancer Study did not show any evidence of cancer patterns in Bethpage, the study was lacking in scope and of the full extent of the plume, which extends roughly 4.5 miles long and 3.5 miles wide.

91.    On or about May 13, 2015, the NYSDEC announced in a press release that finalized a consent order requiring Northrop Grumman to address elevated levels of groundwater contamination originating at its Bethpage site.

92.    Under the Order, Northrop Grumman will be obligated to participate in the cleanup of groundwater originating at the site and cooperate with the U.S. Navy on a remedial design and remedial action work plan the Navy submitted to DEC to remediate contaminant "hot spots" recently identified in the large OU-2 groundwater plume.

93.    In the May 13, 2015 press release, NYSDEC announced that the State Health Department, in consultation with the U.S. Agency for Toxic Substances and Disease Registry, is working to examine if there are any health impacts associated with exposure to groundwater contamination in the Bethpage and Calverton areas of Long Island.  Consistent with a health consultation of this type, the contaminants to be evaluated are VOCs, specifically, tetrachloroethene, trichloroethene and subsequent breakdown products.

94.    On or about January 2016, Governor Andrew Cuomo ordered Defendant Northrup Grumman and the U.S. Navy to provide the Bethpage Water District and State of New York access to monitoring wells so they could further delineate the plume's migration.

17

95.     On March 16, 2016, the NYSDEC sent a letter to Defendant Northrup Grumman and Defendant Northrup Grumman Systems Corporation regarding the March 2013 remedy that was selected for the contamination at the Former Bethpage Settling Ponds.  Despite signing Consent Order #W1-1183-14-05 in March 2014, the NYSDEC further urged Defendants to conduct the pre-design study of the March 2013 remedy that Defendants were bound to undertake pursuant to the Consent Order.

96.     On April 20, 2016, parts of the Bethpage Community Park were closed in connection with a New York State investigation into claims that large drums were found at the Site in the 1990s and were subsequently covered up.

### *The Defendants Have Not Remediated the Contamination*

97.     The remediation plans, if any, set forth by Defendants were and still remain inadequate and insufficient given the breadth of the contamination, as well as the present and historical migration of the harmful contaminants.  Defendants have repeatedly failed to exercise the reasonable care necessary to eliminate, correct, and/or remedy the dangerous condition created by them and/or located upon their land.

98.     Further, Defendants have intentionally delayed and repeatedly chosen meaningless courses of action, patently inadequate and unreasonable given the dire circumstances facing Plaintiffs and the Class.  Nearly three decades have passed since the contamination from Defendants' property was discovered, and Defendants have been unable to remediate or stop the plume presently injuring Plaintiffs and the Class.  The actions chosen and taken by Defendants were with knowledge that such delay and minimal action would cause the toxic contaminants to disburse and migrate off the Site and onto Plaintiffs' and Class Members'

18

land and property.  These actions have been undertaken with actual malice and in wanton and

willful and/or reckless disregard for Plaintiffs' and Class Members' rights, health, and property.

99.     As a result of Defendants' negligent, willful, and/or wanton storage, disposal, and

release of the contaminants into the soil and/or groundwater, and/or the subsequent and

continuing failure to remediate or take reasonable action to mitigate the release and migration of

said substances, there is a contamination located in or about various areas and neighborhoods of

Bethpage, as well as surrounding communities, which has migrated and continues to migrate

throughout these areas and neighborhoods and onto the properties of Plaintiffs and the Class at

dangerous levels, including at concentration levels in excess of federal and/or state regulatory

limits.  In addition, Defendants' failure to properly investigate, test and remediate the hazardous

and toxic substances on their own real properties continues to allow dangerous chemicals to

migrate onto Plaintiffs' and Class Members' properties through the soil and vapor pathways.

100.     The presence of the contaminants in Plaintiffs' environment and on Plaintiffs'

properties has resulted in permanent and continuing harm to Plaintiffs' persons and properties.

101.     As the Contaminants migrate from Defendants' property across other properties

and onto Plaintiffs' and Class Members' properties, contaminants continually come in contact

with, mix with, and react to otherwise benign substances, materials, and chemicals.  Such

contacts, mixtures, and reactions foreseeably result in new, different and/or additional hazardous

materials entering upon, trespassing, and interfering with the rights of Plaintiffs and the Class as

a result of Defendants' actions.

102.     Further, as the contaminants age and decompose, they create toxic byproducts

and/or release noxious gases, fumes, and odors.  Such harmful by-products rising through the

19

soil become trapped under foundations, streets, and driveways and create a real and foreseeable risk of exposures to deadly toxins and odors.

103.    Due to the Defendants' negligent handling of hazardous and toxic chemicals at the Site, Defendants' failure to avoid spilling, unsafe disposal, and/or release of said toxic substances into the environment, failure to adequately warn Plaintiffs and the Class of the condition damaging their properties, and failure to act reasonably in eliminating, correcting, and/or remediating the condition, Defendants, and each of them, are obligated to institute reasonable care and compensation plans to halt, prevent and correct injuries to all Plaintiffs and the Class, their physical and mental well-being, their real and personal property, and their economic interests.

104.    Due to their proximity to the Site, Plaintiffs and the Class would be, and are foreseeably and unnecessarily injured by the discharge of Defendants' contaminants, failure to warn, and failure to exercise reasonable care to eliminate, correct, and/or remediate the dangerous condition created and maintained by Defendants on and around the Site.

105.    Defendants knowingly and negligently released or allowed to be released toxic contaminants into the environment, and/or continue to allow the migration of toxic chemicals into the environment on and around Plaintiffs' and Class Members' properties.

106.    Each and every one of these Plaintiffs and Class Members have been and continue to be exposed to these toxic contaminants by ingestion, inhalation, and dermal exposure.

107.    Each and every one of the Plaintiffs named herein have been and continue to be exposed to these toxic contaminants through dust dispersing through the air into Plaintiffs properties and surrounding communities; through migration of the contaminants into the water

table and groundwater which percolates up through the soil, into the soil, and the environment and ultimately into the Plaintiffs' homes through the vapor intrusion pathway.

108. In addition, Plaintiffs and the Class have been repeatedly exposed to these toxic contaminants through contact with the air and soil at their homes.

109. The Defendants intentionally and/or negligently failed to adequately warn or advise Plaintiffs and the Class and other members of the public as to the nature, extent, composition, effects, and location of the contamination, the fact that Plaintiffs and the Class and their property were being exposed to the contamination, the nature of the contaminants and risks could change over time, and that exposure to the contamination could likely cause life threatening and permanent adverse health effects.

110. The numerous egregious actions and incidents occurring at and near the Site by Defendants constitute an intentional and/or negligent breach of their duty of reasonable care, and blatant violations of New York State law.

111. Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded each and every Plaintiffs' and the Class Members' right to possession and undisturbed occupancy of their residences, and have repeatedly trespassed by causing migration of toxic contaminants onto Plaintiffs' and Class Members' real properties.

112. Defendants, through their negligent and/or reckless acts, have caused continuing damage to Plaintiffs' and Class Members' persons, as well as real and personal properties, and have caused continuous injury to the land values of those Plaintiffs and the Class holding real property due to devaluation resulting from negative publicity that has unfairly injured their competitive status in home equity and re-sale value in relation to real property owners similarly situated in areas outside of the areas affected by the plume and contamination.

21

113.     Each and every Plaintiff has suffered and continues to suffer various types of injuries due to the acts of the Defendants as hereinbefore alleged.  Plaintiffs and the Class, and each of them, have, due to the acts of all the Defendants, suffered and continue to suffer sudden, repeated and continual invasions of their rights of possession and to undisturbed occupancy of their residences and living areas.

114.     Those Plaintiffs and the Class Members who own real property have, due to the acts of the Defendants, suffered and continue to suffer stigma damages and injury due to the creation of an unfair, competitive disadvantage by way of diminution of property value as compared with similarly situated unaffected real property.  This injury has resulted, in part, from the numerous public interest reports in the printed press concerning the contamination.

115.     Due to the negligent and/or intentional acts of each of the Defendants, each and every one of these Plaintiffs and Class Members have suffered and continue to suffer from damage to the air, water and subterranean soils around the Site and Plaintiffs' and Class Members' homes.  This crisis further concerns Plaintiffs and the Class in light of the anticipated risk of potentially injurious and unhealthy vapors escaping through the surface of residential grounds and adjacent private property.

116.     Plaintiffs and the Class have, due to the destructive acts of each of the Defendants, suffered and continue to suffer from the general diminution in the aesthetic qualities of their homes and the area in which they reside, caused by the total compounded effect of all of the above-described circumstances, causing injury to the visual, audible and physically sensible environment of the vicinity surrounding the Site.

117.     In order to compensate Plaintiffs and the Class for damages suffered due to Defendants' acts, each Plaintiff requires, among other things, that Defendants, and each of them,

pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination emanated from the plume, with Plaintiffs and the Class retaining freedom of choice relative to choosing their experts.  Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

118.     Furthermore, Plaintiffs seek compensation for: the diminution in the economic value of their personal and real property; residential soil and air space testing and monitoring; cleanup, removal and remediation of any and all contamination of Plaintiffs' and the Class Members' properties including the costs of investigation and testing of properties; repairs to real property damaged by Defendants; other damages; and attorneys' fees and costs as allowed by law, and any other compensation this court deems just.  To the extent that Defendants' products have commingled, Defendants are jointly and severally liable for the damages from contamination in this case.

### *Fear of Cancer*

119.     Each and every Plaintiff and Class Member has a justifiable and actual fear of developing cancer as a result of said exposure.  With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

120.     The degree of probability that Plaintiffs and the Class will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling Plaintiffs and the Class to recover from Defendants for apprehended consequences that are not presently manifested.

23

121.     A rational basis exists between Plaintiffs' and Class members' exposure to the above-described toxins and contaminants, and Plaintiffs' and Class Members' currently manifested fear of developing cancer in the future.

122.     To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into the soil and groundwater, thereby entering and injuring Plaintiffs' and the Class Members' physical and mental well-being, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case, their physical and mental well-being, their real and personal property, and their economic interests.

## THE PARTIES: PLAINTIFFS

123.     The Plaintiffs are either current or previous owners of residential property located in Bethpage; and/or are individuals who used and visited the Bethpage Community Park.

124.     The Plaintiffs all either currently reside or have resided in the surrounding neighborhoods adjacent and downgradient of the Site.

125.     Plaintiff Rosalie Romano currently resides in Bethpage, NY.  Rosalie Romano has lived at 68 Sherman Avenue in Bethpage, New York, for a total of approximately thirty (30) years, and has been in Bethpage for a total of approximately forty (40) years.  Rosalie Romano owns the property at 68 Sherman Avenue, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  Ms. Romano regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials. Subsequently, Ms. Romano was diagnosed with breast cancer.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding her home, Ms. Romano has developed significant debilitating personal injuries, as well as damage

24

to her personal property.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Romano has suffered and continues to suffer severe physical injury, pain, and suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  Ms. Romano brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

126.    Plaintiff Patricia Glueckert, and her son William P. Glueckert currently reside in Bethpage, NY.  Plaintiff Patricia Glueckert has lived at 3 Kay Avenue in Bethpage, New York, for a total of approximately thirty-seven (37) years.  William P. Glueckert has lived at 3 Kay Avenue for a total of approximately thirty-two (32) years.  Patricia Glueckert owns the property at 3 Kay Avenue, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  The Glueckerts regularly spent time in their yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials.  Subsequently, William P. Glueckert was diagnosed with a large brain tumor.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding their home, the Glueckerts have developed significant debilitating personal injuries, as well as damage to their personal property.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, the Glueckerts have suffered and continue to suffer severe physical injury, pain, and suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene

25

("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  The Glueckerts bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

127.    Plaintiff Francisco Pastolero currently resides in Bethpage, NY.  Francisco Pastolero has lived at 159 11th Street in Bethpage, New York, for a total of approximately twenty-six (26) years, and Plaintiff Maria Spicer lived at 159 11th Street for approximately eleven (11) years.  Francisco Pastolero owns the property at 159 11th Street, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  Mr. Pastolero and Ms. Spicer regularly spent time in their yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials.  Subsequently, Mr. Pastolero was diagnosed with melanoma and Ms. Spicer was diagnosed with breast cancer.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding the home, Mr. Pastolero and Ms. Spicer have developed significant debilitating personal injuries, as well as damage to personal property.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Pastolero and Ms. Spicer have suffered and continue to suffer severe physical injury, pain, and suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  Mr. Pastolero and Ms. Spicer bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential

26

damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

128.     Plaintiff John Varghese currently resides in Bethpage, NY.  John Varghese has lived at 75 N. Martin Road in Bethpage, New York, for a total of approximately thirteen (13) years. John Varghese owns the property at 75 N. Martin Road, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  Mr. Varghese regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials. Subsequently, Mr. Varghese was diagnosed with lung cancer.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding his home, Mr. Varghese has developed significant debilitating personal injuries, as well as damage to his personal property.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Varghese has suffered and continues to suffer severe physical injury, pain, and suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  Mr. Varghese brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

129.     Plaintiff Jayne Mann currently resides in Bethpage, NY.  Jayne Mann has lived at 40 Martin Road S. in Bethpage, New York, for a total of approximately nineteen (19) years.  Jayne Mann owns the property at 40 Martin Road S., and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  Ms. Mann regularly spent time in the yard and ingested, inhaled and had direct

27

dermal contact with surface and subsurface soil and materials. Subsequently, Ms. Mann was diagnosed with breast cancer. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding her home, Ms. Mann has developed significant debilitating personal injuries, as well as damage to her personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Mann has suffered and continues to suffer severe physical injury, pain, and suffering. Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride. Ms. Mann brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

130.     Plaintiff Denise Florio currently resides in Bethpage, NY. Denise Florio has lived at 15 N. Robert Damn St. in Bethpage, New York, for a total of approximately fourteen (14) years. Denise Florio owns the property at 15 N. Robert Damn St., and the property is located adjacent to the OU-1/OU-2/OU-3 plume. Ms. Florio regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials. Subsequently, Ms. Florio was diagnosed with breast cancer. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding her home, Ms. Florio has developed significant debilitating personal injuries, as well as damage to her personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Florio has suffered and continues to suffer severe physical injury, pain, and

suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  Ms. Florio brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

131.     Plaintiffs Ross Meadow and Arlene Meadow currently reside in Bethpage, NY. Ross Meadow and Arlene Meadow have lived at 8 Hoover Lane in Bethpage, New York, for a total of approximately thirty-eight (38) years.  Ross Meadow and Arlene Meadow own the property at 8 Hoover Lane, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  The Meadows regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials.  Subsequently, Ross Meadow was diagnosed with prostate cancer.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding their home, the Meadows have developed significant debilitating personal injuries, as well as damage to their personal property.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, the Meadows have suffered and continue to suffer severe physical injury, pain, and suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  The Meadows bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from

29

Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

132.     Plaintiffs Jacob Kholodny and Bella Kholodny currently reside in Bethpage, NY. Upon information and belief, Jacob Kholodny and Bella Kholodny have lived at 7 Ceil Place in Bethpage, New York at all relevant times herein. Jacob Kholodny and Bella Kholodny own the property at 7 Ceil Place, and the property is located adjacent to the OU-1/OU-2/OU-3 plume. The Kholodnys regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials. Subsequently, Jacob Kholodny was diagnosed with a brain tumor and Bella Kholodny was diagnosed with breast cancer. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding their home, Jacob Kholodny and Bella Kholodny have developed significant debilitating personal injuries, as well as damage to their personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Jacob Kholodny and Bella Kholodny have suffered and continue to suffer severe physical injury, pain, and suffering. Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride. Jacob Kholodny and Bella Kholodny bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

133.     Plaintiff Flo Raucci currently resides in Bethpage, NY.  Flo Raucci has lived at 19 Virginia Lane in Bethpage, New York, for a total of approximately forty-five (45) years. Flo Raucci owns the property at 19 Virginia Lane, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  Ms. Raucci regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials.  As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Raucci has suffered and continues to suffer severe physical injury, pain, and suffering, as well as damage to her personal property.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  Ms. Raucci brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.

134.     Plaintiffs Daniel Gallante and Jennifer Gallante currently reside in Bethpage, NY. Daniel Gallante and Jennifer Gallante have lived at 17 Keats Court in Bethpage, New York, for a total of approximately fifty-four (54) years.  Daniel Gallante and Jennifer Gallante own the property at 17 Keats Court, and the property is located adjacent to the OU-1/OU-2/OU-3 plume.  The Gallantes regularly spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials.  Subsequently, Daniel Gallante was diagnosed with Non-Hodgkin's lymphoma.  As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding their home, the Gallantes have developed significant debilitating personal injuries, as well as

31

damage to their personal property.  As a result of Defendants' reckless, negligent, and grossly

negligent conduct, the Gallantes have suffered and continue to suffer severe physical injury, pain,

and suffering.  Results of soil sampling taken in March 2016 revealed elevated levels of toxic

contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such

as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene

("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.  The Gallantes bring suit

against each Defendant named herein for each cause of action listed herein and seeks general

damages directly and foreseeably resulting from Defendants' actions, consequential damages,

and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.]

135.    The Plaintiffs' causes of action related to soil contamination and exposure are

continuing in nature.  Plaintiffs have and continue to engage in activities on their properties that

require them to come into direct contact with subsurface and surface soil.

136.    Plaintiffs were personally exposed and continue to be exposed to hazardous and

toxic substances, contaminants, and pollutants from the above mentioned sites via ingestion,

inhalation, and or/dermal contact, during normal day activities such as walking in the neighborhood,

gardening and doing yard work, playing at the Park, playing in their yards, as well as living in their

homes.

137.    The contamination and polluting events at the Site have not been stabilized or

eliminated.

138.    The hazardous and toxic substances that Plaintiffs were exposed to are

environmental contaminants as set out in Section 6.8.1 of the ATSDR Public Health Assessment

Guidance Manual.

139.     Plaintiffs are an 'exposed population' as defined in Section 6.8.1 of the ATSDR

Public Health Assessment Guidance Manual as follows:

A population is considered exposed if a completed exposure pathway, which links a contaminant with a receptor population, exists in the past, present, or future.  An exposed population includes persons who ingest, inhale, or contact site contaminants or are exposed to radiation in the past, present, or future. Examples of exposed persons include those who:

> • *have ingested, are ingesting, or will ingest the contaminant from one or more environmental media;*
> • *have inhaled, are inhaling, or will inhale the contaminant from one or more environmental media;*
> • *have contacted, are contacting, or will contact the contaminant in one or more environmental media; and*
> • *were exposed, are exposed, or will be exposed to gamma radiation from one or more environmental media.*

*If an environmental medium (soil) contains a contaminant of concern at a point of exposure (a residential yard), and evidence already exists that a route of exposure (ingestion) has occurred, is occurring, or will occur, the health assessor should assume that persons living at that residence are exposed or will be exposed. If the residential yard contains a vacant house, the health assessor should assume that future residents will be exposed. Persons should also be considered exposed if exposure has been verified by human biologic measurements or medical examination. For health assessments, human biologic measurements or medical examination are not necessary for the assignment of an exposure category to a population.*

## THE PARTIES: DEFENDANTS

140.     Upon information and belief, Defendant Northrop Grumman Corporation

("NGC" "Grumman" or "Defendant") is a corporation organized under the laws of the state of

Delaware, with its principal place of business at 2980 Fairview Park Drive in Falls Church,

Virginia.

141.     Upon information and belief, Northrop Corporation, the predecessor to Northrop

Grumman Corporation, acquired Grumman Corporation, whose primary place of business was in

Bethpage, New York, and it was incorporated under the laws of the State of New York.

33

142.     Defendant Northrop Grumman Systems Corporation ("NGSC" or "Defendant"), is a subsidiary of NGC, and is organized under the laws of the State of Delaware with its headquarters in Falls Church, Virginia.  Upon information and belief, NGSC is the successor in interest to the Grumman subsidiary, Grumman Aerospace Corporation, which was headquartered in Bethpage, New York and incorporated under the laws of the State of New York.

143.      NGC and/or NGSC or their predecessors owned and/or operated the Site at the time of the disposal and/or release of the hazardous and toxic contaminants at the Site.

144.     When reference is made in this Verified Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

145.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

146.     Upon information and belief, each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs and the Class, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner. Defendants owned, operated and maintained the Site at all material times to this action.

34

## INDIVIDUAL CLAIMS

## AS AND FOR A FIRST CAUSE OF ACTION:
## NEGLIGENCE

147.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

148.    Negligence may exist both as an omission as well as an affirmative act.[1]  A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.[2]

149.    Here, the Defendants, as owners and operators of business(es) at the Site that managed, stored, used and disposed of toxic contaminants and solvents, owed Plaintiffs a cognizable duty to exercise reasonable care in the storage, transportation, and disposal of toxic chemicals including but not limited to volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE") and its breakdown products, perchlorate, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride, and the maintenance of their tools and equipment used for such acts.

150.    Defendants breached their duty of reasonable care which a reasonably prudent person should use under the circumstances by negligently storing, transporting, disposing of, or otherwise causing the release into the ground toxic chemicals, including but not limited to volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE") and its breakdown products, perchlorate, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon

---

[1] See, e.g., *Zellar v. Tompkins Community Hospital*, 508 N.Y.S.2d 84 (3d Dep't 1986) (failure of hospital to adopt adequate staffing program stated a cause of action for negligence); *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S.2d 873 (4th Dep't 1976) (event organizer's failure to provide adequate security and crowd control stated a cause of action for negligence).

[2] Am Jur. 2d, Negligence § 1

tetrachloride, and negligently permitting their release into the soil and groundwater in and around the Site and in the vicinity of Plaintiffs' real property.

151. The release of the Contaminants into the soil and groundwater is the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

152. Upon learning of the release of the contaminants, Defendants owed Plaintiffs a duty to timely notify Plaintiffs that the aforementioned spills in the vicinity of Defendants' operations at the Site had occurred.

153. Defendants breached that duty by failing to timely notify the Plaintiffs of the spills of the contaminants at the Site, and, consequently, in the vicinity of Plaintiffs' homes and rental properties.

154. As a result of Defendants' breaches of their duty to timely notify the Plaintiffs, the Plaintiffs were forestalled from undertaking effective and immediate remedial measures and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

155. Upon learning of the release of the contaminants, Defendants owed Plaintiffs a duty to warn the Plaintiffs of the release of the contaminants and the dangers to the Plaintiffs, their property, and neighboring properties that resulted therefrom.

156. Defendants breached this duty by failing to adequately warn the Plaintiffs of the release of the contaminants and the potential dangers and harms that could result.

157. As a result of Defendants' breaches of their duty to warn the Plaintiffs of the release of the contaminants and the potential dangers and harms that could result, the Defendants' actions

and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

158.    Defendants further had a duty to the Plaintiffs upon learning of the release of the contaminants to act reasonably to remediate, contain, and eliminate the spill before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs property.

159.    Defendants breached that duty by failing to act reasonably to remediate, contain, and eliminate the spill before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs property.

160.    As a result of Defendants' breaches of their duty to Plaintiffs by failing to act reasonably to remediate, contain, and eliminate the spill, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

161.    Defendants had a duty to the Plaintiffs to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding their facilities and into the Plaintiffs' homes and rental properties and neighboring properties.

162.    Defendants negligently breached their duties to the Plaintiffs to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding their facilities and, consequently, as a result of this breach, contaminants entered into the surrounding Plaintiffs' homes and rental properties.

163.    As a result of Defendants' breaches of their duty to Plaintiffs by failing to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the release of the contaminants into the environment surrounding their facilities, they are the proximate and legal

37

cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

164. Defendants had a legal duty to properly remediate the contamination from their activities at the Site and had full knowledge of the extent of the contamination and the threat it poses to human health and safety.

165. Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

166. As a result of Defendants' breaches of their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety., they are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

167. Each and every one of these Plaintiffs suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs to be protected against such actions or inactions.

168. Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and

consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

**AS AND FOR A SECOND CAUSE OF ACTION:**
**STRICT LIABILITY**

169.     Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

170.     Activities such as the disposal of hazardous chemical wastes as is the case herein constitutes an abnormally dangerous activity for which strict liability will apply.

171.     Defendants' aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, transporting, disposing of, or otherwise releasing into the ground dangerous contaminations, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

172.     Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leak into the surrounding land and ground water, and in doing so, failed to warn Plaintiffs of the dangerous condition that was caused thereby.

173.     The risks posed by such activities outweigh any value associated with the same. As the result of said ultra-hazardous and abnormally dangerous activities, Plaintiffs have suffered damages and imminent, substantial and impending harm to their health, families, and home values. Plaintiffs have expended or will be forced to expend significant resources to safeguard their health

and property, obtaining monitoring, testing, remediation services or equipment, as well as health monitoring, indefinitely for years and decades into the future.

174.    By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by Plaintiffs.

175.    Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.  Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

**AS AND FOR A THIRD CAUSE OF ACTION:**
**<u>NUISANCE</u>**

176.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

177.    Under a cause of action for private nuisance, Parties may be subject to liability for environmental contamination if their conduct invades another's private use and enjoyment of land and if such invasion is: 1) intentional and unreasonable; 2) negligent or reckless; or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities.[3]

---

[3] *Copart Industries, Inc. v. Consolidated Edison Co. of New York, Inc.*, 41 N.Y.2d 564 (1977); *Snyder v. Jessie*, 546 N.Y.S.2d 777 (Sup 1989), *order aff'd as modified*, 565 N.Y.S.2d 924 (4th Dep't 1990); Restatement, Second Torts § 822.

40

178.     Defendant Northrop Grumman Corporation and its predecessors owned and continue own, occupied and continue to occupy, and controlled and continue to control the real property at the Site.

179.     Defendants owned, occupied, controlled and/or still own, occupy and control their real property in such a way as to create and/or maintain and continue a dangerous and/or hazardous condition.

180.     At all times mentioned herein, Defendants had knowledge and/or notice of the dangerous condition that the contaminants and the plume presented and failed to take reasonable acts to cleanup, correct, or remediate that condition.

181.     Additionally, Defendants owed a duty to Plaintiffs to take reasonable action to eliminate, correct, or remedy any dangerous condition existing on Defendants' property that was reasonably foreseeable to injure Plaintiffs and/or Plaintiffs' real property, and of which they had knowledge and/or notice.

182.     Further, Defendants owed a duty to Plaintiffs to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Defendants have breached these duties, and each of them, by negligently, willfully, and/or wantonly creating a dangerous condition on their property by allowing massive quantities toxic contaminants to be spilled, disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer on their property. This dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and their property due to the size and nature of the releases of the Contaminants and the proximity of Plaintiffs and their properties.

41

183.     Defendants owed a duty to Plaintiffs to exercise reasonable care to keep the dangerous contaminants and their byproducts from being discharged or allowed to escape, enter surrounding properties, and cause injury and damage.

184.     Defendants breached their duty to Plaintiffs by failing to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants.   Specifically, Defendants negligently, willfully, and/or wantonly allowed massive quantities of Contaminants to be disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer at the Site.

185.     Defendants further breached their duty to Plaintiffs by failing to exercise reasonable care and by maintaining their property in such a condition as to allow and fail to prevent large and unknown quantities of the Contaminants to degrade, mix with other chemicals, and escape from their property and enter onto and under Plaintiffs' property.   The above-described breaches endangered, injured, and damaged the neighboring premises and occupants.   Such a dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and their property.

186.     Defendants also breached their duty by continuing and maintaining this dangerous condition at the Site that was reasonably foreseeable to injure Plaintiffs and/or their real property.

187.     Plaintiffs have suffered foreseeable injury and damages proximately caused by the negligent creation and/or maintenance of the dangerous condition by Defendants.

188.     Defendants owed a duty to Plaintiffs to refrain from creating and/or maintaining a dangerous condition on Defendants' properties that was reasonably foreseeable to injure Plaintiffs and/or their real property.

42

189.     Defendants' breach that duty by causing dangerous Contaminants to be released onto Plaintiffs' land and caused noxious gases, fumes and odors to emanate from their soil and homes.

190.     Accordingly, this breach has caused Plaintiffs injury to their persons and property that is certain, substantial, and this resulting condition interferes with Plaintiffs' physical comfort.

191.     Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore Plaintiffs to their original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief, such amount exceeds the jurisdictional amount of all lower courts.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### TRESPASS

192.     Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

193.     Environmental contamination of a property constitutes a trespass as it interferes with the conditions of the property.[4] This act of trespass is, in and of itself, objectionable.[5]

---

[4] See *State v. Fermenta ASC Corp.*, 630 N.Y.S.2d 884 (Sup 1995), aff'd in part, 656 N.Y.S.2d 342 (2d Dep't 1997).

[5] See *PBN Associates v. Xerox Corp.*, 517 N.Y.S.2d 1015 (Sup 1987), *judgment modified*, 529 N.Y.S.2d 877 (2d Dep't 1988) *and decision modified on reargument on other grounds*, 575 N.Y.S.2d 451 (2d Dep't 1991).

43

194.     Upon information and belief, Defendants had exclusive control over the Site at all relevant times.

195.     Upon information and belief Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an uncontrolled quantity of Contaminants to be spilled, disposed of, or otherwise released into the ground, soil, groundwater, and aquifer at the Site.

196.     Upon information and belief, the contaminants spilled, disposed of, or otherwise released into the ground, soil, groundwater, and aquifer at the Site entered and trespassed upon the land and realty of the Plaintiffs, thus interfering with the condition of Plaintiffs' properties and the neighboring properties, causing an injury to their possession and/or right of possession.

197.     Upon information and belief, Defendants took affirmative, voluntary, and intentional actions to store, use, and transport in an unsafe manner and/or intentionally to dispose of the contaminants into the ground.

198.     Upon information and belief, at the time that the above described affirmative, voluntary, and intentional acts were performed, Defendants had good reason to know or expect that the large quantities of contaminants would pass through the soil, groundwater, and aquifer from Defendants' land to the land of Plaintiffs and the neighboring properties.

199.     Upon information and belief, the above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause the Contaminants to be disbursed through the soil, groundwater, and aquifer without regard for the inevitable transport onto the land and property of Plaintiffs and the neighboring properties.

200.     Defendants' actions in disposing of uncontrolled amounts of the Contaminants into the ground were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

44

201.    These voluntary actions resulted in the immediate and continued trespass of the Contaminants on the Plaintiffs' and neighboring and properties, thus interfering with the condition of Plaintiffs' and neighboring property, causing injury and damage to Plaintiffs, their property and their right of possession of their property.

202.    Additionally, and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the soil, groundwater, and aquifer on their properties after having knowledge and notice of said contamination were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

203.    Further, Defendants' actions were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were made with actual malice and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

204.    These actions resulted in the trespass of the Contaminants on the Plaintiffs' and neighboring and properties, thus interfering with the condition of Plaintiffs' and neighboring property, causing injury and damage to Plaintiffs, their property and their right of possession of their property.

205.    Based upon the above, Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and to restore Plaintiffs to their original position, including, but not limited to, consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons,

45

consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct, and exemplary or punitive damages.

## CLASS ACTION ALLEGATIONS

206.     Plaintiffs and the Class bring this action and seek to certify and maintain it as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules, Section 901[6], on behalf of themselves and similarly situated individuals in Bethpage, New York, subject to amendment and additional discovery as follows:

a.     all residents of Bethpage who have been exposed to the toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride, discharged by Defendants at the Site to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins (the "Bodily Injury Class");

b.     all owners of real property in Bethpage, New York for damages, whose property value has been diminished due to the known or perceived contamination in the area, and/or stigmatization of property (the "Property Value Damage Class");

c.     all owners of real property in Bethpage, New York, for all past, present, and future costs of remediation for the contamination of their real property, described of herein (the "Remediation Class");

_____

[6] Article 9 of the CPLR greatly liberalizes the narrow class action legislation which preceded it (*See City of New York v. Maul*, 14 N.Y.3d 499, 509, *quoting Friar v. Vanguard Holding Corp.*, 78 A.D.2d 83) and enables the use of the class action device in cases involving "mass exposure to environmental offenses." *See Evans v City of Johnstown*, 97 A.D.2d 1 (3d Dept 1983).

46

d.      all owners of real property in Bethpage, New York, for all future costs associated with the environmental monitoring of the contamination caused by Defendants described of herein, including but not limited to soil vapor testing, sub-slab testing, and indoor air testing (the "Property Monitoring Class").

e.      Plaintiffs are members of all Classes they seek to represent.

207.      Excluded from the Class are:

a.      Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b.      the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; and

c.      all governmental entities.

208.      Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

## NUMEROSITY AND ASCERTAINABILITY

209.      The Classes are so numerous that joinder of all members is impracticable, given that the amount of affected property owner residents in Bethpage, upon information and belief, has reached the thousands. While the exact number of class members is not yet known, a precise number can be ascertained from U.S. Federal Census records, State of New York and Bethpage public records, and through other discovery.  Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

47

## PREDOMINANCE OF COMMON ISSUES

210.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

a)      whether Defendants engaged in the conduct alleged herein;

b)      whether Defendants knew or should have known that exposure to the Contaminants and solvents used at the Site could increase health risks;

c)      the extent to which Defendants knew about the contamination described of herein in Bethpage, New York;

d)      whether the manner in which Defendants disposed of the Contaminants proximately caused the injuries described of herein;

e)      whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of the Contaminants;

f)      for the Bodily Injury Class, whether any health issue or bodily injury of Plaintiffs and the Class are attributable to Defendants ownership and operation of the Site;

g)      for the Property Value Class, whether property values in Bethpage declined in value following the disclosure of the contamination described of herein; and

h)      whether Plaintiffs and Class Members are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

## **TYPICALITY**

211.    Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have

been damaged by Defendants' misconduct in that they have incurred damages and losses related to the contamination migrating from the Site, causing personal injury and property damages. Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.  The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

## ADEQUACY OF REPRESENTATION

212.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent.  Further, Plaintiffs have retained counsel competent and experienced in class action litigation.

213.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.

## SUPERIORITY

214.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case.  Further, no unusual difficulties are likely to be encountered in the management of this class action. Given the great amount of Bethpage residents impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims for Defendants' complained of conduct. To do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

## DAMAGES SOUGHT BY THE CLASS

215.   Plaintiffs and the Class re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

216.   Plaintiffs and the Class have been and continue to be exposed to elevated and hazardous levels of toxic and hazardous substances, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

217.   Plaintiffs and the Class were, and continue to be exposed to the elevated and hazardous level of toxic and hazardous substances through dermal contact with contaminated soil, ingestion and dermal contact with fruits and vegetables and other items grown or developed in the contaminated soil, the ingestion and/or inhalation of toxic matter, and the continued physical contact with contaminated soil, vapors, and debris.

218.   Plaintiffs and the Subclasses have sustained and will continue to sustain damages to their property as a result of Defendants' actions. As a result, Plaintiffs and the Subclasses seek monetary damages for each violation of the First through Fourth Claims for Relief.  In particular, Plaintiffs and the Subclasses seek (i) monetary damages reflecting the cost to remediate class members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs' property, and (iv) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

50

219.    Plaintiffs and the Subclasses also seek consequential damages sufficient to fund a medical monitoring program[7] that is reasonably tailored to the exposure risks of the contaminants emanating from Defendants' property, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

220.    As cancer risk from multiple agents is additive, the cumulative cancer risk posed by multiple contaminants is consequently greater that the risk posed by any single contaminant.

221.    Defendants continued negligent acts and omissions in operating and maintain the Site are the proximate cause of higher than normal, in fact excessive exposure, to hazardous substances and contaminants, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

222.    The resulting exposure has significantly increased the risk of Plaintiffs and the Class contracting serious latent diseases, including but not limited to lung, skin, breast, bladder, liver, kidney and prostate cancer, permanent intellectual and behavioral effects on child development, effects on the central nervous system, respiratory, and other diseases and conditions.

223.    Each and every one of these Plaintiffs and Class Members will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

224.    In order to compensate Plaintiffs and the Class for damages suffered due to Defendants' acts, each and every Plaintiff and Class Member requires, among other things, that

---

[7] Medical Monitoring is not being sought as in independent cause of action but, rather, as consequential damages in connection with the personal injury and property claims sought herein as is appropriate. *See Ivory v. Int'l Bus. Mach. Corp.,* 983 N.Y.S.2d 110 (2014), *leave to appeal denied,* 11 N.E.3d 204 (2014).

51

Defendants collectively pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination emanated from the plume, with Plaintiffs and the Class retaining freedom of choice relative to choosing their experts. Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

225.    Each and every one of these Plaintiffs' and Class Members' increased susceptibility to certain injuries and the irreparable threat to their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes and businesses in the Bethpage area can only be mitigated and/or addressed by the creation of a medical program (the "Bethpage Program") including but not limited to:

a.   Establishing a program that provides education and outreach on the existence and availability of the services established under the medical monitoring program, including but not limited to the establishment of a public Website with information about the Bethpage Program, meetings with potentially eligible populations, development and dissemination of outreach materials informing Bethpage residents about the program, and the establishment of phone information services;

b.   Funding further studies of the long-term effects of exposure;

c.   Funding medical surveillance for those individuals exposed to the contaminants described of herein, including by not limited to VOCs such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride.

52

d.   Funding research into possible cures for the detrimental effects of breathing, living and working near the contaminants and toxicants present in the Bethpage area as a result of the acts and omissions alleged here;

e.   Gathering and forwarding to each and every one of these Plaintiffs' and Class Members' treating physicians' information related to the diagnosis and treatment of injuries which result from their exposure(s) in and around Bethpage;

f.   Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of each and every one of these Plaintiffs and the Class.

226.   Prescribed monitoring procedures exist that makes the early detection of these diseases possible.

227.   The monitoring procedures or regimes are different from normally recommended procedures that would be used in the absence of the exposure.

228.   The prescribed medical surveillance is reasonably necessary according to contemporary scientific principals for persons such as Plaintiffs and the Class who have been exposed and continue to be exposed to excessive levels of the referenced hazardous chemicals and materials.

229.   Plaintiffs and the Class will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous substance caused by Defendants' negligence.

230.   Detection of these diseases and early treatment is medically reasonable and necessary to prevent progression and further injuries.

231.   It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiffs and the Class.

53

232.    Establishment of a medical monitoring program for the Plaintiffs and the Class is essential as a consequential damage from their exposure to the contaminants because without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

233.    Plaintiffs and the Class request that the Court appoint a plan administrator, require the Defendants to fund the medical monitoring plan, and reserve jurisdiction to enforce the terms and conditions of the plan.

234.    Accordingly, Plaintiffs and the Class are entitled to a medical monitoring program which provides for medical testing, surveillance, monitoring, and study of the Plaintiffs and the Class for conditions caused by exposure to the references substances, as well as payment of their attorney's fees and expenses, and any other relief this court deems just and proper.

## PUNITIVE DAMAGES

235.    Plaintiffs and the Class re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

236.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiffs' properties, disregarding the property rights of Plaintiffs and the Class.

237.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

a.  Issuing no warning to Plaintiffs and the Class concerning the release of PCBs and VOCs from its facility, in the vicinity of Plaintiffs' and Class Members' real property;

b.  Knowing but failing to disclose to Plaintiffs and the Class the certainty of long-lasting water contamination, including specifically high risks to the aquifer, groundwater and production areas, by the use, management, storage, and/or disposal of the Contaminants; and

c.  Defendants' blatant disregard for the safety of the public when they failed to appropriately remediate the contamination after the Contaminants were detected.

238.    Defendants have caused great harm to Plaintiffs' and Class Members' property and water supplies and demonstrated an outrageous conscious disregard for Plaintiffs' and Class Members' safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class demand judgment against Defendants NORTHRUP GRUMMAN CORPORATION and NORTHRUP GRUMMAN SYSTEMS CORPORATION as follows:

A.  As and for the First Cause of Action sounding in negligence, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in the amount no less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

B.  As and for the Second Cause of Action sounding in strict liability, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses

sustained and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in the amount no less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

C.  As and for the Third Cause of Action sounding in nuisance, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and the Class and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and direct and consequential damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants conduct in the amount no less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

D.  As and for the Fourth Cause of Action sounding in trespass, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and the direct and consequential damages flowing from the trespass and resulting condition which are the natural

and proximate result of Defendants conduct in the amount no less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00).

E.      As and for the combined claims on each of the foregoing causes of action, all of which flow directly as a result of the wanton, willful and reckless conduct of the Defendants and each of the Defendants herein, Plaintiffs and the Class seek exemplary or punitive damages in addition to the compensatory damages set forth, *supra*, in an amount to be determined at trial.

F.      An Order mandating that the Defendants, and each of them, and their successors and assigns, take every action necessary to assure that all relief requested herein is obtained and fully funded;

G.      Award Plaintiffs and the Class the costs of this lawsuit, including but not limited to attorneys' fees and expert costs.

H.      Awarding Plaintiffs such other, further, and different relief as the Court may deem appropriate and just.

Dated: New York, New York

       September 13, 2016

Respectfully submitted,


**NAPOLI SHKOLNIK PLLC**

By

_____

Robert Gitelman
Paul J. Napoli
Patrick J. Lanciotti
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
rgitelman@napolilaw.com
pnapoli@napolilaw.com
planciotti@napolilaw.com


*Attorneys for Plaintiffs and the Proposed Class*

September 13, 2016

58

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims asserted in this Verified Complaint.


Dated: Melville, New York

September 13, 2016


Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**

By

_____

Robert Gitelman
Paul J. Napoli
Patrick J. Lanciotti
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
rgitelman@napolilaw.com
pnapoli@napolilaw.com
planciotti@napolilaw.com


*Attorneys for Plaintiffs and the Proposed Class*

September 13, 2016

59

<u>**VERIFICATION**</u>

I, **ROBERT GITELMAN,** am an attorney duly admitted to practice law in the Courts of this State, and I affirm the following under penalties of perjury:

I am the attorney for the Plaintiffs in the above entitled-action.  I have read the foregoing **SUMMONS & VERIFIED COMPLAINT** and know the contents thereof, and upon information and belief, affirmant believes after an inquiry reasonable under the circumstances the matters alleged herein to be true, and that the contentions herein are not frivolous, as that term is defined in 22 NYCRR § 130-1.1(c).

The reason this verification is made by affirmant and not by Plaintiffs is that the Plaintiffs herein reside in a County other than the County in which I maintain my offices.

 The source of affirmant's information and the grounds of his belief are communications, papers, reports and investigations contained in the file maintained by this office.


Dated: New York, New York
       September 13, 2016


_____
   **ROBERT GITELMAN**

60

SUPREME COURT OF THE STATE OF NEW YORK
NASSAU COUNTY

------------------------------------------------------------X

ROSALIE ROMANO; PATRICIA GLUECKERT; WILLIAM
P. GLUECKERT; FRANCISCO PASTOLERO and MARIA
SPICER; JOHN VARGHESE; JAYNE MANN; DENISE
FLORIO; ROSS MEADOW and ARLENE MEADOW;
JACOB KHOLODNY and BELLA KHOLODNY; FLO
RAUCCI; and DANIEL GALLANTE and JENNIFER
GALLANTE, individually and on behalf of all others similarly
situated,

Index No.  _____/2016

*Plaintiffs,*

-against -

NORTHROP GRUMMAN CORPORATION and
NORTHROP GRUMMAN SYSTEMS CORPORATION

*Defendants.*

------------------------------------------------------------X

=================================================================

## SUMMONS AND VERIFIED COMPLAINT

=================================================================

### NAPOLI SHKOLNIK PLLC

*Attorneys for*:  Plaintiffs
360 Lexington Ave, 11th Floor
New York, New York 10017
(212) 397-1000

=================================================================

The undersigned attorney certifies pursuant to 22 NYCRR §130-1.1-a that he has read the within papers
and that, to the best of his knowledge, they are not frivolous as that term is defined in 22 NYCRR §130-
1.1(c).

_____ _____

Robert Gitelman

=================================================================

Service of a copy of the within papers is hereby admitted.

Dated, _____                         _____

ATTORNEY(S) FOR: PLAINTIFFS

=================================================================

PLEASE TAKE NOTICE:

☐  NOTICE OF ENTRY

that the within is a (certified) true copy of an                       duly entered in the office of the clerk of the
within named court on _____200__.

☐  NOTICE OF SETTLEMENT

that an order                                                                 of which the within is a true copy
will be presented for settlement to the HON.                            one of the judges of the
within named Court, at                    on              200___ at_____ O'clock ___.M.

Dated, _____               Yours, etc.

NAPOLI SHKOLNIK PLLC