**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROSALIE ROMANO; PATRICIA GLUECKERT, individually and on behalf of the Estate of WILLIAM G. GLUECKERT; WILLIAM P. GLUECKERT; FRANCISCO PASTOLERO and MARIA SPICER; JAYNE MANN; DENISE FLORIO; ROSS MEADOW and ARLENE MEADOW; JACOB KHOLODNY and BELLA KHOLODNY; FLO RAUCCI, individually and on behalf of the Estate of SALVATORE RAUCCI; DANIEL GALLANTE and JENNIFER GALLANTE; and TERESA MEADE, individually and on behalf of all others similarly situated; and MARYANN HERBERT; CHRISTINA ANDREWS-SALES; CHRISTOPHER CAGNA; JACKIE LIEBERMAN; CATHERINE LEWONKA; EUGENE CONNOLLY; VIVIIANE BLICKENSDERFER; DANA BLICKENSDERFER; GLENN FALINO and MARCIA FALINO; and MICHAEL FALINO, individually<br><br>              Plaintiffs,<br><br>     -against-<br><br>NORTHROP GRUMMAN CORPORATION, NORTHROP GRUMMAN SYSTEMS CORPORATION, and TOWN OF OYSTER BAY<br><br>              Defendants. | Case No. 16-cv-5760-DRH-ARL<br><br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF NORTHROP GRUMMAN CORPORATION AND NORTHROP GRUMMAN SYSTEMS CORPORATION'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.    Overview of the Bethpage Site ................................................................. 2

    B.    Procedural History ................................................................................... 4

    C.    Public Investigation and Remediation Put Plaintiffs on Inquiry Notice No Later Than March 2013. ......................................................................... 6

    D.    Plaintiffs' Allegations Arise From Information Concerning the Remediation at Bethpage That Was Publicly Available Since at Least March 2013. ............................................................................................ 12

    E.    The Bethpage Plaintiffs' Alleged Accrual Date Is Refuted by the Bethpage Plaintiffs' Own Test Results. ................................................... 13

    F.    The Non-Resident Plaintiffs' Delayed Filing Claims Until More Than a Year After the Original *Romano* Complaint Was Filed. ..................... 15

RELEVANT STANDARDS ......................................................................................... 15

ARGUMENT ............................................................................................................... 18

I.    Public Disclosure of Potential Contamination in Bethpage Put Plaintiffs on Inquiry Notice Years Ago, Barring Their Property Damage Claims. ............................ 18

II.    The One-Year Savings Clause Does Not Save Plaintiffs' Personal Injury Claims. ........ 21

    A.    A Reasonable Person in Plaintiffs' Situation Would Have Inquired About and Been on Notice of the Cause of Their Alleged Injuries No Later Than March 2013. ...................................................................................... 22

    B.    The Bethpage Plaintiffs' Test Results Could Not Have Put Them on Notice Because They Do Not Show the Contamination Alleged in the Second Amended Complaint. ............................................................... 24

III.    The Non-Resident Plaintiffs' Claims Are Facially Untimely Because They Were Filed More Than a Year After the Original *Romano* Complaint. ................................... 24

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011)............................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................1 n.1, 15, 16

*Bascom v. Brooklyn Hosp.*,
   No. 15-cv-2256, 2018 WL 1135651 (E.D.N.Y. Feb. 28, 2018) ................................14 n.10, 16

*Benoit v. Saint-Gobain Performance Plastics Corp.*,
   No. 116-cv-1057, 2017 WL 3316132 (N.D.N.Y. Aug. 2, 2017)....................................18 n.14

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004)............................................................................17

*Freier v. Westinghouse Elec. Corp.*,
   303 F.3d 176 (2d Cir. 2002)............................................................................17, 21, 23

*Haynes v. Williams*,
   162 A.D.3d 1377 (N.Y. 3d Dep't. 2018) ...............................................................19-20

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   No. 04 CIV. 4968, 2009 WL 4496736 (S.D.N.Y. Dec. 2, 2009)....................................22

*Lopez v. Nassau Cty. Sheriffs Dep't*,
   No. 17-CV-3722, 2018 WL 3321430 (E.D.N.Y. July 5, 2018)....................................16

*Masters v. GlaxoSmithKline*,
   271 F. App'x 46 (2d Cir. 2008) .......................................................................25

*Matter of New York Cty. DES Litig.*,
   89 N.Y.2d 506 (1997) ...................................................................................18

*Next Millennium Realty, L.L.C. v. Adchem Corp.*,
   No. CV 03-5985 (ARL), 2015 WL 11090419 (E.D.N.Y. Mar. 31, 2015), *aff'd*
   690 F. App'x 710 (2d Cir. 2017) .....................................................................18

*Porrazzo v. Bumble Bee Foods, LLC*,
   822 F. Supp. 2d 406 (S.D.N.Y. 2011)................................................................17

*Riddle v. Bank of Am. Corp.*,
   No. CIV.A. 12-1740, 2013 WL 6061363 (E.D. Pa. Nov. 18, 2013), *aff'd*, 588
   F. App'x 127 (3d Cir. 2014) ...........................................................................20

ii

## TABLE OF AUTHORITIES
### (continued)

*Romano v. Town of Oyster Bay*,
   No. 601158/17 (Sup. Ct. Nassau Cnty.) ............................................................ *passim*

*Romeo v. Sherry*,
   308 F. Supp. 2d 128 (E.D.N.Y. 2004) ........................................................ 18 n.14

*Seneca Meadows, Inc. v. ECI Liquidating, Inc.*,
   983 F. Supp. 360 (W.D.N.Y. 1997) ............................................................. 18, 20

*Sweeney v. Gen. Print.*,
   210 A.D.2d 865 (N.Y. 3d Dep't 1994) ................................................................ 21

*Thompson v. United States*,
   642 F. Supp. 762 (N.D. Ill. 1986) ............................................................... 8 n.6

*Vasilatos v. Dzamba*,
   148 A.D.3d 1275 (N.Y. 3d Dep't 2017) ............................................................. 19

*Village of Milford v. K-H Holding Corp.*,
   390 F. 3d 926 (6th Cir. 2004) ...................................................................... 20

**Statutes**

42 U.S.C. § 9658(b)(4)(A) ...................................................................... 17, 21

**Other Authorities**

104 N.Y. Jur. 2d Trespass § 26 ................................................................... 21

Federal Rule of Civil Procedure 12(b)(6) ................................................. 4, 18, 19

N.Y. C.P.L.R. 214-c ....................................................................... *passim*

US. Navy 2018 Annual Report for Groundwater Impacts at Naval Weapons
   Industrial Reserve Plant, Bethpage, New York (June 2018),
   http://go.usa.gov/DyXF.............................................................................. 7

Water Infrastructure Improvements for the Nation Act
   Pub. Law No. 114-322, (Dec. 16, 2016) ............................................................. 3

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation ("Northrop Grumman") move to dismiss the Second Amended Complaint (ECF No. 34 ("SAC")) for failure to state timely claims upon which relief can be granted.

## INTRODUCTION[1]

Neither the Plaintiffs nor their properties have been harmed by Northrop Grumman, and the statute of limitations on their claims has expired.  All the information needed to place Plaintiffs on inquiry notice to bring this case was in the public record no later than March 2013, and this motion is proper because that public record is recited by and incorporated into the Second Amended Complaint itself.  (*See generally* SAC ¶¶ 68–92.)  Because the original complaint in this matter was not filed until September 16, 2016, Plaintiffs' claims have lapsed.

*First*, on the face of the Second Amended Complaint all of Plaintiffs' property damage claims—whether asserted as nuisance or trespass—expired years ago.  The Second Amended Complaint expressly recites the longstanding public information regarding contamination in the Bethpage area, and Plaintiffs rest their claims on information that was publicly known no later than March 2013, when the Record of Decision ("ROD") for Bethpage Community Park, designated as Operable Unit 3 ("OU-3"), was published.  Objectively reasonable persons, the standard governing the statute of limitations, would have raised inquiries regarding any alleged contamination of their own properties by that time, as other Bethpage residents did.

*Second*, the Plaintiffs named in the original complaint cannot take advantage of the one-year savings clause under CPLR 214-c(4) as modified by the Comprehensive Environmental

---

[1] For purposes of this Motion, the Second Amended Complaint's well-pleaded factual allegations are taken as true, but its legal conclusions, labels, and formulaic recitations of causes of actions' elements are not.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Response, Compensation, and Liability Act ("CERCLA") for their personal injury claims.  That is because, as the Second Amended Complaint makes clear, those Plaintiffs were on inquiry notice no later than March 2013.  The only "new" information alleged in the Second Amended Complaint after March 2013, the results of testing performed in 2016 on the original plaintiffs' properties, added nothing to the calculus of when to sue, because those test results contradict, rather than support, the claims asserted in the Second Amended Complaint.  Consequently, those test results do not suspend or otherwise interfere with the running of the statute of limitations that began no later than March 2013 and expired before this case began.

*Third*, the personal injury claims of Plaintiffs who were added as parties to this case in the Second Amended Complaint are also untimely, because the new Plaintiffs do not fall within any purported class the original complaint proposed, and they filed their claims more than a year after this action was filed.

## BACKGROUND[2]

### A.      Overview of the Bethpage Site

From 1942 to 1996, Northrop Grumman and its predecessor Grumman Corporation ran "government-owned contractor-operated plants" at its manufacturing facility in Bethpage, New York.  (SAC ¶¶ 38, 40–41.)  During World War II, the company produced thousands of combat aircraft for the U.S. Navy that were instrumental in winning the war in the Pacific.  The company continued to produce state-of-the-art military aircraft for the Navy through the Korean War and Cold War, and also designed and built the Apollo lunar module, which landed Neil Armstrong and other astronauts on the moon.  (*See* SAC ¶ 40.)  In carrying out these activities,

---

[2] The exhibits cited herein are the exhibits attached to the Declaration of Jessica Kaufman filed in support of this motion.

ny-1334331

Northrop Grumman acted in accordance with Navy and other government agency contracts and directions and complied with industry and regulatory standards.

In 1983, the New York State Department of Environmental Conservation ("NYSDEC") listed the Bethpage Site in the Registry of Inactive Hazardous Waste Disposal Sites.  (*See, e.g.*, SAC ¶ 69.)  Since then, Northrop Grumman has worked closely with NYSDEC, the New York State Department of Health ("NYSDOH"), the Navy, and other federal, state, and local regulatory agencies to address environmental conditions relating to the former Navy/Grumman facility in Bethpage and the former Grumman settling ponds located at the current Bethpage Community Park (the "Bethpage Site").  (SAC ¶¶ 69–79, 83–84, 88.)  As part of its comprehensive response to these environmental conditions,  Northrop Grumman has entered into three consent orders with NYSDEC, is fully implementing its obligations under those agreements, and continues to conduct investigation and remediation activities.  (SAC ¶¶ 5, 70, 73–77, 79.)  NYSDEC has concluded that Northrop Grumman's extensive efforts protect human health and the environment, and comply with federal, state, and local requirements.[3]

Pursuant to the Water Infrastructure Improvements for the Nation Act (the "WIIN Act") (Pub. Law No. 114-322, Dec. 16, 2016), the Navy is charged with monitoring migration of the chemicals in groundwater at issue in this case, assessing any threat to area residents and water districts, and designing a comprehensive strategy to prevent contamination of drinking water wells downstream.  In June 2018, as part of its second annual report under the WIIN Act, the Navy reported to Congress that remediation efforts underway in Bethpage, in which the Navy actively participates, are effective, in compliance with federal and state law, remain "currently

---

[3] *See, e.g.*, Ex. 1 (2013 OU-3 ROD) at p. 6 (concluding that selected remedy for the Bethpage Site is "protective of human health and the environment, [and] complies with State and Federal requirements").

protective of human health and the environment," and that drinking water in the Bethpage area remains safe to drink.[4]

**B.      Procedural History**

The original *Romano* complaint was filed in New York State court on September 16, 2016, and Northrop Grumman timely removed to this Court on October 14, 2016.  (ECF No. 1.)  After the action was removed, Plaintiffs attempted to evade this Court's diversity jurisdiction by naming the Town of Oyster Bay as a defendant in the First Amended Complaint.  The Plaintiffs failed, however, to provide mandatory notices of claim to the Town pursuant to the New York General Municipal Law.  This led to litigation in the New York State Supreme Court between Plaintiffs and the Town over whether Plaintiffs could file late notice.  (*See Romano v. Town of Oyster Bay*, No. 601158/17 (Sup. Ct. Nassau Cnty).)  In deciding whether Plaintiffs' time for notice may be extended, the New York State Supreme Court considered the date on which Plaintiffs' claims accrued.

Plaintiffs offered the New York State Supreme Court varying explanations of when the Plaintiffs named in the original complaint (the "Bethpage Plaintiffs") were required to inquire into the cause of their alleged injuries, first asserting their claims arose around August 3, 2016 when NYSDEC released a report titled "*Remedial Options Report, Grumman Aerospace-Bethpage Facility.*"  Plaintiffs ultimately asserted that the Bethpage Plaintiffs were not on inquiry notice of the alleged cause of their injuries until around April 7, 2016, when results of soil sampling allegedly revealed elevated levels of chemicals in the Bethpage Plaintiffs' yards "in excess of federal and/or state regulatory limits."  (Short Form Order at 1–2, *Romano v. Town of Oyster Bay*, No. 601158/2017, Sept. 12, 2017, NYSCEF Doc. No. 36.)  The Second Amended

---

[4] U.S. Navy 2018 Annual Report for Groundwater Impacts at Naval Weapons Industrial Reserve Plant, Bethpage, New York (June 2018), http://go.usa.gov/DyXF.

Complaint likewise takes the position that these test results first put the Bethpage Plaintiffs on inquiry notice of their alleged claims because they supposedly show chemicals "in excess of federal and/or state regulatory limits."  (SAC ¶¶ 99, 127, 130, 133, 136, 139, 142, 145, 148.) The test results cited in the Second Amended Complaint and filed with the New York State Supreme Court, however, contradict rather than support Plaintiffs' allegations. For example, those test results show no detection—none—of TCE, which is prominently featured in the Second Amended Complaint.

Before the Town of Oyster Bay could challenge the Bethpage Plaintiffs' test results, the New York Supreme Court granted Plaintiffs leave to file late notices of claim, effectively granting standing to name the Town of Oyster Bay in the present suit, subject to Plaintiffs sitting for examinations by the Town of Oyster Bay pursuant to New York General Municipal Law. The parties agreed to stay the present case pending the completion of those examinations (Order Regarding ECF No. 31), which to date has taken more than eight months.[5]  The parties subsequently entered into an agreement that avoided motion practice over leave to amend the First Amended Complaint and provided for this motion.  (*See* Stipulation and Order Concerning Time for Amended Pleadings and Responses, ECF No. 31, so ordered by the Court, February 23, 2018.)  Consistent with that agreement, Plaintiffs then filed a Second Amended Complaint, adding 12 new Plaintiffs who do not reside in Bethpage (the "Non-Resident Plaintiffs").  All Plaintiffs assert claims for negligence, strict liability, nuisance, and trespass arising from alleged contamination at the Bethpage Site.  (SAC ¶¶ 192–252.)

---

[5]  The examination of one Plaintiff, Mr. Pastolero, had not yet occurred.

**C.      Public Investigation and Remediation Put Plaintiffs on Inquiry Notice No Later Than March 2013.**

Plaintiffs' claims are based on the public administrative record of remediation in Bethpage, which stretches back more than 30 years and has been firmly established since at least March 2013.   The Second Amended Complaint expressly cites documents published no later than March 2013 detailing the investigation and remediation of potential releases of chemicals at and around the Bethpage Site, confirming that environmental conditions at the site drew the attention of local residents, regulators, and elected leaders, and confirming public knowledge of the extensive investigation of and response to such potential releases.  (SAC ¶¶ 64–65, 69–70, 73–79, 84, 88–89.)  The Second Amended Complaint concedes that Northrop Grumman entered into public consent orders and agreements with NYSDEC as early as the 1990s to investigate and remediate environmental conditions at and around the Bethpage Site.  That investigation ultimately led to three Records of Decision providing for onsite soil and onsite and offsite groundwater investigation and remediation.  (SAC ¶¶ 70, 73–79.)  Those administrative records—all cited by and incorporated by reference into the Second Amended Complaint—demonstrate extensive public knowledge of the chemicals at issue and public participation in the remediation process.

**1.      1990 RI/FS and 1995 OU-1 Record of Decision (ROD)**

As the Second Amended Complaint alleges, in 1990 Grumman entered into a Consent Order with NYSDEC to conduct a Remedial Investigation/Feasibility Study ("RI/FS") for two areas: Operable Unit 1 ("OU-1") encompassing the 600-acre property in Bethpage that Grumman and the Navy formerly used for manufacturing, and Operable Unit 2 ("OU-2") encompassing groundwater at and around the Bethpage Site.  (SAC ¶¶ 70–73.)  In accordance with the 1990 RI/FS—for which NYSDEC solicited and received public comment—NYSDEC and Grumman

6

developed a "Citizen Participation Plan" to engage the public and involve those potentially affected by hazardous substances in the remediation decision-making process.  (Ex. 2 (1990 RI/FS) at § IV(d), p. 7.)

According to the Second Amended Complaint, in 1995, NYSDEC issued a Record of Decision for OU-1 (the "1995 OU-1 ROD") (SAC ¶ 75), which describes NYSDEC's and Northrop Grumman's extensive efforts to inform the public of their remediation efforts pursuant to the citizen participation program, including public meetings at the Bethpage Public Library and Bethpage High School between 1990 and 1994 to "present[] the proposed remedy" and "answer[] questions posed by the public."  (Ex. 3 (1995 OU-1 ROD) at BETPARK000007–08.) To further "inform the local community," NYSDEC created a public information repository at the Bethpage Public Library that gave the public access to all reports regarding the Site, developed a "contact list" of interested parties—including citizens, media, public interest groups, and local elected officials—and mailed public notices regarding the investigation and remediation efforts.  (*Id*. at BETPARK000008.)  Questions from concerned residents—putative class members in this suit—*as early as 1994* included the following examples of inquiry notice:

- "Have any cancer studies been conducted in the Bethpage Area?"

- "Has a study been conducted [of] the Bethpage community to determine at what levels the contaminants of concern at the Grumman site are found in members of the community?"

- "Is the contamination emanating from the Grumman site contaminating vegetables grown in gardens in the Bethpage area?"

(*Id*. at BETPARK000032.) [6]

---

[6] Residents asked questions at the 1994 public meeting and at subsequent public meetings, some of which are referenced *infra*.  In response, state regulators repeatedly took the position—which they maintain to this day—that there was and is no public health risk due to site-related contamination offsite.  (*See, e.g.*, Ex. 3 (1995 OU-1 ROD) at BETPARK000032 (explaining why "routes of exposure" to potential contaminants had been "ruled out").)  Of course, the fact that

### 2.      2001 OU-2 ROD

As the Second Amended Complaint notes, in 2001 NYSDEC issued a Record of Decision for OU-2 (the "2001 OU-2 ROD") (SAC ¶ 76) that also describes comprehensive "Citizen Participation activities [] undertaken in an effort to inform and educate the public about conditions at the site."  (Ex. 4 (2001 OU-2 ROD) pp. 31–32.)  By then, additional public outreach by Northrop Grumman, NYSDEC, and the Navy had included notices and press releases sent to the public, nearby property owners, local officials, and media, as well as Restoration Advisory Board meetings sponsored by the Department of the Navy, during which "[m]embers of the community at large" "expressed their concerns about site contamination." (*Id*. at pp. 27, 31–32.)  Presented with information cited in the Second Amended Complaint, Bethpage residents posed questions to NYSDEC and NYSDOH *more than 17 years ago* about a potential impact of the environmental conditions on their offsite property and persons, including:

- "I love to grow vegetables and fruit trees on my property . . . what have I been absorbing through my produce as a result of this?"

- "Now if I want to sell my house, how does that affect what I am going to be able to sell it for [?]"

- "I know water doesn't really adhere to county lines or state lines or any kind of lines that are drawn by planners, water just flows.  So [] it's hard for me to agree that I have no contamination on my property, unless a test is made.  And so I wonder whether the town, the county, somebody, could arrange that."

(*Id*. at pp. 46.)  NYSDEC again addressed these concerns in the 2001 OU-2 ROD.

---

state regulators reject the merits of Plaintiffs' allegations does not affect whether a reasonable person would have long ago investigated and inquired about the cause of their alleged injuries. *See Thompson v. United States,* 642 F. Supp. 762, 766 (N.D. Ill. 1986) ("[T]he discovery rule does not put the [defendant] in the position of having to argue [the plaintiff] should have discovered a cause whose very existence it denies.").

### 3.    2005 OU-3 RI/FS and 2013 OU-3 ROD

In July 2005, Northrop Grumman entered into a third Consent Order with NYSDEC for another RI/FS, this time relating to the former Grumman settling ponds located at the Bethpage Community Park, designated as OU-3.  (SAC ¶¶ 3, 79.)  Around the same time, the Town of Oyster Bay also entered into an order with NYSDEC to investigate the presence of chemicals at the Bethpage Community Park.  (SAC ¶ 65.)  As the Second Amended Complaint acknowledges, upon the discovery of chemicals, the Town of Oyster Bay closed the Bethpage Community Park to the public—which all Plaintiffs must have noticed because they each allege that they "regularly visited"[7] the Park—and the Town undertook an investigation and remediation. NYSDEC then issued its OU-3 Record of Decision in March 2013 (the "2013 OU-3 ROD") (SAC ¶ 95), which, again, described widespread public engagement, including public meetings and "availability sessions" held in 2012, during which the findings of the remedial investigation and feasibility study were presented.  (Ex. 1 (2013 OU-3 ROD) at Appendix A, Responsiveness Summary.)  In 2012, the Bethpage School District reported on its own testing for chemicals in soil vapor at the Bethpage High School and Central Boulevard Elementary School—both located *off* the Bethpage Site.  (*Id*. at A44–A45.)  Citizens were encouraged to sign up for NYSDEC "county listservs" about the investigation and cleanup, including that related to OU-1, OU-2, and OU-3.  (*Id*. at A2–A3.)

In June and July 2012, Bethpage residents again raised questions concerning the potential impact of environmental conditions on their properties and persons:

- "Concern was raised about the potential impact(s) from soil vapor intrusion to the Bethpage High School and the Central Avenue Elementary School. . . . Has soil vapor intrusion impacted the buildings associated with the Bethpage Community Park Pool?"

---

[7] (SAC ¶¶ 125, 128, 131, 134, 140, 143, 149, 152, 154, 157, 160, 163, 166, 169, 172, 175.)

ny-1334331

- "Should we be concerned about shallow groundwater contamination impacting our homes?"

- "What are the potential health risks for people living in the area due to the presence of site related groundwater contamination and the length of time it will take to remediate the plume?"

- "The cancer rate in the Bethpage area is much higher than in other areas of Long Island."

- "Concern was expressed that the contaminated groundwater was getting into the vegetables being grown in their yard, and that the contaminants had gotten into their body through ingestion of these vegetables."

(*Id*. at pp. A8–A14.)  NYSDEC addressed these concerns in the 2013 OU-3 ROD, as well.

### 4.    The 2013 NYSDOH Study

As the Second Amended Complaint explains, residents' concerns regarding potential health effects related to the release of hazardous substances in the Bethpage area led NYSDOH in 2009 to undertake a study of cancer incidence in residents living in the vicinity of the Bethpage Site.  Although the study, which was published in January 2013, showed no evidence of cancer patterns in Bethpage (a fact the Plaintiffs readily acknowledge), the Second Amended Complaint states that the study provided Plaintiffs with "Public Notice of the Cancer Outbreak in Bethpage" *seven years before they filed the original complaint.*  (SAC ¶ 88.)  The NYSDOH Study, incorporated by reference in the Second Amended Complaint, explains that NYSDOH's effort to study cancer incidence in Bethpage was prompted by residents, who "expressed their concerns over the possible link between contamination and illnesses in the area," including through potential groundwater, dermal, air, and soil-vapor exposure "at a public availability session in early 2009."  (Ex. 5 (NYSDOH Study) p. 1 ("Background").)

As the Second Amended Complaint states, the NYSDOH Study was released publicly in January 2013 (SAC ¶ 89), and a public hearing regarding NYDOH's findings was held in

ny-1334331

February 2013, shortly before the release of the 2013 OU-3 ROD.  The NYSDOH Study specifically addressed potential soil-vapor intrusion and other exposure pathways alleged in the Second Amended Complaint.  (Ex. 5 (NYSDOH Study) p. 9 ("Environmental Evaluation").) The Second Amended Complaint acknowledges that the NYSDOH Study examined a residential area adjacent to the Bethpage Site "where measurements had shown elevated levels of contaminants from the site in the air inside some of the homes," and that despite these "elevated levels," the Study "did not show any evidence of cancer patterns in Bethpage."  (SAC ¶¶ 89–90.)[8]

The Second Amended Complaint goes on to allege that, because the NYSDOH Study found no evidence of unusual patterns of cancer occurrence unique to the area, the study was "lacking in scope" and flawed.  (SAC ¶ 90.)  This allegation concedes that inquiry notice began no later than the release of the Study in 2013, and Plaintiff's complaint is therefore untimely. Indeed, on September 28, 2013, after the release of the NYSDOH Study and the 2013 OU-3 ROD, lead named Plaintiff Rosalie Romano contacted NYSDEC to assert her belief that her alleged injuries were caused by the environmental contamination at Bethpage.  (Ex. 6.)[9]

### 5.    2015 Class Action Solicitation

In July 2015, Plaintiffs' counsel mailed to all Bethpage residents and posted online a notice confirming that Plaintiffs had already been on inquiry notice and that the statute of limitations was running on their claims.  (*See* Ex. 7 (Napoli Shkolnik, "Harmful Levels of Toxic

---

[8] After testing in 2009 showed contaminants in soil vapor beneath and in the air in a few homes adjacent to the Naval Weapons Industrial Reserve Plant, the Navy remediated those homes by installing air purification units and sub-slab depressurization systems at the homes, and a soil vapor extraction containment system onsite nearby.  (Ex. 5 (NYSDOH Study) p. 2 ("Site History").)

[9] Ms. Romano's email was sent to NYSDEC and is part of NYDEC's public administrative record.

ny-1334331

Chemicals in Bethpage Yard Soil," https://www.napolilaw.com/article/harmful-levels-of-toxic-chemicals-in-bethpage-yard-soil/).)  The notice alerted Plaintiffs that their counsel had "been retained by many Bethpage residents who were potentially exposed to harmful chemicals resulting from the disposal of toxic waste," and that soil tests *performed in 2014 and 2015* "have confirmed the presence of various chemicals in the yards of Bethpage homes located near the Bethpage Community Park."  (*Id.*)  The notice warned Plaintiffs that "[t]here is a strict time limitation for filing an action for both property damage and personal injury claims" and that plaintiffs might "lose [their] opportunity to file or receive compensation if [they] fail to timely respond" to the notice.  The original complaint was not filed within a year of this notice either— thus, even if measured from when  their counsel advised them of the need to sue (which, of course, is not the relevant standard) Plaintiffs still did not timely commence this action.

### D.    Plaintiffs' Allegations Arise From Information Concerning the Remediation at Bethpage That Was Publicly Available Since at Least March 2013.

Despite all of this publicly available information—including a warning from their own counsel not to delay suit—the Bethpage Plaintiffs did not file suit until September 2016, and the Non-Resident Plaintiffs waited until May 2018.  When they belatedly began this litigation, Plaintiffs asserted claims based on information disseminated to the public since at least March 2013 when the 2013 OU-3 ROD was published.  For example, the Second Amended Complaint asserts that Plaintiffs' class claims arise from exposure to a long, non-exhaustive list of chemicals—even including chemicals that, according to the public records cited by the Second Amended Complaint, were not associated with the Bethpage Site.  (*See* Ex. 4 (2001 OU-2 ROD) p. 7 (explaining that runoff from an adjacent superfund site contributes to contamination in the area).)  The substances listed in the Second Amended Complaint include "arsenic, cadmium, chromium, lead, mercury, polychlorinated biphenyls ('PCBs'), metals," and volatile organic

compounds ("VOCs") "including but not limited to . . . trichloroethylene ('TCE') and its breakdown products, 2-butanone, tetrachloroethylene ('PERC'), 1,1,1-trichloroethane, and carbon tetrachloride," (SAC ¶¶ 3–4), all of which were subjects of inquiry in the public administrative record cited by the Second Amended Complaint.

Similarly, the Second Amended Complaint alleges potential exposure pathways that were addressed in public meetings required by the RODs, discussed in the NYSDOH Study, and were the subject of citizen inquiries during various public meetings held *prior to 2013*.  The Second Amended Complaint alleges that because Plaintiffs have spent time in their yards and in the Bethpage Community Park, Plaintiffs have been exposed to chemicals through:

- "ingestion, inhalation, and dermal exposure" (SAC ¶ 106);

- "through dust dispersing through the air into Plaintiffs properties and surrounding communities" (SAC ¶ 107);

- "through migration of the contaminants into the water table and groundwater which percolates up through the soil, into the soil, and the environment and ultimately into the Plaintiffs' homes through the vapor intrusion pathway"  (SAC ¶ 107);

- "through contact with the air and soil at their homes" (SAC ¶ 108); and

- "during normal day activities such as walking in the neighborhood, gardening and doing yard work, playing at the Park, playing in their yards, as well as living in their homes" (SAC ¶ 179).

**E.    The Bethpage Plaintiffs' Alleged Accrual Date Is Refuted by the Bethpage Plaintiffs' Own Test Results.**

The Bethpage Plaintiffs (the 14 proposed class representatives who reside in Bethpage) assert that they were not put on inquiry notice of the cause of any injuries they might have had until a single "new" development in March 2016, when the soil in their yards was tested for hazardous substances.  (SAC ¶¶ 127, 130, 133, 136, 139, 142, 145, 148, 153.)  In parallel court proceedings, the Bethpage Plaintiffs asserted that receiving the results of these soil tests in April 2016 triggered their inquiry, and they filed copies of the test results with the New York State

13

Supreme Court as proof.  (Ex. 8)[10]  Based merely on the date of the test results, without any

discussion of whether they actually detected the contamination alleged in the complaint—and

indeed they do not, as the key results state the chemicals that form the core of Plaintiffs' claims

were not detected at all—the New York State Supreme Court permitted late notice of claim on

the Town.  (*Romano*, No. 601158/17, Sept. 12, 2017, NYSECF. Doc. No. 36.)[11]

   The Bethpage Plaintiffs' test results, however, provide no basis for relief from the statute

of limitations because they did not detect the chemicals that form the core of Plaintiffs' claims,

and did not detect any chemical above state or federal regulatory levels as alleged in the Second

Amended Complaint.  The results of the Plaintiffs' 2016 soil sampling are attached as Exhibit 8,

and a table summarizing the relevant portion of those tests is attached as Exhibit 9.  (*See*

Kaufman Decl. ¶¶ 9–20.)  First, the results show that testing of the soil involved sampling for

only one substance, polychlorinated biphenyls ("PCBs").  (Ex. 9.)  Not one soil sample showed

PCBs at any of Plaintiffs' properties.  (*Id.*)  Second, in addition to soil, Plaintiffs sampled soil

vapor (that is, gas located in pores between the soil particles) at each property eight feet below

ground surface.  (*See* Ex. 9.)  Again, no sample showed TCE—the primary focus of the

Complaint's allegations—or its breakdown products in any soil vapor, in any air space, at any

location of any Plaintiff.  (*Id.*)[12]  This is significant given the Plaintiffs' repeated references in

the Second Amended Complaint to the widespread use of TCE at the Bethpage Site and release

---

[10] These materials are properly considered on a motion to dismiss because they are integral to the complaint, Plaintiffs possess them and relied on them in framing their allegations, and Plaintiffs have publicly filed them and relied upon them before another court.  *See Bascom*, 2018 WL 1135651, at *3.

[11] As noted in the Town of Oyster Bay's Motion to Dismiss, served the same day as Northrop Grumman's motion, the Town will move to renew its motion challenging Plaintiffs' late notices of claim on the basis of new evidence gathered during the Town's pre-suit investigation.

[12] Northrop Grumman highlighted this fact in its June 4, 2018 pre-motion conference letter, to which it attached a summary of Plaintiffs' test results.  (*See* Northrop Grumman's Pre-motion Conference Letter, ECF Nos. 37, 38.)

of an "uncontrolled quantity" of TCE.  (SAC ¶¶ 42–46, 52, 56–57, 84.)  Third, no air samples

were taken at any location where people might breathe it, *e.g.*, no samples were taken of the

indoor or outdoor air anywhere on the Plaintiffs' properties.  (Ex. 9.)  The test results thus did

not provide anything new to the body of knowledge to trigger inquiry notice of the cause of

Plaintiffs' alleged claims as asserted in the Second Amended Complaint.  Because the Second

Amended Complaint alleges no new developments relevant to the statute of limitations occurred

after the NYSDOH Study and the OU-3 ROD were released in January and March 2013,

respectively, inquiry notice began no later than March 2013, the Bethpage Plaintiffs' claims are

barred, and the Court should dismiss those claims.

> ### F.   The Non-Resident Plaintiffs' Delayed Filing Claims Until More Than a Year After the Original *Romano* Complaint Was Filed.

The 12 other plaintiffs, the Non-Resident Plaintiffs, are non-Bethpage residents who

previously resided in Bethpage and who do not fall within any of the class definitions proposed

in the original complaint.  (*See* Original Complaint ¶ 206, ECF No. 1-1 (proposing claims on

behalf of "residents" of and "owners of real property" in Bethpage).)  The Non-Resident

Plaintiffs were all added to this action when the Plaintiffs filed their second amendment to the

complaint on May 4, 2018, more than a year after the *Romano* action was filed.  The Non-

Resident Plaintiffs assert the same claims as the Bethpage Plaintiffs.  There can be no credible

dispute that the Non-Residents were on notice of their claims no later than when the original

*Romano* complaint was filed.

## RELEVANT STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*,

556 U.S. at 678 (quoting  *Twombly*, 550 U.S. at 570).  This standard demands "more than a sheer

possibility that a defendant has acted unlawfully." *Id.*  While the Court accepts as true all well-pleaded factual allegations, this "tenet . . . is inapplicable to legal conclusions," *id.*, and the complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . . ." *Id.* (quoting *Twombly*, 550 U.S. at 555).  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief,'" and the claim must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In adjudicating a Rule 12(b)(6) motion, the Court may consider:  "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with [government agencies], and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Lopez v. Nassau Cty. Sheriffs Dep't*, No. 17-CV-3722, 2018 WL 3321430, at *3 (E.D.N.Y. July 5, 2018)  (citing *In re Merrill Lynch & Co.*, 273 F.Supp.2d 351, 356–57 (S.D.N.Y. 2003), *aff'd in part & rev'd in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)).

All of the documents cited in this motion—the public records described above and the Bethpage Plaintiffs' test results—are integral because the Second Amended Complaint "relies heavily upon [the documents'] terms and effects" in setting forth the alleged factual bases for Plaintiffs claims and the date those claims purportedly accrued.  *See Bascom*, 2018 WL 1135651, at *3 (unattached documents integral when plaintiff relied on them to address timeliness

16

requirements).  The documents also are in Plaintiffs' possession, and Plaintiffs clearly relied on them in framing the Second Amended Complaint by citing to them extensively.  And, if there were any doubt, the Court also may take judicial notice of these documents because they are public administrative records and, in the case of the test results, were contained in Plaintiffs' own court filings before the New York State Supreme Court.  *See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public records, including [documents] filed in state court . . . ."); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411–12 (S.D.N.Y. 2011) (judicial notice of U.S. Food and Drug Administration fact sheets, correspondence, regulatory guidance, and responses to public petition).

Under New York law, as modified by CERCLA, toxic tort claims for injury to person or property must be brought either (a) three years "from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier," (N.Y. C.P.L.R. § 214-c(2)); or (b) if the cause of the injury was not reasonably ascertainable at the time of the injury, one year from "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance."  42 U.S.C. § 9658(b)(4)(A); *see Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 196–97 (2d Cir. 2002) (applying CERCLA's federally required commencement date to CPLR 214-c(4)).

Here, having delayed until September 2016 and May 2018, years after regulators provided the public with information about environmental conditions at and around the site and area residents inquired about such conditions, this case is too late.  "It is not necessary . . . for a plaintiff to know the identity of each defendant's specific contaminants that damaged the

property before the statute of limitations begins to run," *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 983 F. Supp. 360, 364 (W.D.N.Y. 1997), nor is it "necessary for plaintiff to know the identity of all individuals responsible for the contamination before the statute of limitations begins to run." *Next Millennium Realty, L.L.C. v. Adchem Corp.*, No. CV 03-5985 (ARL), 2015 WL 11090419, at *23 (E.D.N.Y. Mar. 31, 2015), *aff'd* 690 F. App'x 710 (2d Cir. 2017) (quotations & citation omitted).  Plaintiffs simply must be on inquiry notice.  *Freier*, 303 F.3d at 198.  Because Plaintiffs were on inquiry notice no later than March 2013, the Second Amended Complaint should be dismissed.

## ARGUMENT

I.   **PUBLIC DISCLOSURE OF POTENTIAL CONTAMINATION IN BETHPAGE PUT PLAINTIFFS ON INQUIRY NOTICE YEARS AGO, BARRING THEIR PROPERTY DAMAGE CLAIMS.**

Plaintiffs were on inquiry notice of their property damage claims at the latest by March 2013, when the OU-3 ROD for the Bethpage Community Park was published.  (SAC ¶¶ 75–77.)[13]  As the New York Court of Appeals has long held, under CPLR 214-c(2)'s discovery rule, Plaintiffs' property damage claims accrued when they should have "discover[ed] the primary condition[s] on which the claim is based."  *Matter of New York Cty. DES Litig.*, 89 N.Y.2d 506, 509 (1997).  The Second Amended Complaint concedes, as it must, that the OU-3 ROD (and earlier RODs), and all of the community outreach and investigation and remediation that went

---

[13] The Non-Resident Plaintiffs' claims for negligent property damage, nuisance, and trespass fail for the independent reason that the Non-Resident Plaintiffs do not allege any interests in property affected by any alleged contamination.  "It is well established that a plaintiff cannot recover for damage to property he does not own."  *Benoit v. Saint-Gobain Performance Plastics Corp.*, No. 116-cv-1057, 2017 WL 3316132, at *6 (N.D.N.Y. Aug. 2, 2017) (citing 36 N.Y. Jur. 2d § 2).  Private nuisance claims similarly require that a "Plaintiff must have shown that there was an invasion of or interference with his [or] her land," and fail when the plaintiff has no property rights or privileges with respect to the land allegedly affected.  *Romeo v. Sherry*, 308 F. Supp. 2d 128, 146 (E.D.N.Y. 2004).  The same is true of civil trespass.  104 N.Y. Jur. 2d Trespass § 26.

into them, publicly disclosed the nature and extent of the environmental concerns that constitute the "primary conditions" of which Plaintiffs now complain.  (*See* SAC ¶¶ 70–85 (relying on the OU-1, OU-2, and OU-3 RODs to describe the alleged environmental contamination and various alleged exposures).)  Accordingly, Plaintiffs' duty to inquire arose no later than March 2013.

Indeed, when NYSDEC reported on the investigation and remediation of various environmental conditions as part of OU-2 (SAC ¶ 76), reasonable citizens asked then whether and how potential contamination might affect their properties.  (*See* Ex. 4 (2001 OU-2 ROD) pp. 44–45 ("Now if I want to sell my house, how does that affect what I am going to be able to sell it for [?]" and, "[I]t's hard for me to agree that I have no contamination on my property, unless a test is made.  And so I wonder whether the town, the county, somebody, could arrange that.").)  The claims in the Second Amended Complaint have expired.

Any argument that Plaintiffs could not know for certain whether their properties were contaminated until they received the results of soil testing in 2016 is as irrelevant as it is unpersuasive.  That is because the statute of limitations begins to run when Plaintiffs had sufficient information to put them on inquiry notice of their alleged property damage.  The standard is not when Plaintiffs were required to *know*, but rather when they were required to *inquire*.  At most, the argument raises the question *why* Plaintiffs finally decided to conduct testing in 2016, when Plaintiffs do not allege new developments regarding the Bethpage Site after 2013.  The real answer may be that Plaintiffs' attorneys had mailed and posted online a notice stating that, if any Bethpage resident thought they had been injured, they could sue, but the time to make their claim was running out.  But an attorney solicitation has no relevance to when the clock begins to run and does not excuse a plaintiff from plausibly alleging timely claims. *See Vasilatos v. Dzamba*, 148 A.D.3d 1275 (N.Y. 3d Dep't 2017) (attorney's solicitation

letter did not constitute date injury was discovered) (*citing Giordano v. Market Am., Inc.*, 15 N.Y.3d 590, 915 N.Y.S.2d 884 (2010)); *see also Haynes v. Williams*, 162 A.D.3d 1377 (N.Y. 3d Dep't. 2018) (same); *Riddle v. Bank of Am. Corp.*, No. CIV.A. 12-1740, 2013 WL 6061363, at *6 (E.D. Pa. Nov. 18, 2013), *aff'd*, 588 F. App'x 127 (3d Cir. 2014) (claims untimely where Plaintiff "made no inquiry . . . and only proceeded with this litigation when contacted by a lawyer over seven years later").

Plaintiffs also may argue that the statute of limitations could not have run while Northrop Grumman denied that hazardous substances originating from the Bethpage Site are on Plaintiffs' property—and indeed the Bethpage Plaintiffs' test results show they are not.  But that argument is untenable because "[t]o toll the limitations period because a prospective defendant denies its liability . . . would circumvent the purpose of the statute of limitations" itself.  *Village of Milford v. K-H Holding Corp.,* 390 F. 3d 926, 932 (6th Cir. 2004).

As is evident from the Second Amended Complaint, the public records on which Plaintiffs rely to allege property damage claims were widely disseminated years ago, and they would have put a reasonable plaintiff on inquiry notice of the existence of the environmental conditions that the Second Amended Complaint now alleges—however incorrectly—are damaging Plaintiffs' property.  (SAC ¶¶ 70–85.)  Other reasonable Bethpage residents—putative class members—began inquiring years ago whether contamination could affect the sale price of their home, and whether they needed to test for chemicals on their property.  (*See* Ex. 4 (2001 OU-2 ROD) pp. 44–45.)  Plaintiffs therefore were "under an obligation to ascertain the responsible parties and commence this action within the applicable statute of limitations" beginning then, at the latest in March 2013.  *Seneca Meadows*, 983 F. Supp. at 364.  They failed to do so.

Accordingly, Plaintiffs' property damage claims—Count One to the extent it states a claim for negligent injury to Plaintiffs' property, and Counts Three and Four for nuisance and trespass, respectively—are time barred and should be dismissed.

## II.     THE ONE-YEAR SAVINGS CLAUSE DOES NOT SAVE PLAINTIFFS' PERSONAL INJURY CLAIMS.

The Bethpage Plaintiffs' personal injury claims fail for similar reasons.  Plaintiffs' counsel represented to the New York State Supreme Court that all of the Bethpage Plaintiffs' alleged personal injuries were diagnosed between September 1998 and July 2012.  (*See* Ex. 10, Affirmation of Thomas W. Raleigh at ¶ 9, *Romano v. Town of Oyster Bay*, No. 601158/17, June 7, 2017, NYSECF Doc. No. 21.)  As applied to personal injuries, CPLR 214-c's discovery rule requires a plaintiff to sue within three years of "when he or she is actually diagnosed as suffering from a particular disease," which Plaintiffs clearly did not do.  *Sweeney v. Gen. Print.*, 210 A.D.2d 865, 866 (N.Y. 3d Dep't 1994).  The Bethpage Plaintiffs argued before the State court that CPLR 214-c(4)'s savings clause allowed them to bring their claims within a year of discovering the cause of their alleged personal injuries, and CERCLA's federally required commencement date  meant the statute did not run until Plaintiffs "knew (or reasonably should have known) that [their] personal injury or property damages . . . were caused or contributed to by the hazardous substances" at issue.  42 U.S.C. § 9658(b)(4)(A); *see Freier*, 303 F.3d at 196–97 (applying CERCLA to modify accrual under 214-c(4)).  Even assuming CERCLA's federally required commencement date applies, however, the Second Amended Complaint makes clear as set forth above that Plaintiffs had a duty to inquire about the cause of their alleged injuries much earlier than a year before the original complaint was filed.

21

A.    **A Reasonable Person in Plaintiffs' Situation Would Have Inquired About and Been on Notice of the Cause of Their Alleged Injuries No Later Than March 2013.**

To apply CERCLA's "reasonably should have known" inquiry standard, the Court first assesses "whether a reasonable person in [plaintiffs'] situation would have been expected to inquire about the cause of his or her injury."  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. 04 CIV. 4968, 2009 WL 4496736, at 2 (S.D.N.Y. Dec. 2, 2009).  The Court then considers whether such inquiry "would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim."  *Id.*  The answer to both questions is yes, and the Second Amended Complaint's allegations calling into question the validity of the NYSDEC Study in particular make this clear.  (*See* SAC ¶¶ 89–90 (arguing that the NYSDOH Study was "very limited" and "lacking in scope").)

The Second Amended Complaint describes how, after Northrop Grumman first agreed to perform a remedial investigation and feasibility study in 1990, there were more than two decades of public engagement regarding the Bethpage Site.  (SAC ¶¶ 74–77.)  NYSDEC then issued two RODs, each of which included a "citizen participation program," public meetings and availability sessions, and regular mailings to residents and property owners regarding investigation and remediation efforts.  (*Id.*; Ex. 3 (1995 OU-1 ROD); Ex. 4 (2001 OU-2 ROD).)  At these public meetings, citizens asked about the risk of exposure from the daily activities that the Second Amended Complaint now alleges caused Plaintiffs' personal injuries.  (*Compare, e.g.*, SAC ¶ 179 (alleging exposure from "gardening and doing yard work"), *with* Ex. 3 (1995 OU-1 ROD) at BETPARK000032 ("Is the contamination emanating from the Grumman site contaminating vegetables grown in gardens in the Bethpage area?").)  Reasonable people in Plaintiffs' positions thus did inquire about the connection between the potential presence of chemicals on their properties and potential injuries, including by "express[ing] their concerns

22

over the possible link between contamination and illnesses in the area at public availability sessions in 2009." (Ex. 5 (NYSDOH Study) p. 1.)

In 2009, public concerns impelled NYSDOH to study potential exposure pathways and cancer incidence in Bethpage, a study that the Second Amended Complaint itself alleges constituted "Public Notice of the Cancer Outbreak in Bethpage." (SAC ¶ 88; Ex. 5 (NYSDOH Study) p. 1.) As the Second Amended Complaint acknowledges, the NYSDOH Study found no unusual patterns of cancer incidence associated with exposure to hazardous substances on properties around the Bethpage Site. (SAC ¶ 90.) But the fact that the study refutes Plaintiffs' allegations is irrelevant; the salient point is that residents and elected officials inquired and requested the study precisely because they believed there was a potential causal link between the chemicals listed in the Second Amended Complaint and cancer and other illnesses in the area. (*See* Ex. 5 (NYSDOH Study) p. 1 (describing residents' concerns).) Inquiry notice requires no more. Certainly by the time NYSDOH publicized the results of its study in January 2013, the Plaintiffs had more than enough information about the environmental conditions at Bethpage to conduct whatever tests they thought necessary to determine whether they should bring suit. But Plaintiffs did not do so until years later.

This inquiry between 2009 and January 2013, when NYSDOH publicized its findings, was the latest time when reasonable persons would have understood the "primary conditions" and alleged causal links of which Plaintiffs now complain. That the Second Amended Complaint now argues that this was not understood until more recently is of no moment, because the inquiry standard is an "*objective* standard for accrual," and not based on what a plaintiff supposedly subjectively knew. *Freier*, 303 F.3d at 198 (emphasis added). Accordingly, even

ny-1334331

under CPLR 214-c(4)'s one-year savings clause, the Bethpage Plaintiffs' personal injury claims

are untimely and must be dismissed.

> **B.     The Bethpage Plaintiffs' Test Results Could Not Have Put Them on Notice Because They Do Not Show the Contamination Alleged in the Second Amended Complaint.**

The Second Amended Complaint points to the results of the Bethpage Plaintiffs' 2016

soil tests as the relevant trigger for Plaintiffs' inquiry, as Plaintiffs argued before the New York

State Supreme Court; however, the test results do not show the contamination alleged in the

Second Amended Complaint.  In fact, the test results for each Bethpage Plaintiff's property

establish that the chemicals that are the focus of the Complaint were not detected at all, and the

low levels of other chemicals that were detected were not "in excess of federal and/or state

regulatory limits," contradicting Plaintiffs' representations to both the federal and state courts.

*See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) ("[W]here a

conclusory allegation in the complaint is contradicted by a document attached to the complaint,

the document controls and the allegation is not accepted as true.").  The appended table at

Exhibit 9 summarizes the test results for each Plaintiff's property, included in their entirety in

Exhibit 8, showing that (a) no chemicals in the soil were detected for the only substance tested

by Plaintiffs (PCBs); and (b) no TCE or its breakdown products were detected in the soil vapor.

Thus, the results did not provide any new information that could have triggered the statute of

limitations, which had already run before the tests were performed.

**III.    THE NON-RESIDENT PLAINTIFFS' CLAIMS ARE FACIALLY UNTIMELY BECAUSE THEY WERE FILED MORE THAN A YEAR AFTER THE ORIGINAL *ROMANO* COMPLAINT.**

The Non-Resident Plaintiffs' claims should be dismissed as untimely for all the same

reasons.  The Second Amended Complaint alleges that each Non-Resident Plaintiff was a

resident of Bethpage at "all times relevant" in the Second Amended Complaint, when Northrop

24

Grumman, the Navy, and state and local officials' investigation and remediation efforts were underway and being publicized to area residents.  (SAC ¶¶ 149, 152, 154, 157, 160, 163, 166, 169, 175.)  The Non-Residents pursue all of the same claims based on the same alleged facts as the Bethpage Residents.  The Non-Resident Plaintiffs therefore were on inquiry notice by March 2013 when they still lived in Bethpage, just as the Bethpage Plaintiffs were.

Moreover, it is indisputable that the filing of the *Romano* action in September 16, 2016 is the absolute latest date by which the Non-Resident Plaintiffs were on inquiry notice.  Even using that date, the Non-Resident Plaintiffs' claims are time barred.  The *Romano* suit received widespread media coverage and public attention.  *Masters v. GlaxoSmithKline*, 271 F. App'x 46, 50 (2d Cir. 2008) (public disclosure of suits against defendant put plaintiffs on inquiry notice).  The Non-Resident Plaintiffs, however, failed to join *Romano* until the Second Amended Complaint was filed on May 4, 2018, more than a year after the original complaint was filed.  (ECF No. 34.)  Accordingly, the Non-Resident Plaintiffs claims are also untimely and should be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court dismiss the Second Amended Complaint in its entirety.

Dated:  July 27, 2018

Frank Leone (*pro hac vice*)        */s/ Grant J. Esposito*
HOLLINGSWORTH LLP         Grant J. Esposito
1350 I Street, N.W.          Jessica Kaufman
Washington, D.C. 20005        Robert J. Baehr
Telephone:  (202) 898-5800      Amanda L. Gayer
Facsimile:  (202) 682-1639       MORRISON & FOERSTER LLP
Email: fleone@hollingsworthllp.com   250 West 55th Street
               New York, New York 10019
               Telephone:  (212) 468-8000
               Facsimile:  (212) 468-7900
               Email: gesposito@mofo.com;
               jkaufman@mofo.com; rbaehr@mofo.com;
               agayer@mofo.com

               *Attorneys for Defendants Northrop Grumman*
               *Corporation and Northrop Grumman Systems*
               *Corporation*

ny-1334331