UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROSALIE ROMANO, PATRICIA GLUECKERT,
Individually and on behalf of the Estate of WILLIAM
P. GLUECKERT, WILLIAM P. GLUECKERT,
FRANCISCO PASTOLERO and MARIA SPICER,      **MEMORANDUM & ORDER**
JAYNE MANN, DENISE FLORIO,      16-CV-5760 (DRH)(ARL)
ROSS MEADOW and ARLENE MEADOW,
JACOB KHOLODNY and BELLA KHOLODNY,
FLO RAUCCI, individually and on behalf of the
Estate of SALVATORE RAUCCI, DANIEL GALLANTE
and JENNIFER GALLANTE, and TERESA MEADE,
individually and on behalf of all others similarly situated,
and MARYANN HERBERT, CHRISTINA ANDREWS-SALES,
CHRISTOPHER CAGNA, JACKIE LIEBERMAN,
CATHERINE LEWONKA, EUGENE CONNOLLY;
VIVIIANE BLICKENDERFER, DANA BLICKENSDERFER,
GLENN FALINO and MARCIA FALINO, and
MICHAEL FALINO, individually,

            Plaintiffs,

    -against-

NORTHROP GRUMMAN CORPORATION,
NORTHROP GRUMMAN SYSTEMS
CORPORATION, and TOWN OF OYSTER
BAY,

            Defendants.
-------------------------------------------------------------------X

**APPEARANCES:**

**For Plaintiffs and the Proposed Class**

Napoli Shkolnik PLLC
360 Lexington Ave., 11th Floor
New York, NY 10007
By:    Lilia Factor, Esq.

**For Defendants Northrop Grumman Corporation,
Northrop Grumman Systems Corporation:**

Morrisson & Foerster LLP
250 West 55th Street
New York, New York 10019
By:     Grant J. Esposito, Esq.
        Jessica Kaufman, Esq.
        Robert J. Baehr, Esq.
        Amanda L. Gayer, Esq.

Hollingsworth LLP
1350 I Street, N.W.
Washington, D.C. 20005
By:     Frank Leone, Esq.

**For Defendant Town of Oyster Bay**

Milber Makris Plousadis & Seiden, LLP
1000 Woodbury Road, Suite 402
Woodbury, NY 11797
By:     Peter F. Tamifi, Esq.

**HURLEY, Senior District Judge:**

This putative class action is brought on behalf of current and former residents and property owners of Bethpage, New York ("Plaintiffs" or the "Class") asserting various state law causes of action against defendants Northrop Grumman Corporation ("NG"), Northrop Grumman Systems Corporation ("NGSC") (collectively "Northrop Grumman") and the Town of Oyster Bay ("Oyster Bay" or the "Town") (Northrup Grumman and the Town are collectively referred to as "Defendants") for injuries and damages allegedly suffered as a result of the release of hazardous substances from Northrup Grumman's former site of approximately 635 acres in East-Central Nassau County, formerly known as the Grumman-Aerospace-Bethpage Facility Site ("the Site"), as well as 18 acres of land donated by Grumman Corporation ("Grumman") to the Town of Oyster Bay.

Presently before the Court are Defendants' motions, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the claims in the Second Amended Complaint as time-barred. For the reasons set forth below, the motions are denied.

## BACKGROUND

### I. Relevant Procedural History

This putative class action was originally commenced on September 13, 2016, in Nassau County Supreme Court against Northrup Grumman. On October 14, 2016, Northrop Grumman filed a Notice of Removal. An amended complaint was filed on November 4, 2016 adding the Town as a defendant. However, notices of claim, as required by New York's General Municipal Law, were not served on the Town. As a result, litigation ensued between the Town and Plaintiffs in New York State Supreme Court over whether Plaintiffs could file late notices of claim. In considering whether Plaintiffs' time to serve notices of claim could be extended, the New York State Supreme Court considered the date on which Plaintiffs' claims accrued. Among other assertions, Plaintiff took the position that the Plaintiffs were not on inquiry notice of the alleged cause of their injuries until April 2016 when results of soil sampling allegedly revealed chemical levels in excess of state and federal limits. After initially denying the request without prejudice, the New York court granted Plaintiffs leave to file late notices. As of the filing of the instant motion, there was pending a motion for reconsideration of that grant filed by the Town.

By stipulation of the parties, approved by the Court, a second amended complaint ("SAC") was filed on May 4, 2018, adding 12 new Plaintiffs who do not currently reside in Bethpage.

## II.      Allegations of the Second Amended Complaint

The SAC asserts "individual claims based on negligence, abnormally dangerous activity and absolute and strict liability, trespass, [and] nuisance, and class claims for medical monitoring and property damages" "arising out of the prior and continuing release, discharge, and deposit of toxic and hazardous substances and contaminants into Plaintiffs' neighborhood and onto Plaintiff's properties and persons, including but not limited to VOCs and industrial solvents such as trichlorethylene ('TCE')[1] and its breakdown products, 2-butanone, tetrachloroethylene ('PERC')[2], 1,1,1-trichloroethane, 2-hexanone and carbon tetrachloride." (SAC ¶¶ 7, 9.) These claims are based on the allegations set forth below.

### A.      Northrup Grumman's Operations at the Site

For over fifty year, until operations ceased in 1996, Northrup Grumman and its predecessor, Grumman, owned and/or operated manufacturing facilities on approximately 600 acres in Bethpage, New York, which facilities were formerly known as the Grumman Aerospace-Bethpage Facility Site (the "Site"). The Site includes the Northrop Grumman-Bethpage Facility (the "Bethpage Facility"), the Naval Weapons Industrial Reserve Plant - Bethpage ("NWIRP"), and the Grumman Steel Lose Site.  Grumman manufactured and tested airplanes, weapons, and satellites at the Bethpage Facility. In connection with its operations, Grumman used, stored and disposed of various radioactive materials, contaminants and solvents at the Site, including "VOCs (one of which, TCE, was used as a degreaser for metal parts), PCBs and others." (SAC ¶¶ 37-58.) Among other things, various wastes generated by Grumman's operations, including chromium, PCBs and VOCs, were disposed of in a 3.75 acre area referred

---

[1]  As used in the SAC, TCE includes all of its trade names including "Acetylene, Anameth, Benzinol, Pholex and any of its degradation breakdown products." (SAC ¶ 10.)
[2]  As used in the SAC, tetrachloroethylene includes all of its tradenames including "PERC tetrachloroethylene, perchloroethylene, and PCE, and any of its degradation breakdown products." (SAC ¶ 20.)

to as the "Former Grumman Settling Ponds." In 1962, Grumman donated 18 acres of land, now known as Bethpage Community Park (the "Park"), to the Town. Included in the 18 acres was the Grumman Settling Ponds area, over which the Town built a ball field. (SAC ¶¶59-62.)

###    B.    The Contaminants

TCE is a colorless, volatile, man-made liquid chemical that is used by industry as, among other things, a solvent to remove grease from metal parts. It "can be released into the air, water, and soil and places where it is produced or used." It is "highly mobile once it enters the soil and will result in substantial percolation into groundwater aquifers" and "can remain in groundwater for long periods of time since it is not able to readily evaporate from groundwater." TCE is "extremely toxic," "even at low concentrations." "Acute exposure to TCE has been shown to affect the central nervous system, liver, and kidneys in humans. Chronic exposure to TCE may cause liver and kidney damage, impaired immune system function, and impaired fetal development in pregnant women." (SAC ¶¶ 10-13.)

"PCBs are an odorless group of volatile synthetic organic chemicals and are either oily liquids or solids. PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components, known as congeners, as well as impurities." "Once released in the environment [they] do not readily break down and therefore remain for long periods of time cycling between air, water, and soil [; they] can be carried long distances and have been found in snow and sea water in areas far away from where they were released into the environment." PCBs "cause cancer, as well as a variety of other adverse health effects" on the immune, reproductive, nervous and endocrine systems. In 1979, the United States banned the manufacturing of PCBs "because there was evidence that [they] build up in the environment and may cause harmful effects." (SAC ¶¶ 14-17.)

PERC is a manufactured chemical that is widely used for degreasing metal parts and in manufacturing other chemicals. It is known to affect the central nervous system, liver, kidneys, blood, immune system and reproductive system. "Epidemiological studies provide a pattern of evidence for a positive association between PERC exposure in the workplace and several types of cancer, specifically bladder cancer, non-Hodgkin lymphoma, and multiple myeloma." (SAC ¶¶ 21-23.)

"1,1,1-Trichloroethane was often used as a solvent to dissolve other substances, such as glues and paints, and to remove oil or grease from manufactured parts." In groundwater it "can evaporate and pass through soil as a gas and finally be released to the air." (SAC ¶¶ 25-26.)

2-hexanone is a clear, colorless liquid that evaporated into the air as vapor. While it was formerly used in paint, paint thinner, and various chemical substances, it is not longer made in the United States and its uses have been restricted as it was found to have harmful health effects. It "can enter humans when breathing its vapors, eating food or drinking water that contains it, or [by] coming in contact with it through the skin." (SAC ¶¶ 27-30.)

Carbon tetrachloride was used as a cleaning fluid and degreasing agent but, because of its harmful effects, those uses are now banned and it is only used in industrial applications. It is "known to affect the cardiovascular, hepatic and nervous systems in humans." Exposure to high levels of carbon tetrachloride affects the nervous system, including the brain,  and can be fatal. It "can be trapped in groundwater for long period of time and will eventually evaporate into the air" and "does not generally stick to soil particles." (SAC ¶¶ 31-35.)

The above-referenced contaminants "in amounts and concentrations above State and Federal residential and industrial safety levels, were and continue to be released, discharged, and disbursed throughout the neighborhood from the Site." (SAC ¶ 36.)

## C.    Investigations and Remediation

In March 2005, the New York Department of Environmental Conservation ("NYDEC") and the Town signed an Administrative Order on Consent that required the Town to develop and implement a remedial program to clean-up the Park because of the presence of hazardous waste and contamination. In July 2006, the Town entered into an order for an interim remedial measure ("IRM") to investigate and remediate 7 acres of the Park and was formally identified as a potentially responsible party (PRP) for continued contamination emanating from the Park. Despite this Order "the groundwater, containing . . . VOCs from the Park, migrates to the south-southeast [and] [a]s it does immigrates through deeper and deeper portion of the aquifer" resulting in those VOCS seeping into the groundwater and into the soil vapor of "Plaintiffs, affecting the indoor air quality and causing the injuries [of the Plaintiffs as alleged in the pleading.]" (SAC ¶¶64-67.)

In 1983, the Grumman Aerospace-Bethpage Facility Site was listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York. In 1989, Northrup Grumman signed a Remedial Investigation/ Feasibility Study Order of Consent for Operable Unit 1 ("OU-1") and Operable Unit 2 ("OU-2"). "OU1 encompasses the former manufacturing Plant area and includes three groundwater extraction wells which remove contaminated groundwater from the Site and pump it through an air stripping treatment system for the removal of VOCs." "OU-2 consists of an extremely large groundwater contamination plume that is approximately 4.5 miles long and 3.5 miles wide and is continuously moving south-southeast. The source area of the OU-2 plume originates from the NWIRP and Northrup Grumman properties, with VOCs present at different concentrations and different depths" It includes "a network of monitoring wells which are used to monitor the off-site contamination plume." (SAC ¶¶ 69-72.)

In March 1992, Northrup Grumman signed an Order on Consent with New York State to perform a remedial investigation and feasibility study at the Site. In March and July 1995, New York State executed a Records of Decision ("ROD") for the Northrup Grumman and NWIRP Sites concerning on-site soil contamination in OU-1, and in 2001 issued a ROD for OU-2 which provided for treatment at impacted public water supply wells, boundary monitoring of the plume and the contingency for additional wellhead treatment should other wells be affected. The RODs set forth the remedial measures Grumman was required to implement to cure findings of environmental conditions in or around the Bethpage Facility. (SAC ¶¶ 73-77.)

A soil sampling program solely within the Park, conducted at Northrup Grumman's request in March 2002, indicated levels of PCBs exceeding DEC's SCO standard. Northrop Grumman signed a remedial Investigation and Feasibility Study Order on Consent in July 2005 for the former Grumman Settling Ponds, adjacent areas of the Park, and the Grumman Access Road, collectively known as OU-3. OU-3 is located on the Long Island glacial sand deposits which have been designated as a sole source aquifer. "The groundwater table is located at a depth ranging from 50 to 55 feet below ground surface and with a flow direction primarily horizontal with a downward component to the south-southeast." "Groundwater migration from the OU-3 area has resulted in a significant off-site groundwater plume which has impacted both the Upper Glacial and Maothy Formations. As the OU-3 groundwater plume leaves the site as a distinct plume, it becomes comingled with the larger OU-2 Grumman/NWIRP groundwater plume. While generally comingled at depths of less than 400 feet, the OU-3 plume continues deeper than the OU-2 plume, extending to a depth of at least 550 feet below ground surface." The OU-3 plume has "VOC levels ranging from 5 ppb to 10 ppb and extends approximately 5,400 feet down gradient of the Park boundary. Within it an area of elevated concentrations, or

'hotspot' plume of VOCs has been identified approaching the Bethpage Water District No. 4 well field." That "southeast portion of the Park in OU-3 was used as a wastewater discharge/recharge area, sludge drying bed area, and fire training facility where waste oil and jet fuel were ignited and extinguished." "[T]hese actions caused or contributed to the current soil and vapor contamination injuring Plaintiffs and the Class." "[T]here is a large plume of groundwater contaminants, including TCE, in the Bethpage Area extending beyond the boundaries of the Site, impacting more than 2,000 acres, including Plaintiffs' and Class Members' property. The plume has migrated onto Plaintiffs' and Class Members' properties, causing contaminants including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride, to contaminate the soil, properties, and homes of the Plaintiffs and Class, resulting in personal injury and property damage." "The contaminants and hazardous substances from the property have been released, dispersed or otherwise discharged via groundwater, air and other manners onto Plaintiffs properties and persons. This continues to this day." (SAC ¶¶ 78-87.)

> **D.  Investigation of Cancer Incidences in Bethpage**

The New York Department of Health began a study of cancers in people living "in a small area directly east of the NWIRP" site "or directly south of the former Grumman site in Bethpage" (the "NYS Cancer Study"). Although it began in 2009, the study was not made public until 2012 "and was very limited in scope," looking at people living in two areas – "a one-block area directly east of the NWIRP" and "a 19-block area surrounding that block and bordering the Grumman site." The study did not show any evidence of cancer patterns in Bethpage but "was lacking in scope and of the full extent of the plume . . . ." (SAC ¶¶ 88-90.)

In May 2015 NYSDEC and Northrup Grumman finalized a consent order requiring Northrup Grumman to participate in the cleanup of groundwater originating at the Site and cooperate with the U.S. Navy on remediation of contaminant hot spots recently identified in the large OU-2 groundwater plume. At the same time, NYSDEC announced that the State Health Department was "working to examine if there are any health impacts associated with exposure to groundwater contamination in the Bethpage and Calverton areas of Long Island. Consistent with a health consultation of this type, the contaminants to be evaluated are VOCs, specifically, tetrachloroethene, trichloroethene and subsequent breakdown products." (SAC ¶¶91-93.)

In January 2016, New York's governor ordered Northrup Grumman and the U.S. Navy "to provide the Bethpage Water District and State of New York access to monitoring wells so they could further delineate the plume's migration." Two months later the NYSDEC sent a letter to Northrup Grumman regarding "the March 2013 remedy that was selected for the contamination at the Former Bethpage Settling Ponds. Despite signing Consent Order #W1-1183-14-05 in March 2014, the NYSDEC further urged Defendants to conduct the pre-design study of the March 2013 remedy that Defendants were bound to undertake pursuant to the Consent Order." On April 2016, the Park was closed "in connection with a New York State investigation into claims that large drums were found at the site in the 1990s and subsequently covered up." (SAC ¶¶ 94-96.)

### E. Allegations Regarding Remediation Efforts

It is alleged that the remediation, both undertaken and planned, are "inadequate and insufficient" "given the breadth of the contamination, as well as the present and historical migration of the harmful contaminants." As a result, contaminants have migrated onto Plaintiffs' and Class Members properties through the soil and vapor pathways, where they come into

contact with other substances resulting "in new, different and/or additional hazardous materials . . . creating toxic by-products" resulting in Plaintiffs and Class member being exposed, both in the past and on a continuing basis, to these toxic contaminants. (SAC ¶¶ 97—118.)

### F. Injuries Suffered

Various types of injuries as alleged to have resulted from exposure to the toxic substances referenced above and in the SAC. These include, injury to and diminution of the value of Plaintiffs' real properties, fear of cancer and various types of actual cancer and other physical abnormalities and ailments. With respect to those plaintiffs who have been diagnosed with cancer and other physical ailments, the SAC is silent as to the dates of diagnosis. (SAC ¶¶ 119-177.)

## III. Materials Outside the SAC

In support of their motion to dismiss, Defendants submit the following documents: (1) New York State Department of Environmental Conservation ("NYSDEC") Record of Decision for Operable Unit 3 dated March 2013; (2) the Grumman–NYSDEC Order on Consent to conduct a Remedial Investigation/Feasibility Study dated November 1, 1990; (3) the NYSDEC Record of Decision for Operable Unit 1 dated March 1, 1995; (4) the NYSDEC Record of Decision for Operable Unit 2 dated March 2001; (5) the New York State Department of Health ("NYSDOH") Evaluation of Cancer Incidence and Environmental Exposures in the Area of the Naval Weapons Industrial Reserve Plant (NWIRP) and Grumman Aerospace Sites dated January 2013; (6) an email from Rosalie Romano (a named plaintiff in this action) to Steven Scharf of NYSDEC regarding "Bethpage Water," dated September 28, 2013; (7) an article posted on the website of Plaintiffs' counsel Napoli Shklonik PLLC titled "Harmful Levels of Toxic Chemicals in Bethpage Yard Soil," dated July 1, 2015 (available at

https://www.napolilaw.com/article/harmful-levels-of-toxic-chemicals-in-bethpage-yard-soil/);

(8) the results of Plaintiffs' soil testing, as filed by Petitioners on July 21, 2017 in the New York

State Supreme Court proceeding *Romano v. Town of Oyster Bay*, No. 601158/17 (the "Notice of

Claim Proceeding"); (9) a chart "summarizing the relevant portions" of the soil testing results

referenced in 8 above; (10) the Affirmation of Thomas W. Raleigh dated June 7, 2017, as filed

by Petitioners in the Notice of Claim Proceeding.

In opposing the motion, Plaintiffs have submitted various papers filed in the Notice of

Claim proceeding.

## DISCUSSION

### I.    Standard of Review: Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a cause of action, a court should "draw all reasonable inferences in Plaintiff['s] favor,

assume all well-pleaded factual allegations to be true, and determine whether they plausibly give

rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co*., 648 F.3d 98, 104 (2d Cir. 2011)

(internal quotation marks omitted). The plausibility standard is guided by two principles.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

(2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal

conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere

conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Although "legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations." Id. at 679.

A plaintiff must provide facts sufficient to allow each named defendant to have a fair

understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery. *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.' " *Id*. at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig*., 502 F.3d 47, 50 (2d Cir. 2007). Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

"In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint–Pepperell, Inc*., 945 F.2d 40, 44 (2d Cir. 1991)); *see Weiss v. Village of Sag Harbor*, 762 F. Supp. 560, 567 (E.D.N.Y. 2011) (in deciding a motion to dismiss a court is entitled to consider, inter alia, "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference" and "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint"). A document may be considered on a motion to dismiss where the plaintiff has

"reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted). Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id*.; *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral documents may include documents partially quoted in complaint or on which plaintiff relied in drafting complaint). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "This generally occurs when the material considered is a 'contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.' " *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)).

When a defendant raises a statutory bar such as the statute of limitations as an affirmative defense, dismissal under Rule 12(b)(6) is appropriate if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that plaintiffs claims are barred as a matter of law." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F. 3d 406, 425 (2d Cir. 2008) As the statute of limitations is an affirmative defense, a defendant bears the burden of showing that a claim is untimely. *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004).

## II.      Consideration of Materials Outside the Complaint

Preliminarily, the Court must determine what materials "outside" the Complaint it may properly consider on this motion.

Defendants' documents 1 through 5 are public records and specifically referenced in the SAC. As such, they are properly considered, a fact conceded by Plaintiffs (*see* Pl.'s Mem. in Opp. at 5). *Cf. Staehr*, 547 F.3d at 425-26 (court may take judicial notice of regulatory filings, without regard to the truth of their contents, on a motion to dismiss claims as barred by the statute of limitations).

Document 6 is the email from one of the Plaintiffs to the NYDEC. Defendants contend that it is a public document maintained as part of the NYSDEC's administrative record, whereas Plaintiffs contends it is not part of any public document identified in the SAC or relied upon by Plaintiffs. While the document does bear the bates stamp identification of "NYSDEC_NG2_TRAV_0146412," the lack of any information as to exactly what the "administrative record" that it is allegedly part of relates to, counsels against its consideration.

The article from Plaintiffs' counsel website (document 7) does not falls within any of categories of documents that may be considered on a motion to dismiss and will not be considered. *Cf. Abraham v. Town of Huntington*, 2018 WL 2304779, *5 (E.D.N.Y.; May 21, 2018) (declining to consider, on a motion to dismiss, an article from a website of a non-party).

Defendants' document no. 8 and all four of Plaintiff's documents were all filed in the Notice of Claim Proceeding and thus may be considered, although not for the truth of the matters asserted therein. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir.1998) (Courts "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (internal quotation marks omitted).

Document 9 is a chart "summarizing the relevant portions" of the soil testing results referenced in document 8. Defendants reference said chart to argue that Plaintiffs own test results

do not support their claim. (*See* Northrup- Grumman Rep. at 6.) But that argument is not one for a motion to dismiss as it addresses the merits and not the sufficiency of the pleading. Document 9 will not be considered.

## III.     Principles Regarding the Statute of Limitations

Under New York law, a cause of action to recover for damages for personal injury  or injury to property must be commenced within three years of the tortious conduct. N.Y. CPLR § 214(5). However, when it is claimed that the injury has been "caused by the latent effects of exposure to any substance or combination of substances, in any form upon or within the body or upon or within property" the three year period is computed "from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier. *Id.* § 214-c(2).  Further, such a claim may be asserted one year after the date of discovery of the injury's cause as long as the discovery of cause date is within five years of the discovery of injury date. *Id.* § 214-c(4).

However, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), 42 U.S.C. § 9658 "provides for a uniform standard for determining the accrual dates of claims of personal injury [and property damage] due to exposure of hazardous substances." *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 184 (2d Cir. 2002). Section 9658 provides:

> In any case brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date ["FRCD"] in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). As relevant here, the FRCD means "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." *Id*. at § 9658(b)(4). Thus, under § 9658 "the FRCD preempt[s] state law accrual rules if, under those rules, accrual would occur earlier than the date on which the cause of the personal injury [or property damage] was, or reasonably should have been known to be the hazardous substance." *Freier*, 303 F.3d at 196.

The FRCD's "reasonably should have known" prong is an objective test, not subjective. Nonetheless, "because different plaintiffs may have become aware, or should have become aware, of the existence of their claims at different times, the FRCD must be fixed separately on a plaintiff-by plaintiff basis." *Abrams v. Ciba Specialty Chem. Corp.*, 666 F. Supp. 2d 1267, 1272 (S.D. Ala. 2009) (internal quotation marks omitted).

Accordingly, CPLR 214-c, as modified by the FRCD, requires that toxic tort claims for injury to persons or property may be brought (1) either three years from the date of discovery of the injury by the plaintiff (or from the date when through the exercise of reasonable diligence such injury could have been discovered by the plaintiff); or (2) one year from the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages were caused or contributed to by the hazardous substance; which is later. *See Freier*, 303 F.3d at 210.

## IV.     The Parties' Contentions

Defendants argue that the public investigation and remediation put Plaintiffs on inquiry notice no later than March 2013 barring both their property damage and personal injury claims and that the 2016 soil tests conducted at Plaintiffs' behest could not have put them on notice as

they do not show contamination. Further, the non-resident plaintiffs' claims are untimely as they were filed more than a year after the original complaint in this case.

In response, Plaintiffs argue that the "law of the case" is that the claims are timely in view of the decision of the court in the Notice of Claim Proceeding allowing the filing of the late notice of claim. They maintain that when each of the plaintiffs' claims accrued "is an individualized factual inquiry that requires discovery and determinations by the trier of fact" and the "evidence will show that some of the plaintiffs' personal injuries and wrongful death claims occurred within three years of the filing of the complaint in this action in September 2016, or subsequently." (Pls.' Opp. Mem. at 9-10.) Further, the 2016 test results supporting their claims are only one component of a factual inquiry and for some plaintiffs, the "two-injury rule" applies. Finally, they argue that the class action tolls the claims of all plaintiffs, making the claims of the non-residents timely.

## V.     The Law of the Case Doctrine Does Not Apply

Preliminarily, the Court will address Plaintiff's argument that in view of the court's holding in the Notice of Claim Proceeding, it is the law of the case that Plaintiffs' claims did not accrue until April 2016.

"The 'law of the case' doctrine posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Sagendorf-Teal v. Cty. of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996) (quoting *DiLaura v. Power Authority of State of New York*, 982 F.2d 73, 76 (2d Cir. 1992)). "Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *In re PCH Associates*, 949 F.2d 585, 592 (2d Cir. 1991) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478, at 788 (1981)). "[T]he

doctrine applies as much to the decisions of a coordinate court in the same case as to a court's own decisions." *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816, 108 S. Ct. 2166, 2177, 100 L.Ed. 2d 811 (1988).

The Notice of Claim Proceeding is not the "same case' as this, it was a distinct proceeding. Moreover, Northrup Grumman was not a party to that proceeding. The "law of the case" only applies "in following stages" of the same case" or "to different lawsuits between the same parties," *In re PCH Assoc.,* 949 F.2d 585, 592 (2d Cir. 1991) and therefore is inapplicable to this matter. It is also noteworthy that a motion for reconsideration of the decision in the Notice of Claim Proceeding was made and neither party has informed the Court of a ruling thereon.

## VI.     Whether Public Investigations and Remediation Put Plaintiffs on Inquiry Notice

Referencing the NYSDEC RODs for OU-1, OU-2 and OU-3, issued in 1995, 2001 and 2013 respectively, the NYS Cancer Study, and the records related to the concerns of Bethpage residents regarding the Bethpage Site, Defendants argue that Plaintiffs were on inquiry notice of their property and personal injury claims at the latest by March 2013, when the last of the foregoing was published and therefore are barred as this action was commenced more than three years thereafter. In effect, Defendants are arguing that as a matter of law these documents put Plaintiffs on inquiry notice.

Defendants' argument conflates the claims for diminution in real property values as a result of the stigma of the property's proximity to the Bethpage Site with the claims (e.g. for diminution in value, injury to real property, and personal injuries) resulting from actual contamination of their real property.[3] As Plaintiffs point out, there are various questions with respect to the property claims such as "when the toxic substances from the spreading plume may

---

[3] Also, Defendants argument with respect to the property damage claims addresses only the accrual of Plaintiff's real property claims under the New York's CPLR 214-c without consideration of the FRCD.

have reached each of plaintiff's property, when the contamination was discovered, when the diminution of value was or reasonably could have been ascertained and when stigma damages began to be manifested." (Pls.' Opp. Mem. at 10.)

Here, Defendants point to the concerns raised by citizen as to whether the contamination affected their property or posed a health threat. But these concerns are nothing more than suspicions. The case law is clear that a plaintiff's mere suspicion that he or she incurred damages because of defendant's contamination is inadequate to satisfy the "reasonably should have known" standard. Indeed, the FRCD "focuses on knowledge, actual or imputed, not on suspicion. Mere suspicion, whatever its reasonableness, cannot be equated with knowledge . . . ." *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 205–06 (2nd Cir. 2002).

Furthermore, "notice of controversy . . . is not the standard for determining the Federal Commencement Date." *Freier*, 303 F.3d at 210 (documents showing local concerns and controversies about potential health problems from landfill did not permit court to conclude as a matter of law that plaintiffs should have known that landfill was cause of their injuries, starting the limitations clock). A similar argument was considered and rejected by then District Court Judge Christopher Droney in *Collins v. Olin Corp*, 2009 WL 279027 (D. Conn. Jan. 2, 2009). In that case, the defendant argued in seeking summary judgment that given (1) the publicity relating to the contaminants deposited by the defendant at a local landfill, (2) the discovery of hazardous substances at a local school, concerns expressed by local residents about the impact of the contamination on their property and (3) a report which described several residential properties affected by the landfill but did not enumerate which ones, the class knew or reasonably should have known of the damage to their property and that is was caused in part by the contamination defendant caused. In denying that motion, the *Collins* Court found questions of fact as to whether

"any plaintiff reasonably would have known, rather than merely suspected . . . , that they had or would suffer harms" as a result of defendant's contamination. In reaching that result the Court reasoned in part: "in this case, the plaintiffs may have had substantial suspicions that the contamination in the neighborhood was caused by Olin, and that the contamination was likely to extend beyond the tested areas of the Hamden Middle School, public parks and rights-of-way. However, the plaintiffs were told by the EPA that testing on their residences was going to occur in late April, 2001; they were told that the results from earlier tests of the public lands and rights-of-way were preliminary, and they were told by the EPA that results as to the tests on their own properties would be shared with them when the tests were complete." *Id.* at *7.

Defendants do not point to any particular portion of the various RODs that would lead each of the Plaintiffs to believe that contaminants had invaded their property. While the NYS Cancer Study did examine a residential area adjacent to the Bethpage Site "where measurements had shown elevated levels from the site in the air inside some of the homes," the Court has no way of determining based on the allegations in the SAC which, if any, of the Plaintiffs may have resided in that area. Similarly, while the ROD for OU-3 reports that "soil samples from private properties located to the south of the Grumman Access Road AOC have identified several properties . . . with PCB levels greater that 1 ppm in surface and subsurface soil" (Ex. 1 to Kaufman Aff.  (DE 59-1 at p. 26)), the Court cannot determine whether any of the private properties referenced belong to any of the Plaintiffs.

It is also noteworthy that the various RODs also contain information that those in areas surrounding the Grumman Site need not be concerned with contamination. For example, the ROD for OU-3, states that with respect to soil vapor "[b]ased on the sampling results [from the Grumman Access Road, Sycamore Avenue and adjacent numbered streets] . . . no site-related

contamination of concern was identified in the off-site areas evaluated, and impacts to indoor air are not occurring. Therefore, no further action was necessary for off-site residential properties." (Ex. 1 to Kaufman Aff. (DE 59-1 at p. 28).)

With respect to the claims for personal injuries, in addition to the foregoing it is sufficient to note that absent from the SAC are the dates on which the plaintiffs received their diagnoses, which is just one of the pieces of information needed to determine when these claims may have accrued.[4] This observation applies not only to the original Plaintiffs, but also to the "non-resident" Plaintiffs.[5]

In sum, the Court cannot conclude that as a matter of law the Plaintiffs' claims are barred by the statute of limitations.

### CONCLUSION

Defendants' motions to dismiss the claims asserted in the Second Amended Complaint as time-barred are denied.

**SO ORDERED.**

Dated: Central Islip, New York         s/ Denis R. Hurley
       June 13, 2019             Denis R. Hurley
                                      United States District Judge

---

[4] Defendants rely on an Affirmation submitted in the Notice of Claim Proceeding for the dates of diagnoses. However, as noted earlier, the Court may take notice of the filings in that proceeding not for the truth of the matters asserted but rather to establish the fact of such litigation and related filings.
[5] Defendants' arguments that the claims of the non-resident plaintiff claims are barred because they were filed more than one year after the filing of the original complaint, do not relate back to the filing of the original complaint and were not tolled under *America* Pipe, presuppose, among other things, that the non-resident plaintiffs received their diagnoses and/or sold their Bethpage property more than one year before the filing of the original complaint in this case.