FILED
CLERK

2:54 pm, Dec 08, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
ROSALIE ROMANO, et al.,          *     Case No. 16-CV-05760(GRB)
                                 *
             Plaintiffs,         *     Long Island Federal
                                 *      Courthouse
                                 *     814 Federal Plaza
       v.                        *     Central Islip, NY  11222
                                 *
NORTHROP GRUMMAN CORPORATION,    *     December 3, 2020
 et al.,                         *
                                 *
             Defendants.         *
                                 *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

```
For the Plaintiffs:              PAUL J. NAPOLI, ESQ.
                                 LILIA FACTOR, ESQ.
                                 Napoli Shkolnik, PLLC
                                 360 Lexington Avenue, 11th Fl.
                                 New York, NY  100017

For the Defendant,               GRANT J. ESPOSITO, ESQ.
 Northrop Grumman:               KATIE L. VIGGIANI, ESQ.
                                 Morrison & Foerster, LLP
                                 250 West 55th Street
                                 New York, NY  10019

                                 MARK A. MILLER, ESQ.
                                 Hollingsworth, LLP
                                 1350 I Street, NW
                                 Washington, DC  20005
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Fiore Reporting and Transcription Service, Inc.
4 Research Drive, Suite 402
Shelton, Connecticut 06484 (203)929-9992

Appearances (Cont'd)

For the Defendant,          PETER SEIDEN, ESQ.
 Town of Oyster Bay:        Milber Makris Plousadis &
                             Seiden, LLP
                            1000 Woodbury Road, Suite 402
                            Woodbury, NY  11797

3

1          (Proceedings commenced at 10:03 a.m.)

2          THE CLERK:  Calling case Civil 2016-5760, Romano vs.

3     Northrop Grumman Corporation, et al.

4          Counsel, please state your appearance for the

5     record.  Plaintiff goes first.

6          MR. NAPOLI:  Sure.  Paul Napoli, from Napoli

7     Shkolnik, on behalf of the Romano, Ackerman, Akerson, Ball,

8     Cammarata and Cornett plaintiffs.

9          MR. ESPOSITO:  Good morning, Your Honor.

10         Sorry, did I step on someone?

11         THE COURT:  Nope.  Go ahead.

12         MS. FACTOR:  This is Lilia Factor.  I'm just

13    listening in also for plaintiffs.

14         MR. ESPOSITO:  Good morning, Lilia.  Good morning,

15    Your Honor.  Good morning, everyone.

16         This is Grant Esposito from, Morrison & Foerster, on

17    behalf of Northrop Grumman.  On the call today are my

18    colleagues that will be listening in.  Katie Viggiani, from

19    Morrison & Foerster, and Mark Miller, from the Hollingsworth

20    firm.

21         THE COURT:  All right.  Is that everyone then?

22         MR. SEIDEN:  And Pete -- sorry, Your Honor.  I

23    didn't mean to step on you.

24         THE COURT:  No.  Go ahead.

25         MR. SEIDEN:  Peter Seiden, from Milber Makris, for

4

1      the Town of Oyster Bay.

2                  THE COURT:  Right.  Welcome back.  Anyone else?

3                  MR. SEIDEN:  Thank you, Your Honor.

4                  THE COURT:  All right.  Not hearing any responses, I

5      guess we should proceed.

6                  I believe last time we were together we -- I thought

7      it was a good idea we should do this by video and somehow it

8      just didn't get scheduled that way -- and I apologize for that

9      -- but we will move forward with what we have.

10                  I will note for the record we are continuing to

11      waver under the very difficult pandemic conditions that

12      confronts litigators and for that matter humans everywhere.

13      So with that in mind, we are on an audio conference, but we

14      will get through the issues that present themselves.

15                  I have reviewed the joint letter submitted in the

16      last few days by the parties concerning the sort of update as

17      to where we are.  And let me start with plaintiffs on that,

18      please.

19                  And, counsel, let me ask you this.  Is it fair to

20      say that since we last spoke, and we last spoke in July I

21      believe, you've received a substantial amount of information

22      from the defendants since then.  Yes?

23                  MR: NAPOLI:  I would say we received some

24      information.  I think it's all relative, Your Honor, to the

25      amount of information that we're seeking and the type of

1    information that we're seeking in order to be able to prove up

2    our case.

3             THE COURT:  Okay.

4             MR. NAPOLI:  But, we did receive some documents,

5    yes.

6             THE COURT:  All right.  So now I was thinking about

7    that.  And perhaps in reviewing the transcript from July, I

8    recognize that perhaps the discussion wasn't as focused as it

9    could have been, because, you know, we talked about getting

10   everybody the information they need.  This is me talking, so

11   this is my fault, right, but I guess I didn't actually specify

12   need for what.

13            So I guess the question is when you say prove up

14   your case -- that's interesting -- and there's a lot of

15   language in your letter about they're withholding this and

16   only news dates found this and then so forth.

17            MR. NAPOLI:  Sure.

18            THE COURT:  But the real question I guess for

19   today's purposes is you need to gather information to prepare

20   you to move for class action, isn't that -- class action

21   certification.  Isn't that really the next step?

22            MR. NAPOLI:  Yes, Your Honor.  Correct.

23            THE COURT:  Okay.  So if we focus the inquiry that

24   way and say we're looking to tee up a motion for class action

25   certification -- because as I thought about it, and I didn't

6

1    make this distinction last time, that there are individual

2    plaintiffs and that's a sort of different question, right --

3    but in terms of class action certification, what information

4    or categories of information remain that you need to get that

5    you don't have so that you're in a position to move for a

6    class action?

7         MR. NAPOLI:  So when you talk about class action

8    issues under Rule 23, I believe there is some aspect of

9    liability associated with it.  And also in a toxic tort case,

10   exposure and the extent of exposures.  Since the class that

11   we're seeking to certify is for medical monitoring, we need to

12   put together the parameters of exposure.

13        And as we talk with our experts, we understand that

14   there are multiple routes of exposure emanating from this

15   Grumman site over the years and for different periods of time

16   that they changed.

17        So those areas of exposure are both dermal and oral

18   from drinking water exposure, but also potential soil

19   exposure.  There were letters and things of children playing

20   in the backyard and not to play in the backyard or to garden

21   in the backyard at various times.  There's air exposure not

22   only in home but in the community.

23        And so in order to substantiate those routes of

24   exposure, we need to simply know volume of use of the

25   contaminants.  You know, so how much they purchased, how they

7

1  used it and how they disposed of it.

2        So that would include onsite, groundwater

3  remediation, modeling and testing.  So they have monitoring

4  wells on each site that they would test on a consistent basis

5  for volumes of contaminants, offsite monitoring.  But also I

6  would need to understand what they actually used in practice

7  because the monitoring wells only talk about one point in

8  time.

9        In order for experts to consolidate exposure on

10 groundwater, they'd have to know that they've used a thousand

11 tons of TCE and maybe moved off site a hundred tons of TCE, so

12 we know that 900 remain in the ground.

13        THE COURT:  Okay.

14        MR. NAPOLI:  At the same time, they had stacks at

15 this site that also emanated two known products, hexavalent

16 chromium and TCE.

17        So we need to understand their processes of what

18 they did at the facility that generated air emissions, and so

19 that our experts can then extrapolate the exposure over time

20 to various people in the community.

21        These are all documents and items that were not

22 necessarily disclosed to government officials over the years.

23 And we know from representatives at the state, federal and

24 local levels that they haven't been provided or haven't been

25 given that we need to know.

8

1          So that's what we would need as a basis.  And once

2     we have that information, we can then give it to our experts

3     because this will be a very expertintensive certification.

4          We could give it to our experts so that they can

5     give us the calculations to tell us over what period of times

6     were the greatest exposure, who was exposed, how long that

7     exposure matters for various parts of the community.  That's

8     how the case is essentially put together.

9          We've been -- we've met and conferred with the

10    defendants a number of times.  It's not that we have not been

11    doing anything.  We've tried to come to some agreement with

12    them.

13         And we have come to agreement on some issues, but as

14    you saw from the joint letter, it was contingent on us

15    providing information on an individual basis of cases, and we

16    just didn't think one should be contingent on the other.

17         THE COURT:  Okay.  I mean, I can deal with the

18    contingency thing which, I mean, irrespective of whether

19    making it contingent, if you have the individual information,

20    why shouldn't you be required to provide it?

21         MR. NAPOLI:  Oh, if that's a question, Your Honor?

22         If we're litigating the class case and putting the

23    individual cases on hold, then I don't think -- I think it's a

24    distraction.  If we're going to be focusing our efforts on the

25    initial limited issues then, like I said, I think it's just a

9

1    distraction.

2            You know, we're not doing discovery of the

3    individual cases -- IF we're doing discovery of individual

4    cases, you know, we will provide the authorizations and answer

5    interrogatories and do those depositions.  We have no problem

6    with that.

7            But we've been going under the assumption that we're

8    just handling the class.  We would like to do all the cases at

9    once, but we're under the assumption we were doing the class.

10           THE COURT:  But doesn't the -- what I don't

11   understand is, don't the existence of the individual

12   plaintiffs in some senses inform the class?  In other words,

13   if you have individual plaintiff 17 -- I'm making up numbers,

14   I don't even know how many there are, I haven't counted this

15   morning, but who has, you know, malady A and was exposed to

16   chemical B, isn't that part of what's informing your efforts

17   to create a class?

18           MR. NAPOLI:  Well, I think I would answer it this

19   way, Your Honor.

20           I think all -- I would think all the information

21   that we can gather is helpful, but they are -- individual

22   places have different burdens than the class.  The class is

23   primarily for medical monitoring, which are people who have

24   some, and we've talked about this case in previous

25   conferences, the New York Court of Appeals case that deals

1    with it, that have some injury but not the injuries that we're

2    most concerned about, some of these cancers.  The individuals

3    have -- the ones that we filed have cancers.  So there are

4    different issues.

5            THE COURT:  Right.  I understand.  Okay.  All right.

6    Let me back up a little bit into what you said and ask this

7    question.  You said something about when you're looking at the

8    routes of exposure of the contaminants, are we agreed --

9            MR. NAPOLI:  Yes.

10           THE COURT:  -- is there a list as to what the

11   contaminants are?

12           MR. NAPOLI:  Yes.  There are known contaminants, and

13   we've given a list as part of our search terms to the

14   defendants.  And I can -- I mean, I can tell you some of them

15   from memory.  Some of them are long chemical names that I

16   can't even pronounce.

17           THE COURT:  Don't bother.  I just want to -- I'm

18   more interested in numbers.

19           MR. NAPOLI:  Sure.

20           THE COURT:  How many are there?

21           MR. NAPOLI:  So there's probably about a dozen.  But

22   I do say this, Your Honor.  You know, before 2014 nobody knew

23   in the world of at least plaintiffs' mass tort litigation

24   about the word PFOS or 1,4-Dioxane.  And to this day most

25   state regulators around the country don't.  New York is an

1    exception and it does.  It's recently passed laws on it.

2         You know, there are -- what we'd like to know is

3    what chemicals they've used in their process.  As of now we

4    know TCE was used, but we also know that 1,4-Dioxane, which

5    was not known or was not regulated until this year, was used

6    with TCE.  We have no idea how much 1,4-Dioxane Grumman used.

7    So there are potentials for contaminants we know nothing

8    about.

9         You know, we would like to know about their

10   processes, and we'll get into it, but what we believe are the

11   primary are TCE, hexavalent chromium, PFOS, which is there's a

12   number of perfluoronated surfactant.  We're not sure which

13   ones they used PFOA, PFOS, PFMNA, and then 1,4-Dioxane.  Those

14   are the four primary that we know about now that they used in

15   mass quantities, that had exposure, and that emanated from

16   this site.

17        But we don't want to preclude that there aren't any

18   others because, you know, there are 80,000 chemicals that are

19   in use by companies like Grumman that have no regulation and

20   nobody knows much about, if anything, of their use.

21        THE COURT:  Right.  Okay.  So there's the

22   interesting thing.  And I was waiting if you were going to get

23   to that point.

24        Because last time we were together, one of your

25   colleagues who may not be a colleague anymore -- I'm not sure

12

1    if he's still on the case -- but indicated there were 85,000

2    chemicals.  And I said, well, that's ridiculous.  You can't

3    expect responses on 85,000 chemicals because, you know, again,

4    they used Windex to clean the windows and that's not what this

5    case is about, right?

6            MR. NAPOLI:  Sure.

7            THE COURT:  So there's got to be a way of focusing.

8            When you say unknown, if you're saying to me you

9    don't know whether or not Grumman used chemical X, which is a

10   known carcinogen in significant quantities or not, that's

11   interesting to me, right.

12           If you say to me, these chemicals, we don't know if

13   they're harmful yet or not, well, we have litigation here,

14   right.  We can't possibly anticipate everything in the future.

15           And I think of course there's statute of limitations

16   that, you know, protect you from things that are discovery,

17   right.  TCE is a good example.  TCE was declared a carcinogen

18   in 2016 I think it was if I remember correctly.  I think

19   that's right.  And when it's declared a carcinogen, there's a

20   list.  There's some federal agency that has a list, you know.

21           So which one are you talking about?  Are you talking

22   about things we don't know what they do yet or we don't know

23   if Grumman used them in significant quantities?

24           MR. NAPOLI:  Yeah.  We don't know if Grumman used

25   them in significant quantities.  And so most of what they've

1    provided us, Your Honor, are, you know, government reports

2    that are available to the public, not necessarily in a usable

3    fashion.

4          We have no real internal processes or internal

5    information.  Some of this information they've given in other

6    litigations but they haven't given to us.  They've been very

7    restrictive in what they're providing us in time and even with

8    the custodians.  So we just simply need this information.

9          They said, well, it's a lot.  It's two million

10   pages.  It's already been vetted for work product in the prior

11   litigation.  Give it to us.  Two million pages does not scare

12   us.  You know, we'll have to go through it and do our job.

13         THE COURT:  Okay.  All right.  I think I have an

14   idea here.

15         Let me switch to defendants' counsel, please.  Who's

16   speaking again today?

17         MR. ESPOSITO:  Good morning, Your Honor.  Grant

18   Esposito from Mofo.

19         THE COURT:  Mr. Esposito, hold on one more moment

20   before we go forward.

21         Back to plaintiffs' counsel for a second.

22         MR. ESPOSITO:  Sure.

23         THE COURT:  The last time we were together we spoke

24   a great deal about getting information from third parties,

25   water districts and, you know, the government in the town and

1    so forth.  Have you gotten more information from those sources

2    as well?

3            MR. NAPOLI:  We have gotten some additional

4    information.  And as an exhibit to our joint letter, we've put

5    on exactly where we are.

6            And I'll just look -- it's exhibit 1 to the joint

7    letter -- exactly where we are.  I've been in contact with DOJ

8    in Washington and talked to them about many of the *Touhy*

9    letters, talking to the highest people at the Civilian Tort --

10   Civil Tort Division that I've been working with on other

11   cases.

12           And we also represent Nassau county in the opioid

13   litigation, so we've been talking to their county attorney.

14   And they've all consistently told us a few things.

15           One, that the pandemic has made it exceedingly

16   difficult to respond to this information.  Some of it is

17   archived in either federal records offices, archives that are

18   closed or on part-time operation.

19           Some of the information needs to be vetted by Navy

20   and other high levels that have top security clearances before

21   they vet it because that's a matter of course.  So it is going

22   to take some time.

23           Our experience in other litigations is it's taken

24   eight months to get some information and it may take longer.

25   So it's not the panacea for everything in discovery.

1          And as, you know, we indicate in our joint letter

2    and we've been told by various government officials, you know,

3    a lot of the information that we're looking for was never

4    given to the government.  And that's part of the problem.

5          THE COURT:  Okay.  All right.  Let me go back to Mr.

6    Esposito.

7          Mr. Esposito, sorry to interrupt like that.  I just

8    wanted to close out that one issue.

9          All right.  Mr. Esposito, where are we from your

10   perspective?

11         MR. ESPOSITO:  Sure.  Thank you, Your Honor.  So a

12   couple of things.

13         First off, the statement that was made about the

14   restrictions on what we've been producing is not fulsome.  So

15   let's start with the procedural posture, right.

16         As you correctly pointed out, the case has been

17   bifurcated.  We're in class discovery.  Representations were

18   made to Judge Lindsay, who was handling class discovery, that

19   the paper discovery was basically done and we were getting

20   ready to do depositions of putative class reps.

21         As we state in the letter, and as we stated back in

22   our request for a *Lone Pine* order back in March of last year,

23   information came to light during class discovery which

24   suggests, in fact, we say demonstrates, that the plaintiffs

25   cannot satisfy their obligations as part of a class action or

1    really from any of their cases to show exposure or causation.

2    And so we've asked this court to focus the remaining part of

3    class discovery on the issues of exposure and causation.

4         Much of what the plaintiffs are seeking -- and they

5    say things that were done onsite -- that issue was litigated

6    before Judge Lindsay back in March of 2019, even earlier.

7       And, in fact, if you look at plaintiffs' response in

8    March of 2019 to our *Lone Pine* request, they concede that

9    documents related to contamination at the site are not part of

10   class discovery.  And that makes perfect sense and Judge

11   Lindsay was right.

12        So the issue is not what was used on the site, not

13   where there was contamination on the site, but whether or not

14   away from the site, down gradient where the plaintiffs are, if

15   there are contaminants.  So that's what we're trying to focus

16   on.

17        And I really appreciate you asking the question

18   about what are the contaminants we're talking about.  Because

19   as we said in the letter the list of search terms plaintiffs

20   provided includes contaminants that are not alleged in the

21   complaints and have not been found by the New York State

22   Department of Environmental Conservation to be contaminants

23   that are related to the site.

24        So in one of the exhibits, Your Honor, there's a

25   list.  It's from the amended AROD, A-R-O-D.  It is a

1    culmination of 30 years of investigation into the legacy Navy

2    Grumman site and it lists a number of chemicals of concern,

3    not all of them cause health issues, right, but those are the

4    ones they thought were important enough to remediate.  And

5    before this call, I did not hear that the ones that we're

6    talking about are PFOS, hex chrome, 1,4-D and TCE.

7            A word on PFOS, Your Honor.  You know, when we got

8    together back in July, Mr. Napoli was asked in response to

9    your questions about PFOS in the *Benoit* case, as you may

10   recall, and he said that chemical is not part of this

11   litigation.  That's at page 5 to 7 of the transcript back in

12   July.

13           But with regard to TCE and hex chrome and 1,4-D, not

14   only have we produced information about, you know, where those

15   chemicals may or may not be in the community, but they know

16   those chemicals.

17           So the question is what else do they need to know?

18   What other chemicals do they -- are they concerned about that

19   they think may have caused injuries or even had plaintiffs

20   exposed to them?  Tell us those.

21           We've been more than willing to, you know, run some

22   searches and look for information that they don't already

23   have.  You know, this site has been studied extensively.  The

24   nature and the number of the contaminants have gone into the

25   community are known and documented.

1    And so where we're at, Your Honor, is that what the

2    plaintiffs are trying to do is notwithstanding the fact that

3    we are in class discovery, notwithstanding that Judge Lindsay

4    has already defined the bounds of class discovery, is to seek,

5    you know, full-merit discovery into every chemical that was

6    ever used, however it was used on the site, and not focusing

7    on what are the contaminants that are in the groundwater.

8    Nobody disputes those.

9    What are the contaminants that their experts are

10    saying could have caused the types of injuries alleged, and

11    where is the evidence that anybody was exposed to them?

12    Because as we've pointed out in our letters and

13    previously, the regulators have said repeatedly that exposure

14    alleged in this case did not happen -- New York regulated four

15    years.

16    And does anyone really think that if New York's

17    regulators perceived a risk to human health they would not

18    have acted on it?  That's the premise of this lawsuit, Your

19    Honor.

20    And that's why we're asking the Court to focus

21    discovery consistent with *Lone Pine* on the issues of exposure

22    and causation.  And if the plaintiffs need more on exposure

23    and causation in order to come forward with their expert

24    reports on those issues, we remain willing to produce them.

25    THE COURT:  Okay.  So, Mr. Esposito, what I'm having

1    trouble with, and I may be in an unusual position having just

2    served as a magistrate judge for close to a decade on this

3    court and now being the district judge, but when I was reading

4    the joint letter last night, I was thinking this just sounds

5    like a discovery dispute.

6              You're saying it's overly broad and burdensome.  And

7    they're saying, no, it's necessary.  And I'm thinking I'm

8    having a cart before the horse problem with the *Lone Pine*

9    concept.  That's a management -- that's a management tool,

10   right, how we manage a case.  And if it's not being helpful in

11   managing the case, then why are we going through this

12   exercise?

13             In other words, I don't know what tools that *Lone*

14   *Pine* is adding to our toolbox that we don't already have in

15   the form of a very unbelievably talented magistrate judge

16   who's, you know, evaluating things and deciding on the

17   proportionality questions.  Why do I need to talk about *Lone*

18   *Pine* at all?

19             MR. ESPOSITO:  Sure, Your Honor.  And let's be

20   clear, if Your Honor decides that we shouldn't be (inaudible)

21   those processes for the reasons that we talked about

22   (inaudible) a lot of issues because then we can just move

23   right to depositions of the plaintiffs' reps.  Because what

24   the plaintiffs are asking for, Your Honor, they've already

25   asked Judge Lindsay for.  We've already litigated those

20

1      issues.

2              But here's why we think a *Lone* (inaudible), right.

3      The allegations are that plaintiffs were affected (inaudible)

4      contaminated ground (inaudible) below the ground either

5      because it came through the tap or because there was soil

6      vapor intrusion, that the TCE and other chemicals kind of

7      wafted up under the feet into their backyards and their soils.

8      Or it's because they visited Bethpage Community Park.

9              If this site had never been studied before and this

10     was a brand new case and there had been no evidence or no

11     science looking into this, I don't -- we wouldn't be asking

12     for a *Lone Pine* process.

13             But the (inaudible) for decades.  And the

14     regulators, as recently as December of 2019, in response to

15     public comments, including comments that were posed by

16     plaintiffs' counsel, said none of those exposure pathways are

17     viable.  Well, if the pathways are viable, right, we can all

18     agree on this.  If a plaintiff was not exposed to a

19     contaminant, then a plaintiff doesn't have a claim.

20             So because of what we learned during class

21     discovery, and because of the test results the plaintiffs

22     themselves did on their properties which show that the four or

23     five chemicals Mr. Napoli just mentioned are not on the sites,

24     not on their properties, we think a *Lone Pine* (inaudible)

25     administration of this litigation.

1          Because we're either facing a class action of

2     (inaudible) of everybody in Bethpage and a couple of hundred

3     individual cases, or we're going to get our hands around what

4     can actually be litigated and focus on what might be no more

5     than a handful of folks who have plausible claims of exposure

6     given what the regulators have already said.

7          And so in the face of all that existing science and

8     investigation, we think the most efficient path forward is for

9     the plaintiffs to come forward and say this is how the

10    plaintiffs claim (inaudible) and they were exposed to such a

11    degree --

12              THE COURT:  Mr. Esposito --

13              MR. ESPOSITO:  -- that the injuries are plausible.

14              THE COURT:  -- let me just interrupt you for one

15    second.

16              MR. ESPOSITO:  Sure.

17              THE COURT:  I'm sorry.  You're just breaking up a

18    little bit.  I don't know if you're in a bad spot or if you

19    can move a little bit, but I'm just -- I'm losing a few

20    syllables here and there.

21              MR. ESPOSITO:  Okay.  Let me try this.  Is this

22    better, Your Honor?

23              THE COURT:  Oh, much better.  Thank you.  Thank you,

24    Mr. Esposito.

25              MR. ESPOSITO:  Okay.

1           THE COURT:  Okay.  Go ahead.  Sorry.  Continue

2   please.

3           MR. ESPOSITO:  Sorry about the (inaudible).  Okay.

4           So just to recap to make sure that everything was

5   heard, the reason we had moved for a *Lone Pine* type process is

6   to focus on the threshold question of whether or not any of

7   these plaintiffs were actually exposed to (inaudible).

8   Because we can all agree, if they were not, there are no

9   claims.

10          So to get our hands around what can actually be

11  litigated, in order to have an efficient administration of

12  this litigation, what we need to know is are we really facing

13  a class action of everybody in Bethpage and a couple of

14  hundred individual plaintiffs?

15          Or are we really talking about at most a handful of

16  cases where there may have been (inaudible) in Bethpage back

17  in the '50s and '60s when nothing was known about these

18  chemicals and (inaudible) no regulations in place like they

19  are now?  And we have arguments about that and whether or not

20  there could be negligence in that time period, but that's for

21  another day.

22          Let's see which claims (inaudible)?  We've been at

23  this for four years.  The theories about the sources of

24  exposure and the pathways for exposure keep moving, but

25  they've been studied, Your Honor.

1           And so what we respectfully request and continue to

2     request is let's focus on what the plaintiffs have to show

3     (inaudible) these plaintiffs were actually in contact with or

4     exposed to the key chemicals at issue --

5           THE COURT:  Right.  My question to you is this.

6           MR. ESPOSITO:  -- and what these chemicals are.

7           THE COURT:  Why isn't -- at this point, because, you

8     know, part of your arguments on *Lone Pine* to me just sounds

9     like you're either arguing summary judgment or arguing class

10    action up front, right.

11          So before we give them anything, we're entitled to

12    this or we shouldn't have to be sued by this group of people,

13    and that's problematic because I think the answer is, you

14    know, before the New Jersey Superior Court decided *Lone Pine*,

15    we here in the federal court, we had a pretty good system for

16    getting through discovery, getting cases teed up for class

17    action, getting cases teed up for summary judgment and for

18    trial.  I mean, we have, you know, moved.  They talk about

19    proportionality, about undue burden, fairness, balance.  I

20    mean, we have those processes.

21          So when you said a few moments ago, you know, Judge,

22    they're putting chemicals on these lists that include search

23    terms that are just outside the scope of anything that, you

24    know, came up before, well, what I would have done if I were

25    the magistrate judge on the case, at that moment when you said

1    that to me, I'd say what's your added cost to add two more

2    search terms?  If nothing comes up, nothing comes up.  If a

3    few documents, you turn them over.  What's the big deal?

4              So I'm having trouble understanding what's the

5    prejudice to your client.  And conversely, am I really in a

6    position to say, well, the state DEC studied this problem,

7    therefore, the plaintiffs are entitled to no other information

8    from your client because that's done.  Do you see the point

9    I'm making, Mr. Esposito?

10             MR. ESPOSITO:  Yeah.  We're not disagreeing.  We've

11   produced 240,000 pages of information talking about where the

12   contaminants are, (inaudible) are, the composition of them in

13   plumes.  We've never (inaudible) search terms for chemicals

14   that the plaintiffs have either alleged or that there's some

15   reason to believe are in the plumes.  We're not -- there's no

16   (inaudible).  What we're trying to figure out --

17             THE COURT:  A few minutes ago, Counsel --

18             MR. ESPOSITO:  -- (indiscernible) --

19             THE COURT:  Hang on one second, Mr. Esposito.  A

20   quick question.

21             MR. ESPOSITO:  Sure.

22             THE COURT:  You said 240,000 pages.  Interesting,

23   right.  A few minutes ago counsel said that he requested

24   something from you -- and again I don't -- you all work this

25   case every day, I don't, right, but I try to understand

1    everything.  He said two million pages you said you had that

2    you're not going to give him because it's two million pages.

3    What are we talking about?  What's the corpus of information

4    there --

5              MR. ESPOSITO:  Sure.

6              THE COURT:  -- and what's the problem with turning

7    it over?

8              MR. ESPOSITO:  Sure.  So what was said is not true.

9    That's the problem, Your Honor.  Here are the facts.

10             THE COURT:  Oh.

11             MR. ESPOSITO:  As we were meeting and conferring and

12   trying to come up with a process for moving the case forward,

13   as Your Honor directed, they said, well, look, you have

14   documents you've produced in other cases.  And he specifically

15   mentioned three cases; one involving the Town of Oyster Bay,

16   one involving the Town of Hempstead, and one involving the

17   Bethpage Water District.  And we said the documents are beyond

18   the issues of exposure and causation about which we are

19   supposed to be focused, but we will produce those.  We will

20   produce those.

21             THE COURT:  Okay.

22             MR. ESPOSITO:  Now, again, I have to check and see.

23   There may be third parties, there may be some confidentiality

24   issues, but those are not insurmountable obstacles.

25             MR. NAPOLI:  Your Honor.

1                    MR. ESPOSITO:  And we said (inaudible).

2                    MR. NAPOLI:  I'm sorry.

3                    MR. ESPOSITO:  Yeah.  That's okay.

4                    THE COURT:  Hang on.  I'll come back to you counsel.

5          Please.

6                    Go ahead.  Go ahead.

7                    MR. ESPOSITO:  Yeah.  Yeah.  So what we said was we

8          would produce them.  Maybe it's (inaudible) last offer, right,

9          because we went beyond that.  You have 150 search terms.

10         These are way overbroad.  As you know we're not associated

11         with the site or with any of the alleged injuries.

12                   But more importantly, and to talk about the

13         significance of (inaudible), Your Honor, 85 percent of those

14         search terms hit on the documents Northrop Grumman had already

15         produced.

16                   So what we said was, tell you what (inaudible)

17         search terms that didn't hit on those, right, we'll run across

18         the four custodians that the parties were actually able to

19         agree upon.

20                   We have offered to do that.  We are prepared to do

21         that.  And all we asked for in exchange, Your Honor, was

22         whatever the information the plaintiffs have about exposure

23         and causation that they're going to have to give their experts

24         anyway that they hadn't given to us already and they refused

25         to do it.  So there is a deal there that resolves all this.

1          MR. NAPOLI:  So, Your Honor, if I may just --

2          THE COURT:  Yeah.

3          MR. NAPOLI:  -- just address, you know, when counsel

4     says I'm not telling the truth.  As I said, we had meet and

5     confers.  And as a result of one of those meet and confers,

6     Mr. Esposito's associate, or partner, Katie Viggiani, sent us

7     a follow-up letter on September 23rd, 2020 and she addressed

8     three categories of documents.

9          The first documents -- category of documents was

10    associate with the custodians that we had requested search

11    terms be run for.

12         And on page two of her letter, she addresses that

13    those hits, those number of hits were run for all proposed

14    terms across the three custodians, and it would result in a

15    yield of more than 215,000 documents, 1.5 million pages.

16         So that was the first request for documents we asked

17    them to give us which they haven't because they wanted to give

18    us individual information on each individual.

19         The second was what Mr. Esposito just indicated,

20    which is also in the letter on page 4, which talks about an

21    additional 225,000 documents, or two million pages, in the

22    related litigations involving the Grumman site in Bethpage,

23    which they also conditioned on providing us, which we refused.

24         The third category that Mr. Esposito just raised,

25    that he was willing to run the search terms against documents

1    except the search terms that had already had hits, and that's

2    on page 3 of his letter.  And just so you understand what that

3    means, because we had several conversations as to what that

4    means, and my understanding from those conversations is that

5    they originally ran documents-- looked for documents from 1987

6    to 2016.

7            That was all that they provided regardless of the

8    fact that PFOS and 1,4-Dioxane were just known to the

9    government, state and federal in 2018-19, and regardless of

10   the fact that the chimney-spewing hexavalent chromium were

11   from '52 into the '80s, okay.

12           So what they did is they said we're looking at that

13   period of time and these search terms out of your 150.  I

14   think it was like 140 of them had some hit in that period of

15   time.  So we're not going to run those against all time, ever

16   again.  We're just going to run the ten or 12 remaining search

17   terms against everything.  And to us that was just

18   unacceptable.

19           We wanted all the search terms run against all the

20   time.  Obviously, we didn't want the same documents again, but

21   these three categories of documents, one of which they have in

22   their files, they just have to put it to disk or put it in a

23   Hightail link and we'll have them.

24           The other one, they've done the search.  They

25   probably have to cut it to a disk and send it to us. And the

1     third category, they could run the category, and we're done.

2           But everything was conditioned on Mr. Napoli and Ms.

3     Factor going to each individual client and coming up with an

4     Excel chart and giving them an Excel chart. And only if we

5     gave them the Excel chart would they give us these. And that

6     was the problem. We'll take those offers from Mr. Esposito,

7     but we just don't think it's appropriate to link the two

8     together.

9           THE COURT: Okay. You know --

10          MR. ESPOSITO: But, Your Honor --

11          THE COURT: Hold on. No. No. No. Mr. Esposito,

12     hold on.

13          Let me just stay with plaintiffs' counsel for a

14     minute --

15          MR. ESPOSITO: I'm sorry.

16          THE COURT: -- because I don't get this. Because

17     here's the thing. It is inappropriate for everyone to be

18     withholding everything? I don't understand. In other words,

19     what's the harm in turning over the individual plaintiff

20     information that you have?

21          MR. NAPOLI: There is no harm, Your Honor, if we're

22     going to do --

23          THE COURT: Well, then we should just do it.

24          MR. NAPOLI: You ordered me to just --

25          THE COURT: Let's just --

1           MR. NAPOLI:  Yes.

2           THE COURT:  Okay.  Good.

3           MR. NAPOLI:  I'm sorry.

4           THE COURT:  So let me make this clear.

5           MR. NAPOLI:  I don't mean to interrupt you.  I just

6    wanted --

7           THE COURT:  It's all right.  It's all right.

8           MR. NAPOLI:  I just wanted to make it clear.

9           THE COURT:  No one's saying to me that exceptional

10   economic burdens, you know, or that there's privileges.  I'm

11   not hearing any of that.  You know.  And also, frankly, I'd

12   rather leave this to Judge Lindsay who has much more of a

13   handle on it, but I'm going to say everything I just heard

14   about should get turned over.

15           So if we just do that, then the question I have for

16   plaintiffs' counsel is then let's go revisit my question about

17   how long do you need if we're going to be ready to file the

18   class action certification motion?

19           MR. NAPOLI:  So, Your Honor, I would say assuming

20   that we have everything and are able to do depositions, I

21   would say September.

22           THE COURT:  Okay.  Let me go back to counsel for

23   Grumman.  What do you think?  Mr. Esposito, what do you think?

24           MR. ESPOSITO:  So --

25           THE COURT:  I order everybody to turn everything

1    over.  I send this back to Judge Lindsay to resolve any sort

2    of, you know, more specific disputes.  And we set a September

3    date to start briefing the class action motion.

4              MR. ESPOSITO:  Yeah.  Okay.  So, unfortunately, when

5    I broke up before, you broke up a little bit before, could

6    you --

7              THE COURT:  Oh, I'm sorry.

8              MR. ESPOSITO:  -- did you say -- I think what you

9    said was we're going to have a conference with Judge Lindsay

10   to define the scope of whatever discovery is remaining and

11   then start (indiscernible) in September?

12             THE COURT:  No, that's not what I said at all, Mr.

13   Esposito.

14             MR. ESPOSITO:  Sorry.

15             THE COURT:  No.  No.  No.  No.  I said turn over

16   everything we just identified.  I don't know why you're

17   withholding millions of pages of documents that you've

18   identified that you'll only give them if they turn over

19   individual -- we're not going to play it that way.  He's going

20   to give you the individual plaintiffs stuff.

21             MR. ESPOSITO:  Sure.

22             THE COURT:  You're going to give him everything you

23   have, right?  And that will set us in the right direction,

24   hopefully, to get class action -- the class action motion

25   briefed you see.

32

1      I will also look forward to Magistrate Lindsay for

2  any additional disputes that you will have, but that's not

3  like a lot of data to me.

4          MR. ESPOSITO:  Sure.  So again --

5          THE COURT:  So if you turn all that information over

6  -- go ahead -- and then --

7          MR. ESPOSITO:  Yeah.  So --

8          THE COURT:  -- we're aiming for like a September

9  date to do class action, the class action motion.

10         MR. ESPOSITO:  We're fine.  I just want to be clear

11  that what we're talking about is -- so the Court is basically

12  ordering the parties to do the deal that's in the

13  correspondence (inaudible) --

14         THE COURT:  Hold on.  Hold on.  Hold on.  Counsel.

15         MR. ESPOSITO:  Because you say everything, and I

16  just don't know what that means.

17         THE COURT:  Well, look, I just heard -- and, again,

18  I so don't want to do this at this level of granularity -- but

19  I just heard about 214,000 pages and two million pages and all

20  the individual plaintiffs added that you're demanding that's

21  not being turned over. It is what it is.  Everyone has this

22  information.  I don't know why you didn't turn it over before.

23  But I'm just saying turn all that stuff over.  It should give

24  us a good start -- that's not finished --  to get what we need

25  to get for class action depositions and then do the class

1     action motion, right?

2            So, you know, again, I don't know that that's the

3     limits of what's going on, but anything -- any other

4     individual disputes you can bring back to Judge Lindsay who

5     can analyze it using the traditional tools that we use here in

6     federal court to resolve discovery disputes.  Is it

7     burdensome?  Is it privileged?

8            MR. ESPOSITO:  Exactly.

9            THE COURT:  Is it -- there's a cost.  Is it

10    proportional?  All those things.  And Judge Lindsay is very

11    good at that.  She knows that.  She was doing that long before

12    I was.  So I think that's the go forward plan.  Does that make

13    sense to you, Mr. Esposito?

14           MR. ESPOSITO:  It does, Your Honor.  I just want to

15    make sure (inaudible) and after the last conference that we're

16    all crystal clear.  A lot of the things (inaudible), Judge

17    Lindsay has already ruled we're not --

18           THE COURT:  Mr. Esposito, I'm sorry.  I'm sorry.

19    I'm just losing you again.  I don't know, can you move to a

20    different spot?  I have a feeling you're not --

21           MR. ESPOSITO:  Let me try.

22           THE COURT:  -- well connected to the local tower.

23           MR. ESPOSITO:  Yeah.  Is this better?

24           THE COURT:  Yeah.  Much better.  Thank you.  Go

25    ahead.

1          MR. ESPOSITO:  Okay.  No, my apologies.

2          So the only thing I just want to make sure that

3     everyone's clear on is plaintiffs in the most recent exchanges

4     have renewed (inaudible) that Judge Lindsay (inaudible) upon.

5     And so what I'm hearing is the plaintiffs want to renew those,

6     we'll go back to (inaudible) and deal with those again.

7          But as far as running the search terms we said we

8     would run, (inaudible) custodians we said we'd run, producing

9     the documents in those three cases we said we would produce, I

10    hear you.  We will produce them.  And I understand the

11    plaintiffs will be turning over the factual information they

12    have from their plaintiffs.  Is that fair?

13          THE COURT:  I think that makes sense.  Yeah.

14          Counsel for plaintiffs (inaudible) --

15          MR. NAPOLI:  I just -- I think that's fine, but I

16    don't know what he means by renewed.  We made demands.  He

17    needs to respond to the demands.  There were three categories

18    of documents he said he was withholding he would produce.  And

19    we will send them an updated chart on our clients of any

20    additional information we have.  I mean, that's my

21    understanding.

22          MR. ESPOSITO:  Yes.  We'll respond --

23          MR. NAPOLI:  He's going to turn over everything I

24    asked for and I'm going to turn over everything he asked for

25    is the best way to sum it up in my opinion.

1          MR. ESPOSITO:  Yeah.  So, again, he says everything

2     he asked for.  And, Your Honor, things that he's asked for

3     have already been ruled upon.

4          So here's what I think makes the most sense.  We'll

5     give him a formal response to what he has served on us.  We

6     will make clear it include that (inaudible) already agreed to

7     produce.

8          And if they have an issue with it, we say we'll go

9     back to Judge Lindsay and hopefully you don't have to be

10    bothered with this.  But if you do, obviously (inaudible) --

11         THE COURT:  Yeah.  And I don't mean to suggest I'm

12    being bothered.  It's just that, you know, I have a certain --

13    you know, I was struggling with the whole *Lone Pine* and how do

14    we do this and then I realized we already have the mechanism

15    to do this and we all know what that mechanism is, right,

16    which is the Rule 26 rules and the rules around those.

17         Get the documents turned over.  I have the sense

18    that if everybody turns over everything we just talked about,

19    we have a very good start.

20         Now, everyone should recognize discovery is an

21    ongoing process and people may discover things, right -- it's

22    part of the word.  There may be follow-ups and so forth and

23    you're going to have to work together to get through this.

24    That's the only way this is going to work.  So make sure you

25    work together.

1        But I'm going to refer it back to Judge Lindsay for

2    incredible -- to bring her incredible expertise to any further

3    problems that you have.

4        We are going to set a September 1st date to begin

5    the class action discovery motion process.  And I'll ask the

6    counsel to follow up whenever, at your convenience, file a

7    schedule, an agreed-upon schedule (indiscernible) exactly what

8    the (indiscernible) is going to come in.  You all can work

9    that out, you know, to your (indiscernible) schedule.

10        I recognize the pandemic is slowing everything down,

11    that's why I'm giving you this much time.  Because, you know,

12    the case has dragged for a while, but we're talking about

13    another, you know, nine to ten months here before you have to

14    get everything wrapped up.

15        But I think if you turn over the documents and

16    information we discussed today, I think you'd be well on your

17    way to starting.  You'll have some depositions to conduct and

18    you have to do those by video.  You may have to do them in

19    different ways, but, you know, you're all very, very qualified

20    counsel and I have faith that you'll resolve these things.

21    Yes?

22        MR. NAPOLI:  Yes.

23        MR. ESPOSITO:  Thank you, Your Honor.

24        MR. NAPOLI:  Well, we appreciate that.

25        Judge, just so the record is clear too because I

37

1    don't want -- I know we -- everybody keeps talking about the

2    case has been pending for four years and I don't want to blame

3    the parties or the Court, but we have had -- the reason for

4    the delays have been -- the pandemic has certainly had a

5    little bit of a bite, but this case has transferred from

6    several judges over the years who have had some time, the case

7    stayed.  So I don't want to (indiscernible) --

8              THE COURT:  Counsel, I will reiterate -- I will

9    reiterate that I'm hoping that the bouncing from judge to

10   judge will end now, right.  I'm hoping to stay with this for a

11   while.

12             MR. NAPOLI:  Yes.

13             THE COURT:  You know, I'm doing my best.  I'm

14   wearing a mask.  So I hear you.  And I'm not walking out of

15   this.

16             I'm not casting any aspersions or any blame, but I

17   will say it's a very important case to everybody and there's a

18   lot of work to do, so let's get the stuff turned over and

19   let's start focusing on getting, you know, what we really need

20   to get.

21             You're both fine lawyers and, you know, you can't

22   help but sometimes wrap your arguments about the whole case

23   into every dispute that we have.  Ah, Judge, it's just another

24   example, they're not turning over this. But let's just try to

25   move forward so we can all have what we need to resolve

1    things.

2              And to be clear so the record's clear, I'm not

3    imposing any sort of *Lone Pine* framework because I don't think

4    we need it because everything I read suggests to me this is

5    simply discovery disputes.

6              And using the proportionality standard that she

7    knows so well, Judge Lindsay is going to handle this just

8    fine.  So I think she'll be terrific on that.

9              Let me say that once again I've entirely ignored

10   counsel from the Town and I apologize for that.

11             MR. SEIDEN:  That's okay, Your Honor.  I have

12   nothing to add to this.  You've been great.

13             THE COURT:  Okay.  All right.  Well, good.  Just

14   keep doing what you're doing then.

15             MR. SEIDEN:  You've been busy, Judge.  I've been

16   reading about you.

17             THE COURT:  Well, it's a good time for everyone to

18   stay busy.  Let's put it that way, right.

19             MR. SEIDEN:  (Indiscernible.)

20             THE COURT:  (Indiscernible) keeping the courthouse

21   closed.  We did one trial since I last spoke to you by Zoom,

22   the entire trial, and it was phenomenal.  It was amazing.

23             MR. SEIDEN:  I did read about that, Your Honor, yes.

24             THE COURT:  So, you know, there are things we can do

25   and we're going to do what we can.  And hopefully if any of

1    you have any biotech clients, those vaccines will come

2    quickly.  That's all I can wish for.  So, you know.

3          All right.  Anything else we need to cover all

4    together today?

5          MR. SEIDEN:  Just let me tell you, Your Honor, I

6    don't think the plaintiffs and I have -- I mean, anything that

7    we -- I mean, I've produced everything I have except for some

8    historical documents.  I will produce those.  I must say to

9    Mr. Napoli, that unfortunately those historical documents do

10   not -- given the time frame, they do not contain any data.

11         The Town didn't do any kind of environmental

12   assessment -- I can represent that -- when Grumman gave them

13   the land for the park.  That would have been helpful.  Who

14   knows if the Town would have taken the park had it done such,

15   but that's neither here nor there.

16         But I will get him those documents.  I did produce a

17   privilege log.  Anything we have a dispute about, we will try

18   to resolve.  And what we can't resolve, I guess we'll bother

19   Judge Lindsay.

20         THE COURT:  Okay.  Sounds good.

21         Anything else anybody else has for today?

22         MR. NAPOLI:  No, Your Honor.  Just thank you very

23   much.

24         MR. SEIDEN:  Thank you very much, Your Honor.

25         MR. ESPOSITO:  No, Your Honor.  Yeah.

```
1              THE COURT:  Yeah.  Hopefully we'll --
2              MR. ESPOSITO:  Not from defendants either.  Thank
3    you.
4              And happy holidays to everyone.
5              THE COURT:  Yes.  Same to you all.
6              MR. SEIDEN:  Yes.
7              THE COURT:  And let's hope we get to see each other
8    in the new year.  That would be something.
9              MR. ESPOSITO:  I know.  That would be great.
10             MR. SEIDEN:  Thank you.
11             THE COURT:  All right.  Be well.  We'll talk to you
12   soon.  All right.  We're adjourned.
13             MR. NAPOLI:  Thank you.
14             MR. SEIDEN:  Thank you, Your Honor.  Bye.
15         (Proceedings concluded at 10:52 a.m.)
16             I, CHRISTINE FIORE, court-approved transcriber and
17   certified electronic reporter and transcriber, certify that
18   the foregoing is a correct transcript from the official
19   electronic sound recording of the proceedings in the above-
20   entitled matter.
21
22         Christine Fiore
23   _____     December 8, 2020
24   Christine Fiore, CERT
25         Transcriber
```