# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ROSALIE ROMANO; PATRICIA GLUECKERT, individually and on behalf of the Estate of WILLIAM G. GLUECKERT; WILLIAM P. GLUECKERT; JAYNE MANN; ROSS MEADOW and ARLENE MEADOW; JACOB KHOLODNY and BELLA KHOLODNY; FLO RAUCCI, individually and on behalf of the Estate of SALVATORE RAUCCI; DANIEL GALLANTE and JENNIFER GALLANTE; TERESA MEADE, DONALD LAGOMARSINO, SCOTT RUST, LAURIE FRANK, THOMAS NUCCI, CHRISTOPHER BLADES, DAWN CIRINO-SAMBADE, MARY ELLEN GINTY, JOHN SCHLOSSER, individually and on behalf of all others similarly situated; and DENISE FLORIO; MARYANN HERBERT; CHRISTINA ANDREWS-SALES; CHRISTOPHER CAGNA; JACKIE LIEBERMAN; CATHERINE LEWONKA; EUGENE CONNOLLY; VIVIANE BLICKENSDERFER; DANA BLICKENSDERFER; GLENN FALINO and MARCIA FALINO, individually,

Case No: 16-cv-5760

THIRD AMENDED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

_____ Plaintiffs,

-against -

NORTHROP GRUMMAN CORPORATION; NORTHROP GRUMMAN SYSTEMS CORPORATION

_____ Defendants.

------------------------------------------------------------------------X

Plaintiffs ROSALIE ROMANO; PATRICIA GLUECKERT, individually and on behalf of

the Estate of WILLIAM G. GLUECKERT; WILLIAM P. GLUECKERT; JAYNE MANN; ROSS

MEADOW and ARLENE MEADOW; JACOB KHOLODNY and BELLA KHOLODNY; FLO

RAUCCI, individually and on behalf of the Estate of SALVATORE RAUCCI; DANIEL

GALLANTE and JENNIFER GALLANTE; TERESA MEADE, DONALD LAGOMARSINO,

SCOTT RUST, LAURIE FRANK, THOMAS NUCCI, CHRISTOPHER BLADES, DAWN

CIRINO-SAMBADE, MARY ELLEN GINTY, JOHN SCHLOSSER, individually and on behalf

Style Definition: Body Text First Indent 2,numbered indented paragraph,numbered Body Text First Indent 2: Indent: Hanging: 0.25"

Style Definition: Footnote Reference

Formatted Table

Deleted: FRANCISCO PASTOLERO and MARIA SPICER;

Deleted: ; DENISE FLORIO

Deleted: HON. DENIS R. HURLEY¶
¶
SECOND

Deleted: and

Deleted: VIVIIANE

Deleted: and MICHAEL FALINO,

Deleted: ; and TOWN OF OYSTER BAY

Deleted: FRANCISCO PASTOLERO and MARIA SPICER;

Deleted: ; DENISE FLORIO

Deleted: and

of all others similarly situated, and DENISE FLORIO; MARYANN HERBERT; CHRISTINA ANDREWS-SALES; CHRISTOPHER CAGNA; JACKIE LIEBERMAN; CATHERINE LEWONKA; EUGENE CONNOLLY; VIVIIANE BLICKENSDERFER; DANA BLICKENSDERFER; GLENN FALINO and MARCIA FALINO, individually ("Plaintiffs"), through their attorneys, complaining of NORTHROP GRUMMAN CORPORATION, NORTHROP GRUMMAN SYSTEMS CORPORATION ("Defendants"), by and through their attorneys as and for their Third Amended Complaint, hereby allege:

**INTRODUCTION**

1.      Plaintiffs and the putative Class Members (collectively "Plaintiffs") are all individuals who are current or former residents and/or current property owners in or around Bethpage, New York, and nearby communities located within the Town of Oyster Bay and the Town of Hempstead in Nassau County ("Bethpage area").

2.      Plaintiffs reside or resided in the vicinity of the area formerly known as the Grumman Aerospace-Bethpage Facility Site, including the Northrop Grumman – Bethpage Facility, the Naval Weapons Industrial Reserve Plant – Bethpage ("NWIRP"), and the Grumman Steel Los Site.

3.      Many of the toxic waste products used in the operations at the above facilities were disposed of by the Defendants on site, including on an adjacent parcel. which was later donated by Grumman to the Town of Oyster Bay and became known as Bethpage Community Park ("Park").

4.      Collectively, the Grumman-Navy facilities consisting of approximately 635 acres in Nassau County, including the Grumman Aerospace-Bethpage Facility Site, the Northrop Grumman – Bethpage Facility, NWIRP, the Grumman Steel Los Site and the Park shall be referred to as the "Site".

5.     Upon information and belief, Grumman Aeronautical Engineering was incorporated in New York in 1929 and changed its name to "Grumman Corporation" in 1969. Grumman Corporation's headquarters were in Bethpage, New York. Grumman Aerospace Corporation was a subsidiary of Grumman Corporation, with its principal place of business in Bethpage, New York. Collectively, Grumman Corporation and Grumman Aerospace Corporation are referred to as "Grumman."

6.     In 1994, Grumman was acquired by Northrop Corporation. The two companies merged in 1995 to become Northrop Grumman Corporation ("NG"). NG is the successor in interest to Grumman.

7.     During several decades while it operated at the Site, Grumman, an airplane, weapons and satellite manufacturer with significant U.S. Department of Defense contracts, generated, stored, and disposed of toxic contaminants and manufacturing byproducts, including, but not limited to, volatile organic compounds ("VOCs"), semi-volatile organic compounds (SVOCs), metals, polychlorinated biphenyls ("PCBs"), aromatic hydrocarbons, radioactive materials, 1,4-Dioxane, per- and polyfluoroalkyl substances ("PFAS"), and waste products at the Site. Collectively, these substances shall be referred to herein as Contaminants.

8.     Grumman's practices, toxic air emissions, discharges and dumping of Contaminants resulted in extensive pollution at the Site and contaminated off-Site soils, air, groundwater and drinking water supplies in the area, causing Plaintiffs' injuries.

9.     In addition, due to the negligent, willful, and/or wanton actions of the Defendants, large quantities of Contaminants were released at the Site and created massive migrating plumes of contaminated groundwater.

10.     These plumes, designated by the New York State Department of Environmental Conservation ("DEC") as Operable Unit 2 ("OU-2") and Operable Unit 3 ("OU-3"), have resulted in the migration of the Contaminants onto Plaintiffs' properties.

11.     The contamination of groundwater caused by Defendants also severely impacted the drinking water supplies of several of the neighboring communities, which rely entirely on Long Island's sole source aquifer.

12.     Toxic air emissions from Grumman's industrial operations polluted the air in the surrounding area for decades.

13.     Contaminants from the Site also caused pollution of soil and soil vapor intrusion at residential and business properties, as well as neighborhood schools used by Plaintiffs.

14.     As a result of their exposure to the Contaminants originating at the Site, Plaintiffs have and continue to suffer injuries, including significant health impairments as well as future health concerns. In addition, Plaintiffs who are current property owners have and continue to sustain property damages caused by the contamination, including diminution of value and stigma damages.

15.     This action seeks damages for the Plaintiffs' past and continued exposure to Defendants' toxic Contaminants, including the establishment of a medical monitoring program to detect and address exposure- related health conditions, and, for the sub-Class of current homeowners, damages for the diminution of value of their properties, including stigma damages.

16.     This action also seeks damages to compensate each of the named Plaintiffs for their individual personal injuries and related damages caused by their exposure to Defendants' Contaminants.

4

Deleted: Since 2005, there has been an ongoing investigation of the contamination plume emanating from the former Grumman Settling Ponds, now known as the Bethpage Community Park, which is currently owned by the TOWN OF OYSTER BAY

Deleted: as Operating Unit 3 ("OU-3"). During the ongoing investigation of the plume, Defendants,

Deleted: NYSDEC"), and the U.S. Navy expressed

Deleted: belief that they possessed a good understanding of the scope of the contamination plume emanating from the Site.¶ However, the plume's presence resulted in the migration of the contaminants onto Plaintiffs' and Class Members' properties, causing …

Deleted: the Class

Deleted: ongoing

Deleted: and damages to

Formatted: Condensed by 0.15 pt

Formatted: Left, Indent: First line: 0.5", Tab stops: 0.5", List tab

Formatted: Condensed by 0.15 pt

Deleted: properties, as well as the contaminant's damaging effect to their future health concerns.

Formatted: Condensed by 0.15 pt

17. The Third Amended Complaint states, claims based on negligence, abnormally dangerous activity and absolute and strict liability, trespass, and nuisance, and also seeks punitive damages from Defendants.

## JURISDICTION AND VENUE

18. This case has been removed pursuant to 28 U.S.C. §§ 1332, 1441, 1442, 1446, and 1453 on October 14, 2016 (Dkt. 1). Plaintiffs acknowledge this Court's jurisdiction and agree that it is the proper venue for this action.

## PARTIES: DEFENDANTS

19. Upon information and belief, Defendant, Northrop Grumman Corporation ("NGC" or "Defendant"), is a corporation organized under the laws of the state of Delaware, with its principal place of business at 2980 Fairview Park Drive in Falls Church, Virginia.

20. Upon information and belief, Northrop Corporation, the predecessor to Northrop Grumman Corporation, acquired Grumman Corporation, whose primary place of business was in Bethpage, New York, and it was incorporated under the laws of the State of New York.

21. Defendant, Northrop Grumman Systems Corporation ("NGSC" or "Defendant"), is a subsidiary of NGC, and is organized under the laws of the State of Delaware with its headquarters in Falls Church, Virginia. Upon information and belief, NGSC is the successor in interest to the Grumman subsidiary, Grumman Aerospace Corporation, which was headquartered in Bethpage, New York and incorporated under the laws of the State of New York.

22. NGC and/or NGSC or their predecessors owned and/or operated the Site at the time of the disposal and/or release of the hazardous and toxic contaminants at the Site.

23. When reference is made in this Verified Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to

5

adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

24.     The term "Defendant" or "Defendants" refers to both Defendants named herein jointly and severally, including their predecessors.

25.     Each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### *The Contaminants.*

26.     Many toxic chemicals were used and discharged into the environment by the Defendants during their operations.  The list is by no means closed and is only meant to highlight some of the Contaminants released at the Site by Defendants.

27.     **Volatile organic compounds (VOCs)** are emitted gases from certain solids and liquids, such as paints varnishes, wax, pesticides, products for cleaning, disinfecting, cosmetic, degreasing, and other products. Health effects of exposure to VOCs include eye, nose and throat irritation headaches, loss of coordination and nausea, damage to liver, kidney and central nervous system. Some VOCs are known to be carcinogenic.

28.     **Semi-volatile organic compounds (SVOCs)** are a subgroup of VOCs.  They are highly toxic and difficult to decompose.  Most can cause cancer, reproductive disorders, nervous

**Formatted:** Normal, Centered, Indent: First line:  0.5", Line spacing:  Double, Tab stops:  0", List tab +  0.5", List tab

**Deleted:**

**Deleted:** <#>As used herein, TCE shall include all of its trade names including but not limited to Acetylene, Anameth, Benzinol, Pholex and any of its degradation breakdown products. ¶
TCE

system damage, and immune system disruption.  Many polycyclic aromatic hydrocarbons (PAHs), a major group of SVOCs, cause cancer, endocrine disruption and affect the immune system.

29.  **Trichloroethylene ("TCE")** is a colorless, volatile, man-made liquid chemical that is used by industry as, among other things, a solvent to remove grease from metal parts. TCE can be released into the air, water, and soil at locations where it is produced, stored, used, or discharged. The United States Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") classify TCE as a human carcinogen.

30.  As used herein, TCE shall include all of its trade names, including but not limited to Acetylene, Anameth, Benzinol, Pholex and any of its degradation breakdown products.

31.  TCE can enter groundwater systems through improper disposal or leaks into the ground. TCE is highly mobile once it enters the soil and will result in substantial percolation into groundwater aquifers. TCE can remain in groundwater for long periods of time, since it cannot readily evaporate from groundwater.

32.  TCE can enter the human body from the air, water, or soil.

33.  TCE is toxic by inhalation, by prolonged or repeated contact with the skin or mucous membrane, or when taken by mouth. TCE is extremely toxic to humans, even at low concentrations. Acute exposure to TCE has been shown to affect the central nervous system, liver, and kidneys in humans. Chronic exposure to TCE may cause liver and kidney damage, impaired immune system function, and impaired fetal development in pregnant women.

35.  Among other conditions, TCE has been linked to kidney, liver, biliary, pancreatic, bladder, blood, prostate, and skin cancer, Parkinson's and scleroderma and related diseases.

34.  **Polychlorinated Biphenyls ("PCBs")** are odorless volatile synthetic organic chemicals, which are either oily liquids or solids. PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components, as well as impurities.

35.     A manufacturing ban for PCBs took effect in 1979 in the United States because there was evidence that PCBs build up in the environment and may cause harmful effects.

36.     Once released into the environment, PCBs do not readily break down and therefore remain for long periods of time cycling between air, water, and soil. PCBs can be carried long distances and have been found in snow and sea water in areas far away from where they were released into the environment.

37.     PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune system, reproductive system, nervous system, and endocrine system. The IARC classifies PCB as a human carcinogen.

38.     2-Butanone (Methyl ethyl ketone) is a colorless and volatile liquid used as a solvent and an additive for making other chemicals.   It is widely used in paints, glues, and other finishes because it rapidly evaporates and will dissolve many substances.

39.     2- Butanone will not stick to soil, and if it is spilled onto soil, it will travel through the soil into underground water sources. Some of the 2-butanone found in soil or water will also evaporate to the air.

40.     Exposure to 2-butanone in humans can cause irritation to the eyes, nose, and throat.   Chronic inhalation studies in animals have reported slight neurological, liver, kidney, and respiratory effects.   Developmental effects, including decreased fetal weight and fetal malformations, have been reported in mice and rats exposed to this chemical via inhalation and ingestion.

41.     Perchloroethylene ("PERC") is a manufactured chemical that is widely used for degreasing metal parts and in manufacturing other chemicals.

42.     As used herein, PERC shall include its other names - tetrachloroethylene, tetrachloroethene, and PCE - and any of its breakdown products.

43.     In humans, PERC is known to adversely affect the central nervous system, the liver, kidneys, blood, immune system, and the reproductive system.

44.     Epidemiological studies link PERC exposure in the workplace with several types of cancer, specifically bladder cancer, non-Hodgkin's lymphoma, and multiple myeloma.

45.     The EPA has determined that PERC is likely to be carcinogenic to humans by all routes of exposure.

46.     As used herein, **1,1,1-Trichloroethane (TCA)** shall include all of its trade names, including but not limited to methyl chloroform, methyl trichloromethane, trichloromethyl methane, and trichloromethane.

47.     1,1,1-Trichloroethane was often used as a solvent to dissolve other substances, such as glues and paints, and to remove oil or grease from manufactured parts. Since 2002, its use has been restricted.

48.     Until the 1990s, 1,1,1 – Trichloroethane formulations usually included 1,4-Dioxane, an emerging contaminant and probable human carcinogen, which was used as a stabilizer/metal inhibitor.

49.     1,1,1-Trichloroethane in groundwater can evaporate and pass through soil as a gas and, finally, be released to the air.

50.     Effects reported in humans due to acute (short-term) inhalation exposure to 1,1,1-trichloroethane include hypotension, mild hepatic effects, and central nervous system (CNS) depression. Cardiac arrhythmia and respiratory arrest may result from the depression of the CNS. Symptoms of acute inhalation exposure include dizziness, nausea, vomiting, diarrhea, loss of consciousness, and decreased blood pressure in humans. After chronic (long-term) inhalation exposure to methyl chloroform, some liver damage was observed in mice and ventricular arrhythmias in humans.

51.	As used herein, 2-Hexanone shall include all of its trade names, including but not limited to methyl butyl ketone and MBK.

52.	2-Hexanone is a clear colorless liquid that, when in liquid form, evaporates into the air as a vapor.

53.	2-Hexanone was formerly used in paint and paint thinner and in various chemical substances. However, since it was found to have harmful health effects, it is no longer made in the United States, and its uses have been restricted.

54.	Humans can take in 2-Hexanone when breathing its vapors, eating food or drinking water that contains it, or coming into contact with it through the skin.

55.	The most important health concern for humans from exposure to 2-hexanone is its harmful effects on the nervous system. These effects were seen in workers who were exposed to 2-hexanone for almost a year. The major effects were weakness, numbness, and tingling in the skin of the hands and feet. Similar effects were seen in animals that ate or breathed high levels of 2-hexanone; these effects included weakness, clumsiness, and paralysis.  The neurotoxic potency of 2-hexanone is increased when combined with 2-butanone (see above).

56.	As used herein, carbon tetrachloride shall include all of its trade names, including but not limited to carbon chloride, methane tetrachloride, perchloromethane, tetrachloroethane, or benziform.

57.	Carbon tetrachloride is a manufactured chemical that does not occur naturally. Carbon tetrachloride was used as a cleaning fluid and degreasing agent, in fire extinguishers, and in spot removers. Because of its harmful effects, these uses are now banned, and it is only used in some industrial applications.

58.	Carbon tetrachloride can be trapped in groundwater for long periods of time and will eventually evaporate into the air. Carbon tetrachloride does not generally stick to soil particles.

10

59.     Carbon tetrachloride is known to adversely affect the cardiovascular, hepatic, and nervous systems in humans.  After exposure to high levels of carbon tetrachloride, the nervous system, including the brain, is affected. Such exposure can be fatal.

60.     **Chromium** is used mainly in metal alloys as chrome plating.  It can be polished to a mirror-like finish, and provides a durable, highly rust resistant coating.  A common form of chromium used by industry in dyes, paints, primers and other surface coatings is hexavalent chromium (chromium VI).

61.     **Hexavalent chromium** enters the environment through industrial applications such as electro painting and chemical manufacturing. Groundwater contamination may occur due to improper disposal of industrial manufacturing equipment.  It is also released in the form of air emissions from industrial stacks.

62.     Humans can be exposed to hexavalent chromium through contaminated soil, water and air.  Even small amounts of this substance are highly toxic.

63.     Hexavalent chromium is a known human carcinogen.  Inhalation of hexavalent chromium compounds is associated with a higher risk of lung, nasal and sinus cancer.

64.     Other health impacts of exposure to hexavalent chromium include damage to the skin, liver, kidneys, cardiovascular, reproductive, and gastrointestinal systems.

65.     **Benzene** is a petroleum product and a known human carcinogen that adversely affects the hematological, immune and nervous systems.  Breathing benzene can cause drowsiness, dizziness, and unconsciousness; long-term exposure harms the bone marrow and can cause anemia and leukemia.  Related aromatic hydrocarbons, including, **toluene, xylene, and ethylbenzene**, are used in synthetic materials, fuels, and solvents and are also hazardous to human health.

66.     **Dioxin/furans** are some of the most toxic chemicals known to science.  They may be created in certain industrial processes and are also formed as a by-product of waste incineration. These

11

chemicals can be distributed through the air and are highly toxic. In addition to cancer, dioxin exposure has been linked to birth defects, reproductive problems, immune, respiratory and skin disorders and hormonal malfunction.

67. **Radium** is a radioactive metal that has many isotopes, including the hazardous radioactive isotopes radium 226 and radium-228 (collectively "radium").

68. The EPA and the DEC have established a maximum contaminant level for radium-226 and radium-228 (combined) in drinking water of 5.0 picocuries per liter (pCi/L).

69. Radium is a hazardous substance and a known human carcinogen.

70. Exposure to radium can result in an increased incidence of bone cancer, liver cancer, breast cancer, lymphoma, and hematopoietic diseases such as leukemia and aplastic anemia.

71. Radium-226 decays to a radioactive gas, radon-222 ("radon").

72. **Radon** is a known human carcinogen and is a leading cause of lung cancer in the United States.

73. Radon can be dissolved in groundwater and travel through the soil. It can enter the air inside a home through cracks in the foundation and through aeration of water during its use in washing machines, showers, and cooking.

74. **1,4-Dioxane** is a synthetic industrial chemical that is completely miscible in water that has been used in many products, including paint strippers, dyes, greases, varnishes and waxes. 1,4-Dioxane is also found as an impurity in antifreeze and aircraft deicing fluids.

75. 1,4-Dioxane is used as a stabilizer for chlorinated solvents such as TCA and for other industrial and laboratory uses.

76. 1,4-Dioxane is short-lived in the atmosphere, but may leach readily from soil to groundwater, migrates rapidly in groundwater, and is relatively resistant to biodegradation in the subsurface.

12

77.     1,4-Dioxane is classified by the EPA as likely to be carcinogenic to humans by all routes of exposure.  Short-term exposure may cause eye, nose and throat irritation and long-term exposure may cause kidney and liver damage.

78.     **Perfluoroalkyl and polyfluoroalkyl substances ("PFAS")** are chemical compounds containing fluorine and carbon. They are manmade chemicals that are not naturally found in the environment.

79.     PFAS are used to repel oil and water.  These substances have been used for decades in a variety of industrial operations, including metal plating.

80.     PFAS were also widely used in fire suppression, especially of oil-based fires, and for fire-fighter training using Aqueous Film Forming Foam ("AFFF").

81.     The two most widely studied types of PFAS are perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), which each contain eight carbon atoms.

82.     PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

83.     PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

84.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

13

85.     Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

86.     The injuries caused by PFAS can arise months or years after exposure.

87.     Upon information and belief, the Contaminants and their derivatives, in amounts and concentrations above New York State and federal residential and industrial safety levels were and continue to be discharged from the Site, and from the resulting contaminant plumes, polluting the air, soil, and water in the surrounding communities and causing harm to the Plaintiffs.

88.     Upon information and belief, each of the Contaminants is individually toxic and hazardous to human health and the combined effects of exposure to multiple Contaminants cause additional, synergistic adverse impacts.

89.     The presence of certain radioactive and emerging Contaminants became publicly known only recently, as the capability and/or requirements for testing have changed and as specific locations were sampled.

90.     With respect to all of the Contaminants, as well as any new hazardous substances that may be identified as coming from the Site, the Plaintiffs reserve their right to allege additional exposure pathways, contaminant levels, injuries and damages as further information is obtained through discovery, additional environmental testing, medical research, disclosure of government records, and any future updates of public health standards and health advisories.

91.     To the extent that Defendants' Contaminants have commingled with toxic chemicals released by any third party, Defendants are jointly and severally liable for the damages from contamination in this case.

14

### *Defendants' Ownership and Use of the Site*

92.     Defendants and/or their predecessors owned and/or operated the Site for several decades. On information and belief, Grumman's operations at the Bethpage Facility began in 1937 and its use of the NWIRP site began in 1942. Manufacturing operations at the Site continued until 1996.

93.     The uses at the Site included the manufacture and testing of naval aircraft, naval amphibious craft, and satellites for the National Aeronautics and Space Administration.

94.     Throughout its operations at the Site, Grumman used, stored and disposed of various hazardous wastes and solvents from industrial processes directly into the environment. These wastes included VOCs, SVOCs, metals, radioactive materials and other Contaminants.

95.     Grumman knew that the Site is located in close proximity to residential areas. It knew or should have known that the Contaminants it discharged would migrate into the surrounding environment, contaminating the air, soil and groundwater in the neighborhood of the Site.

### Toxic Air Emissions

96.     As part of its decades-long operations at the Site, Grumman released toxic substances, including but not limited to TCE and hexavalent chromium, into the air, through its stacks.

97.     These and other hazardous substances were also released directly into the surrounding environment in the form of fugitive emissions from the manufacturing plants.

98.     Grumman did not take adequate pollution control measures to prevent and mitigate these harmful air emissions.

99.     As a direct result of Grumman's actions and omissions which created severe air pollution in the community, many Bethpage area residents living in the vicinity of the Site have been to exposed to toxic substances, causing and/or contributing to their injuries.

100.     Upon information and belief, Grumman had several plants on the Site, where it used TCE as part of the degreasing operations.

101.     Upon information and belief, starting in or about 1970, Grumman used a 4,000- gallon aboveground tank at Plant #2 to store TCE. At some point, Grumman discovered that the tank was leaking and had it replaced. It is unknown how long TCE had been leaking into the ground before the leak was discovered, but Grumman was aware of an unexplained "loss" of TCE for an estimated two or three years prior to discovery of the leak.

102.     Upon information and belief, after an uncontrolled quantity of TCE was discharged into the soil, Grumman finally replaced Plant #2's leaking tank and discovered that the bottom of the tank was already rotten.

103.     Spray wands containing TCE were used to degrease large parts, such as wings of planes. TCE was also used to clean the paint guns used in painting airplanes.

104.     On information and belief, the wastewater generated from the above operations, would be pumped to a tank truck and taken to Grumman's on-site waste treatment plant at Plant #2, known as the Industrial Wastewater Treatment Facility.

105.     The wastewater treated at the Plant #2 Industrial Wastewater Treatment Facility also came from metal finishing operations conducted at both Plant #2 and Plant #3 at the NWIRP.

106.     As described below, the above wastewater, containing many toxic chemicals, was dumped in sludge drying beds in another area of the property, which later became the Bethpage Community Park.

107.     Improper disposal of Contaminants in this area became a major source of groundwater contamination at and emanating from the Site.

16

**Deleted:** Grumman's use and storage of VOCs at

**Deleted:** including

**Formatted:** Normal, Indent: Left: 0", First line: 0.5", Line spacing: Double, Outline numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.81" + Tab after: 1.06" + Indent at: 1.06", Tab stops: 0.75", List tab + Not at 1.06"

**Deleted:** , occurred primarily at Plants # 1, #2, #3, #5 and #12 within

**Deleted:** Site.

**Deleted:** <#>Upon information and belief, Plants #1, #2, and #3 each contained a form of vapor degreaser that used the contaminant TCE.¶
Upon information and belief, at least eight (8) TCE degreasers operated at Plant #2 from the 1960s through the mid-1990s; at least six (6) TCE degreasers operated at Plant #3 at various times spanning the 1960s through the 1980s; at least one (1) TCE degreaser operated at Plant #5 between the 1960s and two (2) in the 1970s; and Plant #2 also used degreasers outfitted with spray wands that used TCE. ¶
Spray wands were used to degrease large parts, such as wings of planes. To perform this task with a spray wand, a Grumman operator would have to stand on a platform along the degreaser's side. ¶
Grumman's operations at the Site included painting airplanes. There were paint shops on the grounds of the Bethpage Facility for this purpose. TCE was used to clean the paint guns used in the paint booths. To do this, the paint gun would be aimed at the paint curtain and discharged.¶
A "waterfall" in a paint shop was intended to keep sprayed paint from escaping. Water circulated through a closed system and cascaded down the sides of the paint shop to catch paint overspray; water also circulated through troughs on the floor of the paint shop and then back through the waterfalls. ¶
The paint shop consisted of one room and three waterfalls. Grumman's practice was to clean each spray booth re-circulating tank weekly. Water residue would be pumped to a tank truck and taken to Grumman's on-site waste treatment Plant – the toxic wastewater treatment sludge generated at the Grumman Aircraft Engineering Corporation Plant #2 Industrial Wastewater Treatment Facility ("Plant #2") was transported to the Park property and placed in one of two sludge drying beds.¶
The wastewater treated at the Plant #2 Industrial Wastewater Treatment Facility resulted from metal finishing operations conducted at both Plant #2 and Plant #3 at the NWIRP property. ¶
The area where the sludge drying beds were located was enclosed by a chain-link fence, which was secured by a locked gate. This fenced area is visible in available aerial photographs dated between the 1950s and 1962, when the property was transferred to the Town of Oyster Bay.¶

**Moved down [4]:** <#>Upon information and belief, there were at least a dozen recharge basins across the Bethpage Facility at various points in its operational history.¶

**Deleted:** <#>When the discharge basins became clogged and water could no longer percolate into the ground, Grumman would run bulldozers to scrape the basins.

**Moved down [5]:** <#>The contaminated and noxious scrapings obtained from these discharge basins were then used to fill in other low-lying areas on the premises of the Bethpage Facility.

**Formatted:** Condensed by 0.15 pt

**Deleted:** <#>¶

**Formatted:** Condensed by 0.15 pt

**Deleted:** Upon

**Formatted:** Condensed by 0.15 pt

108.    Grumman dug "recharge basins" directly into the ground throughout the Bethpage Facility, which it used, at least in part, to dispose of wastewater. Upon information and belief, there were at least a dozen recharge basins across the Bethpage Facility at various points in its operational history.

109.    These structures were designed to allow the wastewater to infiltrate back into the ground and return to the groundwater supply relied upon by Plaintiffs. This wastewater contaminated the groundwater at the Site and migrated downgradient, causing the ongoing contaminant plume(s) and soil and vapor contamination in the area.

110.    When the discharge basins became clogged and water could no longer percolate into the ground, Grumman would operate bulldozers to scrape the basins. The contaminated and noxious scrapings obtained from these discharge basins were then used to fill in other low-lying areas on the premises of the Bethpage Facility. Upon information and belief, these areas were unlined and also became source areas of contamination.

111.    Grumman also had a practice of spraying waste oil on dirt roads at the Site in order to control dust. Later, petroleum-related substances were found among the Contaminants at and emanating from the Site.

112.    The former NWIRP includes approximately 105 acres of the Site and a separate 4.5-acre parcel to the north of that parcel. The NWIRP was purchased by the United States Navy in 1947 and leased to Grumman for research, testing, design, engineering and manufacturing purposes. Grumman operated this portion of the Site from 1942 until it closed in 1998. In 2002, the Navy transferred the 4.5-acre parcel to Nassau County. In 2008, the Navy transferred 96 acres of the 105-acre main parcel to Nassau County and is leasing the remaining 9 acres to Nassau County.

113.    At their peak, Grumman's operations at the former NWIRP included four plants used for assembly and prototype testing, a group of quality control laboratories, two warehouse complexes,

a salvage storage area, water recharge basins, an Industrial Wastewater Treatment Facility, and several small support buildings.

114.    Starting from the early 1950s, Grumman accumulated and stored drums containing liquid waste materials from operations at Plant 3 and potentially other sources at the former NWIRP in a portion of the Site known as the Drum Marshalling Area.  Approximately 200 to 300 drums were stored at any one time.

115.    The waste drums reportedly contained chlorinated and non-chlorinated solvents, liquid cadmium, cyanide and chromium wastes. During the early 1990's, transformers containing PCBs and autoclaves were also stored at the Drum Marshalling Area.

116.    Until 1982, the drum storage area did not have a cover or spill containment.

117.    The soil contaminants found at in the Drum Marshalling Area include polychlorinated biphenyls (PCBs), chlordane, polynuclear aromatic hydrocarbons (PAHs), and metals.

118.    Subsequent testing determined that the Drum Marshalling Area was a source of groundwater contamination at and emanating from the Site.

119.    120 cesspools located in the vicinity of Plant 3, which were part of the stormwater management system at the Site, were found to contain PCBs.   PCB-containing fluids are suspected to have entered the system through floor drains in Plant 3 and impacted the underlying soil by passing through permeable well bottoms.   These discharges were yet another source of contamination at and emanating from the Site.

### Bethpage Community Park and Former Grumman Settling Ponds

120.    The land that comprises the current Bethpage Community Park was originally primarily farmland and was purchased by Grumman in 1941.

121.    From approximately 1943 through 1962, Grumman utilized a portion of this area, known as the Former Grumman Settling Ponds, for disposal of wastewater and other wastes from

18

its industrial operations the Site.  Among the various wastes were chromium, PCBs and VOCs used for cleaning or degreasing machinery or fabricated parts.

122.    The toxic sludge generated at the Industrial Wastewater Treatment Facility was transported to the Former Grumman Settling Ponds and placed in one of two sludge drying beds.

123.    Spent rags generated during the wipe-down process of a paint booth water curtain located at Plant #2 were also transported to a nearby area, where they were emptied into a pit ("rag pit"). Used oil may have also been discarded in the rag pit.

124.    This area was also utilized as a wastewater discharge recharge area and fire training facility where waste oil and jet fuel were ignited and extinguished.

125.    Defendants' operations in this area resulted in the release of Contaminants into the surrounding soil and groundwater, creating a deep, toxic plume.

126.    In October 1962, Grumman donated this land, comprising approximately 18 acres near the intersection of Stewart Avenue and Cherry Avenue in Bethpage, to the Town of Oyster Bay for use as parkland. Shortly thereafter, Bethpage Community Park, as it appears today, was constructed on the property, and is accessible to community residents year-round.

127.    The Park contains a ball field area, an active storm water recharge basin, a parking area, the Town Ice Skating Rink, and the Town Pool.

128.    Within the Park, the ball field area was built over the location of the Former Grumman Settling Ponds.

129.    NGSC remains the current owner of the Grumman Access Road, a closed private road in the vicinity of the Park associated with the former Plant.

130.    Bethpage High School is located directly to the east of the Park, across Stewart Avenue, and residential properties are located south of the Park across from the Access Road.

131.    In March of 2002, Grumman conducted soil sampling in the Park. The analytical results indicated levels of PCBs and metals exceeding the DEC's Soil Cleanup Objectives. The Park was temporarily closed but was reopened later that year.   The ball field remains closed to this day.

132.    In July of 2005, Northrop Grumman Systems signed a Remedial Investigation and Feasibility Study Order on Consent for the contaminated area encompassing the Former Grumman Settling Ponds, Adjacent Areas of the Bethpage Community Park, and the Grumman Access Road, collectively known as OU-3.

133.    Between 2006 and 2007, the Town of Oyster Bay excavated and disposed of approximately 175,000 cubic yards of contaminated soil from a 7 acre area of the Park as part of the construction of a new ice rink.

134.    Subsequently, in 2008 a Remedial Investigation Report for OU-3 identified 16 contaminants of concern, including the Contaminants.  The Report concluded that the southwest portion of the Park is a continuing source of groundwater contamination.

135.    The ballfield at the Park, continues to be closed due to heavy contamination.   Actual remediation of that site by Grumman began only in 2020 and is ongoing.

136.    In 2019, a new area of contaminated soil, just outside the ballfield and in the parking lot, was discovered during drilling activities conducted by Grumman.  Sampling confirmed the presence of VOCs, at levels exceeding state standards, in an area about two to eight feet thick between 36 to 50 feet beneath the ground surface. Additional remediation has commenced for this area.

**OU-1, OU-2, OU-3, OU-4**

137.    In 1983, the Grumman and NWIRP sites, excluding the Park, were listed in the Registry of Inactive Hazardous Waste Disposal Sites in New York State.

138.    In December 1987, the Bethpage Facility was reclassified as a "Class 2 Site," or a site posing a "[s]ignificant threat to the public health or environment" and requiring remedial action.

139.     In March 1993, the Grumman site and the NWIRP site were separated and listed as independent class 2 Superfund sites, designated as Site 130003-A and Site 130003-B, respectively.

140.     In order to address the on-site and off-site contamination, the DEC divided it into three Operable Units ("OU").

141.     OU-1 encompasses the former manufacturing plant areas on site.

142.     In 1995, the DEC issued Records of Decision ("ROD") for the Northrop Grumman and NWIRP Sites concerning on-site soil contamination in OU-1.

143.     OU-2 consists of an extremely large groundwater contamination plume that is continuously moving south-southeast. The source area of the OU-2 plume originates from both the NWIRP and Northrop Grumman properties, with VOCs present at different concentrations and different depths. OU-2 includes a network of wells which are used to monitor this plume.

144.     In March of 2001, the NYSDEC issued a ROD for OU-2.  This ROD provided for wellhead treatment at impacted public water supply wells, boundary monitoring of the plume, and the contingency for additional wellhead treatment should other wells be affected.  The ROD also included on-site extraction wells and treatment systems, which are currently in operation.

145.     Among other things, the 1995 and 2001 RODs found that groundwater plumes in and around the Site contained TCE and other chlorinated VOCs.

146.     In May 2015, the DEC entered into a Consent Order with Northrop Grumman to remediate "hot spots" identified in the larger OU-2 groundwater plume.

147.     OU-3 encompasses the source area of the Former Grumman Settling Ponds, adjacent areas of the Park, and the Grumman Access Road.  It has also been used to refer to the off-site plume of contaminants flowing from these areas.

21

148.    The groundwater flow direction is primarily horizontal with a downward component to the south-southeast.  OU-3 leaves the Site as a distinct plume, but then becomes comingled with the larger OU-2 plume.

149.    Generally, the OU-3 plume is deeper and more concentrated than the larger OU-2 plume. It has impacted both the Upper Glacial and Magothy aquifers.

150.    In March 2013, the DEC issued a ROD for the remediation of OU-3.  With respect to the off-site groundwater plume, the ROD required the immediate treatment of the area of elevated concentrations, or "hotspot" area of the plume that had been identified approaching Bethpage Water District Plant 4.  The ROD also called for additional monitoring wells to allow for the delineation of the leading edge of the OU-3 plume.

151.    OU-4 was established to by the U.S. Navy to specifically address contaminated oil, soil vapor and groundwater at the former Drum Marshaling Area designated at Site 1.

152.    A ROD issued for this area in August 2018, calls for limited excavation and disposal of PCB-contaminated soil, the installation of a reduced permeability cover, and land use controls to protect the cover and limit future activities.

153.    To implement this plan, the Navy has removed approximately 45,000 cubic yards of contaminated soil, as well as concrete debris from the former cesspools and settling tanks.   It has yet to install an expanded soil vapor extractions system and new groundwater monitoring wells.

154.    All of the above efforts were limited to discrete source areas and were not intended to or sufficient to remediate the full extent of the contaminant plumes.

**2019 Cleanup Plan – Full Hydraulic Containment of the Plume**

155.    Realizing the continuing and expanding threats to groundwater resources and local residents, in February 2017, Governor Cuomo directed the DEC to undertake an immediate engineering investigation to expedite containment of the plume.

22

156.     In May of 2019, after over two years of engineering and groundwater modeling investigations in partnership with the US Geological Survey, the DEC released a Proposed Amended Record of Decision ("ROD") regarding off-site groundwater. At the end of the public comment period, the Amended ROD was issued in its final form in December 2019.[1]

157.     The Amended ROD (at p. 13) specifically identifies 26 "contaminants of concern" in the contaminated groundwater plume originating at the Site.

158.     The DEC estimates that the resulting toxic plume currently extends approximately 4.3 miles south toward the Southern State Parkway and, at its widest point, is about 2.1 miles wide.  The depth of the plume varies from 200 to 900 feet below ground.

159.     The Amended ROD sets forth a 110 (one hundred and ten) year, $585,000,000 (five hundred eighty five million dollars) plan to stop the spread of and, eventually, clean up the plume.

160.     The work plan involves installing 24 groundwater extraction wells - eight of them located in the interior of the plume and 16 along the margins, five treatment plants, four recharge basins and approximately 24 miles of conveyance piping all around the affected region of the plume installed to bring that water from the wells to five nearby treatment plants.

161.     Defendant Grumman initially rejected the proposed remedy as unnecessary and not cost-effective.  The other responsible party, the Navy, also filed comments, rejecting the plan.

162.     However, after a year of negotiations, Grumman  agreed to implement a modified version of the AROD.  Grumman has also agreed to pay $104,000,000 (one hundred and four million dollars) as part of a Natural Resources Damage assessment, with part of the money to be used for well

---

[1] Access to the AROD and other project documents is available online through the DEC info Locator: https://www.dec.ny.gov/data/DecDocs/130003A/ or https://www.dec.ny.gov/data/DecDocs/130003B/.

protection and water supply projects in the Bethpage and South Farmingdale Water District, as well as other water projects associated with the plume[2].

163. No portion of the DEC's cleanup plan or payments promised by Grumman will go to compensating area residents, including Plaintiffs, for the personal injuries, increased risk of illness due to toxic exposure, or property damages which they have incurred as a result of Defendants' actions.

164. While the initial construction and maintenance operations costs are to be spread over 30 years, the full cleanup will take many more decades. Based on the above plan and timeframes, it is evident that Plaintiffs who still reside in or around the Bethpage area have and will continue to reside in areas impacted by the contamination for the foreseeable future.

**Impacts on Drinking Water**

A. Chlorinated Solvents - Generally

165. The 2019 Amended ROD states that 11 public water supply wells have been impacted and 16 public water supply wells are threatened by the Grumman groundwater plume.

166. The above document reiterates and confirms that Defendants' past disposal practice has contaminated both on-site and off-site groundwater with chlorinated solvents.

167. In 2016, the Town of Hempstead and the Bethpage Water District sued the Defendants and others over contamination of their public water supply wells in Levittown and Bethpage.

168. On information and belief, the Bethpage Water District action was dismissed on statute of limitations grounds, while the Town of Hempstead's action is still pending.

169. In May 2018, the Bethpage Water District announced that it will be shutting down five of its public water supply wells due to the contamination caused by Defendants.

---

[2] https://www.governor.ny.gov/news/governor-cuomo-announces-agreement-advance-full-containment-navy-grumman-plume   December 21, 2020.

170.    A Health Consultation report issued in May 2019 by the New York State Health Department ("Health Consultation")[3] concludes that past use of drinking water contaminated with TCE from the Site, at all times prior to the removal from service of Bethpage Water District Well 6-1 in 1976, could have harmed people's health.

171.    The Amended ROD notes that, in 1976, TCE was detected in Well 6-1 at concentrations of 28, 26 and 60 ppb, which is many times the safe limit.   Bethpage Water District Well 6-2 was also taken out of service in 1988, after a detection of TCE at 5 parts per billion ("ppb"). Both wells were returned to service after treatment systems were installed.

172.    Bethpage Water District's Plant 4 and Plant 5 wells were also impacted by TCE, though at lower levels.  Treatment systems for these wells were installed in 1995. See Amended ROD, p. 17.

173.    The Health Consultation acknowledged impacts of Site-related hazardous substances on other wells used by the Bethpage Water District, but concluded that they were either taken out of service or equipped with treatment systems.

174.    The Health Consultation did not address the actual cancer or other disease incidence in the population of the affected area, the cumulative impacts of multi-year exposure to low levels of toxins, such as TCE, prior to the installation of treatment systems, the presence of 1,4-dioxane and radium in the water, discussed below, or any exposure pathways other than drinking water in the Bethpage Water District.

175.    Among the other public water suppliers whose wells have been impacted by Grumman's site-related contaminants are the South Farmingdale Water District and the Seamans Neck Road Water Plant operated by the New York American Water Company.  These wells had

---

[3] The NYSDOH Health Consultation report is available at: https://www.health.ny.gov/environmental/investigations/northrop_grumman/

treatment systems installed in 2011-2013 and 2012-2015, respectively. See Amended ROD, pp. 17-18.

176.    Defendants are liable for Plaintiffs' exposure to contaminated drinking water from any and all impacted public supply wells.

B.    Radium and Radon Detections

177.    On information and belief, Grumman's operations at the Site included quality control and research projects including radionuclides and the use of radium-based paint on luminous dials on aircraft instruments and spacecraft components.

178.    On information and belief, in January 2013, the Bethpage Water District detected radium at 5.87 pCi/L (pico Curies per liter) in its drinking water Well 4-1, which is located southeast of the Site.

179.    This reading is a violation of federal and New York State's maximum contaminant level (MCL) for drinking water, which is 5 pCi/L, for the combined radium isotopes 226 and 228.

180.    As a result, well 4-1 had to be taken out of service.

181.    Upon information and belief, Plaintiffs who were or are customers of the Bethpage Water District have been exposed to elevated levels of radium in their drinking water, at least before the decommissioning of Well 4-1 in 2013.

182.    Subsequently, testing of monitoring wells at the Bethpage High School and the Central Boulevard Elementary School conducted in 2017 revealed elevated levels of radium. On information and belief, radium was found at two to five times the maximum contaminant levels.

183.    Both schools are located within the area of the contaminant plumes emanating from the Site, with the high school being across the street from the Park and the elementary school about a mile to the south of it.

184.    In 2017, the Bethpage School District conducted testing for radon gas.  Although the results from the elementary school were not released, on information and belief, levels of radon found at the high school and middle school were at close to 4.0 pCi/L, a ceiling above which corrective action is recommended by the Environmental Protection Agency.

185.    On information and belief, the School District installed a soil vapor barrier at the elementary school to minimize radon exposure.

186.    Additional groundwater sampling conducted at the Site by the US Navy in 2018 and 2019 found radium levels above federal and state standards in sixteen discreet samples from eight different wells, with the highest being 9.5 pCi/L.

187.    Although the Navy has assured residents that the findings are within the range of "background levels," its data has been questioned, because its consultant, Tetra Tech, was caught falsifying environmental testing data at another Superfund Site in 2017, and is now being sued by the U.S. Justice Department.   As a result, U.S. Senator, Chuck Schumer, has demanded that the testing be repeated using another consultant.

188.    A Preliminary Assessment/Site Investigation report analyzing the Navy's findings has yet to be submitted to the DEC.

189.    None of Defendants' cleanup efforts to date address the possible presence of radium in the groundwater and drinking water or of radon in the soil vapor in areas impacted by the contaminant plume.

190.    The December 2019 Amended ROD does not include a plan to address radium-226, radium-228, and radon.   As of this writing, there is no routine testing by Defendants or any government agency for radioactive contaminants in the groundwater emanating from the Site.

191.    To the extent it is confirmed that the elevated levels of radioactive substances in the soil vapor and groundwater in and around Bethpage are due to Defendants' activities, Defendants are

liable for any personal injuries and/or increased health risks caused to Plaintiffs as a result of their past and/or current exposure to these toxic substances.

C.     Emerging Contaminants: 1,4 – Dioxane

192.    Upon information and belief, 1,4-Dioxane was used by Grumman in its industrial operations at the Site and has been detected in the contaminant plumes.

193.    1,4 – Dioxane is one of the "contaminants of concern" identified in the State's 2019 Amended ROD.

194.    New York State has adopted an MCL of 1.0 ug/L (parts per billion) for 1,4-Dioxane in drinking water.

195.    This standard, which is mandatory for all public water suppliers, went into effect in August 2020.

196.    Sampling conducted by the Navy in 2018 and 2019 confirms that the levels of 1,4-Dioxane in groundwater at the Site are many times higher than the MCL.

197.    This toxic chemical has migrated off-site and contaminated the drinking water supply.

198.    According to available data from the Bethpage Water District, 1,4-Dioxane is present at levels many times 1.0 ppb in the public water supply wells used by the Plaintiffs.

199.    Upon information and belief, Plaintiffs who were or are customers of the Bethpage Water District have been exposed to harmful levels of 1,4-Dioxane in their drinking water as a result of Defendants' actions.

200.    Other nearby water districts within the range of the Grumman contaminant plume have also detected 1,4-Dioxane in their water supply at levels above what is now deemed safe.

201.    Upon information and belief, Plaintiffs who were or are customers of these water districts have been exposed to harmful levels of 1,4-Dioxane in their drinking water as a result of Defendants' actions.

28

D. Emerging Contaminants: PFAS

202.  Upon information and belief, Defendants' operations at the Site, have also contaminated the groundwater and drinking water supplies of the Plaintiffs with toxic perfluoroalkyl and polyfluoroalkyl substances (PFAS).

203.  On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt (parts per trillion).[4]

204.  In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

205.  Effective April 25, 2016, the NYSDEC added PFOS and PFOA to the New York State 6 NYCRR Part 597 list of hazardous substances, making it a hazardous waste pursuant to New York State Environmental Conservation Law Article 27, Title 13 and 6 NYCRR Part 375.

206.  New York State has adopted an MCL of 10.0 ppt or 0.0000100 milligrams per liter (mg/L) for PFOA and 10.0 ppt or 0.0000100 mg/L for PFOS in drinking water.

207.  This standard, which is mandatory for all public water suppliers, went into effect in August 2020.

208.  In 2018 and 2019, as part of its Preliminary Assessment/Site Inspection for Per- and Polyfluoroalkyl Substances, the U.S. Navy conducted several rounds of testing at wells, recharge basin and treatment systems in and around the NWRIP portion of the Site.

---

[4] Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

209.    Five of the monitoring wells showed levels of PFAS that were not only many times New York's MCL, but even exceeded the EPA's current Health Advisory limit of 70 ppt.   The highest PFAS concentration was 239 ppt.

210.    PFAS was also detected at levels well above the MCLs at the NWRIP Recharge Basins and the Interim Remedial Measures treatment system at the Site.

211.    In its November 2019 Fact Sheet summarizing the above results, the Navy specifically noted that plating and anodizing operations were conducted by Grumman at Plant 3 and Plant 5 and likely used PFAS compounds in a mist-suppression system.

212.    Fact Sheet explains that the entire NWRIP portion of the Site was used by Defendants for research, testing, design engineering, fabrication, and primary assembly of military aircraft, from 1942 to 1996.

213.    In addition, Grumman operated a fire training area on site.

214.    These and other operations elsewhere at the Site involving aircraft, weapons, and satellite manufacture and testing likely involved the storage, use and discharge of PFAS, including through the use of AFFF firefighting foam containing PFAS.

215.    As of the filing of the Complaint in this action, Defendants have not published the results of any sampling that they have conducted for PFAS found on Site and in the contaminant plume.

216.    While some of the water districts impacted by the plume have not conducted testing for PFAS or have not published their results, the Levittown Water District has reported PFOA levels as high as 50 ppt in its Drinking Water Quality Report for 2018.

217.    None of the cleanup plans issued or approved by the State address the PFAS contamination in the groundwater at and coming from the Site.   In its Responsiveness Summary for the Amended ROD, issued in December 2019, the DEC states only: "As needed, the Public Water

30

Supply Contingency Plan will be updated to reflect emerging contaminants and other currently unknown contaminants that may be associated with the NWIRP and Northrop Grumman Bethpage Facility sites."

218.    In the meantime, on information and belief, Plaintiffs have been and continue to be exposed to toxic levels of PFAS in their drinking water supplies, which are contaminated as a result of Defendants' operations at the Site.

**The Defendants Have Not Remediated the Contamination**

219.    The remediation plans, if any, set forth by Defendants were and still remain inadequate and insufficient given the breadth of the contamination, as well as the present and historical migration of the harmful contaminants. Defendants have repeatedly failed to exercise the reasonable care necessary to eliminate, correct, and/or remedy the dangerous condition created by them and/or located upon their land.

220.    Further, Defendants have intentionally delayed and repeatedly chosen meaningless courses of action, patently inadequate and unreasonable given the likely injuries to Plaintiffs.

221.    Defendants also challenged and delayed implementing the work required by the 2019 Amended ROD, which finally proposes a comprehensive cleanup and containment of the contaminated groundwater plume emanating from the Site, a cleanup that is estimated to take 110 years.

222.    It took an entire year to get an agreement in principal that Defendants will conduct some of the remedial actions proposed in the AROD.   None of them include testing of residential properties or compensation for the toxic exposure and injuries suffered by former and current residents, including Plaintiffs.

223.    The actions chosen and taken by Defendants were with knowledge that delay and minimal action would cause the toxic contaminants to disperse and migrate from the Site and into the

surrounding residential neighborhood, impacting Plaintiffs and Class members and their property. These actions have been undertaken with actual malice and in wanton and willful and/or reckless disregard for Plaintiffs' health and property.

224.     As a result of Defendants' negligent, willful, and/or wanton storage, disposal, and release of the Contaminants into the soil and/or groundwater, and/or the subsequent and continuing failure to remediate or take reasonable action to mitigate the release and migration of said substances, the plumes of contaminants, at concentration levels in excess of federal and/or state regulatory limits, have and continue to migrate throughout the areas downgradient of the Site and onto the properties of Plaintiffs. These toxic chemicals have entered the water, soil, indoor and outdoor air, causing Plaintiffs' injuries.

225.     In addition, the damage to Plaintiffs includes exposure to toxic air emissions, unsafe drinking water, soil vapor intrusion, and other pathways of exposure through soil, air and groundwater.

226.     The presence of the Contaminants on and off Site in Plaintiffs' neighborhood and on and under their places of residence, school, work and recreation sites has resulted in permanent and continuing harm to Plaintiffs' persons. Plaintiffs have been and continue to be exposed to the Contaminants by inhalation, ingestion, and dermal exposure.

227.     The numerous egregious actions and incidents occurring at and near the Site by Defendants constitute an intentional and/or negligent breach of their duty of reasonable care and violations of New York State law.

228.     Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded each and every Plaintiff's right to possession and undisturbed occupancy of their residences and have repeatedly trespassed thereon by causing migration of toxic contaminants onto Plaintiffs' real properties and harm to their persons.

## THE PARTIES: PLAINTIFFS

**Allegations on behalf of all Plaintiffs**

229.     Except where specified otherwise, all allegations relating to "Plaintiffs"  are meant to include all members of the putative Class.

230.     The Plaintiffs are current or former residents and/or current property owners in the Bethpage area.

231.     Plaintiffs were personally exposed and continue to be exposed to hazardous and toxic substances, contaminants, and pollutants from the above-mentioned sites via ingestion, inhalation, and or/dermal contact, during normal day activities such as walking in the neighborhood, gardening and doing yard work, playing in their yards, as well as living in their homes.

232.     In addition to being exposed to Defendants' Contaminants at their homes, many of the Plaintiffs were exposed while engaging in various activities in the neighborhood, attending local schools and businesses, using water from the local providers, and inhaling Site-related air emissions.

233.     The contamination and polluting events at the Site have not been stabilized or eliminated. For Plaintiffs who continue to reside within the areas impacted by the Contaminants, many of the toxic exposures are continuing in nature.

234.     The hazardous and toxic substances that Plaintiffs were exposed to are environmental contaminants as set out in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual.

235.     Plaintiffs are an 'exposed population' as defined in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual as follows:

A population is considered exposed if a completed exposure pathway, which links a contaminant with a receptor population, exists in the past, present, or future. An exposed population includes persons who ingest, inhale, or contact site contaminants or are exposed to radiation in the past, present, or future. Examples of exposed persons include those who:

*• have ingested, are ingesting, or will ingest the contaminant from one or more environmental media;*

33

*• have inhaled, are inhaling, or will inhale the contaminant from one or more environmental media;*
*• have contacted, are contacting, or will contact the contaminant in one or more environmental media; and*
*• were exposed, are exposed, or will be exposed to gamma radiation from one or more environmental media.*

*If an environmental medium (soil) contains a contaminant of concern at a point of exposure (a residential yard), and evidence already exists that a route of exposure (ingestion) has occurred, is occurring, or will occur, the health assessor should assume that persons living at that residence are exposed or will be exposed. If the residential yard contains a vacant house, the health assessor should assume that future residents will be exposed. Persons should also be considered exposed if exposure has been verified by human biologic measurements or medical examination. For health assessments, human biologic measurements or medical examination are not necessary for the assignment of an exposure category to a population.*

236.   Those Plaintiffs who own real property in areas affected by Defendants' Contaminants have, due to the acts of the Defendants, suffered and continue to suffer stigma damages and injury due to the creation of an unfair, competitive disadvantage by way of diminution of property value as compared with similarly situated unaffected real property.

237.   In addition to compensation for the diminution in the economic value of their real property, Plaintiffs seek residential soil and air space testing and monitoring; cleanup, removal and remediation of any and all contamination of Plaintiffs' properties including the costs of investigation and testing of properties; repairs to real property damaged by Defendants; other damages; and attorneys' fees and costs as allowed by law, and any other compensation this court deems just.

Fear of Cancer

238.   Due to the negligent and/or intentional acts of each of the Defendants, Plaintiffs have suffered and continue to suffer from damage to the air, drinking water and groundwater, surface and subsurface soils and soil vapor on and around the Site, and Plaintiffs' homes.

239.    Each and every Plaintiff has a justifiable and actual fear of developing cancer as a result of said exposure. With reasonable probability, the prospective, feared, and anticipated consequences may be expected to flow from the past harm.

240.    The degree of probability that Plaintiffs will develop cancers is such that there is a reasonable certainty that such cancers will develop at some future date, thus entitling Plaintiffs to recover from Defendants for apprehended consequences that are not presently manifested.

241.    A rational basis exists between Plaintiffs' exposure to the above-described toxins and contaminants, and Plaintiffs' currently manifested fear of developing cancer in the future.

242.    To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants into the soil and groundwater, thereby entering and injuring Plaintiffs' physical and mental well-being, their real and personal property, and their economic interests, Defendants are jointly and severally liable for all damages from contamination in this case, their physical and mental well-being, their real and personal property, and their economic interests.

243.    In order to compensate Plaintiffs for damages suffered due to Defendants' acts, each Plaintiff requires, among other things, that Defendants pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to ascertain and treat the nature and extent of the injuries suffered due to the contamination emanated from the plume, with Plaintiffs retaining freedom of choice relative to choosing their experts. Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

## CLASS REPRESENTATIVES

244.    **Plaintiff Rosalie Romano** currently resides at 68 Sherman Avenue, Bethpage, New York ("property"). She has resided there since approximately 1997.

35

245.   Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

246.   As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

247.   This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

248.   As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

249.   In or around 2007, Rosalie Romano was diagnosed with breast cancer.

250.   As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

251.   In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

252.   **Plaintiff Patricia Glueckert** currently resides at 3 Kay Avenue, Bethpage, New York ("property"). She has resided there since approximately 1980.

253.   Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

254.   Patricia Glueckert's late husband, William G. Glueckert, lived at the property at 3 Kay Avenue for approximately third-seven (37) years.

255.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

256.     Mr. and Mrs. Glueckert were exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

257.     Mr. Glueckert was diagnosed with brain cancer and passed away from his injury on April 8, 2016.

258.     Patricia Glueckert, on behalf of the Estate of William G. Glueckert, brings this claim for wrongful death of her husband, caused by the Defendants.

259.     In addition, Patricia Glueckert, individually, has sustained a loss of companionship, services and support as a result of Defendants' actions, which resulted in the death of her husband, William G. Glueckert.

260.     In addition, Patricia Glueckert has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

261.     **Plaintiff William P. Glueckert** currently resides at 10 Langdon Rd., Farmingdale, New York. From 1984 to 2014, this Plaintiff resided at 3 Kay Avenue, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

262.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants

**Deleted:** <#>On November 1, 2016, William P. Glueckert filed a Notice of Claim against Defendant Town of Oyster Bay pursuant to general Municipal Law (GML) Section 50-e for the injuries alleged herein. On September 18, 2017, Patricia Glueckert, individually and as representative of the estate of William G. Glueckert filed a Notice of Claim against Defendant Town of Oyster Bay. On December 21, 2017, Defendant Town of Oyster Bay conducted a hearing pursuant to GML 50-h of William P. Glueckert and of Patricia Glueckert on January 12, 2018.¶

**Deleted:** <#>area

**Deleted:** <#>their home, the Glueckerts have developed significant debilitating personal injuries, as well as damage to their personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, the Glueckerts have suffered and continue to suffer severe physical injury, pain, and suffering. Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents

**Deleted:** <#>but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride. The Glueckerts bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial

**Formatted:** Condensed by 0.15 pt

**Moved (insertion) [11]**

**Deleted:** Plaintiff Jayne Mann currently resides in Bethpage, NY. Jayne Mann has lived at 40 Martin Road S. in Bethpage, New York, for a total of approximately nineteen (19) years. Jayne Mann owns

**Deleted:** at 40 Martin Road S., and the property located on/or adjacent to

**Deleted:** OU-1/OU-2/OU-3 plume. Ms. Mann regularly visited the Bethpage Community Park, spent time in the yard and ingested, inhaled and had

**Moved (insertion) [12]**

**Formatted:** Left, Indent: First line: 0.5", Tab stops: 0.5", List tab

**Deleted:** Subsequently, Ms. Mann

**Deleted:** breast

**Deleted:** .

**Deleted:** <#>On September 18, 2017, Ms. Mann filed a Notice of Claim against Defendant Town of Oyster Bay pursuant to general Municipal Law (GML) Section 50-e for the injuries alleged herein. On December 6, 2017, Defendant Town of Oyster Bay conducted a hearing pursuant to GML 50-h of Ms. Mann.¶
As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding her home, Ms. Mann has developed significant debilitating personal injuries, as well as damage to her personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Ms. Mann has suffered and continues to suffer severe physical injury, pain, and suffering. ...

**Formatted:** Font: Bold

**Deleted:** Denise Florio

**Deleted:** in Bethpage, NY. Denise Florio has lived at 15 N. Robert Damn St. in

**Deleted:** , for a total of approximately fourteen (14) years. Denise Florio owns the property

were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

263.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

264.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

265.    In or around 2013, William P. Glueckert was diagnosed with brain cancer.

266.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

267.    **Plaintiff Jayne Mann** currently resides at 40 Martin Road South, Bethpage, New York ("property"). She has resided there since approximately 1997.

268.    Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

269.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

270.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

271.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

38

**Deleted:** 15 N. Robert Damn St., and the property located on/or adjacent to the OU-1/OU-2/OU-3 plume. Ms. Florio regularly visited the Bethpage Community Park, spent time in the yard and ingested, inhaled and had

**Deleted:** Subsequently, Ms. Florio

**Deleted:** breast

**Deleted:**

**Formatted:** Left, Indent: First line:  0.5", Tab stops:  0.5", List tab

**Deleted:** <#>On November 1, 2016, Ms. Florio filed a Notice of Claim against Defendant Town of Oyster Bay pursuant to general Municipal Law (GML) Section 50-e for the injuries alleged herein. On December 15, 2017, Defendant Town of Oyster Bay conducted a hearing pursuant to GML 50-h of Ms. Florio.¶

**Deleted:** area

**Deleted:** her home, Ms. Florio

**Deleted:** developed

**Deleted:** , as well as damage to her personal property.

272. In or around 2006, Jayne Mann was diagnosed with breast cancer and an ovarian cyst.

273. In or around June 2020, Jayne Mann was diagnosed with thyroid cancer.

274. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

275. In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

276. **Plaintiff Ross Meadow** currently resides at 8 Hoover Lane, Bethpage, New York ("property"). He has resided there since approximately 1978.

277. Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

278. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

279. This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

280. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

281. In or around 2002, Ross Meadow was diagnosed with prostate cancer.

282. Ross Meadow also suffers from multiple sclerosis, high blood pressure and arthritis.

283. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

284. In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

285. **Plaintiff Arlene Meadow** currently resides at 8 Hoover Lane, Bethpage, New York ("property"). She has resided there since approximately 1978.

286. Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

287. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

288. This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

289. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

290. In or around 2016, Arlene Meadow was diagnosed with depression.

291. Arlene Meadow also suffers from diabetes and high blood pressure.

292. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

**Formatted:** Left, Indent: First line: 0.5", Tab stops: 0.5", List tab

**Deleted:** area surrounding their home, the Meadows have developed significant debilitating personal injuries, as well as damage to their personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, the Meadows have suffered and continue to suffer severe physical injury, pain, and suffering. Results of

**Deleted:** sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents

**Deleted:** but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride. The Meadows bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial

**Formatted:** Condensed by 0.15 pt

**Deleted:** <#>Plaintiffs Jacob Kholodny and Bella Kholodny currently reside in Bethpage, NY. Upon information and belief, Jacob Kholodny and Bella Kholodny have lived at 7 Ceil Place in Bethpage, New York at all relevant times herein. Jacob Kholodny and Bella Kholodny own the property at 7 Ceil Place, and the property located on/or adjacent to the OU-1/OU-2/OU-3 plume. The Kholodnys regularly visited the Bethpage Community Park, spent time in the yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials. Subsequently, Jacob Kholodny was diagnosed with a brain tumor and Bella Kholodny was diagnosed with breast cancer. ¶
On November 1, 2016, Jacob and Bella Kholodny filed a Notice of Claim against Defendant Town of Oyster Bay pursuant to general Municipal Law (GML) Section 50-e for the injuries alleged herein. On December 4, 2017, Defendant Town of Oyster Bay conducted a hearing pursuant to GML 50-h of Jacob and Bella Kholodny.¶
As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the area surrounding their home, Jacob Kholodny and Bella Kholodny have developed significant debilitating personal injuries, as well as damage to their personal property. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Jacob Kholodny and Bella Kholodny have suffered and continue to suffer severe physical injury, pain, and suffering. Results of soil sampling taken in March 2016 revealed elevated levels of toxic contaminants and industrial solvents, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride. Jacob Kholodny and Bella Kholodny bring suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial.¶
Plaintiff Flo Raucci currently resides in Bethpage, NY. Flo Raucci has lived at 19 Virginia Lane in Bethpage, New York, for a total of approximately forty-five (45) years. Flo Raucci owns the property at 19 Virginia Lane, and the property located on/or adjacent to the OU-1/OU-2/OU-3 plume. Mrs. Raucci's late husband Salvatore Raucci lived at the property at 19 Virginia Lane for approximately forty-three (43) years. The Rauccis regularly visited the Bethpage Community Park, spent time in their yard and ingested, inhaled and had direct dermal contact with surface and subsurface soil and materials. Subsequently, Salvatore Raucci was diagnosed with Non-Hodgkin's lymphoma and passed away on December 30, 2015 as a result of his exposure at 19 Virginia Lane. ¶
On November 1, 2016, Flo Raucci, individually and as representative of the estate of Salvatore Raucci filed a Notice of ...

293.     In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

294.     **Plaintiff Jacob Kholodny** currently resides at 7 Ceil Place, Bethpage, New York ("property"). He has resided there since approximately 1986.

295.     Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

296.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

297.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

298.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

299.     In or around 2008, Jacob Kholodny was diagnosed with kidney cancer.

300.     In or around 2020, Jacob Kholodny underwent testicular surgery.  He was also hospitalized for pneumonia and heart complications in 2020-2021.

301.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

302.     In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

303.    **Plaintiff Bella Kholodny** currently resides at currently resides at 7 Ceil Place, Bethpage, New York ("property"). She has resided there since approximately 1986.

304.    Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

305.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

306.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

307.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

308.    In or around 2010 and 2015, Bella Kholodny was diagnosed with breast cancer.

309.    In or around 2013, Bella Kholodny was diagnosed with basal cell cancer in the nose.

310.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

311.    In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

312.    **Plaintiff Flo Raucci** currently resides at 19 Virginia Lane, Bethpage, New York ("property"). She has resided there since approximately 1971.

313.    Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

---

**Moved up [11]:** Mr.

**Deleted:** on/or adjacent to the OU-1/OU-2/OU-3 plume.

**Deleted:** Pastolero and Ms. Spicer visited

**Deleted:** Bethpage Community Park, visited

**Deleted:** Bethpage Community Park, spent time in their yard

**Deleted:** ingested, inhaled

**Deleted:** had

**Deleted:** Subsequently,

**Moved up [12]:** Mr.

**Deleted:** Pastolero was diagnosed with melanoma and Ms. Spicer

**Deleted:**

314. Flo Raucci's late husband, Salvatore Raucci, lived at the property at 19 Virginia Lane Bethpage, New York for approximately forty-three (43) years.

315. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

316. Mr. and Mr. Raucci were exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

317. Salvatore Raucci was diagnosed with Non-Hodgkin's lymphoma and passed away on December 30, 2015.

318. Flo Raucci, on behalf of the Estate of Salvatore Raucci, brings this claim for wrongful death of her husband, caused by the Defendants.

319. In addition, Flo Raucci, individually, has sustained a loss of companionship, services and support as a result of Defendants' actions, which resulted in the death of her husband, Salvatore Raucci.

320. As a result of the toxic exposures described above, Flo Raucci has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

321. In or around 2021, Flo Raucci was diagnosed with diverticulosis.

322. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

323. In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

324. **Plaintiff Daniel Gallante** currently resides at 17 Keats Court, Bethpage, New York ("property"). He has resided there from 1964 to 1994 and from 2008 to the present.

325. Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

326. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

327. This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

328. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

329. In or around 1998, Daniel Gallante was diagnosed with non-Hodgkin's lymphoma.

330. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

331. In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

332. **Plaintiff Jennifer Gallante** currently resides at 17 Keats Court, Bethpage, New York. She has resided there since approximately 2008.

333. This Plaintiff was born in Bethpage and has lived in the area most of her life at various addresses, including 28 Linden Avenue, 194 Hicksville Road, 359 Central Avenue and 51 Crescent Drive, Old Bethpage.

44

334.     All of the above properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

335.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site,  Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residences at the above properties.

336.     This Plaintiff was exposed to the Contaminants at the above properties, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

337.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

338.     In or around 2017, Jennifer Gallante was diagnosed with depression and anxiety.

339.     In or around 2017, Jennifer Gallante was diagnosed with melanoma.

340.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

341.     **Plaintiff Teresa Meade** currently resides at  53 West Main Street, Apt. 7, Norfolk, New York.

342.     From 1961 to 1974, this Plaintiff resided at 1130 Stewart Avenue, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

343.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

344.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

345.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

346.    In or around 2016, Teresa Meade was diagnosed with Parkinson's disease.

347.    Teresa Meade also suffers from asthma and heart disease.

348.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

349.    **Plaintiff Donald Lagomarsino** currently resides at 77 Meredith Lane, Barnstead, New Hampshire.  From 1964 through 2015, this Plaintiff resided at 207 N. 2d Street, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

350.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

351.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

352.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

353.    In or around 1998, Donald Lagomarsino was diagnosed with colon cancer.

354.    In 2011, Donald Lagomarsino was diagnosed with coronary artery disease.

46

Deleted: Christopher Cagna currently resides in Newburgh, NY. For all times relevant herein, Christopher Cagna lived at 37 Grant Avenue in Bethpage, New York for thirty-four (34) years. The property at 37 Grant Avenue is located on/or adjacent

Deleted: OU-1/OU-2/OU-3 plume. Mr. Cagna regularly visited

Deleted: Bethpage Community Park, spent time in

Deleted: yards

Deleted: ingested, inhaled and had

Deleted: Subsequently, Mr. Cagna

Deleted: thyroid abnormalities and suffered

Formatted: Left, Indent: First line:  0.5", Tab stops:  0.5", List tab

Deleted: a

Deleted: attack

Deleted: <#>On November 8, 2017, Mr. Cagna filed a Notice of Claim against Defendant Town of Oyster Bay pursuant to general Municipal Law (GML) Section 50-e for the injuries alleged herein. On March 26, 2018, Defendant Town of Oyster Bay conducted a hearing pursuant to GML 50-h of Mr. Cagna.¶

Formatted: Left, Indent: First line:  0.5", Tab stops:  0.5", List tab

Deleted: hazardous substances into the area surrounding her home, Mr. Cagna has developed significant debilitating personal injuries. As a result of Defendants' reckless, negligent, and grossly negligent conduct, Mr. Cagna has suffered and continues to suffer severe physical injury, pain, and suffering. Mr. Cagna brings suit against each Defendant named herein for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants' actions, consequential damages, and exemplary or punitive damages as allowed by law and in an amount to be proved at trial

Formatted: Condensed by  0.15 pt

Deleted: Jackie Lieberman currently resides in Huntington, NY. For all times relevant herein, Jackie Lieberman lived at 15 Romscho Street in Bethpage, New York for ten (10) years and 14 Simone Court for nine (9) years (collectively the "Liberman Properties"). The Liberman Properties are located on/or adjacent

Deleted: OU-1/OU-2/OU-3 plume. Ms. Lieberman regularly visited

Deleted: Bethpage Community Park, spent time in

Deleted: yards, and ingested, inhaled and had

Deleted: Subsequently, Ms. Lieberman

Formatted: Left, Indent: First line:  0.5", Tab stops:  0.5", List tab

Deleted: Non-Hodgkin's lymphoma.

Deleted: <#>On December 20, 2017, Ms. Lieberman filed a Notice of Claim against Defendant Town of Oyster Bay pursuant to general Municipal Law (GML) Section 50-e for the injuries alleged herein. On April 5, 2018, Defendant Town of Oyster Bay conducted a hearing pursuant to GML 50-h of Ms. Lieberman.¶

355.     Donald Lagomarsino also suffers from neurological problems and a nervous system disorder.

356.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

357.     **Plaintiff Scott Rust** currently resides at 6 Larry Road, Selden, New York.

358.     From 1963 through 1993, this Plaintiff resided at 101 Harrison Avenue, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

359.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

360.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

361.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

362.     In or around 2004, Scott Rust was diagnosed with rectal cancer.

363.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

364.     **Plaintiff Laurie Franks** currently resides at 32 Columbia Street, Bethpage, New York. She owns the above property and has resided there since approximately 1984.

365.     From approximately 1978 through 1984, Plaintiff resided at 164 Harrison Avenue, Bethpage, New York.

366.    Both of the above properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

367.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site,  Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residences in Bethpage.

368.    This Plaintiff was exposed to the Contaminants at the above properties, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

369.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

370.    In or around 2014, Laurie Franks was diagnosed with basal cell carcinoma, with a recurrence in 2018.

371.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

372.    In addition, Plaintiff has and continues to incur property damage due to the contamination of the property at 32 Columbia Street and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

373.    **Plaintiff Thomas Nucci** currently resides at 5021 Lagan Ct., Southport, North Carolina. From 1984 through 2012, this Plaintiff resided at 20 Gates Avenue, Plainview, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

48

374. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

375. This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

376. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

377. In or around 2019, Thomas Nucci was diagnosed with neuropathy.

378. In or around 2001 Thomas Nucci was diagnosed with melanoma.

379. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

380. **Plaintiff Christopher Blades** currently resides at 9 Beverly Road, Bethpage, New York. He owns the above property and has resided there since approximately 2004.

381. From 1975 through 2004, this Plaintiff resided at 95 Sycamore Avenue, Bethpage, New York.

382. Both of the above properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

383. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residences in Bethpage.

384. This Plaintiff was exposed to the Contaminants at the above properties, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

385. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

386. In or around 1989, Christopher Blades was diagnosed with asthma.

387. In or around the late 1980s or early 1990s, Christopher Blades was diagnosed with basal cell carcinoma. In 2018, he was treated for a possible reoccurrence of the cancer.

388. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

389. In addition, Plaintiff has and continues to incur property damage due to the contamination of the property at 9 Beverly Road and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

390. **Plaintiff Dawn Cirino-Sambade** currently resides at 990 Tyrus Ct., Merrick, New York. From 1974 to 2001, she resided at 240 10th Street, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

391. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

392.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

393.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

394.    In or around 2006, Dawn Cirino-Sambade was diagnosed with Hashimoto's disease.

395.    In or around 2018, Dawn Cirino-Sambade was diagnosed with dermatomyositis.

396.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

397.    **Plaintiff Mary Ellen Ginty** currently resides at 110 South 6th Street, Bethpage, New York ("property").  She has resided there since approximately 1975.

398.    Plaintiff owns the above property, which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

399.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

400.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

401.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

402.    In or around 1998, Mary Ellen Ginty was diagnosed with ulcerative colitis and hypothyroidism.

51

403.     In 2018, Mary Ellen Ginty was diagnosed with a breast cyst.

404.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

405.     In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

406.     **Plaintiff John Schlosser**, currently resides at 32 Pinetree Drive, Shirley, New York.

407.     From 1974 to 1985, he resided at 121 S. 2d Street, Bethpage. From 1985 to 1987, he resided at 4 Albergo Court, Bethpage, New York. Both of these properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

408.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

409.     This Plaintiff was exposed to the Contaminants at the properties in Bethpage, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

410.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

411.     In or around 2019, John Schlosser was diagnosed with oral cancer.

412.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

## ADDITIONAL PLAINTIFFS WITH INDIVIDUAL CLAIMS

413.     **Plaintiff Denise Florio** currently resides at 78 Sarah Court, Amityville, New York. From 2004 to 2020, Plaintiff resided at 15 N. Robert Damm Street,  Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

414.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

415.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

416.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

417.     In or around 2011, Denise Florio was diagnosed with breast cancer.

418.     In or around 2018, Denise Florio was diagnosed with liver and pancreatic cysts.

419.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

420.     Plaintiff **Maryann Herbert** currently resides at 105 Round Swamp Road, Old Bethpage, New York.

421.     Maryann Herbert resided at 71 Maple Avenue in Bethpage, New York from  1975 to 1982; 20 Linden Avenue in Bethpage, NY from 1982 until 1985; 389 Broadway Avenue in Bethpage, New York from 2001 until 2008; and 26 Meade Avenue in Bethpage, NY from 2008 until 2015 (collectively the "properties").

53

422.    The properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

423.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residences at the above properties.

424.    This Plaintiff was exposed to the Contaminants at the properties, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

425.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

426.    In or around 2007, Maryann Herbert was diagnosed with colon cancer.

427.    In or around 2008, Maryann Herbert was diagnosed with neuropathy.

428.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

429.    **Plaintiff Christina Andrews-Sales** currently resides at 156 Cedar Street, Amityville, New York.

430.    Christina Andrews-Sales resided at 497 Farm Ranch Road in Bethpage, New York from 1990 to 2010 ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

431.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

54

432.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

433.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

434.    In or around 2017, Christina Andrews-Sales was diagnosed with thyroid cancer.

435.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

436.    **Plaintiff Christopher Cagna** currently resides at 1409 Harvester Circle, Myrtle Beach, South Carolina.

437.    From 1972 to 2004, Christopher Cagna resided at 37 Grant Avenue in Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

438.    As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

439.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

440.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

441.    In or around 2010, Christopher Cagna was diagnosed with reproductive problems.

55

442.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

443.     **Plaintiff Jackie Lieberman** currently resides at 32 Artisan Avenue, Huntington, New York.

444.     From 1987 to 1997, Jackie Lieberman resided at 15 Romscho Street in Bethpage, New York and from 1997 to 2006, she resided at 14 Simone Court, Bethpage, New York ("properties")

445.     The properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

446.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residences at the properties.

447.     This Plaintiff was exposed to the Contaminants at the properties, , the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

448.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

449.     In or around 2014, Jackie Lieberman was diagnosed with non-Hodgkin's lymphoma, and liver and spleen tumors.

450.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

451.     **Plaintiff Catherine Lewonka** currently resides at 820 Gates Street, Easton, PA.

452.     From 1956 to 1984, Catherine Lewonka resided at 2 Cambridge Avenue, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

453.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

454.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

455.     As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

456.     In or around 2003, Catherine Lewonka was diagnosed with thyroid cancer.

457.     In or around 2008, Catherine Lewonka was diagnosed with tachycardia.

458.     Catherine Lewonka also suffered from adenomyosis.

459.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

460.     **Plaintiff Eugene Connolly** currently resides at 1965 Blossom Hill Road, Easton, PA.

461.     From 1958 to 2005, this Plaintiff resided at 4 Kilmer Street in Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

462.     As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants

57

were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

463.　This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

464.　As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

465.　In or around 2002, Eugene Connolly was diagnosed with bladder cancer.

466.　As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

467.　**Plaintiff Viviane Blickensderfer** currently resides at 4223 Cartnal Avenue, Tampa, FL.

468.　From 1970 to 1995**,** Viviane Blickensderfer resided at 66 Farmers Avenue, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

469.　As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

470.　This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

471.　As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

58

472. In or around 1995, Viviane Blickensderfer was diagnosed with kidney and bladder problems.

473. Viviane Blickensderfer also suffers from tachycardia.

474. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

475. **Plaintiff Dana Blickensderfer** currently resides at 4223 Cartnal Avenue, Tampa, FL.

476. From 1988 to 1995, Dana Blickensderfer resided at 66 Farmers Avenue, Bethpage, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

477. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

478. This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

479. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

480. Dana Blickensderfer was born in 1988 with a birth defect, which required open heart surgery and other surgical procedures.

481. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

482. **Plaintiff Glenn Falino** currently resides at 415 Avalon Court Drive, Melville, New York.

483. From 1984 to 2019, Glen Falino resided at 2 Beryl Lane in Farmingdale, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

484. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

485. This Plaintiff was exposed to the Contaminants at the property, the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

486. As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

487. In or around 2017, Glen Falino was diagnosed with esophageal cancer.

488. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

489. **Plaintiff Marcia Falino** currently resides at 2 Beryl Lane in Farmingdale, New York ("property"), which is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site. She has lived there since 1984.

490. As a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

491.    This Plaintiff was exposed to the Contaminants at the property, , the neighborhood, and other areas at or near the Site, through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials.

492.    As a result of the toxic exposures described above, this Plaintiff has a high risk of developing significant debilitating personal injuries caused by the Contaminants.

493.    In or around 2000, Marcia Falino was diagnosed with migraines and dizziness.

494.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain and suffering.

495.    In addition, Plaintiff has and continues to incur property damage due to the contamination of the property and the surrounding area with Site-related Contaminants and the resulting diminution of value and stigma associated with the Site and the nearby communities.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION: NEGLIGENCE

496.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

497.    Negligence may exist both as an omission as well as an affirmative act. A cause sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.

498.    Here, the Defendants Northrop Grumman Corporation and Northrop Grumman Systems Corporation, as owners and operators of business(es) at the Site that managed, stored, used and disposed of toxic contaminants and solvents, owed Plaintiffs a cognizable duty to exercise reasonable care in the storage, transportation, and disposal of toxic chemicals including but not limited to the Contaminants , and in the maintenance of their tools and equipment used for such acts.

499.     Defendants breached their duty of reasonable care which a reasonably prudent person should use under the circumstances by causing and/or allowing and/or failing to prevent the releases of Contaminants into the air, soil and groundwater in and around the Site and the surrounding neighborhoods, where they caused toxic exposure to Plaintiffs and the contamination of their homes.

500.     The releases of the Contaminants into the soil and groundwater is the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

501.     Upon learning of the releases of the Contaminants, Defendants owed Plaintiffs and the putative Class a duty to timely notify Plaintiffs that these had occurred in the vicinity of Defendants' operations at the Site.

502.     Defendants breached that duty by failing to timely notify the Plaintiffs of the releases of Contaminants at the Site, and, consequently, in the vicinity of Plaintiffs' homes, schools, and businesses.

503.     As a result of Defendants' breaches of their duty to warn the Plaintiffs of the releases of the Contaminants and the potential dangers and harms that could result, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

504.     Upon learning of the release of the Contaminants, Defendants further had a duty to the Plaintiffs to act reasonably to remediate, contain, and eliminate the resulting contamination before it injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs' property.

62

Deleted: <#>Defendant Town of Oyster Bay is the current owner and operator of the land that comprises the current Bethpage Community Park where the groundwater, containing volatile organic compounds (VOCs) is migrating deep into portions of the aquifer, moving into the soil vapor (air spaces within the soil) of Plaintiffs and the putative Class, affecting the indoor air quality and causing the injuries described of herein.¶

Formatted: Condensed by 0.15 pt

Formatted: Left, Indent: First line: 0.5"

Deleted: <#>negligently storing, transporting, disposing of, or otherwise causing the release into the ground toxic chemicals, including but not limited to volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE") and its breakdown products, perchlorate, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride, and negligently permitting their release into the soil and groundwater in and around the Site and in the vicinity of Plaintiffs' and the putative Class' real property.

Formatted: Indent: First line: 0.5"

Deleted: release

Deleted: and the putative Class

Deleted: release

Deleted: contaminants

Formatted: Condensed by 0.15 pt

Deleted: and the putative Class that the aforementioned spills

Deleted: had occurred

Deleted: and the putative Class

Deleted: spills

Deleted: the contaminants

Deleted: and the putative Class ' homes and rental properties

Deleted: timely notify

Deleted: and the putative Class, the Plaintiffs and the putative Class were forestalled from undertaking effective and immediate remedial measures and Plaintiffs and the putative Class have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.¶
Upon learning

Deleted: release of the contaminants, Defendants owed Plaintiffs and the putative Class a duty to warn of the release of the contaminants and the dangers to the Plaintiffs and the putative Class, their property, and neighboring properties that resulted therefrom.¶
Defendants breached this duty by failing to adequately warn the Plaintiffs and the putative Class of the release of the contaminants and the potential dangers and harms that could result.¶
As a result of Defendants' breaches of their duty to warn the Plaintiffs and the putative Class of the release of the contaminants

Deleted: and the putative Class upon learning of the release of the contaminants

Deleted: spill

Deleted: Plaintiffs

505.     Defendants breached that duty by failing to act reasonably to remediate, contain, and eliminate the contamination before it injured Plaintiffs and their property and/or act reasonably to minimize the damage to Plaintiffs' property.

506.     As a result of Defendants' breaches of their duty to Plaintiffs by failing to act reasonably to remediate, contain, and eliminate the releases of the Contaminants and resulting contamination, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

507.     Defendants had a duty to the Plaintiffs and the putative Class to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the releases of the Contaminants into the environment surrounding their facilities and the surrounding neighborhoods, including the Plaintiffs' homes, schools, and businesses.

508.     As a result of Defendants' breaches of their duty to Plaintiffs and the putative Class by failing to ensure that their refining and storage facilities were safe and sufficiently secure as to prevent the releases of the Contaminants into the environment surrounding their facilities, Defendants are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

509.     Defendants had a legal duty to properly remediate the contamination from their activities at the Site and had full knowledge of the extent of the contamination and the threat it poses to human health and safety.

510.     Defendants willfully and wantonly breached their legal duty to properly remediate the contamination despite full knowledge of the extent of the contamination and the threat it poses to human health and safety.

511.    As a result of Defendants' breaches of their legal duty to properly remediate the contamination, despite full knowledge of the extent of the contamination and the threat it poses to human health and safety., they are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well being and to their properties and the adjacent properties.

512.    Each and every one of these Plaintiffs suffered foreseeable injuries and damages as a proximate result of said Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiffs, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs to be protected against such actions or inactions.

513.    Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of their properties and such value if the harm had not been done, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial. Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

**AS AND FOR A SECOND CAUSE OF ACTION:**
**ABNORMALLY DANGEROUS ACTIVITY**

514.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

515.    Activities such as the disposal of hazardous chemical wastes as is the case herein constitutes an abnormally dangerous activity for which strict liability will apply.

516. Defendants' aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, transporting, disposing of, or otherwise handling toxic substances, including the Contaminants, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

517. Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to be released into the surrounding air, land and groundwater, and in doing so, failed to warn Plaintiffs of the dangerous condition that was caused thereby.

518. The risks posed by such activities outweigh any value associated with the same. As the result of said ultra-hazardous and abnormally dangerous activities, Plaintiffs have suffered damages and imminent, substantial and impending harm to their health, families, and home values. Plaintiffs and the putative Class have expended or will be forced to expend significant resources to address their injuries caused by the contamination indefinitely for years and decades into the future.

519. By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by Plaintiffs.

520. Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs to their original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injuries to persons, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct in an amount to be proved at trial.

65

521.    In addition, Plaintiffs who have sustained personal injuries seek damages in a sufficient amount to compensate them for the injuries and losses sustained, including but not limited physical pain and suffering, physical disabilities, mental anguish, loss of the enjoyment of life's pleasures, inability to participate in Plaintiffs' usual employment and activities, lost income and lost earning opportunities, medical expenses (past and future), economic loss, loss of companionship, services and support and other damages which are the natural and proximate result of Defendants' conduct.

522.    Upon information and belief such amount exceeds the jurisdictional amount of the lower courts.

## AS AND FOR A THIRD CAUSE OF ACTION: <u>NUISANCE</u>

523.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

524.    Under a cause of action for private nuisance, Parties may be subject to liability for environmental contamination if their conduct invades another's private use and enjoyment of land and if such invasion is: 1) intentional and unreasonable; 2) negligent or reckless; or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities.

525.    Defendant Northrop Grumman Corporation and its predecessors owned and continue to own, occupied and continue to occupy, and controlled and continue to control the real property at the Site.

526.    Defendants owned, occupied, controlled and/or still own, occupy and control their real property in such a way as to create and/or maintain and continue a dangerous and/or hazardous condition.

527. At all times mentioned herein, Defendants had knowledge and/or notice of the dangerous condition that the Contaminants in the air, soil and the toxic groundwater plumes presented and failed to take reasonable acts to cleanup, correct, or remediate that condition.

528. Additionally, Defendants owed a duty to Plaintiffs to take reasonable action to eliminate, correct, or remedy any dangerous condition existing on Defendants' property that was reasonably foreseeable to injure Plaintiffs and/or Plaintiffs' real property, and of which they had knowledge and/or notice.

529. Further, Defendants owed a duty to Plaintiffs to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Defendants have breached these duties, and each of them, by negligently, willfully, and/or wantonly creating a dangerous condition on their property by allowing massive quantities toxic Contaminants to be spilled, disposed of, or otherwise released into the air, ground, soil, groundwater and/or aquifer on their property. This dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and their property due to the size and nature of the releases of the Contaminants and the proximity of Plaintiffs and their properties.

530. Defendants owed a duty to Plaintiffs and the putative Class to exercise reasonable care to keep the dangerous Contaminants and their byproducts from being discharged or allowed to escape, enter surrounding properties, and cause injury and damage.

531. Defendants breached their duty to Plaintiffs by failing to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Specifically, Defendants negligently, willfully, and/or wantonly allowed massive

**Deleted:** contaminants

**Deleted:** plume

**Deleted:** and the putative Class

**Formatted:** Not Expanded by / Condensed by

**Deleted:** the putative Class and

**Deleted:** and the putative Class'

**Formatted:** Not Expanded by / Condensed by

**Deleted:** and the putative Class

**Deleted:** contaminants

**Formatted:** Not Expanded by / Condensed by

**Deleted:** the putative Class and

**Deleted:** contaminants

**Deleted:** and the putative Class

**Formatted:** Condensed by 0.15 pt

quantities of Contaminants to be disposed of, or otherwise released into the ground, soil, groundwater and/or aquifer at the Site.

532.     Defendants further breached their duty to Plaintiffs and the putative Class by failing to exercise reasonable care and by maintaining their property in such a condition as to allow and fail to prevent large and unknown quantities of the Contaminants to degrade, mix with other chemicals, and escape from their property and enter onto and under Plaintiffs' property. The above-described breaches endangered, injured, and damaged the neighboring premises and occupants. Such a dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and their property.

533.     Defendants also breached their duty by continuing and maintaining this dangerous condition at the Site that was reasonably foreseeable to injure Plaintiffs and/or their real property.

534.     Plaintiffs have suffered foreseeable injury and damages proximately caused by the negligent creation and/or maintenance of the dangerous condition by Defendants.

535.     Defendants owed a duty to Plaintiffs to refrain from creating and/or maintaining a dangerous condition on Defendants' properties that was reasonably foreseeable to injure Plaintiffs and and/or their real property.

536.     Defendants breached that duty by causing dangerous Contaminants to be released onto Plaintiffs' and the putative Class' land and caused noxious gases, fumes and odors to emanate from their soil and homes.

537.     Accordingly, this breach has caused Plaintiffs injury to their persons and property that is certain, substantial, and this resulting condition interferes with Plaintiffs' physical comfort.

538.     Furthermore, as the new State mandated Amended ROD requires installing 24 groundwater extraction wells, five treatment plants, four recharge basins and approximately 24 miles of conveyance piping to contain and treat the contamination, those Plaintiffs who currently

reside in or near the affected neighborhoods, will suffer the additional nuisance, loss of value, disturbance and damages caused by the above work.

539.     Plaintiffs seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained, and to restore Plaintiffs to their original position, including, but not limited to consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, and all other direct and consequential damages flowing from the nuisance. Upon information and belief, such amount exceeds the jurisdictional amount of all lower courts.

<div align="center">

**AS AND FOR A FOURTH CAUSE OF ACTION:**
**TRESPASS**

</div>

540.     Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

541.     Environmental contamination of a property constitutes a trespass as it interferes with the conditions of the property. This act of trespass is, in and of itself, objectionable.

542.     Upon information and belief, Defendants had exclusive control over the Sites at all relevant times.

543.     Upon information and belief Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an uncontrolled quantity of Contaminants to be spilled, disposed of, or otherwise released into the air, ground, soil, groundwater, and aquifer at the Site.

544.     Upon information and belief, the contaminants spilled, disposed of, or otherwise released into the air, ground, soil, groundwater, and aquifer at the Site entered and trespassed upon the land and realty of the Plaintiffs and the putative Class, thus interfering with the condition of

Plaintiffs' and the putative Class' properties and the neighboring properties, causing an injury to their possession and/or right of possession.

545.    Upon information and belief, Defendants took affirmative, voluntary, and intentional actions to store, use, and transport in an unsafe manner and/or intentionally to dispose of the contaminants into the ground.

546.    Upon information and belief, at the time that the above described affirmative, voluntary, and intentional acts were performed, Defendants had good reason to know or expect that the large quantities of contaminants would pass through the air, soil, groundwater, and aquifer from Defendants' land to the land of Plaintiffs and the neighboring properties.

547.    Upon information and belief, the above-described affirmative, voluntary, and intentional acts were performed with the willful intent to cause the Contaminants to be disbursed through the air, soil, groundwater, and aquifer without regard for the inevitable transport onto the land and property of Plaintiffs and the neighboring properties.

548.    Defendants' actions in disposing of uncontrolled amounts of the Contaminants into the air, soil and groundwater were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

549.    These voluntary actions resulted in the immediate and continued trespass of the Contaminants on the Plaintiffs' properties, thus interfering with the condition of Plaintiffs' and neighboring property, causing injury and damage to Plaintiffs, their property and their right of possession of their property.

550.    Additionally, and/or alternatively, Defendants' decision to delay and the resulting delay in taking any affirmative action to eliminate, correct, and/or remedy the contamination of the soil, groundwater, and aquifer on their properties after having knowledge and notice of said

contamination were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

551. Further, Defendants' actions were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were made with actual malice and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

552. These actions resulted in the trespass of the Contaminants on the Plaintiffs' properties, thus interfering with the condition of Plaintiffs' property, causing injury and damage to Plaintiffs, their property and their right of possession of their property.

553. Furthermore, as the State mandated Amended ROD requires installing 24 groundwater extraction wells, five treatment plants, four recharge basins and approximately 24 miles of conveyance piping to contain and treat the contamination, those Plaintiffs who currently reside in or near the affected neighborhoods, will suffer the additional nuisance, loss of value, disturbance and damages caused by the above work.

554. Based upon the above, seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and to restore Plaintiffs and the putative Class to their original position, including, but not limited to, consequential damages for medical monitoring, the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, injury to persons, consequential damages flowing from the trespass which are the natural and proximate result of Defendants conduct, and exemplary or punitive damages.

## CLASS ACTION ALLEGATIONS

555.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed subclasses and seek to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, subject to amendment and additional discovery as follows:

a.      all current and former residents of the Bethpage area who have been exposed to the Contaminants discharged by Defendants, whether through the air, dust, soil, groundwater, drinking water, soil vapor or any other means of exposure, for a period of one year or more , to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins (the "Medical Monitoring Class");

b.      all current owners of real property in the Bethpage area, which has been impacted by Defendants' Contaminants in the air, dust, soil, groundwater, drinking water, soil vapor or any other environmental medium for damages due to the diminution of value due to the known or perceived contamination in the area, and/or stigmatization of property (the "Property Damage Class");

c.      The following Plaintiffs seek to represent the proposed Medical Monitoring Class: Mary Ellen Ginty, Christopher Blades, Laurie Franks, Daniel Gallante, Jennifer Gallante, Bella Kholodny, Jacob Kholodny, Ross Meadow, Arlene Meadow, Flo Raucci, William P. Glueckert, Donald Lagomarsino, Scott Rust, Thomas Nucci, Theresa Meade, Dawn Cirino-Sambade, and John Schlosser. All proposed Medical Monitoring Class Representatives suffered exposure to the Contaminants and are at high risk of developing significant personal injuries caused by the Contaminants. Therefore, the proposed Class Representatives are members of the Medical Monitoring Class and will adequately represent the proposed class.

d.      The following Plaintiffs seek to represent the proposed Property Damage Class: Mary Ellen Ginty, Christopher Blades, Laurie Franks, Daniel Gallante, Bella Kholodny, Jacob Kholodny, Ross Meadow, Arlene Meadow, Flo Raucci, Rosalie Romano, Patricia Glueckert, and Jayne Mann. All proposed Property Damage Class Representatives currently own contaminated property located in the vicinity of the Site and/or the contaminated groundwater plumes and suffer diminution of property value and the associated stigma. Therefore, the proposed Class Representatives are members of the Property Damage Class and will adequately represent the proposed class.

e.      Plaintiffs are members of all Classes they seek to represent.

556.    Excluded from the Class are:

a.      Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

b.       the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family; and

c.       all governmental entities.

557.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded, divided into additional subclasses, or modified in any other way.

### NUMEROSITY AND ASCERTAINABILITY

558.     The Classes are so numerous that joinder of all members is impracticable, given that the amount of affected property owner residents in Bethpage, upon information and belief, has reached the thousands. While the exact number of class members is not yet known, a more precise number can be ascertained from U.S. Federal Census records, State of New York, Nassau County, the affected water districts and local municipal public records, and through other discovery. Finally, Class members can be notified of the pendency of this action by Court-approved notice methods.

### PREDOMINANCE OF COMMON ISSUES

559.     There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

a)       whether Defendants engaged in the conduct alleged herein;

b)       whether Defendants knew or should have known that exposure to the Contaminants and solvents used at the Site could increase health risks;

c)       the extent to which Defendants knew about the contamination described of herein;

d)       whether the manner in which Defendants disposed of the Contaminants proximately caused the injuries described of herein;

e)      whether Defendants made unlawful and misleading representations or material omissions with respect to the health impacts of the Contaminants;

f)      for the Property Value Class, whether property values in the areas affected by the Contaminants declined in value following the disclosure of the contamination described of herein; and

g)      whether Plaintiffs and Class Members are entitled to damages and other monetary relief, including punitive damages, and if so, in what amount.

<u>**TYPICALITY**</u>

560.    Plaintiffs' claims are typical of the claims of class members, and arise from the same course of conduct by Defendants. Plaintiffs' persons and real property, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred damages and losses related to the contamination migrating from the Site, causing personal injury and property damages. Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiffs seek is typical of the relief sought for absent Class Members.

<u>**ADEQUACY OF REPRESENTATION**</u>

561.    Plaintiffs will serve as fair and adequate class representatives as their interests, as well as the interests of their counsel, do not conflict with the interest of other members of the class they seek to represent. Further, Plaintiffs have retained counsel competent and experienced in class action litigation.

562.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.

**SUPERIORITY**

563.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Further, no unusual difficulties are likely to be encountered in the management of this class action. Given the great number of current and former residents of the Bethpage area impacted by Defendants' conduct, it is impracticable for Plaintiffs and the Class to individually litigate their respective claims for Defendants' complained of conduct. To do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

**DAMAGES SOUGHT BY THE CLASS**

564.    Plaintiffs and the Class re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

565.    Plaintiffs and the Class were and continue to be exposed to elevated and hazardous levels of Contaminants through inhalation, ingestion, and dermal contact with contaminated media, as described above.

566.    Plaintiffs and the Property Damage Class have sustained and will continue to sustain damages to their property as a result of Defendants' actions. In particular, Plaintiffs and the Property Damage Class seek (i) monetary damages reflecting the cost to remediate class members' property of the contamination caused by Defendants' conduct or, in the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages for the diminution of the value of the plaintiffs'

75

property, and (iv) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

567.    Plaintiffs and the Medical Monitoring Class also seek consequential damages sufficient to fund a medical monitoring program[10] that is reasonably tailored to the exposure risks of the Contaminants.

568.    As cancer risk from multiple agents is additive, the cumulative cancer risk posed by multiple contaminants is consequently greater that the risk posed by any single contaminant.

569.    Defendants' past and continued negligent acts and omissions in operating and maintain the Site are the proximate cause of higher than normal, in fact, excessive exposure, to the Contaminants.

570.    The resulting exposure has significantly increased the risk of Plaintiffs and the Class contracting serious latent diseases, including but not limited to cancer, autoimmune diseases, respiratory and reproductive illnesses, cardiac and central nervous system illnesses and other serious health conditions.

571.    Each and every one of the Plaintiffs and Class Members will incur future expenses for medical monitoring and, as a result, seek payment of their related medical expenses as an element of the consequential damages.

572.    In order to compensate Plaintiffs and the Class for damages suffered due to Defendants' acts, each and every Plaintiff and Class Member requires, among other things, that Defendants collectively pay the past and future costs of obtaining necessary medical care, toxicological examinations and diagnoses, and any other medical monitoring necessary in order to

---

[10] Medical Monitoring is not being sought as in independent cause of action but, rather, as consequential damages in connection with the personal injury and property claims sought herein as is appropriate. *See Ivory v. Int'l Bus. Machines Corp.*, 983 N.Y.S.2d 110 (2014), *leave to appeal denied*, 11 N.E.3d 204 (2014).

76

**Deleted:** Subclasses

**Deleted:** contaminants emanating from Defendants' property, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

**Deleted:** Defendants

**Deleted:** excessive exposure, to hazardous substances and contaminants, including but not limited to VOCs and industrial solvents such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, 2-hexanone, and carbon tetrachloride.

**Deleted:** lung, skin, breast, bladder, liver, kidney and prostate

**Deleted:** permanent intellectual

**Deleted:** behavioral effects on child development, effects on the

**Deleted:** , respiratory,

**Deleted:** diseases and

**Deleted:** these

ascertain and treat the nature and extent of the injuries suffered due to the contamination emanating from the Site and throughout the surrounding residential neighborhoods.

573.    As part of the medical monitoring program, Plaintiffs and the Class should retain their freedom of choice relative to choosing their experts and medical providers.

574.    Many of these costs would not be covered by health care insurers, and if covered, may unfairly result in increased premiums.

575.    Each and every one of these Plaintiffs' and Class Members' increased susceptibility to certain injuries and the irreparable threat to their future health and well-being resulting from their exposure to the Contaminants can only be mitigated and/or addressed by the creation of a medical program (the "Grumman Contamination Health Monitoring Program") including but not limited to:

a.    Establishing a program that provides education and outreach on the existence and availability of the services established under the medical monitoring program, including but not limited to the establishment of a public Website with information about the Grumman Contamination Health Monitoring Program, meetings with potentially eligible populations, development and dissemination of outreach materials informing current and former Bethpage area residents about the program, and the establishment of phone information services;

b.    Funding further studies of the long-term effects of exposure;

c.    Funding medical surveillance for those individuals exposed to the Contaminants described of herein.;

d.    Funding research into possible cures for the detrimental effects of breathing, living and working in the Bethpage area as a result of the acts and omissions alleged here;

77

Deleted: emanated

Deleted: plume, with

Deleted: retaining

Deleted: .

Formatted: Indent: First line:  0.5"

Deleted: hazardous substances and chemicals in and around their homes and businesses in

Deleted: Bethpage area

Deleted: Bethpage

Deleted: Bethpage

Deleted: contaminants described of herein, including by not limited to VOCs such as trichloroethylene ("TCE") and its breakdown products, 2-butanone, tetrachloroethylene ("PERC"), 1,1,1-trichloroethane, and carbon tetrachloride.

Deleted: near the contaminants and toxicants present

e.  Gathering and forwarding to each and every one of these Plaintiffs' and Class Members' treating physicians' information related to the diagnosis and treatment of injuries which result from their exposure(s) to the Contaminants in and around the Bethpage area;

f.  Aiding in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of each and every one of these Plaintiffs and the Class.

576.  Prescribed monitoring procedures exist that makes the early detection of these diseases possible.

577.  The monitoring procedures or regimes are different from normally recommended procedures that would be used in the absence of the exposure.

578.  The prescribed medical surveillance is reasonably necessary according to contemporary scientific principals for persons such as Plaintiffs and the Class who have been exposed and continue to be exposed to excessive levels of the referenced hazardous chemicals and materials.

579.  Plaintiffs and the Class will suffer irreparable harm if the requested medical monitoring program is not implemented because they are in danger of suffering catastrophic latent diseases as a result of their prolonged exposure to toxic and hazardous substances caused by Defendants' negligence.

580.  Detection of these diseases and early treatment is medically reasonable and necessary to prevent progression and further injuries.

581.  It is also medically reasonable and necessary to collect data and coordinate study efforts for persons exposed to such substances in order to effectively treat Plaintiffs and the Class.

582.  Establishment of a medical monitoring program for the Plaintiffs and the Class is essential as a consequential damage from their exposure to the contaminants because without the requested medical monitoring programs, they will be subjected to further injuries and delayed treatment.

78

583.     Plaintiffs and the Class request that the Court appoint a plan administrator, require the Defendants to fund the medical monitoring plan, and reserve jurisdiction to enforce the terms and conditions of the plan.

584.     Accordingly, Plaintiffs and the Class are entitled to a medical monitoring program which provides for medical testing, surveillance, monitoring, and study of the Plaintiffs and the Class for conditions caused by exposure to the references substances, as well as payment of their attorney's fees and expenses, and any other relief this court deems just and proper.

## **PUNITIVE DAMAGES**

585.     Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

586.     Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing property damage, nuisances, and trespasses upon Plaintiffs' properties, disregarding the property rights of Plaintiffs.

587.     Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to:

a.  Issuing no warning to Plaintiffs concerning the releases of Contaminants   at the Site and their impacts on the environment;

b.  Knowing but failing to disclose to Plaintiffs and the Class the certainty of long-lasting air, soil and water contamination caused by the Contaminants; and

c.  Defendants' blatant disregard for the safety of the public when they failed to appropriately remediate the contamination after the Contaminants were detected.

588. Defendants have caused great harm to Plaintiffs' health and real property and demonstrated an outrageous conscious disregard for Plaintiffs' safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants NORTHRUP GRUMMAN CORPORATION, NORTHRUP GRUMMAN SYSTEMS CORPORATION for each and every cause of action alleged herein, granting Plaintiffs:

a. compensatory damages, including all past, current and future costs and expenses associated with their injuries and damages, together with the costs and disbursements of this action, and state that the amounts sought herein exceed the jurisdictional limits of all lower courts which would otherwise have jurisdiction;

b. the establishment of a fully funded medical monitoring program, as described above;

c. exemplary or punitive damages in an amount to be determined at trial.

d. the costs of this lawsuit, including but not limited to attorneys' fees and expert costs.

e. such other, further, and different relief as the Court may deem appropriate and just.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims asserted in this Verified Third Amended Complaint.

Dated: Melville, New York
June 8, 2021

Respectfully submitted,

NAPOLI SHKOLNIK

**Formatted:** Indent: First line: 0.5", Tab stops: 0.5", List

**Deleted:** Class Members'

**Deleted:** water supplies and

**Deleted:** and Class Members'

**Deleted:** and the Class

**Deleted:** , and TOWN OF OYSTER BAY as follows

**Formatted:** Font: Not Bold

**Deleted:** <#>As and for the First Cause of Action sounding in negligence, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in the amount no less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00).¶
As and for the Second Cause of Action sounding in strict liability, Plaintiffs and the Class seek general damages from Defendants NORTHRUP GRUMMAN CORPORATION, NORTHRUP GRUMMAN SYSTEMS CORPORATION, in an amount to be determined at trial, directly resulting from their injuries in a sufficient amount to compensate them for the injuries and losses sustained and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and consequential damages flowing from the trespass which are the natural and proximate result of Defendants' conduct in the amount no less than ONE HUNDRED MILLION DOLLARS ($100,000,000.00).¶
As and for the Third Cause of Action sounding in nuisance, Plaintiffs and the Class seek general damages from Defendants, in an amount to be determined at trial, directly resulting from the their injuries in a sufficient amount to compensate them for the injuries and losses sustained by Plaintiffs and the Class and to restore Plaintiffs and the Class to their original position, including, but not limited to the difference between the current value of the land and such value if the harm had not been done, the cost of repair or restoration, the value of the use of the continuous trespass, and direct and consequential damages flowing from the nuisance and trespass which are the natural and proximate result of Defendants conduct ...

**Formatted:** Indent: First line: 0.5", No bullets or numbering, Tab stops: Not at 1.5"

**Deleted:** Awarding Plaintiffs

**Formatted:** Centered, Line spacing: single, No bullets or numbering, Pattern: Clear, Tab stops: Not at 1.5"

**Formatted:** Centered

**Deleted:** Dated: May 19, 2021¶
New York, New York ¶
Respectfully submitted, ¶ ...

**Deleted:** Second

**Deleted:** ¶

**Deleted:** , New York

**Deleted:**

**Deleted:** IMBESI LAW P.C.¶
¶
By: /s/ Brittany Weiner¶ ...

By: _____

Lilia Factor

400 Broadhollow Rd.
Melville, NY 11747
Telephone: (212) 397-1000
lfactor@napolilaw.com;

Paul Napoli
Email: pnapoli@nsprlaw.com

ENVIRONMENTAL LITIGATION GROUP, PC
Gregory A. Cade
Greg Anderson
Kevin B. McKie
2160  Highland  Avenue South
Birmingham, AL 35205
Telephone: (205) 328-9200
email:     GregC@elglaw.com;
gary@elglaw.com; kmckie@elglaw.com

*Counsel for Plaintiffs and the Class*

81