# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
    ------------------------------------
    ROSALIE ROMANO et al,
                                          Case #2:16-cv-05760-GRB-ARL
                             Plaintiffs,  United States Courthouse
                                          Central Islip, New York
                       v.                 May 4, 2021
    NORTHROP GRUMMAN CORPORATION et al,   11:15 a.m. Calendar
                             Defendants.
    ------------------------------------

                  FOR CIVIL CAUSE - DISCOVERY HEARING
                BEFORE THE HONORABLE ARLENE R. LINDSAY
                   UNITED STATES MAGISTRATE JUDGE

                    - A P P E A R A N C E S -

     For Plaintiff:            PAUL J. NAPOLI, ESQ.
                               LILIA FACTOR, ESQ.
                               Napoli Shkolnik PLLC
                               400 Broadhollow Road, Suite 305
                               Melville, New York 11747
                               (212) 397-1000; (646) 843-7603 fax

     For Plaintiff:            GARY ANTHONY ANDERSON, ESQ.
                               KEVIN BERNARD MCKIE, ESQ.
                               Environmental Litigation Group P.C.
                               2160 Highland Avenue South
                               Birmingham, Alabama 35205
                               (205) 328-9200

     For Defendant,           KATIE LOUISE VIGGIANI, ESQ.
     Northrop Grumman:        DAVID J. FIOCCOLA, ESQ.
                               JESSICA KAUFMAN, ESQ.
                               Morrison & Foerster LLP
                               250 West 55th Street
                               New York, New York 10019
                               (212) 468-8000; (212) 468-7900 fax

     For Defendant,           MARK A. MILLER, ESQ.
     Northrop Grumman:        Hollingsworth LLP
                               1350 'I' Street N.W.
                               Washington, DC 20005
                               (202) 898-5800; (202) 682-1639 fax

     For Defendant,           PETER F. TAMIGI, ESQ.
     Town of Oyster Bay:      Burns, Russo, Tamigi & Reardon, LLP
                               390 Old Country Road
                               Garden City, New York 11566
                               (516) 712-4000

          (Proceedings recorded by electronic sound recording)
```

1          THE COURT:  Good morning.  Thank you all for agreeing

2     to move up the timing of the conference.  The matter I had on

3     earlier fell through, and I thought, well, let me just give it a

4     shot.  And I appreciate your accommodating that.  So, I'll just

5     review what I have.  For the plaintiffs, I have Mr. Napoli, Ms.

6     Factor.  For ELG, I have Mr. Cade, Mr. Anderson, Mr. McKie.  For

7     Northrop Grumman, I have Mr. Fioccola, Ms. Kaufman, Ms.

8     Viggiani, and Mr. Miller.  And for the Town of Oyster Bay, I

9     have Mr. Tamigi.  Is there anyone else on the phone call that

10    I've missed?

11          (No response.)

12          THE COURT:  Okay.  All right.

13          MR. NAPOLI:  Your Honor, this is Mr. Napoli, Paul

14    Napoli.  Good morning.  Thank you for giving us extra time.  Mr.

15    Cade has not made it on, but we can proceed without him.  I

16    believe he's on a plane and not landing till a little later.

17          THE COURT:  Okay.  And Mr. Anderson, I take it you

18    represent Environmental Litigation Group.  Are you in agreement

19    with that?

20          MR. ANDERSON:  Yes, Your Honor.  We, myself and Mr.

21    McKie, are with the Environmental Litigation Group for the

22    Plaintiff.  We can proceed without Mr. Cade.  He's in transit.

23          THE COURT:  Okay.  All right.  Then let's get on with

24    some of the issues that arose as a result of the pandemic.  Some

25    of which were resolved by Judge Brown, but others which were

1   left open and are the subject matter of this conference.  First,

2   let me just say that I've reviewed the conference notes or

3   minutes, which included the proceedings before Judge Brown.  And

4   I will start with the proposition that I do not agree with the

5   notion that Judge Brown overruled earlier orders of this court,

6   and I also find that he left specific issues of how to implement

7   discovery to this court.  So, against that background, I will go

8   over some of the items that are presented for this conference.

9        One of the things I wanted to start with, and then

10  I'll give you both an opportunity to be heard, are the disputed

11  discovery items with respect to, we'll start with, search terms.

12  It is my opinion that the search terms, which were discussed

13  with Judge Brown, the disputed search terms, to the extent that

14  they've been agreed upon, are not a problem.  But to the extent

15  they are not agreed upon, with the issue being, whether or not

16  limiters should apply, I do believe that I have the authority,

17  notwithstanding the discussion before Judge Brown, to apply

18  limitations to those search terms as I deem appropriate.

19       And so, I understood that there might have been some

20  agreement at one time to limit the search terms, and then there

21  was some walking away from that agreement.  I don't know if

22  that's a fair characterization, but it's suggested by the

23  submissions of counsel.  So, I'll be happy to hear from the

24  plaintiffs first, and then I'll hear from the defendants.

25       MR. NAPOLI:  Your Honor, when we discuss -- actually,

1    let me back up a second.  So, what we have on the immediate

2    horizon when it comes to this case is the class action, or what

3    we consider Phase I.  And so, what we have to show in the class

4    for certification for a medical monitoring claim under Second

5    Circuit and Court of Appeals caselaw in New York, the

6    substantive law, is that we have people who were exposed to a

7    certain level of toxins that would increase their risks of

8    getting an injury, cancer or whatever those diagnoses are.  And

9    so, what we're looking to do in order to prove our case is to

10   under expand what the amount of exposure was over a long period

11   of time that people lived in the Bethpage area and were exposed

12   to air, water, and soil, all of which there have been

13   indications in the environmental inspections and analyses done

14   by government agencies, but also by Grumman themselves that

15   there's been some level of exposure.  So, that is how we're

16   looking at discovery, by saying, what is the exposure?

17          And when you look at exposure, it's one thing to look

18   at the endpoint of what we can see now, what is in the

19   neighborhood now, like what is being removed from the ground,

20   what can be measured now, but that's only a piece of the story.

21   And I like to think of it as an analogy, a baking analogy.  When

22   you have a cake, at the end of having that cake and eating that

23   case, you're going to have a plate with crumbs.  And that's what

24   offsite is.  But what's very important for us, because looking

25   at the plate with crumbs, you can't necessarily tell how much

1 | cake was on the plate and what that cake was made of, so we need

2 | to look --

3 | THE COURT:  Mr. Napoli, your cake analogy is not

4 | working for me.  I don't understand this cake and crumb

5 | business.

6 | MR. NAPOLI:  But if I could just finish one sentence,

7 | Your Honor?  So, what we need to know is what was put in the

8 | oven, what were the ingredients put in the oven at Grumman, what

9 | was released, and what came out of the oven.  What were the

10 | processes, what were the ingredients, what was it that resulted

11 | in the exposure in the community?  So, we need to know that over

12 | time, not only for releases into the ground, dumping PCE into

13 | the soil, or burying barrels of contamination, but also the

14 | processes of baking in the ovens, what they put into the

15 | equipment that released through the stacks in the community that

16 | were there for 50 years, the hexavalent chromium, and the

17 | extent.

18 | And we explained this to Judge Brown, the extent that

19 | we need additional information.  I think Judge Brown understood.

20 | In order to show the levels of exposure required, we need to see

21 | what went into the oven, as well as what came out.  And all that

22 | information is available.  Grumman has that information of what

23 | processes and procedures they did.  And the EPA and other

24 | governmental agencies require them to get permits and keep track

25 | of the chemicals that were on their site, and the emissions on

1   their site.

2          THE COURT:  Mr. Napoli, I hate to interrupt you, but

3   this is not responsive to the question I asked.  The question I

4   asked is with respect to Exhibit F.

5          MR. NAPOLI:  Yes.

6          THE COURT:  This is a listing of disputed terms and

7   there is a suggestion that the limiter be placed on those

8   disputed terms and Bethpage.  You've already identified that

9   you're interested in the Bethpage area.  So, I'm thinking that

10  "and Bethpage" is an appropriate limiter to those items that are

11  listed on the disputed terms.  That's it.

12          MR. NAPOLI:  Okay.  So, Your Honor, two things.  So,

13  when it comes to these search terms, one is, Bethpage is the

14  location of where the Grumman plant was, but it wasn't

15  necessarily the location of where all the contamination went.

16  And there are communities around Bethpage that are affected and

17  are part of our class that make it appropriate to expand it.

18  But when you add "and Bethpage", when you add a limiter to some

19  of these items, we're going to restrict our ability to collect

20  some information that could potentially be relevant.

21          THE COURT:  What are the other communities?

22          MR. NAPOLI:  It's not as if, Your Honor --

23          THE COURT:  Mr. Napoli, what are the other

24  communities?  Because there's going to be a limiter.  So, if you

25  tell me that Bethpage is inadequate because it doesn't cover the

1   communities that you are investigating, and feel should be --

2          MR. NAPOLI:  Sure.

3          THE COURT:  What are those communities?

4          MR. NAPOLI:  So, if you hold on one second, it was in

5   the joint letter, the additional communities, and I can pull it

6   up if I can locate it easily.

7          MS. VIGGIANI:  Your Honor, if I may, in the meantime

8   just speak briefly on this search-term issue.  This is Katie

9   Viggiani --

10          THE COURT:  You have to identify yourself.  Please

11   identify yourself.  I don't know who's speaking right now.  Who

12   is this?

13          MS. VIGGIANI:  Sure, Your Honor.  This is Katie

14   Viggiani from Morrison & Foerster, on behalf Defendant, Northrop

15   Grumman.

16          THE COURT:  Yes.  Go ahead.  To those who speak up,

17   please identify yourself first,  because I don't recognize your

18   voices yet.  Go ahead.

19          MS. VIGGIANI:  Thank you, Your Honor.  Understood.

20   So, just to be clear, a couple of things that have happened

21   since our letter was submitted.  First Northrop Grumman, I hope

22   it's clear from our letter, but we have run the search terms.

23   We've run the search terms that are on Exhibit F.  You're right

24   that there are some disputed terms where we've added this "and

25   Bethpage" limiter.  So, we've done that at this time.  We've run

1    the terms, we've reviewed the documents, and we've made our

2    Phase I document production.  It was, to date, 5.8 million.

3    These are the documents that we have produced.

4         In terms of the limiter, as you can see from Exhibit

5    F, we didn't apply the limiter to all terms.  To the contrary --

6         THE COURT:  You did not?

7         MS. VIGGIANI:  We did not apply the limiter to all

8    terms.  There's a group of terms on Exhibit F that have no

9    limiters.  And that includes all of the chemicals that

10   plaintiffs say are relevant to this case.  So, to the extent

11   that there's a chemical that goes beyond Bethpage and is

12   relevant to this case, and relevant to Phase I's issue,

13   plaintiffs now have those documents.

14        What we did do is apply limiters, a geographic limiter

15   to a small fraction of the search terms.  And as you can see,

16   these are sort of generic terms.  Things like duck, fill, leak.

17   There are abbreviations here like ROD, which stand for record of

18   decision.  And we found when we tested these terms that they

19   were yielding a high volume of false hits.  So, ROD was yielding

20   produce or introduction.  FS was yielding documents containing

21   the word "offset", for instance.

22        So, we talked with plaintiffs about this.  They did

23   agree in theory that there was no reason for any party to be

24   reviewing documents that were not responsive to this case, and

25   so we proposed a limiter.  And our original limiter was "within

1  ten of Bethpage", plaintiff pushed back for "and Bethpage".

2  That's what we applied, that's what we reviewed and produced.

3  And we already know that even applying a limiter to these terms,

4  we had to review and call 10,000 documents that have nothing to

5  do with this case.  And we know that removing the limiter all

6  together would mean that we would need to review another 30,000

7  documents.  And just to put that in perspective, that translates

8  to about a thousand hours of attorney review time.  So, we --

9          THE COURT:  Let me just ask for clarification.

10          MS. VIGGIANI:  Yes.

11          THE COURT:  As I understood what you just said, you

12  produced the materials that are identified as disputed terms.

13  In other words, you did that search with the "and Bethpage"

14  limiter and produced that?

15          MS. VIGGIANI:  That's correct, Your Honor.

16          THE COURT:  Okay.  So, the only question is, is

17  whether or not there's some other community that Mr. Napoli

18  feels would satisfy the area of what he claims are the victims

19  of this superfund or discharge.  So, what are those other

20  communities, Mr. Napoli?

21          MR. NAPOLI:  Yes, it is a superfund, Your Honor.  It

22  is the Town of Oyster Bay, Your Honor.  Which would encompass

23  language.  We have it in the joint letter.  Town of Oyster Bay,

24  Town of Hempstead.  Which would include Levittown, Farmingdale,

25  Plainedge, and Hicksville.

1          THE COURT:  So, wait a minute.  Levittown,

2   Plainedge --

3          MR. NAPOLI:  Levittown, Farmingdale, Plainedge,

4   Hicksville and Plainview should cover it.  And Massapequa, I'm

5   sorry, which is south of where the plume is going.

6          THE COURT:  All right.  So, let me make sure I got it.

7   Levittown, Plainview, Farmingdale, Massapequa, Hicksville.  Did

8   I get those right?

9          MR. NAPOLI:  Yes, Your Honor.

10         THE COURT:  Okay.  And in the town of Oyster Bay?  Any

11  particular sections of Oyster Bay?

12         MR. NAPOLI:  No.  As you know, Your Honor, Bethpage

13  sits in the town of Oyster Bay.  They are a defendant in this

14  lawsuit.

15         THE COURT:  All right.  Let me address Ms. Viggiani.

16  Ms. Viggiani?

17         MS. VIGGIANI:  Yes?

18         THE COURT:  With respect to those limiters, I think

19  that's fair.  Levittown, Plainedge, Farmingdale, Massapequa,

20  Hicksville, and Town of Oyster Bay.  So, with those limiters

21  applied, I think we will have addressed the plaintiff's concern

22  that they get a comprehensive search, that addresses the area

23  that they feel is impacted, and addresses your concern that

24  because the terms are so generic, that it just produces a lot of

25  unnecessary work for the defendants.  So, let's apply those

1  limiters.

2          MR. NAPOLI:  Thank you, Your Honor.

3          MS. VIGGIANI:  Thank you, Your Honor.  I just want to

4  address two points very quickly.  The first is that this case

5  has been pending for the trail, four and a half years ago.  And

6  it's clear from the face of the complaint that the class of

7  plaintiffs alleged consists of Bethpage residence.  So, the "and

8  Bethpage" limiter was thoughtful on our part.  And second, we've

9  been meeting and conferring with plaintiff on these search terms

10  since September.  This is the first time in this letter that

11  they've raised any of these town names.  We have a September 1

12  deadline that Judge Brown set for plaintiffs to move for class

13  certification.  That's a deadline they picked themselves

14  proposed.  We need to move forward.  We've produced 5.8 million

15  pages of documents.  If we need to search these limiters, Your

16  Honor, of course, we'll do it.  But this is the first time we're

17  hearing about it, and it sure seems like plaintiffs are looking

18  to delay their class certification deadline and continue to fish

19  for potentially viable class (inaudible).

20          THE COURT:  Well, I don't subscribe any motive to what

21  the plaintiffs are requesting, other than that as the case goes

22  forward, they're discovering more things that give them concern

23  and expand the scope of this.  But as to the September date,

24  that's fixed.  And so, one of the things we're going to do today

25  is set the schedule, so you can meet that September deadline,

1  which Judge Brown has made clear to me, it will not be moved.

2  So, you folks need to know that that class certification

3  deadline is locked in.  He's very much aware of how long this

4  case has been going on.  So, this is being recorded that you're

5  being put on notice that you're not going to get an extension of

6  that September deadline, so don't expect it.

7              MR. NAPOLI:  If I may, Your Honor.  We did not put the

8  case into a stay for two years.  The defendants did and refused

9  to communicate for two years.  And we've been trying to get this

10  information, Your Honor, forever.  And they have not given it to

11  us.  They gave us millions of pages on Friday.  And what we're

12  doing, Your Honor, just so you're aware, we're playing a

13  guessing game with the defendants.  It's ironic that they're

14  saying we're delaying.  Every time we serve a demand for

15  production of documents, they say we're going to give it to you

16  in a data dump, and they dump it on us, and we have no idea if

17  they've responded to any of the questions and productions.

18              The rule requires that they respond with either the

19  custodian files and the way they're kept, or with a Bates number

20  in response to the production.  We don't have that.  So, all we

21  know is we got two million pages on Friday or whatever last

22  week.  We don't know what they're response to.  They've not

23  complied with giving us any indication of what answers they're

24  objecting to and which ones they're actually responding to in

25  the productions.  So, now we have to sift through two million

1   pages for the next two months to figure out if they responded to

2   our production, and then come back.  You know, they're trying to

3   put us at an unfair advantage.  This is a superfund site.

4            THE COURT:  Mr. Napoli, the schedule is going to be

5   set today.  You were before Judge Brown; you and the defendants

6   agreed to the September date.  I'm just telling you that I --

7            MR. NAPOLI:  I understand, Your Honor, but I did not

8   understand that they would not act in good faith for the last

9   four months, produce stuff at the last minute, not comply with

10  the rule.  If you look at their responses, Your Honor, --

11           THE COURT:  Well, I'm sorry to tell you --

12           MR. NAPOLI:  -- Exhibit H, they did not indicate what

13  Bates ranges respond to our requests.  I think that's something

14  basic that we should be able to get from them.  And I ask that

15  they be directed to amend their responses to tell us what Bates

16  ranges respond to which productions we request.  Because if not,

17  it's going to be two or three months before we can figure out

18  after reviewing two or three million pages of documents what

19  they haven't given us.  And this was their game; wait till the

20  last minute, dump stuff on them, and figure it out.  That's

21  what's going on, and it would be wrong where I'm representing a

22  community not to be able to speak up and to put that on the

23  record and to force them to comply with the rules.  That's all

24  I'm asking, that they comply with the rules and give us the

25  Bates ranges.

1          THE COURT:  All right.

2          MS. VIGGIANI:  Your Honor, Katie Viggiani again.

3          THE COURT:  Yes?

4          MS. VIGGIANI:  Apologies, Your Honor.

5          THE COURT:  Look, I'm only telling you that September

6    is fixed.  That's it.  There's not going to be any adjournment

7    of September unless it's made directly to Judge Brown.

8    Notwithstanding any of the issues that you briefed, Mr. Napoli,

9    you're bound by the same date, unless Judge Brown makes an

10   adjournment to that date, that's the date.  So, now, let's move

11   on to the question of whether or not air emissions are within

12   the bounds of discovery.  I think that issue was decided by

13   Judge Brown, and notwithstanding the argument of the defendant,

14   air emissions are included within the discovery.  You know, I'm

15   not sure exactly what the specific requests were, but to the

16   extent that seems to be an open issue as presented by the

17   submissions, I think it's fair to say that Judge Brown felt that

18   that should be included, however, within the same time limits

19   that have been set by this court.

20         MR. NAPOLI:  So, Your Honor, Exhibit D-4 --

21         MS. VIGGIANI:  Your Honor?  If I may, Your Honor?

22         MR. NAPOLI:  Go ahead, Katie.  Go ahead.

23         MS. VIGGIANI:  Thank you, Paul.  On the air emissions

24   request, Your Honor, we did respond to those.  I'll note that

25   many of the requests rehash many of the same arguments that

1   plaintiffs made way back when we were before Your Honor in 2018

2   and 2019.  You'll recall at that conference that plaintiff

3   sought information relating to merits and liability, onsite

4   issues about what chemicals were used at the site, all things

5   that Your Honor --

6           THE COURT:  Those rulings stand.  Those rulings stand.

7   I'm not revisiting everything that I ordered back in February.

8   That's not going to happen.  There was no overruling of those

9   orders that were done by Judge Brown.  Whatever I decided then,

10  stands.  Except to the extent, and I don't recall  right now

11  whether or not air emissions were part of it, but to the extent

12  that air emissions were addressed by Judge Brown, and it seems

13  to me that he's included it, that's the exception.  So, I want

14  it to be very clear.

15          MS. VIGGIANI:  Absolutely, Your Honor.  We couldn't

16  agree more, Your Honor.  Judge Brown did not specifically rule

17  on the air emissions request, but what I'll say is I don't

18  actually think there is an ongoing dispute on this.  We served

19  our written responses, and as we told plaintiffs, we applied the

20  search terms they proposed about all of the chemicals they said

21  were relevant.  We applied those without a geographic limiter

22  and without regard to any alleged pathway.  So, to the extent

23  there are air emissions documents that we found, and they were

24  relevant to class, we've produced them.  They might have those.

25          We provided them some Bates numbers because they asked

1   when we corresponded with them by email.  And if I may briefly,

2   Your Honor, on the topic of the productions we made, that

3   argument, frankly, is disingenuous.  Plaintiffs are complaining

4   now that they're getting too many documents, yet they're still

5   asking for more.  They set the September 1 deadline.  I know

6   we've discussed that.  I know you've made clear that that

7   deadline will not move.  We don't think that it should.  But

8   plaintiff knew exactly what volume was at issue when they

9   propose that deadline.  They continued to ask for more.  They

10  don't want limiters.  We produced the documents in the exact

11  same manner that we did all along.  We produced two million

12  pages within two weeks of the conference with Judge Brown.  We

13  finalized our production last week before the deadline that we

14  submitted, so we believe that we're done with Northrop Grumman

15  Phase I document production at this point.

16          THE COURT:  All right.  But I do want, to the extent

17  that Mr. Napoli requires, or the plaintiffs require, some

18  clarification as to which documents are responsive to which

19  requests as much as you're able to.  It would be help in

20  delineating that.  And he's right, the rules require that.  That

21  should be done, if it wasn't.  So, I want to move on to the

22  Traveler documents.

23          MR. NAPOLI:  I'm sorry, Your Honor.  I just wanted to

24  say, we don't have any problem with the volume of the documents.

25  It was just that, we just don't know which documents were

1  responsive to which requests.

2         THE COURT:  Okay.  So --

3         MS. VIGGIANI:  And you have rulings on those requests,

4  and you asked us to apply search terms, which we did, and we

5  produced those documents to you.  So, they're responsive to the

6  search terms you proposed, and now you can run those search

7  terms.  I know that you have IT folks because you've been on

8  meet and confers with them, so you have the same ability --

9         THE COURT:  Okay.  Take a little time.  I don't have

10  to be on the phone for that kind of clarification, but to the

11  extent there's some confusion over it, resolve it.  it sounds to

12  me like it's not even an argument about production.  It's not

13  even an argument.  It's what do these documents relate to?  And

14  that should be an easy thing for counsel to figure out and make

15  clear.  So, make sure you take care of that, so plaintiffs

16  understand what the parameters are.  All right.

17         MR. NAPOLI:  Your Honor, just on air emissions before

18  we get to Travelers.  The things that we needed that were not

19  produced that we can tell from our initial searches of what was

20  produced is that we did not get the chemical-use inventory, or

21  the air permit documents.  We know they exists because we've

22  gotten one or two from our subpoenas to the DEC.  But we haven't

23  gotten the full range of the air permit documents, or their

24  chemical-use inventory, those two items.  And we ask that the

25  defendants produced those two items.

1      THE COURT:  Ms. Viggiani?

2      MS. VIGGIANI:  Again, Your Honor, those requests go to

3  onsite issues that are not relevant to Phase I.  We objected to

4  those requests, but we did search the documents without regard

5  to location.  So, I believe some of those documents are included

6  in our production.  Plaintiffs have refused to meet and confer

7  with us on these air emissions requests.  I don't know what else

8  we can do --

9      MR. NAPOLI:  That's not true.

10     MS. VIGGIANI:  -- to try to find these responsive

11 documents.  We've done what we can.  We've applied the search

12 terms.

13     MR. NAPOLI:  Well, Your Honor, this goes to the core

14 then because people --

15     THE COURT:  Mr. Napoli, I'm speaking, okay?

16     MR. NAPOLI:  I'm sorry.  I'm sorry.

17     THE COURT:  You've got to give me a chance.

18     MR. NAPOLI:  I can't see you; I apologize.  I

19 apologize.

20     THE COURT:  All right.  So, Ms. Viggiani, you know

21 whether or not you think it's relevant, I think that Judge Brown

22 has resolved that issue against the defendants.  So, to the

23 extent there are documents regarding chemical emissions

24 inventory, or the air permit documents, I mean you may have

25 already done this based on what you just described, but do it.

1   That to me is a decision that was made by Judge Brown, which has

2   to be enforced.  Travelers documents.  Okay.

3          MR. NAPOLI:  Your Honor, just to clarify one thing,

4   Your Honor?  And if I may proceed?  I'm sorry.  I don't mean to

5   interrupt.

6          THE COURT:  The problem here is, because there's been

7   no meet and confer on this, I'm doing the meet and confer and

8   prefer not to.  So, you can have a conversation with Ms.

9   Viggiani about some other clarification you want, and if you had

10  an issue, there's no agreement, I think I've made the court's

11  position very clear, then you can come back to me.  But I don't

12  want every question you may have, or she may have on what's

13  what, I don't want to spend the time on, because I don't know

14  that you've ever discussed it as required by the rules.

15         MR. NAPOLI:  Of course, Your Honor.  We have met and

16  conferred.  I don't know what Ms. Viggiani is talking about.

17  I've been on the phone at least a dozen times since the last

18  conference with the judge.  And I have even emails between us

19  that we're not getting anywhere; all remaining issues should be

20  brough up in front of judge Lindsay.  And hence, we worked

21  cooperatively to put together the joint status letter on our

22  outstanding issues that could not resolve.  And this was --

23         THE COURT:  Yes.  And that's what I would want.

24         MR. NAPOLI:  Yes, of course.

25         THE COURT:  That's what I want.  Okay.  So, that's

1   what I want.  I know you've discussed it, but on the question of

2   air emissions, it sounds like you have to have a little more

3   discussion on it.  All right.

4           MR. NAPOLI:  So, Your Honor?  And I don't mean to

5   interrupt, but the issue of air emissions and what has held us

6   up is what Ms. Viggiani just said.  There are two things, the

7   temporal, and the location.  She said, well, that was onsite.

8   You know when you talk about chemical inventory and you talk

9   about air emissions, the air stacks are onsite emitting into the

10  community.  So, we keep getting this fine line.  There are no

11  air emissions from offsite to onsite, it's the other way around.

12  So, when we have a blanket statement, nothing onsite, or nothing

13  prior to 1987, the operations, if my memory serves me correctly,

14  of the air emissions ended in the mid-90s.  But the air

15  emissions started in 1940.  And the people who are most

16  vulnerable are the children that were born during that period of

17  time, and the adults who lived there during that period of time.

18  So, if there's just a blanket nothing before '87 and nothing

19  onside, then the defendants hide behind that and then I can't

20  get the materials to give to my experts to meet the deadline for

21  September, which I intend to do.  Even though I'm arguing about

22  not getting all the information, if I don't get it, I want to

23  leave the door open, but I want to get certification done and go

24  to trial as quickly as possible.  I can't wait for the day I

25  have a jury again.

1          THE COURT:  Well, Mr. Napoli, I'm not sure what you're

2     asking for.  Give me a specific question you would put to the

3     defense.  What is it?

4          MR. NAPOLI:  So, I would like the air emissions data

5     from the site, Grumman site, which is onside, from the time of

6     operation, which was in the '50s, whatever they have, to when

7     they ceased in the mid-90s.  And I'm --

8          THE COURT:  That's denied.  That's denied.  We're not

9     going back to the fifties.  All right?  So, give me something

10    more realistic and I'll be happy to consider it.

11         MR. NAPOLI:  So, the sixties.  Because, Your Honor,

12    remember, we're talking about Long Islanders and Bethpage is one

13    of those communities on Long Island where people are born and

14    live most of their lives.  And children that were born there are

15    most vulnerable to hexavalent chromium that came from the air

16    emissions, and I need as early as possible to put together the

17    EPA model, that's what the experts do.  They put together an EPA

18    approved model based upon Grumman's own data to shown what the

19    relevant risk of getting cancer is in that community from air,

20    soil, and water.  Those are the three exposure routes that

21    effected the community.

22         I mean, I grew up on Long Island.  I lived in

23    Brookville, Long Island.  I grew up in Manhasset.  Everybody

24    knew there was this problem in Bethpage, but nobody could

25    pinpoint it.  And what we're discovering now and what news they

1   started finding out a few years ago is that hexavalent chromium

2   was being released into the community with no pollution

3   scrubbing of the material.  And what we learn in Travelers and

4   in the Bethpage case, the Park case is that they were dumping

5   PCBs and PCEs into our aqua first.  And that was ending up in

6   private wells and also public wells.  So, we're putting all the

7   pieces together.

8           THE COURT:  Ms. Viggiani, what is your view?  Ms.

9   Viggiani, what --

10          MS. VIGGIANI:  Well, Your Honor, everything -- I

11  apologize, Your Honor, I didn't mean to interrupt you.

12          THE COURT:  Go ahead.

13          MS. VIGGIANI:  Everything you're hearing from

14  plaintiff's counsel relates to meritorious issues, Your Honor.

15  And this case has been pending for four and a half years.  They

16  served document requests for class discovery back in 2018.  Air

17  emissions were not included in those requests.  So, one of our

18  objections to the request is that they're belated.  So, putting

19  that aside, this is the same issue we litigated back then.

20  They're talking about air emissions, but with respect to what

21  chemicals Northrop Grumman used at the site, how they used them,

22  in what quantities they used, how those materials -- at that

23  point, during those requests, the question was how they got into

24  the ground.  And Your Honor correctly ruled that those issues go

25  to merit.  They go to liability.  They do not go to class issues

1  because class issues deal with whether the plaintiffs in these

2  proposed classes were exposed to any of these chemicals offsite.

3  All we're talking about in terms of the class are offsite

4  exposure.

5          So, this ideal of tying those chemicals back to the

6  site is exactly what we spent all that time litigating back in

7  2018 and 2019.  It doesn't matter that the request now relates

8  to air emissions, and plaintiffs are looking up instead of down,

9  this is the same issue, it's been decided, and Your Honor ruled

10  upon it.

11          THE COURT:  It's just that Judge Brown has included

12  the air emissions, so I'm going to allow discovery of air

13  emissions back to '77.  I'm going to go back ten years.  That's

14  it.  Nothing else.

15          MS. VIGGIANI:  Thank you, Your Honor.

16          THE COURT:  Done.  Travelers documents.

17          MR. NAPOLI:  Yes.

18          THE COURT:  I reviewed the issue with respect to

19  Travelers documents, I'm just going to rule, because I don't

20  think that there is any discussion that can persuade me that the

21  Travelers documents are necessary to identifying the class.

22  They may be relevant to the merits, but they are absolutely

23  irrelevant to identifying the class.  I'm not going to allow

24  discovery on that at this time.  So, we're going to move this

25  case forward so we can get the class certification.  Next?

1          The Bethpage Community Park documents in my opinion in

2    my opinion should be produced.  To the extent that there are

3    matters that relate to Bethpage Community Park, or requests that

4    relate to the park and emissions that might have covered the

5    park, I think it's already included in what we've ordered, but

6    if for whatever reason that was not part of the production, it

7    should be.

8          MS. VIGGIANI:  Your Honor, and it was.  Again, we

9    searched all of the chemicals that plaintiff said were relevant

10   to the case.  So, if there's a document involving a chemical and

11   it deals with the park and it's relevant to class, plaintiffs

12   now have that document.  What Northrop Grumman did not do is

13   search Bethpage Community Park as an independent firm.  And the

14   reason for that is again, we're in Phase 1 class discovery and

15   plaintiffs are not alleging a class of people who visited the

16   park.  The class relates to residents of Bethpage and offsite

17   alleged exposure.

18         THE COURT:  Wouldn't the limiter "and Bethpage" cover

19   Bethpage Community Park?  I mean, it seems to me it would come

20   up anyway.

21         MS. VIGGIANI:  No, Your Honor.  So, we did not search

22   Bethpage Community Park at all.  That's the one term we didn't

23   search as a standalone term.  But again, to the extent that

24   there were chemicals or documents involving the chemicals

25   plaintiff asked us to run and search for, those documents would

1   have been included.  And --

2          THE COURT:  All right.  So, just to be sure, include

3   the search term, Bethpage Community Park.  Okay.  Now, we can

4   move on to setting the schedule.  The schedule that was proposed

5   by the defendants to get this all done in a timely fashion was

6   set forth in their submission.  I mean I'm happy to let you

7   folks confer on it, because I didn't get the plaintiff's

8   position with respect to the schedule, so if you want to have

9   time to discuss or meet and confer on the preferred schedule, I

10  will give you that, but at the end of the day, you've got to

11  work back from the date in September that was set by Judge

12  Brown.  So, take the time.  If you want to do it first, and then

13  submit to me what you're proposing, I'll be happy to enter what

14  you've agreed upon, but I do think it's beneficial for you two

15  to have a discussion on what that schedule should look like.

16         MR. NAPOLI:  I think that --

17         THE COURT:  Unless, Mr. Napoli, you agree to what's

18  been proposed in counsel's submission.

19         MR. NAPOLI:  I do not agree.  I think the meet and

20  confer idea is probably best.

21         THE COURT:  Okay.

22         MR. NAPOLI:  And I can meet and confer with Ms.

23  Viggiani in the next 24 hours.  And then, if we have a dispute,

24  we can maybe submit it to you next week at this time.

25         THE COURT:  Okay.

1           MR. NAPOLI:  My only concern is to understand what we

2     haven't received and review and work in some of the depositions

3     that we're going to have.  And think we'll probably work out a

4     fuller schedule to make sure we cover everything.

5           THE COURT:  Okay.  All right.  In my opinion, I've

6     reviewed the matters that were submitted on the joint status

7     report.  I don't really want to address things that haven't been

8     included in that report, because I like to take the time to

9     think about stuff.  So, I'll let you work on the schedule.  Send

10    that to me.  If you've agreed on it, I'll enter the schedule as

11    agreed.  If you have a problem with the schedule, I'll schedule

12    another conference and we can discuss those issues.  Or I'll

13    simply, based on what you submit, resolve those disputes.

14          MR. NAPOLI:  Thank you.

15          THE COURT:  We're going to get this case moving again.

16          MR. NAPOLI:  Thank you.

17          THE COURT:  Okay.  All right.  I always ask this

18    question, but it always turns out to be a bad one.  Does anyone

19    have anything else?

20          MR. NAPOLI:  Well, Your Honor, just letter 'G' in our

21    submission, we ask for a consolidation and joint filing

22    procedures.  There were two new actions, Cornet and Auer.  And I

23    don't believe they're necessarily consolidated.  And both sides

24    are finding that we have to file the joint status report, which

25    I hope you found was helpful, on all dockets.

1           THE COURT:  It was.

2           MR. NAPOLI:  And we'd like to try to avoid that if

3    possible by just filing in one action.

4           THE COURT:  What's the docket numbers on the ones that

5    you feel are not consolidated?  Just remind me.

6           MR. NAPOLI:  Do you have them handy, Lilia?

7           THE COURT:  I have the Cornet document.  Is it Cornet

8    and Auer?

9           MR. NAPOLI:  Yes.

10          COURTROOM DEPUTY:  I have those dockets.  This is Rob.

11          THE COURT:  Okay.  And, Rob, who's the DJ on those

12   cases?

13          COURTROOM DEPUTY:  I wrote the case names and numbers.

14   Let me check the DJ.  I'm sorry, I don't have that at the

15   moment.  I'll find it in one minute.

16          THE COURT:  Cornet is 18-6453.

17          COURTROOM DEPUTY:  Correct.  Auer is 20-cv-413.

18          THE COURT:  20 or 21?

19          COURTROOM DEPUTY:  I believe it's 20.

20          THE COURT:  Okay.

21          COURTROOM DEPUTY:  It is, but I'll make it 21.  For

22   Cornet, it is Judge Brown as well.

23          THE COURT:  Okay.

24          COURTROOM DEPUTY:  I'm looking for Auer now.

25          MR. NAPOLI:  I think it's Judge Brown as well, if my

1  memory serves me correct.

2              MS. VIGGIANI:  That's correct.

3              THE COURT:  Okay.  So, to the extent that they're

4  already before Judge Brown, then your motion should consolidate

5  all the discovery requests to include 18-6453 and 21-415.

6  That's granted.  We're going to run these cases together as best

7  we can.  And so, if you've been doing separate filings under

8  those cases, there's no longer any need to do that.  And Rob,

9  you can correct me if I'm wrong.  Under our docket system, all

10  of those cases are on the same docket, correct?

11             COURTROOM DEPUTY:  If there is a formal consolidation

12  order, and all the cases are tied together, yes.  You can spread

13  out one docket --

14             THE COURT:  Well, can't you tell by looking at the

15  docket?  Aren't you able to tell by looking at the docket?

16             COURTROOM DEPUTY:  I've got to pull up the lead one to

17  see.  It's certainly not on the Auer matter, which we're

18  discussing.

19             THE COURT:  It's Romano.  The lead one is Romano.

20             COURTROOM DEPUTY:  I'm looking at Romano now to see if

21  it's been done.  It has not been done from what I can see.

22             THE COURT:  All right.  So, let's get ahold of Judge

23  Brown's clerk to get them to add those two to the docket.  Or

24  the clerk's office.

25             COURTROOM DEPUTY:  Yes.

1          THE COURT:  Okay.  All right, we'll take care of that,

2     Mr. Napoli.

3          MR. NAPOLI:  Thank you.  Just two quick things, Your

4     Honor.  I just wanted to say, even though Ms. Viggiani and our

5     office have some professional disagreements, we've been working

6     pretty well together, and very cooperatively.  And I appreciate

7     that from her.  And I just wanted the court to know that, so

8     that you didn't get the impression that we're at loggerheads on

9     issues.

10          THE COURT:  No, I actually think you are working

11     together because, my goodness, this is a very document intensive

12     case, and you've gotten a ton done between you.  And so, the

13     issues that you've presented to the court have been pretty

14     concise, narrow, and indicate that there's been a lot of

15     cooperation, and that you've worked hard on this.  So, I

16     appreciate your statement, but I could see it in the submissions

17     as well.

18          MR. NAPOLI:  And I just wanted to thank you Your Honor

19     too.  I look forward to being in the courthouse in front of you

20     sooner than later.

21          THE COURT:  Well, that's nice.  I'll look forward to

22     it as well.  And for you, Ms. Viggiani, thank you for your

23     cooperation.  All right.  Let's see what we can do about getting

24     that schedule set.  All right?

25          MR. NAPOLI:  Great.  Thank you, Your Honor.

1          MS. VIGGIANI:  Thank you very much, Your Honor.

2          THE COURT:  Everyone, stay well.  Take good care of

3    yourselves, okay?  All right.  Signing off.

4          MR. NAPOLI:  You too.  Thank you.

5          ALL COUNSEL:  Thank you, Your Honor.

6                          - o0o -

7                        CERTIFICATION

8          I, Rochelle V. Grant, approved transcriber, certify

9    that the foregoing is a correct transcript from the official

10   electronic sound recording of the proceedings in this matter,

11   Case 16-cv-05760, held on 5/4/21.

12

13                      May 7, 2021

14                 AA EXPRESS TRANSCRIPTS
                   195 Willoughby Avenue
                   Brooklyn, New York 11205
15                    (888) 456-9716
                aaexpress@court-transcripts.net

16

17

18

19

20

21

22

23

24

25