UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------)
)
ROSALIE ROMANO; PATRICIA GLUECKERT,           )
individually and on behalf of the Estate of WILLIAM G.   )   Case No: 16-cv-5760-GRB-AKT
GLUECKERT; WILLIAM P. GLUECKERT; JAYNE   )
MANN; ROSS MEADOW and ARLENE MEADOW;    )
JACOB KHOLODNY and BELLA KHOLODNY; FLO   )
RAUCCI, individually and on behalf of the Estate of       )
SALVATORE RAUCCI; DANIEL GALLANTE and    )
JENNIFER GALLANTE; TERESA MEADE, DONALD   )
LAGOMARSINO, SCOTT RUST, LAURIE FRANKS,    )
THOMAS NUCCI, CHRISTOPHER BLADES, DAWN    )
CIRINO-SAMBADE, MARY ELLEN GINTY, JOHN     )
SCHLOSSER, individually and on behalf of all others       )
similarly situated; and DENISE FLORIO; MARYANN     )
HERBERT; CHRISTINA ANDREWS-SALES;          )
CHRISTOPHER CAGNA; JACKIE LIEBERMAN;       )
CATHERINE LEWONKA; EUGENE CONNOLLY;        )
VIVIANE BLICKENSDERFER; DANA              )
BLICKENSDERFER; GLENN FALINO and MARCIA    )
FALINO; individually,                        )
)
Plaintiffs,        )
)
vs.                                          )
)
NORTHROP GRUMMAN CORPORATION;              )
NORTHROP GRUMMAN SYSTEMS CORPORATION       )
)
Defendants.        )
----------------------------------------------------------------------)

## PLAINTIFFS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR CLASS CERTIFICATION

TABLE OF CONTENTS

Page

A. INTRODUCTION ......................................................................(1)

B. PLAINTIFFS' PROPOSED CLASSES.........................................(4)

    1. The Medical Monitoring Class ..........................................(4)

    2. Medical Monitoring – Alternate Subclass ...........................(6)

    3. The Property Damage Class...............................................(7)

    4.  Property Damage – Alternate Subclass...............................(7)

C. PLAINTIFFS' PROPOSED CLASS REPRESENTATIVES........................(9)

ARGUMENT ........................................................................ (15)

    I.  All Class Representatives and Class Members have Article...............(15)
        III Standing

        A. The Medical Monitoring Class  ........................................(15)

        B. The Property Damage Class.............................................(18)

    II. With Respect to All Class Requirements, the Plaintiffs have ............(19)
        Established All Requirements of Rule 23(a) by a Preponderance of
        the Evidence

        A. The Implied Ascertainability Requirement.......................(20)

            1. The Medical Monitoring Classes ..................................(21)

            2. The Property Damage Classes ....................................(21)

        B. Rule 23(a)(1) Numerosity ...............................................(22)

        C. Rule 23(a)(2) Common Issues..........................................(23)

            1.  Medical Monitoring Classes ......................................(23)

            2. The Property Damage Classes ....................................(25)

D. Rule 23(a)(3) Typicality...................................................(26)

   1. The Medical Monitoring Classes ...................................(26)

   2. The Property Damage Classes ......................................(26)

E. Rule 23(a)(4) Adequacy of Representation.......................................(27)

III. With Respect to All Classes, the Plaintiffs have Established All
   Requirements of Either Rule 23(b)(2), or Rule 23(b)(3), by a
   Preponderance of the Evidence...............................................(30)

A. The Medical Monitoring Classes Should Be Certified Under
   Rule 23(b)(2)..............................................................(31)

B. The Classes Should Be Certified Under Rule 23(b)(3) ....................(33)

   1. The Property Damage Classes ......................................(33)

   a. Questions of Law, or Fact, Common to the Property Damage Class
   Members Predominate.................................................(33)

      (1) The Negligence Claim...........................................(34)

      (2) The Trespass Claim............................................(39)

      (3) The Abnormally Dangerous Activities Claim......................(42)

      (4) The Private Nuisance Claims ...................................(43)

   2. The Medical Monitoring Classes ...................................(44)

   a. Questions of Law, or Fact, Common to the Medical Monitoring
   Class Members Predominate.........................................(44)

   b. Questions of Law, or Fact, Common to the Medical Monitoring
   - Alternate Class Members Predominate.............................(46)

   3. A Class Action is Vastly Superior to Other Methods to
   Adjudicate the Foregoing Claims...................................(47)

CONCLUSION...................................................................(49)

TABLE OF AUTHORITIES

<u>Cases</u>

*Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325 (1981) ............................(34)

*Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111
(2d Cir. 2000) ....................................................................................................(34)

*Amgen Inc. v. Conn. Ret. Plans &amp; Trust Funds*, 568
U.S. 455 (2013) ..................................................................................................(20)

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................(16, 27)

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955
F.3d 254 (2nd Cir. 2020), vacated and remanded on other
grounds, 141 S. Ct. 1951 (2021) .......................................................................(19)

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52
(2d Cir. 2000) ....................................................................................................(27)

*Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp.
3d 233 (N.D. N.Y. 2017), aff'd in part, 959 F.3d 70 (2d Cir. 2018) .......(35,38,43)

*Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491
(2nd Cir. 2020) ..................................................................................................(45)

*Berni v. Barilla S. P.A.*, 964 F.3d 141 (2nd Cir. 2020) ....................................(31)

*Buck v. Am. Gen. Life Ins. Co.* No. 1:17-cv-13278-NLH-KMW
(D. N.J. 2021) .....................................................................................................(8)

*Burdick v. Tonoga, Inc.*, 179 A.D.3d 53, 112 N.Y.S.3d 342
(N.Y. App. Div. 2019) ...................................................................................(38,48)

*Buckley v. Metro-North Commuter R.R.*, 79 F.3d 1337
(2nd Cir. 1996), rev'd on other grounds, 521 U.S. 424 (1997) ........................(46)

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283
(2nd Cir. 1999), overruled on other grounds by *In re*
*IPO*, 471 F. 3d 24, 42 (2d Cir. 2006)................................................................(28)

*Carlough v. Amchem Prods., Inc.*, 834 F.Supp. 1437
(E.D. Pa. 1993) ..................................................................................................(16)

*Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439,
5 N.E.3d 11 (2013) ................................................................(43,44,46)

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .............................................(19)

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473
(2d Cir. 1995) ................................................................(22)

*Copart Industries, Inc. v. Consolidated Edison Co.*, 41 N.Y.2d
564, 569 (1977) ................................................................(43)

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) .........................(17)

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ......................(27, 28)

*Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 398
N.Y.S.2d 401, 368 N.E.2d 24 (N.Y. 1977) ................................................(42)

*Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*,
405 F.Supp.3d 408 (W.D. N.Y. 2019) .............................................(38)

*General Telephone Co. v. Falcon*, 457 U.S. 147 (1982) .................................(26)

*German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp.
537, 570-71 (S.D.N.Y. 1995).………………………………………..(43)

*In re MTBE Prod Liab*. Litig., 859 F.3d 178 (2d Cir. 2017)…………………..(41)

*In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997,
2018 WL 6573118 (D.N.J. Oct. 30, 2018) ..........................................(8)

*In re Petrobras Securities*, 862 F.3d 250 (2nd Cir. 2017) ...............................(20)

*In re Sunedison, Inc. Sec. Litig.*, 16 md-2743 (PKC) (S.D.
N.Y. 2019) ................................................................(8)

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d
124 (2d Cir. 2001) ................................................................(28)

*Irvin v. Harris*, 944 F.3d 63 (2d Cir. 2019) ......................................(28)

*Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 983
N.Y.S.2d 110 (2014) ................................................................(39, 43)

*Jianmin Jin v. Shanghai Original, Inc.*, 990 F.3d 251
(2nd Cir. 2021) ................................................................(22)

*Langan v. Johnson & Johnson Consumer Cos.,* 897 F.3d 88
(2nd Cir. 2018) ........................................................................(20)

*Leslie v. Medline Indus.,* No. 20-cv-01654 (N.D. Ill.
September 30, 2021) ...............................................................(16)

*Osarczuk v. Associated Univs., Inc.,* 36 A.D.3d 872,
873-78, (2nd Dept. 2007)………………………………………………..(43)

*Prantil v. Arkema Inc.,* 986 F.3d 570 (5th Cir. 2021) .........................(32)

*Quick v. Shell Oil Co. (In re Methyl Tertiary Butyl Ether Prods.
Liab. Litig.),* 241 F.R.D. 435, 437-38 (S.D.N.Y. 2007)......................(43)

*Robidoux v. Celani,* 987 F.2d 931, 937 (2nd Cir. 1993) .....................(8)

*Rolan v. Atl. Richfield Co.,* 2017 WL 3191791
(N.D. Ind. July 26, 2017) .......................................................(16)

*Rowe v. E.I. Dupont De Nemours & Co.,* 262 F.R.D. 451,
454 (D.N.J. 2009)..................................................................(43)

*Scott v. Chipotle Mexican Grill, Inc.,* 954 F.3d 502 (2nd Cir. 2020) ...............(34)

*State of N.Y. v. Prato,* 45 Misc. 3d 722, 731-32 (Sup. Ct. 2014)………………(41)

*Sykes v. Mel S. Harris &; Assocs. LLC,* 780 F.3d 70 (2nd Cir. 2015) ..............(47)

*Town of New Windsor v. Avery Dennison Corp.,* 10-CV-8611,
2012 U.S. Dist. LEXIS 27264 at 46-512012 WL 677971, (S.D.N.Y. 2012)….. (41)

*TransUnion LLC v. Ramirez,* 141 S.Ct. 1540 (2021) ...................................(15,17)

*Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036 (2016) .........................(34,38)

*Walker v. City. of E. Chi.,* 2017 WL 4340259
(N.D. Ind. Sept. 29, 2017) .......................................................(16)

*Wal-Mart Stores v. Dukes,* 564 U.S. 338  (2011) ...........................(19, 23, 32, 34)

*Yi Xiang v. Inovalon Holdings, Inc.,* 2018 WL 4445114
(S.D.N.Y. Sept. 18, 2018) .......................................................(8)

Restatement (Second) of Torts § 839, Comment d (1979) ……………………..(41)

Court Rules

Fed. R. Civ. Pro. 23(a) ...............................................................................(19, 30)

Fed. R. Civ. Pro. 23(a)(1) ...............................................................................(22)

Fed. R. Civ. Pro. 23(a)(2) ...............................................................(23, 25, 26)

Fed. R. Civ. Pro. 23(a)(3) ...............................................................(26, 28)

Fed. R. Civ. Pro. 23(a)(4) ...............................................................(27, 30)

Fed. R. Civ. Pro. 23(b) ...............................................................................(30)

Fed. R. Civ. Pro. 23(b)(2) ...............................................................(30, 31, 32)

Fed. R. Civ. Pro. 23(b)(3) .........................................(30, 31, 33, 34, 38, 47)

Fed. R. Civ. Pro. 23(b)(3)(A)-(D) ...............................................................(47)

Fed. R. Civ. Pro. 23(b)(4) ...............................................................................(33)

Plaintiffs seek certification of the following classes as set forth below:

> (1) A medical monitoring class for residents of the Bethpage area who suffered exposure to hazardous chemicals released from the Northrop Grumman facility; Pls. Ex. 1 showing the proposed class boundary ("Medical Monitoring Class")

> (2) Alternatively, a medical monitoring class for residents of the Bethpage area who currently own property in the area and suffered exposure to hazardous chemicals released from the Northrop Grumman facility; Pls. Ex. 2 showing the proposed class boundary ("Medical Monitoring – Alternate Subclass)

> (3) A property damage class for current property owners for damages due to the diminution of value due to the known or perceived contamination in the area, and/or stigmatization of property; Pls. Ex. 3 showing the proposed class boundary ("Property Damage Class")

> (4) Alternatively, a property damage for current property owners for damages due to the diminution of value due to the known or perceived contamination in the area, and/or stigmatization of property – certification sought on the issue of liability only; Pls. Ex. 3 showing the proposed class boundary ("Property Damage – Alternate Subclass")

A.    <u>INTRODUCTION</u>

For over 60 years, Northrop Grumman Corporation, its subsidiaries, and its predecessors-in-interest (collectively "Grumman") owned and/or operated a number of industrial facilities in Bethpage, New York. These facilities – including a track of land donated to the Town of Oyster Bay in 1962 and converted into the Bethpage Community Park – span approximately 635 acres [hereinafter "the Site"]. Grumman engaged in airplane and satellite manufacturing operations at these facilities. <u>Third Amended Complaint</u> ¶¶ 2-7 [hereinafter "TAC"]; Pls. Ex. 4 (Robertson Rule 26 Report at 8, 10).

During several decades prior to 1994 when it operated the facilities, Grumman "generated, stored, and disposed of toxic contaminants and manufacturing by-products" at the Site. TAC ¶ 7. These toxic contaminants and manufacturing by-products [collectively

referred to as the "Contaminants"] included "volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), metals, polychlorinated biphenyls ("PCBs"), aromatic hydrocarbons, radioactive materials, 1,4-Dioxane, per- and polyfluoroalkyl substances ("PFAS") and waste products." TAC ¶ 7. Grumman also discharged trichloroethylene ("TCE"), hexavalent chromium ("CrVI"), and other toxic substances through the smoke stacks of its manufacturing facilities and through fugitive emissions from the manufacturing plants. TAC ¶¶ 96-97; Pls. Ex. 4 at 10-11; Pls. Ex. 5 (Rosenfeld Rule 26 Report at 25-26).

Grumman's releases of the Contaminants "resulted in extensive pollution at the Site and contaminated off-Site soils, air, groundwater and drinking water supplies in the area…" TAC ¶ 8. The releases "created massive migrating plumes of contaminated ground water" (TAC ¶ 9) "polluted the air in the surrounding area" (TAC ¶ 12), and "caused pollution of soil and soil vapor intrusion" at nearby properties. TAC ¶ 13. In 1983, the New York State Department of Environmental Conservation declared the Site a Superfund site. W. Richard Laton, PhD, the Plaintiffs' hydrogeologist expert, has determined: (1) that there are multiple groundwater plumes extending from the Site which have commingled and moved over four miles to the south of the Site; and (2) that there are many residential properties that lie above the contaminated groundwater plume. Pls. Ex.6 (Laton Rule 26 Report at 13).

The Plaintiffs "are current or former residents and/or current property owners in the Bethpage area." TAC ¶ 230. The Plaintiffs have been exposed to the Contaminants that have migrated off-site "via ingestion, inhalation, and or/dermal contact, during normal day activities such as walking in the neighborhood, gardening and doing yard work, playing in

their yards, as well as living in their homes." TAC ¶ 231. The Plaintiffs have also been exposed "while engaging in various activities in the neighborhood, attending local schools and businesses, using water from the local providers, and inhaling Site-related air emissions." TAC ¶ 232. In addition, the Plaintiffs who are current property owners have suffered additional exposure and property damage by the invasion of their property.

Because many of the Contaminants are carcinogenic, the Class Representative Plaintiffs have a reasonable and actual fear that they will develop cancer and other illnesses as a result of the exposure. TAC ¶ 238-240. The Class Representative Plaintiffs who currently own real property near the Site have also sustained property damages caused by the contamination, including diminution of value of their land caused by the invading groundwater plumes and the stigma of being located near the Site. TAC ¶ 14, 236-37. These damages include the loss of the full market appreciation that would have occurred in the area but for Grumman's contamination of the soil, water, and air in the Bethpage area. Pls. Ex. 7 (Boyle Rule 26 Report).

The Plaintiffs filed this action to recover individual compensatory and punitive damages. In addition, the Class Representative Plaintiffs, on their own behalf and on behalf of other persons similarly situated - and as consequential damages/relief to tort claims - seek injunctive relief in the form of the establishment and funding of a Medical Monitoring Program. The Class Representative Plaintiffs have asserted four counts seeking this relief: Count One (negligence); Count Two (abnormally dangerous activity); Count Three (nuisance); and Count Four (trespass). The Plaintiffs now ask the Court to certify the classes as hereinafter specified. The Class Representative Plaintiffs also seek property damages on their own behalf, and on behalf of other persons similarly situated.

B.        PLAINTIFFS' PROPOSED CLASSES

1.        The Medical Monitoring Class

The Plaintiffs request certification of the following Medical Monitoring Class:

> all current and former residents of the Bethpage Area who have been exposed to the Contaminants discharged by Defendants, whether through the air, dust, soil, groundwater, drinking water, soil vapor or any other means of exposure, for a period of one year or more – to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins

TAC ¶ 555(a).

The "Bethpage Area" for this class is defined as the area within Plaintiffs' Exhibit 1 as prepared by Dr. Paul Rosenfeld. The chemicals of concern ("COC") for purposes of this class are CrVI and TCE. Because "cancer risk posed by historical CrVI exposure was greater than the risk posed by TCE exposure," the boundary "is based on historical CrVI emissions from the Facilities and elevated cancer risk from CrVI exposure." Pls. Ex. 5 at 2. In this regard, the map is based on the "Grumman Base Case" by the Plaintiffs' expert air modeler, Richard Bost P.E. who made reasonable adjustments to emissions reported by Grumman to regulatory authorities. Pls. Ex. 8 (Bost Rule 26 Report). The Base Case was used as it "is the most reasonable scenario to quantify the Facilities' emissions." Pl. Ex. 5, at 3. As Dr. Rosenfeld further has explained:

> The Proposed Class Boundary represents the contiguous geographic area within which a resident's lifetime cancer risk would exceed 3 in a million.

> The Proposed Class Boundary is based on tripling of the *de minimus* acceptable risk of 1 in a million cancer risk as defined by the USEPA and the New York State Department of Environmental Conservation ("NYSDEC") over 1 year of residential exposure.

> [R]esidents that lived closer to the Facilities require fewer years of residential exposure to qualify for the medical monitoring program.

4

The air contaminants historically emitted by the Facilities that impacted the Proposed Class Boundary are a cause for significant health and environmental concerns.

To address these concerns, a medical monitoring protocol that is recommended to be implemented in the community within the Proposed Class Boundary has been prepared by Plaintiff's expert Dr. Tee Guidotti, MD, MPH.

The Proposed Class Boundary is supported by multiple lines of evidence including, but not limited to: air permits prepared by Grumman and submitted to NYSDEC, emissions reported to the USEPA, air dispersion modeling using USEPA's preferred modeling software (AERMOD), historical emissions data, historical operations information, historical aerial photographs, historical chemical use inventories, and source terms emission factors developed by Plaintiff's expert Richard Bost of I2M.

*Id.* at 2-5.

The Class Representatives for this class are: Rosalie Romano, Christopher Blades, Laurie Franks, Bella Kholodny, Jacob Kholodny, Teresa Meade, and John Schlosser. All of the proposed Class Representatives have been diagnosed with diseases that can be caused by exposure to the Contaminants tortiously released by Grumman; and, they contend, *were* caused, or aggravated, by the Contaminants tortiously released by Grumman. The Class Representatives on behalf of the class have asserted tort claims against Grumman, *inter alia*, for negligence, nuisance, and ultrahazardous activity.

As consequential damages relief for these torts, these Class Representative Plaintiffs, on their own behalf and on behalf of the class, seek medical monitoring for lung cancer, kidney cancer/renal cell carcinoma, liver cancer, non-Hodgkin's lymphoma, multiple myeloma, cancer of the head and neck (mouth, nose, nasal sinus, pharynx), breast cancer, asthma, scleroderma (systemic sclerosis) and chronic infertility [hereinafter collectively the "Diseases of Concern"]. Dr. Tee Guidotti, the Plaintiffs' medical expert, opines that, based upon the modeling done by Dr. Rosenfeld of the CrVI and TCE

emissions from the Site, the Class Representatives would have been exposed to a dose of the Contaminants sufficient to cause the diseases of concern and that they are at an increased risk of developing additional diseases. Pls. Ex. 9, at 4-5 (Guidotti Rule 26 Report).

2.   <u>Medical Monitoring – Alternate Subclass</u>

The Plaintiffs alternatively seek certification of the following Medical Monitoring - Alternate Subclass:

> all current owners of residential real property in the Bethpage Area, whose real property has been damaged and reduced in value by the invasion of the contaminated water plumes, and/or the stigma of being located near the Site, and who have been exposed to the Contaminants discharged by Defendants for a period of one year, or more, to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins.

The "Bethpage Area" for this Medical Monitoring - Alternate Subclass is defined as the residential real property within the boundaries of the Groundwater Contamination Map prepared by Dr. Laton and also within the boundaries of the air dispersion modeling done by Dr. Rosenfeld. Pl. Ex. 2. For purposes of this subclass, "reduced in value" includes the loss of the full market appreciation that would have occurred but for Grumman's contamination of the soil, water, and air in the Bethpage area. Pls. Ex. 7.

Plaintiffs Jacob Kholodny, Bella Kholodny, Mary Ellen Ginty, Christopher Blades, Laurie Franks, Rosalie Romano, Patricia Glueckert, Ross Meadow, and Arlene Meadow are the Class Representative for this subclass. Each Class Representative owns real property within the boundaries of the Groundwater Contamination Map; has suffered a diminution in value of that property as a result of Grumman's tortious release of Contaminants; has been exposed to the Contaminants tortiously released by Grumman for

more than one year; and is at an increased risk of developing one of the Diseases of Concern. The medical monitoring requested is sought as consequential relief for the torts of negligence, nuisance, nuisance, and abnormally dangerous activities.

3.      The Property Damage Class

The Plaintiffs request certification of the following Property Damage Class:

> All current owners of residential real property in the Bethpage Area, which has been impacted by Defendants' Contaminants in the air, dust, soil, groundwater, drinking water, soil vapor or any other environmental medium for damages due to the diminution of value due to the known or perceived contamination in the area, and/or stigmatization of property (the "Property Damage Class")

TAC ¶ 555(b).

The "Bethpage Area" for this subclass is defined as the residential real property within the boundaries of the Groundwater Contamination Map prepared by Dr. Laton. Pls. Ex. 3. For purposes of this class, "reduced in value" includes the loss of the full market appreciation that would have occurred but for Grumman's contamination of the soil, water, and air in the Bethpage area.

The class representatives for this class are Mary Ellen Ginty, Christopher Blades, Laurie Franks, Bella Kholodny, Jacob Kholodny, Ross Meadow, Arlene Meadow, Rosalie Romano, and Patricia Glueckert. The Plaintiffs seek certification for this class based on the torts of negligence, nuisance, trespass, and abnormally dangerous activities.

4.      Property Damage – Alternate Subclass

The Plaintiffs alternatively seek certification of a Property Damage – Alternate Subclass. This class is identical to the Property Damage Class, has the same class area, and has the same named Class Representatives. The Plaintiffs, however, seek certification only of the issue of whether Grumman *is liable* to the class for the torts of negligence, nuisance,

7

trespass, and abnormally dangerous activities. Fed. R. Civ. Pro. Rule 23(c)(4) permits a Court to certify subclasses with respect to a particular issue, including liability.

The Medical Monitoring Class and the Property Class are set forth in the TAC. While the proposed Medical Monitoring – Alternate Subclass and the Property Damage – Alternate Subclass are not included in the TAC, Plaintiffs respectfully submit that the Court has full authority to permit the addition of proposed alternate subclasses at this stage of the litigation. "A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani*, 987 F.2d 931, 937 (2nd Cir. 1993). Courts routinely allow plaintiffs to modify class definitions in briefs without going through a formal Rule 15 amendment process. In fact, courts even permit this *where the class definition is changed in a reply brief. Buck v. Am. Gen. Life Ins. Co.* "No. 1:17-cv-13278-NLH-KMW..." (D. N.J. 2021)(" Defendant has not been prejudiced by Plaintiffs' actions in amending their class definitions in their reply brief"); *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *2 n.1 (D.N.J. Oct. 30, 2018) (analyzing class definitions as refined and amended in plaintiffs' reply brief). Moreover, the Court always retains discretion to modify the plaintiff's class definition *sua sponte. E.g., In re Sunedison, Inc. Sec. Litig.*, 329 F.R.D. 124, 134 (S.D.N.Y. 2019)(court divided plaintiff's proposed class definition into two subclasses – "the Court has authority *sua sponte* to modify a proposed class definition." *Yi Xiang v. Inovalon Holdings, Inc.*, 2018 WL 4445114, at *8 (S.D.N.Y. 2018)").

C.      PLAINTIFFS' PROPOSED CLASS REPRESENTATIVES

Plaintiffs propose the following individuals to serve as class representatives as herein stated.[1] Each of them is a member of the classes he/she seeks to represent and is typical of all class members in that class. Each of them requires additional medical monitoring for the Diseases of Concern caused by Grumman's contamination. Those who currently own property within the class area are also entitled to property damages.

**Christopher Blades** owns residential real property located at 9 Beverly Road, Bethpage, within the proposed medical monitoring and property damage class boundary. Blades EBT Transcript (Pl. Ex. 10) at 124, ln. 05, pg. 127, ln. 22. Prior to purchasing his current home, he lived at 95 Sycamore Avenue from 1975 to 2004. *Id.* at 43, ln. 1, pg. 47, ln. 5. Mr. Blades has lived in the community for 43 years and was exposed to the COC. *Id.* Mr. Blades was diagnosed with asthma between 2000-2004, which is linked to exposure to the COC. *Id.* at 155, ln. 1, pg. 159; ln. 22, pg. 170, ln. 11, pg. 174, ln. 22.

Mr. Blades believes his property has lost value because of Grumman's contamination. *Id.* at 215, ln. 13, pg. 218, ln. 22, pg. 260, ln. 1, pg. 263, ln. 22. Mr. Blades' home is located above the contaminated groundwater plume. He believes that both his

---

[1] Plaintiffs withdraw from consideration as class representatives the following individuals previously included in the TAC: William B. Glueckert, Scott Rust, Dawn Cirino-Sambade, Jennifer Gallante, Daniel Gallante, Flo Raucci, Thomas Nucci, Donald Lagomarsino, and Jayne Mann. These plaintiffs expressly reserve all individual claims and causes of action set forth in the complaint. "Courts have generally permitted the addition or substitution of class representatives when there is no showing of prejudice to defendants and such addition or substitution would advance the purposes served by class certification." *In re Initial Pub. Offering Sec. Litig.*, 2008 U.S. Dist. LEXIS 38768, at *8 (S.D.N.Y. 2008).

current property and former property are in highly contaminated areas as a result of Grumman's actions. *Id.* at 238, ln. 1, pg. 240, ln. 11.

Mr. Blades understands the role of a class representative and is willing to serve in that role. *Id.* at 32, ln. 03, pg. 35, ln. 22, pg. 204, ln. 1, pg. 210, ln. 22.

**Laurie Franks** owns residential real property located at 32 Columbia Street, Bethpage, within the proposed medical monitoring and property damage class boundary. Franks EBT Transcript (Pl Ex. 11). She has lived in Bethpage since 1959 (62 years) and was exposed to the COC. *Id.* at 49, ln. 10, pg. 56, ln. 05. She describes herself as having "lived in Grumman's backyard" during its period of operations. Mrs. Franks has been diagnosed with breast cancer, which is linked to exposure to the COC. *Id.* at 28, ln. 7, pg. 32, ln. 6.

Mrs. Franks' home is located above the contaminated groundwater plume. She believes that Grumman's contamination has diminished the value of her property. *Id.* at 178, ln. 5, pg. 186, ln. 1. Mrs. Franks understands the role of a class representative and is willing to serve in that role. *Id.* at 61, ln. 4, pg. 60, ln. 7. Furthermore, she understands the purpose of the proposed classes. *Id.* at 258, ln. 1, pg. 262, ln. 16.

**Mary Ellen Ginty** owns residential real property located at 110 6th South Street, Bethpage, within the proposed medical monitoring and property damage class boundary. Ginty EBT Transcript (Pl. Ex. 12) at 43, ln. 9-19, pg. 55, ln. 2-13. Mrs. Ginty has lived in the community since 1975 and was exposed to COC *Id.* at 50, ln. 4-21.

Mrs. Ginty's home is located above the contaminated groundwater plume. Ms. Ginty believes that her property was contaminated by Grumman and that property values in the area have diminished. *Id.* at 186, ln. 1, pg. 187, ln. 2, pg. 193, ln. 20, pg. 194, ln. 20.

Mrs. Ginty understands the role of a class representative and is willing to serve in that role. *Id.* at 189, ln. 2-22.

**Patricia Glueckert** owns residential property at 3 Kay Avenue, Bethpage, within the proposed medical monitoring and property damage class boundary. P. Glueckert EBT Transcript (Pl. Ex. 13) at 40, ln. 17-20. She has lived in the community for 41 years and was exposed to COC released from the Site. *Id.* pg. 28, ln. 5-17.

She believes her property has lost value because of Grumman's contamination. *Id.* at 76, ln. 6-22. Mrs. Glueckert's home is located above the contaminated groundwater plume. She believes her property is in a highly contaminated area as a result of Grumman's actions. *Id.* Mrs. Glueckert understands the role of a class representative and is willing to serve in that role. *Id.* at 30, ln. 10-22.

**Bella Kholodny** owns residential property at 7 Ceil Place, Bethpage, within the proposed medical monitoring and property damage class boundary. B. Kholodny EBT Transcript (Pl. Ex. 14) at 123, ln. 8-10. She purchased it in 1986. *Id.* Mrs. Kholodny has lived in the community for 35 years and was exposed to the COC released from the Site. *Id.* at 23, ln. 12-14. She has been diagnosed with breast cancer, which is linked to exposure to the COCs. *Id.* at 78, ln. 12-22, pg. 79, ln. 1-10. She believes her exposure was through ingestion, inhalation, and dermal contact with contaminated water, soil, and air. *Id.* at 22, ln. 15-22, pg. 23, ln. 1, pg. 115, ln. 2-8.

Mrs. Kholodny's home is located above the contaminated groundwater plume. She believes her property is in a highly contaminated area as a result of Grumman's actions. *Id.* at 23, ln. 5-22,  pg. 24, ln. 1-9. Mrs. Kholodny believes her property has lost value because of Grumman's contamination. *Id.* at 60, ln. 14-22, pg. 61, ln. 1-8.

Mrs. Kholodny understands the role of a class representative and is willing to serve in that role. *Id.* at 109, ln 105-116.

**Jacob Kholodny** owns property at 7 Ceil Place, Bethpage, within the proposed medical monitoring and property damage class boundary. J. Kholodny EBT Transcript (Pl. Ex. 15) at 65, ln. 7-13. He has lived in the community for 35 years and was exposed to COC released from the Site. *Id.* He has been diagnosed with kidney cancer, which is linked to exposure to the COC. *Id.* at 38, ln. 20-22, pg. 39, ln 1.

Mr. Kholodny's home is located above the contaminated groundwater plume. He believes his property is in a highly contaminated area as a result of Grumman's actions. *Id.* at 49, ln. 4-7. Mr. Kholodny believes his property has lost value because of Grumman's contamination. *Id.* at 77, ln 3-4.

Mr. Kholodny understands the role of a class representative and is willing to serve in that role. *Id.* at 162, ln. 15-22, pg. 163, ln 1-10.

**Teresa Meade** owned residential real property located at 1113 Stewart Avenue, Bethpage, within the proposed medical monitoring class boundary. Meade EBT Transcript (Pl. Ex. 16) at 217, ln. 10-12. Mrs. Meade lived there for 14 years from 1961 to 1975 and was exposed to the COC. *Id.* She has been diagnosed with asthma, which is linked to exposure to the COC. *Id.* at 122, ln. 16. Mrs. Meade understands the role of a class representative and is willing to serve in that role. *Id.* at 123, ln. 13-17, pg.163, ln. 18-22.

**Arlene Meadow** owns residential property at 8 Hoover Place, Bethpage, within the proposed medical monitoring and  property damage class boundary. A. Meadow EBT Transcript, (Pl. Ex. 17) at 38, ln. 17-19. She has lived in the community for 43 years and was exposed to COC released from the Site. *Id.* at 146, ln. 3-5. Mrs. Meadow believes that

she was exposed to contaminants at her home, in the neighborhood, and other areas at or near the site. She believes her exposure was through ingestion, inhalation, and direct dermal exposure from contaminated, air water, and soil. *Id.* at 118, ln. 15-22, pg. 119, ln. 1-3.

Mrs. Meadow believes her property has lost value because of Grumman's contamination. *Id.* at 105, ln 13-22, pg. 106, ln. 1-11. Mrs. Meadow's home is located above the contaminated groundwater plume. She believes that her property is in a highly contaminated area as a result of Grumman's actions. *Id.* at 32, ln. 21-22, pg. 33, ln. 1-9. Mrs. Meadow understands the role of a class representative and is willing to serve in that role. *Id.* at 25, ln. 16-22, pg. 26, ln. 16-20.

**Ross Meadow** owns residential property at 8 Hoover Lane, within the proposed medical monitoring and property damage class bounty. R. Meadow EBT Transcript (Pl. Ex. 18) at 59, ln. 15-22. He believes that he was exposed to contaminants at this property. *Id.* at 79, ln. 9-21. He has lived in the community for 43 years and was exposed to COC released from the Site. *Id.* at 51, ln. 16-17. Mr. Meadow believes he was exposed to contaminants at his home, in the neighborhood, and other areas at or near the site. He believes his exposure was through ingestion, inhalation, and direct dermal contact with surface and subsurface soil and materials. *Id.* at 72, ln. 1-22, pg. 73, ln. 1-7.

Mr. Meadow believes his property has lost value because of Grumman's contamination. *Id.* at 105, ln. 16-22. Mr. Meadow's home is located above contaminated groundwater plume. He believes that his property is in a highly contaminated area as a result of Grumman's actions. *Id.* at 79, ln. 9-21. Mr. Meadow understands the role of a class representative and is willing to serve in that role. *Id.* at 42, ln. 9-17.

**Rosalie Romano** owns residential property at 68 Sherman Avenue, within the proposed medical monitoring and property damage class boundary. Romano EBT Transcript (Pls. Ex. 19) at 285, ln. 16-18. She has lived in the Bethpage area for 45 years and was exposed to the COC released from the Site. *Id.* at 73, ln 13-22, pg. 74, ln. 1-5. She has been diagnosed with breast cancer, which is linked to exposure to the COC. *Id.* at 100, ln. 2-6. Mrs. Romano believes she was exposed to the contaminants at her home, in the neighborhood, and other areas at or near the site. She believes her exposure was through ingestion, inhalation, and direct dermal contact with contaminated soil, air, and water. *Id.* at 48, ln. 12-22, pg. 49, ln. 1-7.

Mrs. Romano believes her property has lost value because of Grumman's contamination. *Id.* at 194, ln. 22, pg. 195, ln. 1-22. Mrs. Romano's home is located above the contaminated groundwater plume. She believes her property is in a highly contaminated area as a result of Grumman's actions. *Id.* at 326, ln. 13-16. Mrs. Romano understands the role of a class representative and is willing to serve in that role. *Id.* at 58, ln. 20-22, pg. 59, ln. 1-6.

**John Schlosser** lived at 121 South Second Street in Bethpage, New York from 1974 to 1985, and at Albergo Court in Bethpage, New York from 1985 to 1987, within the proposed medical monitoring class boundary, and was exposed to COC from the Site. Schlosser EBT Transcript (Pl. Ex. 20) at  88, ln. 18-22, pg. 89, ln. 1-20, pg. 91, ln. 16-20.  He has been diagnosed with oral cancer which is linked to exposure to COC. *Id.* at 200, ln. 3-19. Mr. Schlosser understands the role of a class representative and is willing to serve in that role. *Id.* at 35, ln 8-21, pg. 297, ln. 18-22, pg. 298, ln. 1-22, pg. 299, ln. 1-17, pg. 300, ln. 3-20, pg. 301, ln. 1-22, pg. 302, ln. 1-22, pg. 303, ln. 11-17.

**ARGUMENT**

I.     **ALL CLASS REPRESENTATIVES AND CLASS MEMBERS HAVE ARTICLE III STANDING**

In order to sue in federal court, a plaintiff must first show that he has a personal stake in the case sufficient to confer Article III standing. This requires the plaintiff to show three elements:

> To demonstrate their personal stake, plaintiffs must be able to sufficiently answer the question: "'What's it to you?'…
>
> To answer that question in a way sufficient to establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief. …If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.

*TransUnion LLC v. Ramirez*, 141 S.Ct. 1540, 1547 (2021).

A.     <u>The Medical Monitoring Classes</u>

The evidence accompanying this motion establishes all three elements of standing for the Medical Monitoring classes. For example, Jacob Kholodny and Bella Kholodny are typical of all the Class Representatives and the putative classes. The Kholodnys' own residential real property located within the proposed class boundaries. They have lived at the residence since 1986. Pls. Ex. 15 at 65, ln. 7-13; Pls. Ex. 14. at 123 , ln 8-10, pg. 23, ln. 12-14. They were exposed to toxic air emissions released from the Site for approximately nine years before Grumman ceased operations. Jacob has been diagnosed with kidney cancer that he believes was caused by exposure to the COC. Pls. Ex. 15 at 38, ln. 11-13, pg. 39, ln. 17-22. He visits the doctor once a year to monitor his kidney cancer but receives no medical monitoring for the other Diseases of Concern. *Id.* at 146, ln. 4-6.

15

In Dr. Guidotti's and Dr. Rosenfeld's view, he is at increased risk of developing one of the other Diseases of Concern. Pls. Ex. 9;  Pls. Ex. 5.

Bella has been diagnosed with breast cancer and basal cell cancer on the nose that she believes were caused by exposure to the COC. She visits the doctor every year for regular checkups because of her cancers. Pls. Ex. 14 at 78,  ln. 12-22, pg. 79, ln. 1-10, pg. 88, ln. 1-4. In Dr. Guidotti's and Dr. Rosenfeld's view, she is at increased risk of developing one of the other Diseases of Concern. Pls. Ex. 9;  Pls. Ex. 5.

Jacob and Bella's exposure to and resulting risk from Grumman's COC is in itself an actual and imminent injury that is concrete and particularized for Article Three standing purposes. *Leslie v. Medline Indus.*, No. 20-cv-01654 (N.D. Ill. September 30, 2021)(for "purposes of standing, 'risk of contamination' is an 'actual and imminent' injury"); *Walker v. City. of E. Chi.*, 2017 WL 4340259, at *12 (N.D. Ind. Sept. 29, 2017) (finding that the plaintiffs' exposure to high levels of lead and arsenic at the site of a public housing complex was a sufficiently "concrete and particularized" injury to satisfy the first prong of standing); *Rolan v. Atl. Richfield Co.*, 2017 WL 3191791, at *5 (N.D. Ind. July 26, 2017) ("[t]he Plaintiffs need not allege that they have already been contaminated [by the refineries' releasing of lead and arsenic into the community] to have sufficiently alleged an injury. For purposes of standing, 'risk of contamination' is an 'actual and imminent' injury"); *Carlough v. Amchem Prods., Inc.*, 834 F.Supp. 1437, 1454 (E.D. Pa. 1993) (surveying federal case law dealing with exposure to a toxin as an Article III injury-in-fact and concluding that exposure to a toxic substance like asbestos, "without more, " "constitute[d] sufficient injury in fact to give a plaintiff standing to sue in federal court").

The Kholodnys' injuries were likely caused by the tortious conduct of Grumman in permitting the releases of the Contaminants from the Site. The injuries can be redressed by the judicial relief sought – viz., medical monitoring of the Diseases of Concern.

Similarly, because of Grumman's tortious conduct, each of the other Class Representatives has a concrete, particularized, and actual injury in fact, the exposure to harmful substances and the *need* for medical monitoring to detect the diseases at the earliest possible stage. The Plaintiffs respectfully submit the foregoing evidence is sufficient to establish Article III standing for all the Class Representatives at this stage in the proceeding.

With respect to the putative class members, the Plaintiffs are not required to show they have standing at the class certification stage. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019)("we agree with Cordoba that, for a class action to be justiciable, 'all that the law requires' is that a named plaintiff have standing"); *See TransUnion LLC v. Ramirez*, 141 S.Ct. 1540, 1547 note 4 (2021)("We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class").

Nonetheless, the Plaintiffs respectfully submit that each putative class member does have standing, regardless of whether they ever develop any of the Diseases of Concern. Because of the Defendants' tortious conduct and each class member's exposure to the Contaminants, the class has a need for medical monitoring to detect diseases at the earliest possible stage.

With respect to the Medical Monitoring – Alternate Subclass, the Kholodnys – and the other Class Representatives - also have standing based on their allegations that the Contaminants released by Grumman caused damage to their property by the invasion of

17

the contaminated groundwater plumes that caused a diminution in the value of that property, and by the stigma of being near the Site. Dr. Kevin Boyle, the Plaintiffs' real estate expert, opines that all current owners of real property in the Bethpage area have suffered a diminution of value –including the loss of full market appreciation - in their real property as a result of the stigma of living near this Superfund site. Pls. Ex. 7.

This is obviously an actual injury and the need for medical monitoring is a consequential damage flowing from *that* injury. This is also true of the putative class for this subclass. Judicial relief in the form of medical monitoring would redress these injuries.

B.      The Property Damage Classes

As previously noted, Jacob and Bella Kholodny and the other Class Representatives of the Property Damage Class - Mary Ellen Ginty, Christopher Blades, Laurie Franks, Ross Meadow, Arlene Meadow, Rosalie Romano, and Patricia Glueckert - currently own residential real property within the Groundwater Contamination area. Pl. Ex. 3. Each Class Representative has suffered a diminution in value of the real property – including the loss of full market appreciation - as a result of the contamination of the property by Grumman, and/or the associated stigma. These losses can be addressed by judicial relief, an award of compensation.  This is also true of the putative class.

This foregoing is also true with respect to the Property Damage - Alternate Subclass. The Class Representatives and putative subclass have suffered property damage as a result of Grumman's contamination, and the stigma of being located near the Site. This injury can be addressed by judicial relief.

The Plaintiffs respectfully submit that the foregoing evidence is sufficient to establish Article III standing for both the Class Representatives, and the putative subclass, at this stage in the proceeding.

## II. WITH RESPECT TO ALL CLASSES, THE PLAINTIFFS HAVE ESTABLISHED ALL REQUIREMENTS OF RULE 23(a) BY A PREPONDERANCE OF THE EVIDENCE

Fed. R. Civ. Pro. 23(a) provides four prerequisites for any class action:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

In order to obtain class certification, a movant must provide evidence to satisfy all four prerequisites of Rule 23(a), and one provision of Rule 23(b):

a party seeking to maintain a class action "must affirmatively demonstrate his compliance" with Rule 23. …The Rule "does not set forth a mere pleading standard." *Id.* Rather, a party must not only "be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). *Id .* The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).

*Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013), *quoting in part Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011). *See also Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 260 (2nd Cir. 2020), vacated and remanded on other grounds, 141 S. Ct. 1951 (2021)("To certify a class under Rule 23 of the Federal Rules of Civil Procedure, the named plaintiffs must demonstrate (1) that the class is so numerous that joinder is impracticable, (2) that at least one question of law or fact is common to the class, (3) that

the class representatives' claims are typical of the class wide claims, and (4) that the class

representatives will be able to fairly and adequately protect the interests of the class").

Finally, while a motion for class certification requires the Court to make a rigorous

analysis of whether the requirements of Rule 23 have been met, the Court may inquire into

*the merits* of the Plaintiffs' claim <u>only</u> to the extent that they are relevant to Rule 23:

> Although we have cautioned that a court's class-certification analysis must
> be "rigorous" and may "entail some overlap with the merits of the plaintiff's
> underlying claim," …Rule 23 grants courts no license to engage in free-
> ranging merits inquiries at the certification stage. Merits questions may be
> considered to the extent—but only to the extent—that they are relevant to
> determining whether the Rule 23 prerequisites for class certification are
> satisfied.

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013).

A.      The Implied Ascertainability Requirement

Although Rule 23 does not mention "ascertainability" of the class as a requirement

for a class action, the courts agree that there is an implied ascertainabilty class definition

requirement for a class action. In the Second Circuit, a class need only be defined by

objective criteria to meet the implied ascertainability requirement:

> We take this opportunity to clarify the ascertainability doctrine's substance
> and purpose. We conclude that a freestanding administrative feasibility
> requirement is neither compelled by precedent nor consistent with Rule 23,
> joining four of our sister circuits in declining to adopt such a requirement.
> The *ascertainability doctrine that governs in this Circuit requires only that
> a class be defined using objective criteria that establish a membership with
> definite boundaries.*

*In re Petrobras Securities*, 862 F.3d 250, 264 (2nd Cir. 2017)(emphasis added).

Classes "identified by subject matter, timing, and location" are *per se* deemed to

satisfy this requirement. *Langan v. Johnson & Johnson Consumer Cos.,* 897 F.3d 88, 95

(2nd Cir. 2018)("Since the class at issue here is identified by subject matter (purchasers of

the two products), timing (before November 2012 and 2013 respectively), and location (the eighteen identified states), it is likewise 'clearly objective' and 'sufficiently definite' such that determining who purchased the products is undoubtedly 'objectively possible'"). Further, the Second Circuit permits putative class members to submit "sworn affidavits" to establish class membership. 897 F.3d at 93, note 2.

1.   The Medical Monitoring Classes

The Medical Monitoring Class is defined entirely by similar subject matter, timing, and location objective criteria. The class member must be: (1) a current or former resident of the Bethpage Area (location); (2)  who has been exposed to the COC discharged by Grumman (subject matter); (3) for one year or more (timing). Former Bethpage residents can identify themselves as class members by filing a sworn affidavit attesting to their residency. The same principles apply to the Medical Monitoring - Alternate Subclass, except that the Class Member must be (1) a current owner of residential real property in the Bethpage Area; (2) whose real property has diminished in value, including the loss of full market appreciation; (3) as a result of actual contamination or the stigma of being located near the Site.

2.   The Property Damage Classes

The Property Damage Class and Property Damage – Alternate Subclass are likewise defined entirely by the same objective criteria. These classes seek compensation for the diminution in value of their property. Current property owners in the affected area are easily identified through real property records.

All proposed classes accordingly satisfy the Second Circuit's implied ascertainability standard.

B.      Rule 23(a)(1) numerosity

Rule 23(a)(1) requires the movant to prove that "the class is so numerous that joinder of all members is impracticable." "Although there is no magic number of class members needed to satisfy numerosity, …numerosity is generally 'presumed at a level of 40 [or more] members.'" *Jianmin Jin v. Shanghai Original, Inc.*,  990 F.3d 251, 263 note 20 (2nd Cir.  2021), quoting *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Relying on U.S. Census data, Dr. Rosenfeld reports that there are 348,506 persons living and 118,521 housing units within a five-mile radius from Grumman's address at 925 South Oyster Bay Road in Bethpage. Pls. Ex. 5 at 22. Within the Medical Monitoring proposed area map, he estimates that there are 16,054 residential parcels. *Id.* Assuming three people per household, approximately 48,000 persons live in the affected area and may have received exposure to sufficient levels of  CrVI  to subject them to at least a 3 in one million cancer risk – triple the *de minimus* acceptable risk of 1 in a million-cancer risk. *Id.* Numerosity is therefore clearly established for the Medical Monitoring Class.

With respect to the Medical Monitoring – Alternate Damage Subclass and the Property Damage Classes, Dr. Laton estimates that there are 13,233 residential properties affected by the contaminated water plume shown in Plaintiffs' Exhibit 3. Pls. Ex. 6 at 4, 71, 163. The overlap between the proposed Medical Monitoring class boundary and the proposed Property Damage class boundary is shown in Plaintiffs' Exhibit 2. Thousands of properties are encompassed in this area. Numerosity is therefore clearly established for the Medical Monitoring - Alternate Subclass and the Property Damage Classes.

C.     Rule 23(a)(2) common issues

Rule 23(a)(2) requires the movant to prove that "there are questions of law or fact common to the class." The Supreme Court held this provision requires a plaintiff to prove there are "common answers" to a common contention that is central to each claim:

> The crux of this case is commonality—the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Rule 23(a)(2). That language is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.' " …For example: Do all of us plaintiffs indeed work for Wal–Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury," …
>
> Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.
>
> "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Nonetheless, the Court has been clear that it only takes one "common question" of this nature to satisfy this requirement - "We quite agree for purposes of Rule 23(a)(2) that 'even a single common question will do…." 564 U.S. at 359.

1.     Medical Monitoring Classes

There are many common issues of fact central to the Medical Monitoring Class that can be satisfied by common answers. Dr. Rosenfeld, while considering other possible sources of exposure, opines that the overwhelming source of the airborne COC to which

the Medical Monitoring Class members were exposed came from the facilities operated by Grumman at the Site. Pls. Ex. 5 at 74-76. He further opines that Grumman, either intentionally or negligently, caused or permitted the COC discharges that traveled through the air and caused injury. *Id.* He and Mr. John Robertson, PG, one of the Plaintiffs' experts in hydrology and environmental science, opine to facts from which the jury can find that the operation of the facilities in the Site near a residential housing community is an ultra-hazardous activity. Pls. Ex. 4 at 10-15. The resolution of these questions – central to the claims in this class action to establish the torts alleged – are thus established for purpose of the present motion *by class-wide proof*.

There are also common factual issues with respect to general causation.

Dr. Guidotti opines that exposure to the COC at the levels modeled by the other experts can cause each of the Diseases of Concern. Pls. Ex. 9 at 4-5. These common issues of fact also apply to the Medical Monitoring – Alternate Subclass. Additional common issues for the subclass are whether Grumman tortiously caused damage to the real property of the class members by causing the formation of the contaminated underground water plume that has migrated beneath their properties. Dr. Laton and Dr. Robertson will provide class-wide proof as to these issues. Pls. Ex. 6; Pls. Ex. 4.

Questions of law that have class-wide common application to one or both classes include:

> 1. whether Grumman owed a duty of care to the class members to conduct operations on its property in a manner that did not pose an unreasonable danger to the community;
>
> 2. whether Grumman is liable to injured class members for the torts of negligence, nuisance, trespass, and abnormally dangerous activity;

3. whether medical monitoring is an available remedy to the Medical Monitoring Class members as consequential damages/relief for these torts;

4. whether medical monitoring is an available remedy for the Medical  Monitoring – Alternate Subclass as a consequential damage for the torts committed against their real property.

The Plaintiffs submit the foregoing evidence establishes common questions of fact and law for purposes of Rule 23(a)(2) with respect to the Medical Monitoring Classes.

2.      The Property Damage Classes

Whether Grumman negligently, or intentionally, discharged the Contaminants and whether they are:  (1) the source of the contamination that has invaded the property of many class members and (2) the source of the contamination that has diminished the value of the properties of the other class members - are also central common questions resolved by class-wide proof with respect to the claims of  the Property Damage Class. Again Dr. Laton and Dr. Robertson will provide class-wide proof as to these issues. Pls. Ex. 6; Pls. Ex.4 at 15. In addition, Dr. Boyle will offer class-wide proof as to diminution in value – including the loss of full market appreciation - of the class members' real property. Pls. Ex. 7.

Questions of law that will have class-wide common application include:

1. whether Grumman owed a duty of care to the class members to conduct operations on its property in a manner that did not pose an unreasonable danger to the community;

2. whether Grumman is liable to injured class members for the torts of negligence, trespass, and abnormally dangerous activity;

3. whether class members can recover stigma damages.

These same issues apply to the Property Damage – Alternate Class. Rule 23(a)(2) common issues of fact and law, therefore, are present for the Property Damage Classes.

D.   Rule 23(a)(3) typicality

Rule 23(a)(3) requires the movant to show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The Supreme Court has noted typicality and commonality tend to merge because "[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

As the Second Circuit explained:

> Typicality requires that "the disputed issue[s] of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." …One purpose of the typicality requirement is "to ensure that ... 'the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.' "

*Mazzei v. Money Store*, 829 F.3d 260, 271-72 (2nd Cir. 2016).

1.   The Medical Monitoring Classes

The claims of the Medical Monitoring Class Representatives are typical - and in fact identical - to the claims of the Medical Monitoring Class and the Medical Monitoring – Alternate Subclass. Both claims of the Class Representatives and the putative classes derive from the same exact conduct - the release by Grumman of the COCs into the environment that have placed them at greater risk of developing the Diseases of Concern. Both seek the exact same relief – the establishment of a Medical Monitoring Program to detect these diseases at the earliest opportunity. There are no unique defenses that the Defendants have with respect to any Class Representative that are not also applicable to

26

the entire class. *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").

2.      The Property Damage Classes

Similarly, the claims of the Property Damage Class Representatives are typical - and in fact identical - to the claims of the Property Damage Classes. Both the claims of the Class Representatives and the putative class derive from the same exact conduct - the release by the Defendants of the COC into the environment that have caused a diminution in the value of their property, including the loss of full market appreciation. There are no unique defenses that Grumman has with respect to any Class Representative that are not also applicable to the entire class.

The Plaintiffs submit that Rule 23(a) typicality is also easily satisfied with respect to these classes.

E.      Rule 23(a)(4) adequacy of representation

Rule 23(a)(4) requires the movant to show "the representative parties will fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In considering Rule 23(a)(4)'s adequacy requirement, the Second Circuit has advised the primary factors are whether the class representatives have any "interests antagonistic to the interests of other class members" and whether the representatives "have an interest in vigorously pursuing the claims of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Even if some degree of conflict exists, however, the conflict does not

"necessarily defeat class certification—the conflict must be 'fundamental.'" *Denney*, 443 F.3d at 268 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)).

Moreover, "[t]his criterion does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 293 (2nd Cir. 1999), overruled on other grounds by *In re IPO,* 471 F. 3d 24, 42 (2d Cir. 2006).

Nonetheless, there are a few black letter rules. First, "[t]he named plaintiffs in a class action cannot represent a class of whom they are not a part…." *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019). Second, the named plaintiffs "can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class." *Id.*

Jacob and Bella Kholodny are typical of the Medical Monitoring Class Representatives and the Property Damage Class Representatives.[2] There are no conflicts of interest between the Kholodnys and any class member. The Kholodnys will fairly represent these classes. They have been in this case "from the beginning." Both understand this is a class action, that they are class representatives, and that they are seeking compensation not only for themselves but also for the community. Pls. Ex. 15 at 162, ln. 15-22, pg. 163, ln. 1; Pls. Ex. 14 at 107, ln. 4-22, pg. 108, ln. 1-22, pg. 109, ln. 1-4.

---

[2] The other Class Representatives also meet Rule 23(a)(3) & (4)'s requirement as stated *supra*.

Both Jacob and Bella understand they are class representatives for both the Medical Monitoring classes and the Property Damage classes. They believe the value of the properties in the area would be higher if the properties had not been contaminated by Grumman. They also believe that people like themselves who have been exposed to Grumman contamination are at a higher risk of developing certain illnesses and need to have doctors check them to catch those illnesses early. Pls. Ex. 15 at 165, ln. 10-17. In the opinion of both Kholodnys, potential buyers of their property would be worried about living in a contaminated neighborhood. For this reason, they think that their property would sell for less money than it should. Pls. Ex. 15 at 171, ln. 1-10; Pls. Ex.14 at 109, ln. 105, 116, pg. 60, ln. 18-22, pg. 61, ln. 1-8.

Both Kholodnys have a keen interest in vigorously pursuing the claims of the class. They testified they are willing to do whatever is necessary to perform the duties of a class representative and that they would rely on their attorneys to represent them. Pls. Ex. 15 at 163, ln. 6-17, 21-22, pg. 164, ln. 1-5; Pls. Ex. 14 at 107, ln. 16-22, pg. 108, ln. 1).

In this regard, the Kholodnys and the other Class Representatives have hired two law firms skilled in toxic torts and class actions to represent them. These law firms have the skills, experience, and the resources to represent the classes vigorously and competently. Pls. Ex. 21 (Declaration of Gregory Cade, Esq.); Pls. Ex. 22 (Declaration of Paul Napoli, Esq.).

Jacob and Bella Kholodny are members of all the classes they represent. With respect to the Medical Monitoring Class, they have both resided in the Bethpage Area and has been exposed to the COC released from the Site for approximately 35 years, including eight years when the plant was in operation. With respect to the Medical Monitoring –

Alternate Subclass and the Property Damage classes, they own residential real property located at 7 Cecil Place in Bethpage. This property is located within the boundaries for the proposed classes and, according to Plaintiffs' experts, it has suffered a diminution of value, including a loss of full market appreciation. Like other Class Representatives and putative members of the Medical Monitoring Class, both Bella and Jacob have one of the Diseases of Concern and face a substantial risk of developing others. They need special medical monitoring to provide early detection of these diseases. Furthermore, as current property owners, they should be compensated for their damages, as described above. The Plaintiffs submit that Rule 23(a)(4)'s adequacy of representation requirement is satisfied with respect to Mr. and Mrs. Kholodny and to the other Class Representatives of each class.

**III. WITH RESPECT TO ALL CLASSES, THE PLAINTIFFS HAVE ESTABLISHED ALL REQUIREMENTS OF EITHER RULE 23(b)(2), OR RULE 23(b)(3), BY A PREPONDERANCE OF THE EVIDENCE**

In addition to satisfying Rule 23(a), the Plaintiffs must also satisfy one provision of Rule 23(b) in order to have their classes certified. Rule 23(b) provides in pertinent part:

> b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
> …
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. Pro. 23(b)(2) & (3).

A.     The  Medical Monitoring Classes should be certified under Rule 23(b)(2)

The Plaintiffs seek to certify the Medical Monitoring Classes under Rule 23(b)(2).

They seek an injunction to compel Grumman to establish a medical monitoring program

for the benefit of the class. They seek *an incidental* award of damages to fund the program.[3]

As to, Fed. R. Civ. Pro. 23(b)(2),  it is undisputed that, by discharging the COC into the

community, Grumman has acted on grounds that generally apply to the class, and has

refused to provide medical monitoring to the Plaintiffs and the putative class. Answer to

TAC. Therefore, certification of a Rule 23(b)(2) medical monitoring class is appropriate in

this case.

Rule 23(b)(2) certification differs from Rule 23(b)(3) certification in that every

class member's injury must be remediable by the injunction:

> According to the Federal Rules of Civil Procedure, a class may be certified
> under Rule 23(b)(2) in a single circumstance: when "the party opposing the
> class has acted or refused to act on grounds that apply generally to the class,
> so that final injunctive relief or corresponding declaratory relief is
> appropriate respecting the class as a whole." As such, the Supreme Court
> has counseled that " Rule 23(b)(2) applies only when a single injunction or
> declaratory judgment would provide relief to each member of the class."
> Put another way, a class may not be certified under Rule 23(b)(2) if any
> class member's injury is not remediable by the injunctive or declaratory
> relief sought.

*Berni v. Barilla S. P.A.*, 964 F.3d 141, 144 (2nd Cir. 2020).  All of the class members have

been injured by exposure to the COC and need medical monitoring to identify and,

hopefully, provide early warning or diagnosis for the development of any of the Diseases

---

[3] Assuming arguendo that the Court finds the damages sought are not incidental to the
injunctive relief, the Plaintiffs alternatively seek to certify the damages sought to fund the
program under Rule 23(b)(3).

of Concern. A single injunction ordering Grumman to fund the Medical Monitoring Program will remedy each class member's injury in this regard.

According to the Fifth Circuit, class certification under <u>Fed. R. Civ. Pro</u>. 23(b)(2) has three requirements:

> Thus, 23(b)(2) certification has three requirements: "(1) 'class members must have been harmed in essentially the same way'; (2) 'injunctive relief must predominate over monetary damage claims'; and (3) 'the injunctive relief sought must be specific.' "...The specificity element requires plaintiffs to give content to the injunctive relief they seek so that final injunctive relief may be crafted to describe in reasonable detail the acts required.".

*Prantil v. Arkema Inc*., 986 F.3d 570, 580-81 (5th Cir. 2021). Assuming the Second Circuit would adopt this formulation, these standards have all been met. All class members were harmed in the same way – by exposure to the COC. The damages sought are incidental to the injunctive relief. The Plaintiffs, as Class Representatives, are not seeking individual damages, but solely an award to fund the Medical Monitoring Program[4]. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011)(injunctive relief class could not be certified under Rule 23(b)(2) where plaintiffs also sought individual damages award - Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages").

Finally, the injunctive relief sought is reasonably specific. Dr. Guidotti has fashioned a Medical Monitoring Program that lists the range and types of procedures that will be available under the program. Pls. Ex. 9 at 15-17. Matthew L. Garretson, the Plaintiffs' expert in class actions and medical monitoring administration, explains how the

---

[4] The Plaintiffs have also asserted individual claims against the Defendants. While they are seeking damages for those claims, these are not part of the class damages discussed herein.

Medical Monitoring Program can be set up, and how the members of the class can be: (1) identified and (2) given notice through an Outreach Campaign. He also opines that a medical monitoring program is feasible for this class and can be effectively managed and administered. Pls. Ex. 23 (Garretson Rule 26 Report).

The Plaintiffs have proven by a preponderance of the evidence all requirements for the Rule 23(b)(2) certification of the Medical Monitoring Classes.

B.    The classes should be certified under Rule 23(b)(3)

1.    The Property Damage Classes

The Plaintiffs seek to certify the Property Damage Class under Fed. R. Civ. Pro. 23(b)(3) and the Property Damage – Alternate Subclass under Fed. R. Civ. Pro. 23(b)(4). Fed. R. Civ. Pro. 23(b)(3) permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(4) in turn provides that "[w]hen appropriate, an action may be maintained as a class action with respect to particular issues."

a.    Questions of law, or fact, common to the Property Damage Class members predominate

As the Supreme Court has explained:

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. " …This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."….The predominance inquiry "asks whether the common, aggregation-enabling,

33

issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."…When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)(citations omitted).

In the Second Circuit:

The requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." …
A court examining predominance must assess (1) "the elements of the claims and defenses to be litigated," (2) "whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief," and (3) "whether the common issues can profitably be tried on a class[-] wide basis, or whether they will be overwhelmed by individual issues."

*Scott v. Chipotle Mexican Grill, Inc.,* 954 F.3d 502, 512 (2nd Cir. 2020).

(1)    The Negligence Claim

The elements of the Property Damage Class Plaintiffs' negligence claims are as

follows:

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"

*Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000), *quoting Akins v. Glens*

*Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981).

Whether Grumman owes a duty to the members of the Property Damage Classes is

a question of law which is based on class-wide proof – the relationship between Grumman

and the community members, the foreseeability of harm to the class members, and the nature of the harm caused. As one court recently explained:

> "However a party's duty is ultimately defined in pollution cases, this policy determination must include a duty not to pollute a plaintiff's drinking water. *Society has a reasonable expectation that manufacturers avoid contaminating the surrounding environment*, an expectation that extends to the pollution of an area's water supply."

*Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D. N.Y. 2017)(emphasis added), *aff'd in part*, 959 F.3d 70 (2d Cir. 2018). Either the Defendants owe a duty to *all* of the class members injured by their discharge of the Contaminants based on this class-wide proof, or they owe a duty to none of them. The expert reports of Dr. Rosenfeld, Dr. Laton, Dr. Robertson, and Mr. Bost provide compelling class-wide expert evidence of facts from which the Court can concluded that Grumman owed the Property Damage Classes a duty to exercise reasonable care to avoid contaminating their properties.

Whether Grumman breached this duty to the Plaintiffs is likewise a question which is certainly based on class-wide proof. Dr. Laton opines that:

- "historical disposal practices at the Site have led to the contamination of the soil, soil vapor groundwater on and off-Site";

- that Grumman knew as early as 1943 that the groundwater beneath the Site was contaminated;

- that Grumman knew as early as 1949 that contamination associated with on-Site activities had migrated off-site and that local wells contained hexavalent chromium;

-that Grumman "was aware of potential health effects of drinking contaminated drinking water";

-that multiple chemicals of concern have been found both on and off site;

-that there are multiple groundwater plumes extending from the Site and that these plumes have moved over four miles to the south of the Site; and

-that there are many residential properties that lie above the TCE groundwater plume.

Pls. Ex. 6 at 14-16. Dr. Laton's Groundwater Contamination Map identifies the specific residential properties invaded by the plume. Dr. Robertson has provided similar class-wide expert testimony from which the jury could find Grumman negligently breached the duty of care it owed class members and proximately caused their properties to be contaminated by the underground water plumes:

> NG disposed of waste chlorinated solvents, oils, cleaning rags and other wastes by intentionally dumping them in one or more of several open pits (sometimes referred to as a "rag pit" and/or oil pit) on a portion of what is now the Bethpage Community Park land. That practice was the primary source that contributed to the eastern lobe of the groundwater contamination plume associated with OU-3. That CVOC plume has the greatest CVOC concentrations and is the thickest (vertically) and deepest of the two co-mingled east and west plume lobes. In addition to the liquid CVOC wastes dumped in the pit(s), the rags disposed of therein reportedly were used to wipe down equipment and parts and contained organic paint and solvent residues. These practices resulted in extensive environmental harm, were deliberate, non-accidental and neither the releases nor the resulting harm would have been unexpected. These practices were contrary to best industrial practices of the time and NG knew or would have known that they would likely result in contamination of soil, groundwater and air.

Pls. Ex. 4 at 15.

Dr. Rosenfeld conducted a retrospective assessment of community exposure to air emissions from the Site of CrVI and TCE. In his Rule 26 Report, he opines:

-that from the 1930's to 1994 Grumman's operations "resulted in emissions and discharges of" CrVI and TCE into the ambient air in the surrounding community;

-that the inhalation of elevated levels of CrVI and TCE can cause cancer;

-that the CrVI and TCE-laced ambient air contamination "is a result of a single primary migration pathway, namely, air dispersion from…activity at the Facility;"

-that, while additional sources of CrVI and TCE may have existed in Bethpage "Grumman is the primary source of anthropogenic historical ambient CrVI in the proposed Class Area

-that the Grumman emissions "blanket" the Class Area;

-that the Class Area "represents the area that was significantly impacted by Grumman emissions prior to the facility closing in 1994. All land within the …[Class Area] was similarly impacted by emissions from the Grumman facility from the 1950's up until the facility closed;"

-that the residents in the Class Area "can reasonably be concerned about their historical exposure to CrVI and TCE from historical operations of the Grumman Facility."

Pls. Ex. 5 at 74-76.

A jury could find from this *class-wide evidence* that the Defendants failed to exercise reasonable care in operating their facilities and in disposing of the Contaminants. This breach of duty evidence applies to every member of the classes.

Whether individual class members have been injured as a result of Grumman's negligence – and the amount of this injury - is also established for certification purposes by class-wide proof. Dr. Kevin J. Boyle, in his Rule 26 report, opines that Grumman's pollution "more likely than not diminishes the market value of residential properties over and near the Northrop site by as much as 27%." Pls. Ex. 7 at 2. He will testify that "[m]arket values of properties located over the contamination plume or near the plume are diminished by the stigma of the contamination.…" *Id.* at 4. That "Nassau County property values have increased" in his view "does not mean that the Grumman site history of contamination is not affecting market values of properties." *Id.* at 10. Using a property value meta-analysis model which compiles multiple hedonic studies, Dr. Boyle has calculated the diminution in value attributable to Grumman's contamination using entirely class-wide evidence.

Whether stigma damages are recoverable is a *question of law* central to the property damage classes. New York law permits plaintiffs in toxic tort actions to recover stigma damages measured by the diminution in value of the property caused by the defendant's tortious conduct. This is a long recognized exception to the economic loss rule:

37

> 'stigma damages' have been recognized as a valid category of damages by
> the New York courts in environmental cases," *87th St. Owners Corp.* , 251
> F. Supp. 2d at 1223 (citing *Commerce Holding Corp. v. Bd. of Assessors of
> the Town of Babylon*, 88 N.Y.2d 724, 732, 649 N.Y.S.2d 932, 673 N.E.2d
> 127 (1996)), and are "defined loosely as the public's perhaps unwarranted
> fears concerning a property" that reduce its value, *Nashua Corp. v. Norton
> Co.* , No. 90-CV-1351 (RSP/RWS), 1997 WL 204904, at *6 (N.D.N.Y. Apr.
> 15, 1997). "These damages are recoverable because the diminished property
> values result from an actual or imminent invasion of a landowner's property
> by a defendant's polluting conduct."

*Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y.*, L.L.C., 405 F.Supp.3d 408 (W.D.

N.Y. 2019). So long as the fear or stigma is traceable to the conduct of the defendant and

the conduct is connected to the property in question, diminished values resulting from the

stigma are recoverable. *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp.

3d 233, 246 (N.D. N.Y. 2017), *aff'd in part*, 959 F.3d 70 (2d Cir. 2018). Dr. Boyle  opines

the diminution in value of each class member's real property resulting from stigma was

caused by Grumman's conduct, which created the Superfund site.

The only *individual* issues pertinent to the Property Damage Class's negligence

action are any affirmative defenses Grumman may have as to individual class members

and specific monetary damages. Because all other central issues are common to the class,

the law is clear that these issues are not an impediment to class certification:

> When "one or more of the central issues in the action are common to the
> class and can be said to predominate, the action may be considered proper
> under Rule 23(b)(3) even though other important matters will have to be
> tried separately, such as damages or some affirmative defenses peculiar to
> some individual class members."

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). *See Burdick v. Tonoga,

Inc.*, 179 A.D.3d 53, 112 N.Y.S.3d 342 (N.Y. App. Div. 2019)(affirming certification of

similar environmental contamination property damage class and finding predominance,

notwithstanding that individual class members would have different damages;

38

"Defendant's argument that individual class members will have different damages, though likely true, does not alter this conclusion. Even if, after determining the answers to these common questions, it becomes clear that "questions peculiar to each individual may remain" or that there are varied damages suffered among class members, class certification is still permissible").

The Plaintiffs submit that class issues predominate for purposes of the negligence claim of the Property Damage Class. With respect to the Property Damage - Alternate Class, this conclusion is even more compelling. For this subclass, damages are not part of the equation and cannot be considered in determining predominance. The court accordingly should certify the Property Damage Classes with respect to the negligence claim.

(2)      The trespass claim

In order to recover for trespass involving toxic chemicals, a plaintiff must prove the defendant intentionally caused the entry of toxic chemicals onto his property and had good reason to know or expect the chemicals would migrate to the plaintiff's land:

> On the merits, a trespass claim represents an injury to the right of possession …and the elements of a trespass cause of action are an intentional entry onto the land of another without permission … Regarding intent, the defendant "must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he [or she] willfully does, or which he [or she] does so negligently as to amount to willfulness" …For a trespass claim involving toxic chemicals, a defendant is liable only if "he [or she] had good reason to know or expect that subterranean and other conditions were such that there would be passage [of the toxins] from [the] defendant's to [the] plaintiff's land."

*Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 983 N.Y.S.2d 110 (2014).

Mr. Robertson opines Grumman intended the acts that contaminated the groundwater and created the contaminated plume:

> [The Grumman disposal] practices resulted in extensive environmental harm, were deliberate, non-accidental and neither the releases nor the resulting harm would have been unexpected. These practices were contrary to best industrial practices of the time and NG knew or would have known that they would likely result in contamination of soil, groundwater and air.

Pls. Ex. 4 at 15. He notes that Grumman deliberately pumped contaminated groundwater back into recharge basis which exacerbated contamination of the groundwater:

> One of the NG practices that exacerbated CVOC contamination of groundwater was that of pumping groundwater known to be highly contaminated with CVOCs and discharging it back into recharge basins. This constituted deliberate disposal of hazardous substances to the environment at concentrations above those considered safe for human health and the environment. In some cases, the waste-water NG discharged to the recharge basins contained more CVOCs that the contaminated groundwater that it extracted with its production wells. In such cases, there was a net increase in the quantity of those CVOCs added to the groundwater. In addition, the practice likely caused the plume of CVOC contamination in groundwater to become more widespread and thus more difficult and costly to remediate. In addition, CVOCs would have evaporated into the atmosphere from the contaminated water surfaces in the recharge basins.

> The former practice by NG of dumping waste chromic acid and other chromium-containing process waters in recharge basins at the site was an intentional release of chromium to the environment. Similarly, its former practice of burying and dewatering industrial waste treatment sludges containing chromium, cadmium and perhaps other toxic metals in impoundments excavated in bare soil constituted an intentional waste disposal practice that caused releases of those metals to the environment. NG would have known that those practices would cause contamination of soil and groundwater, as well as air through fugitive dust emissions. NG was notified in the 1940s and the 1950s that the practice of dumping untreated chromium wastes in recharge basins was prohibited and was likely causing chromium contamination of municipal wells.

*Id.* at 16-17.

Dr. Laton likewise opines the contaminated groundwater plume was created by Grumman's operations at its facilities. He opines Grumman knew about this as early as 1943. Pls. Ex. 6 at 12. In his Groundwater Contamination Map, Dr. Laton identified the

40

areas where the contaminated underwater plume traceable to Grumman has migrated and the thousands of residential properties that now overlay this contaminated plume. *Id.* The jury could find from this class-wide evidence that Grumman intended the acts that produced the invasion, that the intrusion was the immediate and inevitable consequence of Grumman's operations, and that Grumman had good reason to know or expect that subterranean and other conditions were such that there would be passage of the toxins from Grumman's Site to the class members' land.[5] Class-wide proof thus establishes **all** of the central elements to the Property Damage - Alternate Subclass trespass claim and most of the central elements of the trespass claim of the Property Damage Class.

Further, the Property Damage class members suffered a direct trespass onto their property through deposition of CrVI particles onto their land. Pls. Ex. 5 at 70. The same aerial release which exposed the class members to COC naturally fell to the earth and deposited onto the class members property. Indeed, Dr. Rosenfeld opines the modeling he conducted shows "CrVI particles deposited throughout the Proposed Class Boundary." *Id.*

Dr. Boyle formulated class wide evidence of the stigma damages suffered by the Property Damage Class. The only individual issues for the Property Damage Class trespass count are *the amount* of damages suffered by each class member. As with the negligence

---

[5] As noted in Restatement (Second) of Torts § 839, Comment d (1979), "liability [of a possessor of land] is not based upon responsibility for the creation of the harmful condition, but upon the fact that he has exclusive control over the land and the things done upon it and should have the responsibility of taking reasonable measures to remedy conditions on it that are a source of harm to others. *State of N.Y. v. Prato*, 45 Misc. 3d 722, 731-32, 993 N.Y.S.2d 442, 451 (Sup. Ct. 2014). See also *In re MTBE Prod Liab*. Litig., 859 F.3d 178 (2d Cir. 2017); *Town of New Windsor v. Avery Dennison Corp*., No. 10-CV-8611, 2012 U.S. Dist. LEXIS 27264 at 46-51, 2012 WL 677971 (S.D.N.Y. 2012).

claim, this determination can be made in separate trials without prejudicing the certification of the trespass class.

The Plaintiffs submit class issues predominate for purposes of the trespass claim of the Property Damage Classes.

(3)     The abnormally dangerous activities claim

New York law imposes strict liability upon landowners who undertake abnormally dangerous activities and thereby cause injuries. The New York Court of Appeals has identified six factors to determine if an activity is abnormally dangerous:

> The many cases and authorities suggest the numerous factors to be weighed. Particularly useful are the six criteria listed in Restatement of Torts Second (§ 520): "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes".

*Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 398 N.Y.S.2d 401 (N.Y. 1977).

Dr. Rosenfeld, Dr. Layton, Dr. Robertson, and Mr. Bost offer extensive class-wide expert testimony from which the jury could find all six of these factors. The class-wide damages testimony will be the same as for the negligence and trespass classes. The Plaintiffs submit that class issues predominate for purposes of the abnormally dangerous activity claims of the Property Damages Class and the Property Damage – Alternate Subclass.

(4)  The Private Nuisance Claim

The elements of a private nuisance in New York are: (1) an interference substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a

person's property right to use and enjoy land, (5) caused by another's conduct in acting or failure to act. *Copart Industries, Inc. v. Consolidated Edison Co.,* 41 N.Y.2d 564, 569 (1977); *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 570-71 (S.D.N.Y. 1995). Class actions alleging, inter alia, private nuisance tort claims for environmental contamination, have been certified by New York state and federal courts. See, e.g. *Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 131-33 (3rd Dept. 2014); *Osarczuk v. Associated Univs., Inc.*, 36 A.D.3d 872, 873-78, (2nd Dept. 2007); *Quick v. Shell Oil Co. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.)*, 241 F.R.D. 435, 437-38 (S.D.N.Y. 2007); *German v. Fed. Home Loan Mortg. Corp.*,  supra.

Even where a nuisance affects an entire community and is large enough to be considered a public nuisance, plaintiffs can still state a claim for private nuisance as to any person who is specially injured by it to an extent beyond the injury to the public. *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 247-49 (N.D.N.Y. 2017). Medical monitoring may be recovered as consequential damages associated with a property damage claim, such as  private nuisance. See *Ivory v. Int'l Bus. Machs. Corp., supra* citing *Caronia v Philip Morris USA, Inc.*, 22 NY3d 439 ,448, 452 (2013); *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 454 (D.N.J. 2009).

As noted above, Plaintiffs' experts, Dr. Rosenfeld, Dr. Robertson, and Dr. Laton, have shown that Grumman's practices, which led to the spread of COC from the Site, were intentional and unreasonable and that the resulting contamination has substantially interfered with Plaintiffs' use and enjoyment of their property by inter alia, causing diminution of value and stigma damages. The proposed classes of individuals who have been exposed and have experienced property damages (the Medical Monitoring –

Alternative Class and the Property Damage Classes) have injuries which are special and different from the community at large, such that they support this cause of action.

2.     The Medical Monitoring Classes

        a.     Questions of law, or fact, common to the Medical Monitoring Class members predominate

Under New York law, there is no independent cause of action for medical monitoring. Plaintiffs who have suffered physical injury, or damage to property, as the result of a tort committed by the defendant, however, can recover medical monitoring as a consequential damage caused by the tort:

> We conclude that the policy reasons set forth above militate against a judicially-created independent cause of action for medical monitoring. Allowance of such a claim, absent any evidence of present physical injury or damage to property, would constitute a significant deviation from our tort jurisprudence. That does not prevent plaintiffs who have in fact sustained physical injury from obtaining the remedy of medical monitoring. Such a remedy has been permitted in this State's courts as consequential damages, so long as the remedy is premised on the plaintiff establishing entitlement to damages on an already existing tort cause of action.

*Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 5 N.E.3d 11,19 (2013).

The Second Circuit Court of Appeals has interpreted *Caronia* as follows:

> we interpret *Caronia II*'s recounting of the general New York tort law principles, together with its apparent approval of the test enunciated in Abusio --"clinically demonstrable presence of [toxins] in the plaintiff's body, or some indication of [toxin]-induced disease, i.e., some physical manifestation of [toxin] contamination "--to mean (a) that an action for personal injury cannot be maintained "absent allegation of any physical injury"; (b) that it is, however, sufficient to allege "some injury"; and (c) that to meet the requirement to plead "some" physical injury, it is sufficient to allege that "in the plaintiff's body" there is either a "clinically demonstrable presence of toxins " "or some physical manifestation of toxin contamination ." (All emphases ours.) …

> We conclude that under *Caronia II*, allegations of the physical manifestation of or clinically demonstrable presence of toxins in the plaintiff's body are sufficient to ground a claim for personal injury and that

for such a claim, if proven, the plaintiff may be awarded, as consequential damages for such injury, the costs of medical monitoring.

*Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 501 (2nd Cir. 2020). Thus, either (1) a physical injury/disease tortiously caused by the defendant or (2) a physical manifestation of toxins in the plaintiff's body caused by the defendant's tort are sufficient to permit the recovery of medical monitoring as consequential damages.

As previously discussed, the Plaintiffs' experts will present class-wide proof:

-that Grumman owed all class members a duty to exercise reasonable care to avoid contaminating the air and the real property in the community;

- that Grumman breached this duty by negligently releasing CrVI and TCE into the air from 1955 to 1995 that migrated into the community where the class members lived and worked;

-that Grumman breached this duty by negligently creating contaminated underground water plumes that have migrated beneath the land owned by many class members and under public areas where many of the class members worked or traveled; and

-that the foregoing pollution was also caused by Grumman's operation of ultra-hazardous activities at the Site.

Dr. Guidotti, in his expert report, opines the Class Representatives and all class members have been exposed to the COC at levels sufficient to cause the Diseases of Concern; that they are at risk of developing these diseases; and that a medical monitoring program is feasible and advisable to hopefully provide early detection of these diseases. He has fashioned a class-wide Medical Monitoring Program that lists the range and types of procedures available under the program. Pls. Ex. 9. Mr. Garretson, as previously noted, explains how the Medical Monitoring Program can be structured, and how the members of the class can be identified and be given notice through an Outreach Campaign. He also

45

opines that a medical monitoring program is feasible for this class and can be effectively managed and administered. Pls. Ex. 23.

All of the Class Representatives have suffered some physical injury or disease linkable to the Contaminants negligently discharged by Grumman. For example, Jacob Kolodny has developed kidney cancer that he believes was caused by the COC negligently discharged by Grumman. Mr. Kolodny receives medical monitoring for his kidney cancer, but not for the other diseases. He is entitled to medical monitoring as a consequential damage of the tort of negligence for himself and all similarly situated class members. See *Buckley v. Metro-North Commuter R.R.*, 79 F.3d 1337, 1347(2nd Cir. 1996), rev'd on other grounds, 521 U.S. 424 (1997)(in action brought under the Federal Employer's Liability Act, medical monitoring is a compensable item of damage where, inter alia, " a reasonable physician would prescribe for her or him a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure").

Whether the diseases developed by the Class Representatives were in fact caused by Grumman's negligence and ultra-hazardous activity are, of course, individual questions that will be litigated on the merits at trial.  But these individual issues are dwarfed by the issues of law and fact common to the class. The Plaintiffs respectfully submit that common issues predominate on both the negligence and ultrahazardous activities claims and that the Medical Monitoring Class should be certified on both claims.

      b.      <u>Questions of law, or fact, common to the Medical Monitoring – Alternate Subclass members predominate</u>

With respect to the Medical Monitoring - Alternate Subclass, all of the class wide issues discussed above also apply. In addition, Dr. Boyle's opinions on the stigma damages are additional factual issues provable by class-wide proof. Under *Caronia*, evidence of

tortiously caused damage to real property permits the property owner to recover medical monitoring as a consequential damage. 5 N.E.3d at 19. Here, however, there are no individual damages issues. Each class member will receive the same medical monitoring. Accordingly, the Plaintiffs submit the Court should find that class issues predominate with respect to this subclass and should certify the subclass under negligence, trespass, nuisance, and ultrahazardous activity.

3.  <u>A Class Action is Vastly Superior to Other Methods to Adjudicate the Foregoing Claims</u>

Factors bearing on whether a class action is superior to other methods to adjudicate a controversy include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

<u>Fed. R. Civ. Pro.</u> 23(b)(3)(A)-(D)).

In the Second Circuit:

> While Rule 23(b)(3) sets out four individual factors for courts to consider, manageability "is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication." …As a component of manageability, in determining whether a class action in a particular forum is a superior method of adjudication, courts have considered "when a particular forum is more geographically convenient for the parties ... or, for example, when the defendant is located in the forum state."

*Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2nd Cir. 2015).

This Court is the most geographically convenient forum for this class action. The Property Damage class members all reside in the area and most of the Medical Monitoring

class members do as well. Grumman's facilities are located in this area and many of the fact witnesses remain in the area. Because the classes are objectively ascertainable, there are no particular difficulties in managing the class action. Property damage class members are easily identified by the county property records for purposes of notice and relief. Mr. Garretson's class-wide testimony as to how the Medical Monitoring Program will operate in practice rebuts any notion that particular difficulties in managing the class action exist.

The Plaintiffs believe the class members have no real interest in prosecuting the medical monitoring and property damage claims individually. The prime reason is an economic one – to prosecute the instant claims requires expensive expert testimony. Only by pooling resources in a class action does it make sense to litigate these claims. To the extent that any class member desires to individually control his claim, however, he can simply opt out of the class when he receives notice. No other similar litigation has been filed by, or against, the class members. The Plaintiffs accordingly submit that a class action is by far the superior method to adjudicate this controversy.

The court in *Burdick v. Tonoga, Inc.*, 179 A.D.3d 53, 112 N.Y.S.3d 342 (3d Dept. 2019) - affirming certification of similar environmental contamination property damage classes and medical monitoring classes - likewise found the superiority requirement satisfied for all classes:

> We also agree with Supreme Court's determination that the proposed property classes and the medical monitoring class met the … superiority class certification prerequisites. ….
>
> Finally, because certification will "allow one action to do a job, or a good part of it, that would otherwise have to be done by many" …and avoid "multiple lawsuits involving claims duplicative of those asserted in this action and inconsistent rulings by various courts in this state" …and thus conserve judicial resources, we agree with Supreme Court's determination that class certification is superior to adjudicating claims individually

179 A.D. 3d at 60.

## CONCLUSION

For the reasons stated, the Plaintiffs respectfully request the Court to certify the

specified classes.

Dated: Melville, New York
October 29, 2021

*Counsel for Plaintiffs and
the Proposed Classes*

NAPOLI SHKOLNIK

By:

Lilia Factor
Paul Napoli
Robert Gitelman
400 Broadhollow Rd.
Melville, NY 11747
Telephone: (212) 397-1000
lfactor@napolilaw.com;
rgitelman@napolilaw.com
pnapoli@nsprlaw.com

ENVIRONMENTAL LITIGATION
GROUP, PC
Gregory A. Cade
Greg Anderson
Kevin B. McKie
2160 Highland Avenue South
Birmingham, AL 35205
Telephone: (205) 328-9200
email:    GregC@elglaw.com;
gary@elglaw.com
kmckie@elglaw.com