**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROSALIE ROMANO; PATRICIA GLUECKERT, individually and on behalf of the Estate of WILLIAM G. GLUECKERT; WILLIAM P. GLUECKERT; JAYNE MANN; ROSS MEADOW and ARLENE MEADOW; JACOB KHOLODNY and BELLA KHOLODNY; FLO RAUCCI, individually and on behalf of the Estate of SALVATORE RAUCCI; DANIEL GALLANTE and JENNIFER GALLANTE; TERESA MEADE, DONALD LAGOMARSINO, SCOTT RUST, LAURIE FRANKS, THOMAS NUCCI, CHRISTOPHER BLADES, DAWN CIRINO-SAMBADE, MARY ELLEN GINTY, JOHN SCHLOSSER, individually and on behalf of all others similarly situated; and DENISE FLORIO; MARY ANN HERBERT; CHRISTINA ANDREWS-SALES; CHRISTOPHER CAGNA; JACKIE LIEBERMAN; CATHERINE LEWONKA; EUGENE CONNOLLY; VIVIANE BLICKENSDERFER; DANA BLICKENSDERFER; GLENN FALINO and MARCIA FALINO; individually, <br><br> Plaintiffs, <br><br> -against- <br><br> NORTHROP GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION <br><br> Defendants. | Case No. 2:16-cv-5760-GRB-ST <br><br><br><br><br> **NORTHROP GRUMMAN CORPORATION'S AND NORTHROP GRUMMAN SYSTEMS CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ......................................................................................... 1

BACKGROUND .......................................................................................... 3

    A.    Plaintiffs' Claims ............................................................................. 3

    B.    Plaintiffs Seek Certification Of Medical Monitoring And Property Damage Classes ......................................................................... 5

    C.    Long Ago, Plaintiffs Conceded That Key Issues Are Individualized.................. 7

    D.    Discovery Further Confirmed the Individualized Nature of Plaintiffs' Claims. ....................................................................................... 8

    E.    Plaintiffs Offer Putative Expert Testimony That Confirms The Individualized Nature Of Their Claims ....................................................... 9

RELEVANT STANDARDS ............................................................................. 13

ARGUMENT ............................................................................................... 14

I.    THE PROPOSED CLASSES DO NOT SATISFY RULE 23 ...................................... 14

    A.    The Proposed Classes Raise Highly Individualized Claims And Thus Do Not Satisfy Commonality, Typicality, Predominance, or Superiority ................ 14

        1.    The Proposed Classes Raise Individualized Inquiries ............................ 15

            a)    The Property Damage Classes Raise Individualized Issues Of Contamination, Causation, Damages, Timeliness, Standing, Duty, Breach, Nuisance, And Trespass ...................... 15

            b)    The Medical Monitoring Class Presents Individualized Issues Of Exposure, Injury, Causation, Consequential Damages, Timeliness, Standing, And Nuisance ......................... 26

            c)    The Alternate Medical Monitoring Subclass Presents The Same Individualized Issues ......................................................... 33

        2.    The Proposed Classes Fail To Satisfy Commonality, Typicality, Predominance, Or Superiority ................................................. 35

    B.    The Proposed Class Representatives And Class Counsel Are Inadequate .......... 40

        1.    The Property Damage Classes And Alternate Medical Monitoring Subclass Representatives Have Conflicts With The Classes.................. 40

        2.    The Medical Monitoring Class Representatives Cannot Represent The Class Because It Includes Exposure-Only Members........................ 41

        3.    The Medical Monitoring Classes Representatives And Proposed Class Counsel's Litigation Choices Show They Are Not Adequate........ 42

    C.    The Proposed Classes Are Not Ascertainable ...................................... 43

**TABLE OF CONTENTS**
(continued)

D.      The Liability-Only Class Cannot Be Certified Under Rule 23(c)(4)................... 45

E.      The Medical Monitoring Classes Cannot Be Certified Under Rule 23(b)(2)
        Because They Do Not Seek Unitary Injunctive Relief ........................................ 46

        1.      The Medical Monitoring Classes Seek Consequential Damages, So
                Rule 23(b)(2) Is Inapplicable .................................................................. 46

        2.      The Medical Monitoring Classes Are Insufficiently Cohesive................ 49

II.     PLAINTIFFS' PUTATIVE EXPERT EVIDENCE IS INADMISSIBLE...................... 50

CONCLUSION.................................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
    96 N.Y.2d 280 (2001) ........................................................................................16, 22

*Amara v. CIGNA Corp.*,
    775 F.3d 510 (2d Cir. 2014)........................................................................................48

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................15, 42

*Arch v. Am. Tobacco Co., Inc.*,
    175 F.R.D. 469 (E.D. Pa. 1997)........................................................................43, 49

*Askey v. Occidental Chem. Corp.*,
    102 A.D.2d 130 (N.Y. App. Div. 1984) ...............................................28, 34, 49

*Ayres v. Delaware, Lackawanna & W. R.R. Co.*,
    158 N.Y. 254 (N.Y. 1899) ........................................................................................48

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000)........................................................................................37

*Baker v. Saint-Gobain Performance Plastics Corp.*
    232 F. Supp. 3d 233 (N.D.N.Y. 2017)...............................................................23

*Benjamin v. Nelstad Materials Corp.*,
    214 A.D.2d 632 (N.Y. App. Div. 1995) ...............................................................26

*Benoit v. Saint Gobain Performance Plastics Corp.*,
    959 F.3d 491 (2d Cir. 2020)..................................................................... *passim*

*Bentley v. Honeywell Int'l, Inc.*,
    223 F.R.D. 471 (S.D. Ohio 2004) .............................................................................47

*Bldgs. & Constr. Dept. v. Rockwell Int'l Corp.*,
    7 F.3d 1487 (10th Cir. 1993) .....................................................................................49

*Bolinder Real Estate, L.L.C. v. U.S.*,
    No. 2:97–CV–0912C, 2002 WL 732155 (D. Utah Apr. 24, 2002).........................26

*Brecher v. Republic of Arg.*,
    806 F.3d 22 (2d Cir. 2015)........................................................................................44

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010)......................................................................................14

iii

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Burdick v. Tonoga, Inc.*,
   179 A.D.3d 53 (N.Y. App. Div. 2019) ...............................................................39

*Burdick v. Tonoga, Inc.*,
   60 Misc.3d 1212(A) (N.Y. Sup. Ct. 2018), *aff'd*, 179 A.D.3d 53 (N.Y. App.
   Div. 2019) .....................................................................................................28, 39

*Cannon v. BP Prods. N. Am., Inc.*,
   No. 3:10-CV-00622, 2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) ...............21, 45

*Caronia v. Philip Morris USA, Inc.*,
   22 N.Y.3d 439 (N.Y. 2013) ..................................................................... *passim*

*Central States Southeast and Southwest Areas Health and Welfare Fund v.*
   *Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007) ...........................................................................37, 48

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .....................................................................................13, 14, 20

*Comer v. Cisneros*,
   37 F.3d 775 (2d Cir. 1994) ..................................................................................47

*Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*,
   41 N.Y.2d 564 (N.Y. 1977) ...........................................................................16, 25

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................................. *passim*

*Davies v. S.A. Dunn & Co., LLC*,
   200 A.D.3d 8 (N.Y. App. Div. 2021) ...........................................................16, 17, 23

*Donavan v. Saint-Gobain Performance Plastics Corp.*,
   No. 1:16-CV-924, 2017 WL 3887904 (N.D.N.Y. Sept. 5, 2017).....................17, 23

*Doundoulakis v. Town of Hempstead*,
   42 N.Y.2d 440 (N.Y. 1977) .................................................................................16

*Ebert v. Gen. Mills, Inc.*,
   823 F.3d 472 (8th Cir. 2016*)* ................................................................. *passim*

*Fisher v. Ciba Specialty Chems. Corp.*,
   238 F.R.D. 273 (S.D. Ala. 2006) ...................................................................20, 46

iv

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                      **Page(s)**

*Foster v. St. Jude Med., Inc.*,
   229 F.R.D. 599 (D. Minn. 2005).............................................................................43

*Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*,
   405 F. Supp. 3d 408 (W.D.N.Y. 2019)..................................................................16

*Gates v. Rohm & Haas Co.*,
   265 F.R.D. 208 (E.D. Pa. 2010), *aff'd*, 655 F.3d 255 (3d Cir. 2011) ..................15, 18, 31, 50

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011)........................................................................... *passim*

*German v. Federal Home Loan Mortgage Corporation*,
   885 F. Supp. 537 (S.D.N.Y. 1995).........................................................................26

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)..............................................................................................47

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)..............................................................................................40

*Henke v. Arco Midcon, L.L.C.*,
   No. 4:10CV86 HEA, 2014 WL 982777 (E.D. Mo. Mar. 12, 2014) ......................37

*In re Agent Orange Prod. Liab. Litig. MDL No. 381*,
   818 F.2d 145 (2d Cir. 1987)..................................................................................32

*In re Amla Litig.*,
   282 F. Supp. 3d 751 (S.D.N.Y. 2017)...................................................................46

*In re Fosamax Prods. Liab. Litig.*,
   248 F.R.D. 389 (S.D.N.Y. 2008) ..............................................................15, 37, 43

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013)....................................................................................25

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   241 F.R.D. 435, 442 (S.D.N.Y. 2007) .................................................................26

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002). ............................................................41, 42, 43

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   No. 1:15-cv-6549 (CM) (RWL), 2021 WL 100489 (S.D.N.Y. Jan. 12, 2021)......14

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*In re Nassau County Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ............................................................................46

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017) ............................................................................44

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) ......................................................................51

*In re St. Jude Med., Inc.*,
    425 F.3d 1116 (8th Cir. 2005) ........................................................................50

*In re Teflon Prods. Liab. Litig.*,
    254 F.R.D. 354 (S.D. Iowa 2008) ..................................................................43

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ............................................................................13

*In re World Trade Center Lower Manhattan Disaster Site Litig.*,
    758 F.3d 202 (2d Cir. 2014) ............................................................................32

*Irvin v. Harris*,
    944 F.3d 63 (2d Cir. 2019) ..............................................................................41

*Ivory v. Intl Bus. Machines Corp.*,
    116 A.D.3d 121 (N.Y. App. Div. 2014) ................................................. *passim*

*Jaffee v. United States*,
    592 F.2d 712 (3d Cir. 1979) ............................................................................48

*Kuhn v. Skyline Corp.*,
    Civ. A. No. 83-0942, 1984 WL 62775 (M.D. Pa. Aug. 3, 1984) ..........................15

*Kurczi v. Eli Lilly & Co.*,
    160 F.R.D. 667 (S.D. Ohio 1995) ..................................................................44

*LaBauve v. Olin Corp.*,
    231 F.R.D. 632 (S.D. Al. 2005) ................................................................22, 24

*Lee-Bolton v. Koppers Inc.*,
    319 F.R.D. 346 (N.D. Fla. 2017) ....................................................................21

*Levitt v. J.P. Morgan Sec., Inc.*,
    710 F.3d 454 (2d Cir. 2013) ............................................................................14

NY-2379558.52

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                      **Page(s)**

*Lloyd v. Covanta Plymouth Renewable Energy, LLC*,
    No. CV 20-4330, 2022 WL 407377 (E.D. Pa. Feb. 10, 2022)................................37

*Matter of New York City Asbestos Litig.*,
    148 A.D.3d 233 (N.Y. App. Div. 2017), *aff'd*, 32 N.Y.3d 1116 (N.Y. 2018).........................29

*Mays v. Tenn. Valley Auth.*,
    274 F.R.D. 614 (E.D. Tenn. 2011)........................................................15

*McCarty v. Natural Carbonic Gas Co.*,
    189 N.Y. 40 (N.Y. 1907) ...............................................................26

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010).............................................................38

*Nalley v. Gen. Elec. Co.*,
    165 Misc.2d 803 (N.Y. Sup. Ct. 1995) ..................................................16

*Nemeth v. Brenntag N. Am.*,
    No. 24, -- N.E.3d --, 2022 WL 1217464 (N.Y. Apr. 26, 2022) ..............................31

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ...................................................39, 40

*O'Connor v. Boeing N. Am., Inc.*,
    184 F.R.D. 311 (C.D. Cal. 1998) ...................................................39, 40

*Osarczuk v. Associated Univs., Inc.*,
    82 A.D.3d 853 (N.Y. App. Div. 2011). ..................................................26

*Packard v. City of New York*,
    15 Civ. 7130 (AT), 2020 WL 1467127 (S.D.N.Y. Mar. 25, 2020) ..........................46

*Parker v. Mobil Oil Corp.*,
    7 N.Y.3d 434 (N.Y. 2006) .............................................................31

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) .........................................................15

*Prantil v. Arkema Inc.*,
    986 F.3d 570 (5th Cir. 2021) .......................................................15, 31

*Putnam v. New York*,
    223 A.D.2d 872 (N.Y. App. 1996) ......................................................17

NY-2379558.52

## **TABLE OF AUTHORITIES**

**Cases**                                                                **Page(s)**

*R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corporation*,
959 F.3d 509 (2d Cir. 2020)..................................................................23

*Ranney v. Tonawanda City Sch. Dist.*,
160 A.D.3d 1461 (N.Y. App. Div. 2018) ................................................26

*Rhodes v. E.I. du Pont de Nemours & Co*.,
253 F.R.D. 365 (S.D. W. Va. 2008).......................................................15

*Rink v. Cheminova, Inc.*,
203 F.R.D. 648 (M.D. Fla. 2001)...........................................................42

*Rittenhouse v. St. Regis Hotel Joint Venture*,
149 Misc. 2d 452 (N.Y. Sup. Ct. 1990) .................................................28

*Small v. Lorillard Tobacco Co*.,
252 A.D.2d 1 (N.Y. App. Div. 1998) .....................................................43

*Steering Comm. v. Exxon Mobil Corp*,
461 F.3d 598 (5th Cir. 2006) ...........................................................33, 38

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015).....................................................................38

*Taylor v. CSX Transp., Inc.*,
264 F.R.D. 281 (N.D. Ohio 2007) ..........................................................38

*Thomas v. FAG Bearings Corp., Inc.*,
846 F. Supp. 1400 (W.D. Mo. 1994) ......................................................48

*Thompson v. Am. Tobacco Co., Inc.*,
189 F.R.D. 544 (D. Minn. 1999)............................................................43

*Town of New Windsor v. Avery Dennison Corp.*,
No. 10-CV-8611 (CS), 2012 WL 677971 (S.D.N.Y. Mar. 1, 2012) ......25

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)...........................................................................21

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)..........................................................................14, 31

*United States v. Botti*,
711 F.3d 299 (2d Cir. 2013)...................................................................46

NY-2379558.52

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ................................................................................. *passim*

*Wall v. Sunoco, Inc.*,
    211 F.R.D. 272 (M.D. Pa. 2002) ............................................................... 42

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) .................................................................. 48

**Other Authorities**

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Fed. R. Evid. 702 .............................................................................................. 51

NY-2379558.52

Northrop Grumman Corporation and Northrop Grumman Systems Corporation ("Northrop Grumman") respectfully oppose Plaintiffs' motion for class certification ("Mot.," and the memorandum of law in support thereof, "MOL").

## INTRODUCTION

For the past six years, Plaintiffs' counsel have insisted—contrary to the considered opinions of all regulators and water districts—that residents of Bethpage were exposed to toxic levels of contaminants through their soil, groundwater, and drinking water due to operations at a legacy Navy/Grumman manufacturing site.  Plaintiffs' counsel pressed these theories to the hilt: even falsely representing to their clients that their properties were contaminated when their own testing yielded negative results.

Now forced to make an evidentiary showing for the first time in moving for class certification, Plaintiffs abandon the exposure pathways they have touted for years in favor of a new one: alleged exposure to outdoor air emissions that ended more than a quarter of a century ago.  Plaintiffs' new theory is no more valid—or appropriate for class treatment—than their abandoned ones.  Plaintiffs concede that supposed exposures to historical air emissions involve countless individual inquiries that preclude class certification.  And after years of litigation and a full and fair opportunity for discovery, Plaintiffs make no showing that they can prove whether such exposures occurred on a class-wide basis.  As a result, Plaintiffs' certification motion relies on speculation about possible exposure and theoretical harm.

Rule 23 requires more.  Among other things, Rule 23 requires common issues to predominate over individual ones in damages actions, so that a single proceeding can efficiently resolve the class's claims.  As courts routinely recognize, mass environmental torts seldom satisfy Rule 23(b)(3)'s predominance requirement.  Neither do mass personal injury actions.  That is because both types of claims require proof of issues—such as exposure, causation, and

injury—that can rarely be proven on a class-wide basis.  This case is no exception.  Because New York law recognizes no claim for medical monitoring, Plaintiffs' so-called "medical monitoring" class is nothing more than a (notoriously uncertifiable) personal injury class by another name.  And their property damage classes, too, raise individualized issues of supposed contamination, causation, and property devaluation that Plaintiffs all but concede they cannot prove on a class-wide basis.  Infinite individual factors—such as a plaintiff's medical history, lifestyle, travel patterns, and genetics, his or her property's topography, soil type, and distance from the alleged source of contamination–will determine how each plaintiff's claim is tried.

The deficiencies in Plaintiffs' class certification motion do not end there.  Plaintiffs' proposed classes fail virtually every requirement of Rule 23.  For example, the proposed classes lack commonality because their members suffered different injuries.  And the representatives' claims are not typical of the classes' claims because each claim depends on unique characteristics of the plaintiff or his property.  Nor can the proposed class representatives adequately represent the putative classes.  They will be focused on individual concerns—such as the need to disprove the test results showing no contamination of their properties and the strong exposure and causation defenses Northrop Grumman has to their individual claims—not the needs of the classes.  The proposed classes are also not superior vehicles for resolving the putative classes' claims because class litigation would inevitably devolve into individualized trials.  The "injunctive" relief class Plaintiffs propose in an effort to circumvent Rule 23(b)(3)'s predominance requirement runs into yet another problem because it seeks damages, not injunctive relief  and, in any event, fails to meet Rule 23(a)'s requirements just as the putative damages classes do.  And their proposal to sever the liability portion of their property damage claims for class certification fares no better, because the myriad problems the property damage

NY-2379558.52

class faces, like causation, exposure, and injury, are all liability issues.

The class action device was not built for such highly individualized claims.  Plaintiffs have offered no evidence (much less common proof) that anyone or any property was adversely affected by the migration of chemicals from the legacy Navy/Grumman site that were used to build the warplanes that defended this country in its time of need.  Even Plaintiffs have conceded (and this Court agreed) years ago that key issues in this action—like the timeliness of Plaintiffs' claims—would be individualized.  The certification motion should be denied.

## BACKGROUND[1]

### A.   Plaintiffs' Claims

In 2016, Plaintiffs commenced this action, asserting claims for personal injuries and property damage, relating to their alleged exposure—primarily via groundwater, soil, soil vapor intrusion, and airborne dust—to chemicals released from the legacy Navy/Grumman site.  Ex. 1 at ¶¶ 107, 206.[2]  In bringing this action, Plaintiffs ignored assurances from the responsible public authorities who had scrutinized the legacy Navy/Grumman site for more than three decades and concluded that a) the true environmental contamination is plumes of groundwater deep below the surface that are not harming public health or property and b) the ongoing effort to remediate the groundwater by Northrop Grumman, the United States Navy and others has protected human health and the environment.  Ex. 2 at 2-3.[3]  The water districts that provide water to the area maintain that the same water Plaintiffs claim caused injury was and remains safe to use and drink

---

[1] The exhibits cited herein are the exhibits attached to the Declaration of Jessica Kaufman filed in support of this motion unless otherwise noted.

[2] From the 1940s to the mid-1990s, Northrop Grumman and its predecessor Grumman Corporation ran government-owned, contractor-operated manufacturing plants at the legacy Navy/Grumman site in Bethpage, New York.  Ex. 2 at 2.  During World War II, the company produced thousands of combat aircraft for the U.S. Navy that were instrumental in winning the war in the Pacific.  *Id.*  While those honorable acts that led to the environmental contamination are not at issue presently, Phase II will reveal how Northrop Grumman acted in accordance with Navy and other government agency contracts and directions, and complied with all industry and regulatory standards.  *Id.*

[3] For more than 25 years, Northrop Grumman has worked with the State, local regulators, and Navy to implement its portion of the State's remedy for addressing environmental issues relating to the legacy Navy/Grumman Site.

and the New York State Department of Environmental Conservation has reaffirmed that Bethpage residents have not been exposed and are not being exposed to harmful levels of contaminants from the legacy Navy/Grumman site.  *See id.*  Plaintiffs also failed to mention the results of their own pre-complaint soil tests, which demonstrated, contrary to their allegations, that trichloroethylene ("TCE") and polychlorinated biphenyls ("PCBs") were *not* detected on the properties of any Plaintiffs who participated in the testing, and that no other chemicals alleged were detected on their properties in excess of federal or state regulatory limits.  Ex. 3 at 3 ¶ 10.

After several years of litigation, and just three months before the court-ordered deadline to move for class certification, Plaintiffs were forced to admit that the pathways to exposure previously alleged were not viable and filed the Third Amended Complaint ("TAC").  Ex. 4. The TAC added new allegations relating to exposure via air emissions from the manufacturing operations at the legacy Navy/Grumman site.  Plaintiffs have swapped this new theory in for their abandoned ones in seeking class treatment, but it suffers from the same absence of evidentiary support and raises even more individualized inquiries.  During operations of the legacy Navy/Grumman site, which ceased in 1996, Northrop Grumman held and complied with permits issued pursuant to the Clean Air Act and the state equivalent for any emissions.  Ex. 2 at 23.  Audits conducted on behalf of the Navy and EPA during that period concluded that "[a]ll the stacks are reported to be in compliance with the permit stipulations," "all stacks that are required to hold a permit are reported to have same," and "there are no known problems" concerning "air quality."  Ex. 5 at NGROM1702364.[4]

Plaintiffs offer no evidence that any named Plaintiff was actually exposed to harmful emissions from the site, much less evidence of the duration or amount of any such exposure that

---

[4] *See also* Ex. 17 at NGROM0141086 ("A release to the air of contaminants from this site has been neither observed nor suspected").

4

could cause any harm.  *See* Exs. 6-16 at questions 20(b) and 62.  They rely exclusively on their expert witnesses' general—and unsupported—assumptions, such as those employed by Paul Rosenfeld, their putative air modeling expert.  Rosenfeld, rather than incorporating the actual evidence, substituted assumptions that were contrary to the facts, including that (a) Northrop Grumman routinely violated air permits (no evidence); (b) the site operated additional emission points that were not reflected in Grumman's permits (no evidence); and (c) all class members were exposed to the equivalent of Bethpage outdoor air 24 hours per day, 350 days per year (preposterous, as most of us tend to travel for work and, you know, sleep inside) in forming his conclusions.  Mot. Ex. 5 ("Rosenfeld Rep.") at 2, 56.  In determining the risk threshold for his proposed medical monitoring class boundary, Rosenfeld also relies on standards set by regulators to assess whether they may need to investigate and consider remediation, not benchmarks that inform whether human health is actually at risk.  And he admitted that the three in one million risk level used to define the class was an arbitrary number decided upon with the lawyers. Ex. 18 at 95:7-20 ("[Plaintiffs' counsel and I] concluded that three in a million is better than one in a million, it's better than two in a million, so three in a million was a relatively robust number.").).  Plaintiffs' motion for class certification reveals this case for what it is: attorney-manufactured litigation.

### B.   Plaintiffs Seek Certification Of Medical Monitoring And Property Damage Classes

Plaintiffs seek to certify classes for medical monitoring and property damage (collectively the "Proposed Classes").  The principal medical monitoring class (the "Medical Monitoring Class") is defined as:

> all current and former residents of the Bethpage Area who have been exposed to the Contaminants discharged by Defendants, whether through the air, dust, soil, groundwater, drinking water, soil vapor or any other means of exposure, for a period of one year or more—to establish medical monitoring as 'reasonably

5

anticipated' consequential damages resulting from their exposure to the aforementioned toxins.

MOL at 4. The "Bethpage Area" is a geographical boundary invented by Paul Rosenfeld's air dispersion model for hexavalent chromium ("CrVI") emitted between 1950 and 1994. MOL at 4; Rosenfeld Rep. at 1-2. The Medical Monitoring Class definition, however, does not require the current or former resident to have resided in the Bethpage Area during the modeled emissions period. MOL at 4.[5] Additionally, although Plaintiffs' TAC alleges exposure to volatile organic compounds and other substances (Ex. 4 at ¶ 7; MOL at 1-2), Plaintiffs' motion limits this class to "CrVI and TCE" exposures. MOL at 4. The putative Medical Monitoring Class representatives have current health conditions that they allege (without any evidence) were caused by exposure to contaminants from the legacy Navy/Grumman site. They seek compensatory damages and medical monitoring for themselves, but only medical monitoring for the class. MOL at 3, 32 n.4.

Alternatively, Plaintiffs propose a subclass for medical monitoring (the "Alternate Medical Monitoring Subclass" and together with the Medical Monitoring Class, the "Medical Monitoring Classes") comprised of:

> all current owners of residential real property in the Bethpage Area, whose real property has been damaged and reduced in value by the invasion of the contaminated water plumes, and/or the stigma of being located near the Site, and who have been exposed to the Contaminants discharged by Defendants for a period of one year, or more, to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins.

MOL at 6. Here, the "Bethpage Area" is defined as the overlapping boundaries of Rosenfeld's

---

[5] Similarly, although the Medical Monitoring Class definition includes individuals exposed via dust, soil, groundwater, drinking water, soil vapor, and any other means of exposure, the only putative evidence of exposure Plaintiffs have submitted concerns air emissions.

air dispersion modeling and Figure 11 of W. Richard Laton's report.  *Id.* at 6.[6]  But Plaintiffs offer no evidence (or expert opinion) that living above the plumes actually harmed any Plaintiff or her property.

> The putative property damage class (the "Property Damage Class") is composed of:
>
> All current owners of residential real property in the Bethpage Area, which has been impacted by Defendants' Contaminants in the air, dust, soil, groundwater, drinking water, soil vapor or any other environmental medium for damages due to the diminution of value due to the known or perceived contamination in the area, and/or stigmization of property.

MOL at 7.  The "Bethpage Area" is here defined by Figure 11 of Laton's report.  *Id.* at 7. Alternatively, Plaintiffs propose a subclass that seeks certification of the issue of Northrop Grumman's liability for negligence, nuisance, trespass, and abnormally dangerous activities (the "Liability-Only Property Damage Class" and, together with the Property Damage Class, the "Property Damage Classes").  *Id.* at 7-8.

### C.   Long Ago, Plaintiffs Conceded That Key Issues Are Individualized

In successfully opposing Northrop Grumman's motion to dismiss on statute of limitations grounds, Plaintiffs represented—and are estopped from contesting—that "[e]xactly when each of [the Plaintiffs'] claims accrued is an individualized factual inquiry."  Ex. 19 at 9.  The Court agreed that facts relevant to timeliness, such as "when the toxic substances from the spreading plume may have reached each of plaintiff's property, when the contamination was discovered, when the diminution of value was or reasonably could have been ascertained and when stigma damages began to be manifested," as well as "the dates on which the plaintiffs received their diagnoses" would require individualized inquiries.  Ex. 20 at 19-20, 22.  As expected, the class

---

[6] Figure 11 is a composite of several TCE plume maps, regardless of groundwater depth, meant to show the maximum extent of TCE impacted groundwater.  Mot. Ex. 6 ("Laton Rep.") § 5.3.  Laton opines that residential properties within the map in Figure 11 have an unquantified "potential to be impacted by vapor intrusion."  *Id.* § 8.3.2.

representatives and other Plaintiffs testified to becoming aware of their alleged claims at varying times.[7]

### D. Discovery Further Confirmed the Individualized Nature of Plaintiffs' Claims.

Before Plaintiffs filed their motion, the parties exchanged extensive discovery, with all Phase I discovery disputes resolved as of August 20, 2021. Ex. 21 at ¶ 1. During Phase I, Northrop Grumman produced approximately 5.9 million pages of documents. The parties conducted 24 depositions and exchanged 155 interrogatories, requests for production, and requests for admissions. Plaintiffs produced medical records and fact sheets, and Northrop Grumman deposed each of the class representatives.

These materials are brimming with individual plaintiff-specific information. For example, the 11 putative representatives for the two Medical Monitoring Classes alone reported 19 different medical conditions, including six different types of cancer, and 13 non-cancer conditions ranging from asthma to bladder infection. *See* Exs. 6-16 at q. 26. They vary in age from 50 to 81 years old. *See* Exs. 6-16 at q. 4. Six have family histories of cancer. *See* Exs. 6, 7, 9, 12, 14, 16 at q. 48-49. Some hold or have held jobs that may have exposed them to contamination outside of their homes. *See, e.g.*, Ex. 26 at 55:159:9; Ex. 27 at 271:3–12. Each putative representative reported that they drink alcohol in varying quantities (*see* Exs. 6-16 at q. 5051), and four are past cigarette smokers. *See* Exs. 7, 8, 13, 14 at q. 50-51. Each of these factors, among many others, has health implications that affect Plaintiffs' present physical condition, likelihood of developing future medical issues, and potential sources of any present or future medical conditions.

Discovery also revealed the individualized nature of Property Damage Classes' claims.

---

[7] *See, e.g.*, Ex. 22 at 45:4–16 (became aware of chemical contamination roughly 10 years ago); Ex. 23 at 128:14–129:13 (became aware of potential Park contamination between 2000 and 2010); Ex. 24 at 89:22–90:4 (became aware of alleged property claim in 2016); Ex. 25 at 99:20–100:13 (became aware of plume in 2012).

NY-2379558.52

The nine representatives purchased their seven properties between 1975 and 2005—a thirty-year span. *See, e.g.*, Ex. 6 at q. 21(b); Ex. 8 at q. 21(b). None had received property testing confirming contamination.[8] Each representative's property has *increased* in value since the purchase date—by varying amounts.[9] And each property differs in its proximity to the Navy/Grumman site and subterranean conditions, as well as its structure, features, and improvements, all of which have differing impacts on property value.[10]

### E. Plaintiffs Offer Putative Expert Testimony That Confirms The Individualized Nature Of Their Claims

In support of their motion, Plaintiffs offer the putative expert opinions of Mr. Bost and Drs. Rosenfeld, Guidotti, Laton, and Boyle.[11] Northrop Grumman is moving to exclude their opinions because they fail to satisfy the requirements of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). But even if these putative experts are not excluded, their testimony falls far short of proving the requirements of Rule 23.

**Richard Bost.** Plaintiffs rely on Bost to calculate annual air emissions of CrVI and TCE from historical manufacturing operations at the legacy Navy/Grumman site from 1950 through 1995. Rather than conduct a reliable analysis incorporating the actual facts, Bost provides inflated emissions estimates by assuming Grumman always violated every air emission permit it received—contrary to the evidence, his own understanding of the purpose of air emissions

---

[8] Ex. 3 at 3 ¶ 10.

[9] *See* Ex. 6 at q. 21(b); Ex. 28 at 261:21-262:8 ($220,000 increase); Ex. 7 at q. 21(b), Ex. 22 at 181:12-22 ($258,000 increase); Ex. 8 (M. Ginty Fact Sheet) at q. 21(b), Ex. 23 at 124:14-126:6 ($531,900 increase); Ex. 9 at q. 21(b), Ex. 24 at 103:2-9 ($417,000 increase); Exs. 10-11 at q. 21(b), Ex. 26 at 78:17-79:1 ($365,000 increase); Exs. 13-14 at q. 21(b), Ex. 25 at 64:4-10 ($403,500 increase); Ex. 15 at q. 21(b), Ex. 29 at 206:17-207:3 ($293,700 increase).

[10] *See* Ex. 30 at 86:2–87:13 and Ex. 31 at Figure 3-9 (p.204) (showing varying depth below ground); *see also, e.g.*, Ex. 24 at 50:18-19, 56:1922 (basement and garage); Ex. 25 at 64:17-21 (no basement or garage); Ex. 22 at 184:22–186:1 (describing kitchen and bathroom improvements); Ex. 32 at 81:14–82:2 (describing kitchen improvement); Ex. 29 at 218:18–219:4 (describing deck expansion).

[11] Plaintiffs also offered the reports of John B. Robertson and Matthew Garretson. But Robertson subsequently withdrew his report, and Garretson's report, which discusses only the management and administration of a proposed medical monitoring program for a "settlement class," Mot. Ex. 23 ("Garretson Rep.") at ¶ 16, is irrelevant to whether Plaintiffs have satisfied the requirements of Rule 23.

permits, and common sense.  Ex. 33 at 208:23-209:24; *see also id.* 41:24-42:21.  To further inflate his air emission calculations, Bost added several, unpermitted emission points with no evidence they were ever built or operated, and assumed, with no factual support, that Grumman lacked efficient air emission controls, utilized poor painting techniques, and used low efficiency equipment.  *Id.* at 114:12-22, 141:23-142:2, 143:7-11, 158:14-17, 159:2-4, 168:8-11, 208:23-209:24; Mot. Ex. 8 ("Bost Rep.") at 14.  Bost's biased assumptions led to gross overestimations of the historical air emissions from the legacy Navy/Grumman site operations.

**Paul Rosenfeld**.  Plaintiffs rely on Rosenfeld to establish the boundaries of the Medical Monitoring Class by creating a model of CrVI particles that were purportedly emitted into the air during manufacturing operations at the legacy Navy/Grumman site between 1950 and 1994.[12]  In creating the model, Rosenfeld relied exclusively on Bost's unreliable emission calculations and did not independently confirm or verify Bost's data.  Ex. 18 at 68:24-69:4, 81:17-25, 82:10-19.  Rosenfeld, who is not a medical expert, then converted his air dispersion model to a theoretical model purporting to show increased cancer risk that depends on the assumption that all class members were exposed to the equivalent of outdoor air 24 hours per day, 350 days per year, for purposes of calculating the dose for one-year of exposure from 1950 to 1994, which he conceded overestimates the risk for purported class members.  *See id.* at 148:6-18.

In arriving at his model for supposed health risk, Rosenfeld opted not to use measures designed to gauge whether human health was actually at risk.  Instead, he used the U.S. Environmental Protection Agency ("EPA") regional screening levels ("RSLs").  But RSLs were developed for an entirely different purpose: identifying whether levels of contamination found at

---

[12] Rosenfeld also modeled TCE emissions, but the proposed class boundary is based only on CrVI emissions. Rosenfeld Rep. at 2.  Rosenfeld admitted that most individuals within the class boundary would not have been exposed to harmful levels of TCE.  *See* Ex. 18 at 128:1-7 (admitting TCE risk estimates do not meet his proposed threshold for class membership); Rosenfeld Rep. Exhibit T (Rosenfeld's TCE dispersion maps showing majority of proposed class area faced 0.5 in a million to zero chance of increased risk from TCE).

NY-2379558.52

the site may warrant further investigation or cleanup.  The EPA has "emphasized that [R]SLs are not cleanup standards" (Ex. 34 at ¶ 1, and were designed to be ultra-conservative and *overstate* potential risk.[13]  RSLs are not a medical diagnostic tool, as even Plaintiffs' putative expert Laton admitted.  *See* Ex. 30 at 182:22-183:1 (agreeing that EPA's screening levels are not about "the levels at which an individual will experience an adverse effect").  Then, Rosenfeld collaborated with Plaintiffs' counsel to define class membership based on an arbitrary, scientifically unsound risk threshold.[14]

**Tee Guidotti**.  Plaintiffs rely on Guidotti to opine about supposed exposure to contaminants, the increased risk of disease that potentially arises from exposure, and the design of a proposed medical monitoring program.  MOL at 5-6, 24, 45.  Guidotti concedes that the level of exposure for any individual person is based on individualized factors—such as the duration and dose of the exposure—and that that each individual's risk of contracting disease in the future depends on individual factors that he did not consider.  Ex. 36 at 70:2-10, 146:7-147:1, 147:5-13.  Instead, Guidotti based his exposure opinions solely on Rosenfeld's theoretical risk model and Bost's flawed air emission calculations.  Mot. Ex. 9 ("Guidotti Rep.") at 4-5; Ex. 36 at 57:16-23, 60:6-9.  Guidotti acknowledges that there are no epidemiological studies of the impact of exposure to CrVI at Rosenfeld's theoretical levels and that no medical monitoring program has ever been approved based on the EPA RSLs or theoretical risk thresholds like Rosenfeld's.  Ex. 36 at 34:7-21, 70:11-22.  He also offered no opinion that each member of the class is presently injured, performed no causation analysis, and conceded that he had not

---

[13] *See* Ex. 35   at pg. 1-7 ("Use of health protective risk assessment procedures as described in these cancer guidelines means that estimates, while uncertain, are more likely to overstate than understate hazard and/or risk.").

[14] Ex. 18 92:16-93:1, 95:7-20 ("I was collaborating with [Plaintiffs' counsel], and we concluded that three in one million was a representative number that could be utilized for defining the class boundary . . . [because] three in a million is better than one in a million, it's better than two in a million, so three in a million was a relatively robust number.").

determined whether any class member is more likely than not to develop cancer or any other health conditions as a result of exposure. *Id.* at 73:9-25, 83:16-84:1, 146:7-18, 180:6-21. Guidotti conceded that he has never before proffered the opinion he offers here. *Id.* at 32:18-33:5, 34:7-21.

**W. Richard Laton**. Plaintiffs rely on Laton for the Property Damage Classes' boundary based on the potential for a vapor intrusion risk from TCE that NYSDEC says does not exist to properties that are hundreds of feet above the groundwater contamination plumes. Laton did not opine on whether any property currently has a vapor intrusion issue, or the likelihood that it would develop one in the future. Ex. 30 at 74:22-75:19, 153:22-154:15. He also admitted that the likelihood that any property within the boundary will experience soil vapor intrusion varies based on individualized factors, including distance from the plumes, soil type, and concentration of chemicals in the plumes. *Id.* at 180:19-181:10, 189:6-15. And he admitted that determining whether any properties currently experience soil vapor intrusion would require individualized testing. *Id.* at 154:16-19, 177:11-179:19, 189:9-15.

**Kevin Boyle**. Finally, Plaintiffs rely on Boyle to opine that all current owners of real estate in Laton's property damage boundary have suffered a diminution in value as a result of the alleged stigma of living near the legacy Navy/Grumman site. Boyle did not consider the physical and locational attributes of each property, evidence of the varying values of properties in the immediate area, or actual sales in the putative class area, as he would have to do to determine whether property values have actually decreased. Ex. 37 at 34:23-35:3, 39:8-15, 123:8-11. Even taken at face value, moreover, his unsupported assumption that "residential properties over and near the Northrop site" suffered a decrease in value "by as much as 27%" does not support a common finding of damages. Mot. Ex. 7 ("Boyle Rep.") at 2. Boyle could

not identify when property values supposedly dropped, so determining whether a class member purchased property before or after the alleged drop in property values will require individualized inquiries. *Id.* at 2; Ex. 37 at 132:11-136:8.

## RELEVANT STANDARDS

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations and citation omitted). To fit within this exception, a plaintiff must "affirmatively demonstrate his compliance with Rule 23." *Id.* (internal quotations and citation omitted.) "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). That means a plaintiff must "establish that the four threshold requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—are satisfied and demonstrate 'through evidentiary proof' that the class satisfies at least one of the three provisions for certification found in Rule 23(b)." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (citation omitted). "The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013). And in order to show that the putative class will be able to prove its claims through class-wide—rather than individualized—proof, the movant cannot rely on evidence that a plaintiff could not herself rely on in proving her claims in an individual action. *See Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 458 (2016).

In reviewing a motion for class certification, the court in turn must perform a "rigorous analysis" to determine that the prerequisites of Rule 23 have been satisfied. *Comcast*, 569 U.S. at 35 (internal quotations and citation omitted). The court must "make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement," and must find that each

13

requirement is "established by at least a preponderance of the evidence." *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010). In that vein, courts in this circuit agree that the court must ensure that putative expert evidence offered by a plaintiff to satisfy his Rule 23 burden passes muster under *Daubert*. *See, e.g., In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-cv-6549 (CM) (RWL), 2021 WL 100489, at *8 (S.D.N.Y. Jan. 12, 2021) (collecting cases).

## ARGUMENT

### I.     THE PROPOSED CLASSES DO NOT SATISFY RULE 23

The Proposed Classes raise such highly individualized claims that they cannot satisfy even Rule 23(a)'s commonality and typicality requirements, let alone Rule 23(b)(3)'s more demanding predominance and superiority requirements. On top of that, the proposed class representatives are inadequate and Proposed Classes' memberships cannot be readily ascertained. Plaintiffs' various attempts to "fix" their class certification problems do not work. Their Liability-Only Property Damage Class has all the same problems as the principal Property Damage Class. And their attempt to circumvent Rule 23(b)(3) by certifying their Medical Monitoring Classes under Rule 23(b)(2) is futile: the Medical Monitoring Classes do not seek unitary injunctive relief and, in any event, even Rule 23(b)(2) classes must satisfy Rule 23(a), which the Medical Monitoring Classes fail to do.

### A.     The Proposed Classes Raise Highly Individualized Claims And Thus Do Not Satisfy Commonality, Typicality, Predominance, or Superiority

Rule 23 contains several requirements that ensure that putative class members have enough in common to make it efficient for them litigate their claims as a class. Under Rule 23(a), for instance, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Dukes*, 564 U.S. at 349-50 (citation omitted), and typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or

NY-2379558.52

defenses of the class," Fed. R. Civ. P. 23(a)(3).   Similarly under Rule 23(b)(3), even where commonality and typicality are demonstrated, "[c]ommon questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted).   Because the Proposed Classes assert classic tort claims that are highly individualized, they satisfy none of these requirements.

## 1.   The Proposed Classes Raise Individualized Inquiries

As numerous courts have recognized, property damage classes like those here raise significant individualized issues of contamination, causation, and damages.[15]   Medical monitoring classes too present highly individualized issues of exposure, injury, medical causation, and the availability and propriety of medical monitoring.[16]   Plaintiffs' Proposed Classes present all of these aggregation-defeating issues and more.

### a)   The Property Damage Classes Raise Individualized Issues Of Contamination, Causation, Damages, Timeliness, Standing, Duty, Breach, Nuisance, And Trespass

The Property Damage Classes—classes covering current owners of residential real property in the Bethpage Area, as defined by Laton's groundwater map—assert highly individualized tort claims for negligence, nuisance, abnormally dangerous activities, and trespass.   The Property Damage Classes' claims require them to prove that Northrop Grumman's conduct *caused* each class member a *present injury*.[17]   The negligence claim additionally

---

[15] *See, e.g., Prantil v. Arkema Inc.*, 986 F.3d 570, 581 (5th Cir. 2021); *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. 2016*); Parko v. Shell Oil Co*., 739 F.3d 1083, 1085-87 (7th Cir. 2014); *Mays v. Tenn. Valley Auth.*, 274 F.R.D. 614, 625-27 (E.D. Tenn. 2011); *Gates v. Rohm & Haas Co*., 265 F.R.D. 208, 232-34 (E.D. Pa. 2010), *aff'd*, 655 F.3d 255 (3d Cir. 2011); *Kuhn v. Skyline Corp*., Civ. A. No. 83-0942, 1984 WL 62775, at *4 (M.D. Pa. Aug. 3, 1984).

[16] *See, e.g., Gates v. Rohm & Haas Co.*, 655 F.3d 255, 261, 269-70 (3d Cir. 2011); *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 401 (S.D.N.Y. 2008); *Rhodes v. E.I. du Pont de Nemours & Co*., 253 F.R.D. 365, 374-80 (S.D. W. Va. 2008).

[17] See *Davies v. S.A. Dunn & Co., LLC*, 200 A.D.3d 8, 16 (N.Y. App. Div. 2021) ("To recover in negligence, a

requires proof that Northrop Grumman owed a duty of care to each class member, not to the community at large. *See 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.,* 96 N.Y.2d 280, 290 (2001). And the trespass and nuisance claims require proof that Northrop Grumman caused an actual invasion of, or substantial and unreasonable interference with, each class member's property. *Ivory*, 116 A.D.3d at 130 (trespass); *Nalley v. Gen. Elec. Co.*, 165 Misc.2d 803, 811 (N.Y. Sup. Ct. 1995) (nuisance).

The Property Damage Classes also request individualized relief—damages for the "stigmatization of property" "due to the known or perceived contamination in the area." MOL at 7. Such "stigma damages" are recoverable under New York law only in connection with the "actual" or perhaps "imminent" contamination of a plaintiff's property. *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.*, 405 F. Supp. 3d 408, 447 (W.D.N.Y. 2019) (citations omitted.).[18] Contrary to Plaintiffs' argument (MOL at 37), stigma damages are not an "exception" to New York's economic loss rule (the rule that pure economic loss is not recoverable in tort); they are an application of that rule. *See Davies*, 200 A.D.3d at 16-17 ("[T]he economic loss resulting from the diminution of plaintiffs' property values is not, standing alone, sufficient to sustain a negligence claim under New York law").[19]

---

plaintiff must sustain either physical injury or property damage resulting from the defendant's alleged negligent conduct."); *Ivory v. Intl Bus. Machines Corp.*, 116 A.D.3d 121, 129 (N.Y. App. Div. 2014) (to commit trespass, defendant "must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he [or she] willfully does, or which he [or she] does so negligently as to amount to willfulness.") (internal quotations and citation omitted); *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 569 (N.Y. 1977) ("[O]ne is subject to liability for a private nuisance if his conduct is a legal cause of the invasion of the interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities"); *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (N.Y. 1977) ("those who engage in activity of sufficiently high risk of harm to others, especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent").

[18] *See also Donavan v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-CV-924 (LEK/DJS), 2017 WL 3887904, *6 (N.D.N.Y. Sept. 5, 2017) ("Court is unaware of any New York case where a plaintiff alleged property damages based on contamination without claiming actual pollution of his drinking water or property").

[19] A prime example of a case where stigma damages may be available is one where (unlike here) the defendant's conduct actually contaminated the plaintiff's property and, although the property has been remediated, the stigma of

As courts have recognized, claims like those here present substantial individualized issues. The Eighth Circuit's decision in *Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016) is illustrative. There, residents of a Minneapolis neighborhood sued General Mills, alleging that its release of TCE threatened their properties via soil vapor intrusion and diminished their property values. *Id.* at 475-77. The court held that the "district court abused its discretion in determining that the individualized issues in this case 'do not predominate over the common issues . . . .'" *Id.* at 479. "To resolve liability," the court explained, "there must be a determination as to whether vapor contamination, if any, threatens or exists on each individual property as a result of General Mills' actions, and, if so, whether that contamination is wholly, or actually, attributable to General Mills in each instance." *Id.* These issues were "not suitable for class-wide determination." *Id.* And, the court continued, "there likely will be a property-by-property assessment of additional upgradient (or other) sources of contamination, whether unique conditions and features of the property create the potential for vapor intrusion, whether (and to what extent) the groundwater beneath a property is contaminated, whether mitigation has occurred at the property, or whether each individual plaintiff acquired the property prior to or after the alleged diminution in value." *Id.* The court found the "matter is thus unsuitable for class certification under Rule 23(b)(3) . . . ." *Id.* at 480. The same is true here.

**Contamination**. Plaintiffs cannot prove that each class member's property is or imminently will be contaminated without a property-by-property assessment. *See Gates v. Rohm & Haas Co.*, 265 F.R.D. at 233-34 (questions "relating to causation of contamination, extent of contamination, [and] fact of damages" were individual questions that predominated over common ones); *Ebert*, 823 F.3d at 479 (same). To date, Plaintiffs have offered no evidence that even a single class member's property is contaminated with the substances at issue. The results

---

contamination continues to depress its value. *See Putnam v. New York*, 223 A.D.2d 872, 873-74 (N.Y. App. 1996).

of testing at individual Plaintiff residences is to the contrary, yielding non-detects of TCE, the chemical the regulators have found to be the main one associated with the legacy Navy/Grumman Site and the very chemical for which Plaintiffs seek to certify a class.  Ex. 38 at 11, 14, 37, 40, 64, 67, 102, 105, 121, 124, 141, 144, 161, 164, 200, and 203.  The other chemical about which Plaintiffs seek to certify a class—CrVI—was not found, or even tested for at all. Ex. 38.  Determining which (if any) of the putative class members has property that is or imminently will be contaminated would thus require individualized inquiries.

Laton's class boundary certainly does not provide a class-wide method of determining whether each property within the boundary faces actual or imminent contamination.  Laton's two-dimensional map, within which he claims there is an unquantified potential vapor intrusion risk from TCE, fails to convey that the contaminated groundwater plumes are deep below ground—ranging in depth, but in most places hundreds of feet below surface—and are covered by a lens of clean groundwater.  *See* Ex. 39 at pp. PL_ROM_0263208, 0263276.  Laton admitted that distance from groundwater and overlying clean water—among other factors—can eliminate or reduce the potential for soil vapor intrusion.  Ex. 30 at 152:9–154:19, 211:10–212:7, 215:13– 22.  And he admitted that he had not considered these factors for any class member.  *Id*. at 181:5- 10 (admitting "beyond my scope" to review any of NYSDOH's environmental factors affecting soil vapor intrusion risk).  For example, he acknowledged that "the potential for vapor intrusion associated with contaminated groundwater decreases with increasing depth to groundwater."  *Id*. at 178:9-20.  Yet he also conceded that "for any particular plaintiff's residence" he did not "look at what the depth to . . . groundwater plume is at their location" because his "map was the spatial extent, not the depth to water."  *Id*. at 179:2-7.[20]  His boundary accordingly says nothing about

---

[20]  Similarly, Laton admitted that "[i]f contaminated groundwater is overlain by clean water . . . then vapor phase migration . . . is unlikely."  Ex. 30 179:9-19; *see also id.* 170:12-15 (acknowledging "DEP's determination that

the presence of chemicals on properties within that area or the likelihood that chemicals will affect those properties via soil vapor intrusion.[21]

Laton thus conceded that he offered no opinion on whether any property is currently contaminated or the likelihood that it would become so in the future. *See* Ex. 30 at 74:25-75:2 ("I'm only offering an opinion that . . . vapor intrusion . . . is . . . potential."); 153:24-154:2 (admitting that he did not "quantify" the "potential" for soil vapor intrusion). And he admitted that determining whether any property has soil vapor intrusion would require individualized inquiries. *See id*. at 189:9-15 (admitting that individualized testing would be necessary to determine existence of soil vapor intrusion), 177:11-179:19 (admitting that individualized factors like distance from plumes, soil type, and concentration of chemicals in plumes affect each property's risk of soil vapor intrusion); 212:17-23 (admitting actual risk assessment for individual properties would require thousands of samples across time).[22]

Nor does Rosenfeld's testimony provide class-wide proof of contamination. While Rosenfeld postulates that historical air emissions deposited CrVI particles onto the class members' properties, any CrVI particles would have persisted for days, at most. Ex. 18 at 214:19-215:22. Certainly they would not have affected class members who purchased properties after air emissions stopped decades ago, assuming any landed offsite in the proposed class boundary. Rosenfeld admitted that "very little" CrVI would have been deposited even while the facilities were operating, to the point that he did not expect that there have been "detectable

---

there's a clean groundwater lens" and testifying "I can't say it's not true"). Yet his map fails to account for that lens.

[21] The contamination of the groundwater, of course, does not represent contamination of putative class members' property "because groundwater does not belong to the owners of real property . . . ." *Ivory*, 116 A.D.3d at 130.

[22] Plaintiffs do not present any evidence that the class's drinking water is contaminated. For good reason: "[T]he drinking water in the [Bethpage] area complies with all Federal and State drinking water standards, and is therefore safe to drink." Ex. 40 at p. 6-2. And the public water supply wells "have been providing safe, MCL-compliant water for over 25 years." Ex. 41 at p. 4-1.

levels of chromium-6 in the soil" of class members. *Id*. at 213:21-214:2.[23]

**Causation of Contamination**.  Class certification is also routinely denied in cases (like this one) involving allegations of soil vapor intrusion, because proving that any contamination of a class member's property was caused by the defendant's tortious conduct would also require individualized inquiries.  "[A] determination as to whether vapor contamination, if any, threatens or exists on each individual property as a result of [a defendant's] actions, and, if so, whether that contamination is wholly, or actually, attributable to [the defendant] in each instance" is "not suitable for class-wide determination."  *Ebert*, 823 F.3d at 479; *Fisher v. Ciba Specialty Chems. Corp.,* 238 F.R.D. 273, 305 n.70 (S.D. Ala. 2006) ("[A] property-by-property inquiry will unquestionably be necessary to determine whether that source and that pathway have any bearing on the experience of a particular property owner within the Proposed Class Area.").

Plaintiffs have undertaken no causation inquiry.  There is no evidence that any Plaintiff has experienced soil vapor intrusion, but even if they have, Laton offered no opinion as to the source of any such vapor intrusion.  Ex. 30 at 74:22-75:2.  Yet "[t]he alternate sources must be accounted for and ruled out in *each* home in order to prove that the excess [contaminant] in any given home is in fact attributable" to the Navy/Grumman site.  *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 385 (N.D. Fla. 2017).

**Damages**.  The availability, fact of, and extent of any damages will also require individualized inquiries.  Although individualized damages inquiries may not, on their own, doom a motion for class certification, here the need for individualized inquiries swells the already long list of individualized inquiries.  In particular, questions about whether stigma

---

[23] To the extent Plaintiffs' rely on Rosenfeld's modeling for alleged class-wide contamination they have offered no evidence that such alleged contamination caused class-wide economic loss.  Boyle's testimony estimates diminution in property values based on their proximity to the groundwater plumes (Boyle Rep. at 4), not Rosenfeld's modeling. *See Comcast*, 569 U.S. at 35 (at class certification, "any model supporting a plaintiff's damages case must be consistent with its liability case . . . .") (internal quotations and citation omitted).

damages are legally available for each class member (has she proven actual or imminent contamination of her property?), whether each class member in fact incurred any stigma damages (did she purchase her property before or after the alleged drop?), and the amount of any such damages will all require individualized inquiries. *See Ebert*, 823 F.3d at 479-80.[24]

**Standing**. "Every class member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). To prove standing, each class member will need to prove, *inter alia*, that he suffered "an injury in fact that is concrete, particularized, and actual or imminent . . . ." *Id*. at 2203. Plaintiffs offer no means of proving on a class-wide basis that that each class member's property is or imminently will be contaminated. And their assertion of stigma damages would not support a class-wide finding of injury-in-fact because they offer no admissible evidence capable of proving such stigma damages for the class.

**Statute of Limitations.** Litigating the timeliness of each class member's claims will also require individualized review. Plaintiffs have acknowledged, and the Court agreed, "that when each of the plaintiffs' claims accrued 'is an individualized factual inquiry' . . . ." Ex. 20 at 18.[25] As Plaintiffs told the Court, "there could be numerous questions of fact relating to when the toxic substances from the spreading plume may have reached each plaintiff's property, when the contamination was discovered, when the diminution of value was or reasonably could have been ascertained and when stigma damages began to be manifested." Ex. 19 at 10. "Only after painstaking factfinding on a plaintiff-by-plaintiff basis will each plaintiff's status vis a vis the

---

[24] *See also Cannon v. BP Prods. N. Am., Inc.*, No. 3:10-CV-00622, 2013 WL 5514284, at *9 (S.D. Tex. Sept. 30, 2013) ("If the stigma associated with the Refinery already existed in 2006, [plaintiff] would have purchased his house at a discount then and would not have been injured by the discount in his property value that still existed during the class period").

[25] Plaintiffs contradict themselves in arguing that "[t]here are no unique defenses that Grumman has with respect to any Class Representative that are not also applicable to the entire class." MOL at 27.

21

statute of limitations defense be ascertainable." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 675 (S.D. Al. 2005) (denying Rule 23(b)(3) certification).

**Duty and Breach**.  Under New York law, a defendant owes no duty to protect others from purely economic loss that is unaccompanied by injury to person or property.  *532 Madison Ave. Gourmet Foods*, 96 N.Y.2d at 290.  Because the Property Damages Classes include members who allege only economic loss (that is, stigma damages), whether Northrop Grumman owed and breached a duty to each class member—elements of the Property Damage Classes' negligence claim—also cannot be determined on a class-wide basis.  In *532 Madison Avenue Gourmet Foods,* the New York Court of Appeals dismissed a negligence suit by shop owners for lost income caused by a construction collapse that did not directly injure their properties because a landowner owes no "duty to protect an entire urban neighborhood against purely economic losses." *Id.* at 290.

That principle applies equally to alleged environmental torts.  In *R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corporation*, the Second Circuit rejected a negligence claim seeking economic loss caused by perfluorooctanic acid ("PFOA") contamination in Hoosik Falls because there was "no plausible allegation that any property owned by [the plaintiff] was invaded, injured, or damaged by PFOA."  959 F.3d 509, 518 (2d Cir. 2020).  In *Donavan*, the district court dismissed a plaintiff's claim that the defendant's negligence in releasing PFOA into the neighborhood diminished the value of his property because the plaintiff "ha[d] not alleged contamination of his drinking water or the presence of PFOA on his property . . . ." 2017 WL 3887904, at *4.  And in *Davies*, the New York Appellate Division similarly dismissed the negligence claim of property owners seeking damages for diminished property values due to noxious odors from a nearby landfill because plaintiffs alleged no "tangible" or "physical"

damage and "economic loss resulting from the diminution of plaintiffs' property values is not, standing alone, sufficient to sustain a negligence claim under New York law." 200 A.D.3d at 17. Determining whether Northrop Grumman owed and breached a duty to each class member will thus turn on individualized inquiries into whether each class member has suffered "tangible property damage" or instead asserts a purely economic loss. *Id.* at 17.

Plaintiffs' reliance on *Baker v. Saint-Gobain Performance Plastics Corp.* (MOL at 35) is misplaced.  232 F. Supp. 3d 233 (N.D.N.Y. 2017), *aff'd in part*, 959 F.3d 70 (2d Cir. 2020). *Baker* was not a class certification decision; it was a decision on a motion to dismiss.  And it did not hold that plaintiffs could prove duty to the entire class with common evidence, it held only that the named plaintiffs had adequately alleged that the defendant breached a duty to them by contaminating their drinking water.  232 F. Supp. 3d at 245.  Here, in contrast, Plaintiffs are seeking to certify a class, which requires them to offer proof, not mere allegations, and they offer no evidence that class members' drinking water is contaminated (or that they could prove such contamination on a class-wide basis).

**Intrusion on Plaintiffs' Property.**  Proof of an unauthorized entry on the Plaintiffs' land—a requirement of the Property Damage Classes' trespass claim—also requires a property-by-property inquiry.  *See LaBauve*, 231 F.R.D. at 673 ("invasion affecting an interest in the exclusive possession of [plaintiff's]) property" would require "substantial individualized proof and legal argument").

Plaintiffs mistakenly suggest that they can satisfy this element on a class-wide basis by demonstrating that the contaminated groundwater plumes exist.  MOL at 39-41.  It is well-established, however, that plaintiffs "cannot support trespass claims based on contaminated groundwater, because groundwater does not belong to the owners of real property, but is a

23

natural resource entrusted to the state by and for its citizens." *Ivory*, 116 A.D.3d at 130.[26]

Plaintiffs alternatively suggest that they can prove a common trespass through Rosenfeld's historical air modeling that supposedly showed that the CrVI particles "naturally fell to the earth and deposited onto the class members property." MOL at 41. Not so. Rosenfeld only modeled dispersion of CrVI in the air (he did not model actual deposits), and only between 1950 and 1994. Rosenfeld Rep. at 3 (describing class boundary as "based on air dispersion modeling using AERMOD, I2M's Base Case emissions, and risk calculations for CrVI"). Such modeling says nothing about whether class members, especially those who purchased their property outside that span, have experienced any intrusions—particularly since CrVI quickly degrades and can be washed or blown away. *See LaBauve*, 231 F.R.D. at 648-70 (modeling of mercury deposition via air emissions 35 years in the past failed to show that class representatives' properties were currently contaminated). In any event, Rosenfeld's modeling does not purport to show that CrVI particles fell onto each and every class member's property during the modeled time period because his models do not analyze whether CrVI particles degraded into non-toxic forms of chromium first before falling out of the air.[27] Ex. 18 at 214:12-215:7.

**Reason To Expect Pollutant To Travel To Plaintiffs' Properties**. To prevail on their trespass claims, Plaintiffs must also prove that Northrop Grumman "had good reason to know or expect that subterranean and other conditions were such that there would be passage [of the pollutant] from defendant's to [Plaintiffs' properties]." *In re Methyl Tertiary Butyl Ether*

---

[26] In *Ivory*, which involved individual (not class) claims, the plaintiffs' trespass claims survived summary judgment only because they offered evidence that the contaminated groundwater had contaminated their soil with TCE. 116 A.D.3d at 130. Here, Plaintiffs' property tests detected no TCE in their soil. *Supra* p. 4.

[27] Rosenfeld does not suggest that any TCE would have touched putative class members' properties because, as he acknowledges, TCE quickly evaporates upon emission. *See* Rosenfeld Rep. at 71 (explaining "TCE emissions were modeled as a gas vapor and not as a particle" so would not fall onto properties).

24

(MTBE) Prods. Liab. Litig., 725 F.3d 65, 119 (2d Cir. 2013) (internal quotations and citation omitted). Proving that Northrop Grumman was aware of a risk to each class member's particular property will require individualized inquiries into the distance of each putative class member's land from the site (some are as far as two miles away)[28] and differences in subterranean and other conditions. *See, e.g., Town of New Windsor v. Avery Dennison Corp.*, No. 10-CV-8611 (CS), 2012 WL 677971, at \*15 (S.D.N.Y. Mar. 1, 2012) (considering defendant's Plant's "proximity to Plaintiff's land" in determining whether plaintiff plausibly alleged this element). Such an analysis cannot be conducted on a class-wide basis.

   **Substantial And Unreasonable Interference With Plaintiff's Property**.  To assert a claim for private nuisance in the absence of an actual invasion, Plaintiffs would need to prove interference that is "substantial in nature" and "unreasonable in character." *Copart*, 41 N.Y.2d at 570. Whether any interference was substantial depends on the "degree" of interference (if any) each class member experienced with his or her use and enjoyment of the property. *Ranney v. Tonawanda City Sch. Dist.*, 160 A.D.3d 1461, 1462 (N.Y. App. Div. 2018). Whether interference was reasonable would also turn on individualized factors such as the "extent and frequency of the injury" to the class member's property and whether the class member or Northrop Grumman could claim "priority of occupation." *McCarty v. Natural Carbonic Gas Co.*, 189 N.Y. 40, 46-47 (N.Y. 1907); *Benjamin v. Nelstad Materials Corp.*, 214 A.D.2d 632, 633 (N.Y. App. Div. 1995) ("Although not conclusive, weight must also be given to the plaintiffs' awareness of the existence of the cement plant on the subject premises prior to purchasing their respective homes.").[29] These elements of Plaintiffs' nuisance claims would thus

---

[28] Rosenfeld Rep. at 22 (proposed boundary "extends approximately two (2) miles from the Facilities.").
[29] Before the mid-1970s, the potential negative effects of TCE were largely unknown. *See Bolinder Real Estate, L.L.C. v. U.S.*, No. 2:97–CV–0912C, 2002 WL 732155, \*\*7–8 (D. Utah Apr. 24, 2002) (environmental impacts of TCE were not recognized before the mid-1970s).

require individualized inquiries too.

Plaintiffs contend that private nuisance classes have previously been certified (at MOL at 43), but the cited cases are either factually inapposite or disprove Plaintiffs' point.  In *Osarczuk v. Associated Univs., Inc*., the Appellate Division *reversed* certification of an environmental tort class because "questions of whether the emissions of various toxic materials, over several decades, from various sources and in various ways, caused injury to the individual properties and economic loss to the property owners, cannot be resolved on a class-wide basis."  82 A.D.3d 853, 855-56 (N.Y. App. Div. 2011).  In *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, the court specifically noted that the private nuisance subclass was suitable for certification only because the contamination came from a single discrete oil spill.  241 F.R.D. 435, 442 (S.D.N.Y. 2007).  In *German v. Federal Home Loan Mortgage Corporation*, the class sought remediation—not damages—and was certified under Rule 23(b)(2) (not Rule 23(b)(3)).  885 F. Supp. 537, 546, 557-60 (S.D.N.Y. 1995).  And *Ivory* is not a class certification decision at all; it is a summary judgment decision on individual plaintiffs' claims.  116 A.D.3d at 125-33.

> **b)  The Medical Monitoring Class Presents Individualized Issues Of Exposure, Injury, Causation, Consequential Damages, Timeliness, Standing, And Nuisance**

Plaintiffs' Medical Monitoring Class is nothing more than a personal injury class by another name, and cannot be certified for the same core reason: it raises inherently individualized claims.  In some jurisdictions, medical monitoring is an independent cause of action that requires the plaintiff to prove exposure to toxins and increased risk of future disease, but does not require proof of a present physical injury.  *See Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439, 450 (N.Y. 2013) (listing examples of such jurisdictions).  Not so in New York.  New York recognizes no "independent cause of action for medical monitoring."  *Id.* at 452.  Medical monitoring is instead a form of damages that may be obtained once a plaintiff has proved an underlying

personal injury claim.  *Id.*  Plaintiffs seeking medical monitoring must thus prove all elements of the underlying tort claim, including a physical injury.  *Id.* at 451 (declining to "dispens[e] with the physical injury requirement" for personal injury torts where monitoring for future illness is sought).[30]

In the exposure context, there are two—and only two—ways a plaintiff can prove a present physical injury.  *First*, a plaintiff can show that "in the plaintiff's body there is . . . a clinically demonstrable presence of toxins."  *Benoit*, 959 F.3d at 501 (internal quotations, citation, and emphasis omitted).  *Second*, a plaintiff can prove that he is experiencing "some physical manifestation of toxin contamination."  *Id*.  (citation and emphasis omitted.)  Plaintiffs concede that they cannot prove a clinically demonstrable presence of toxins in any class member's body.  *See* Ex. 36 at 130:13, 180:16-21.  So Plaintiffs will have to prove that each class member is physically manifesting toxin contamination—in other words, that each class member currently has "some indication of [a] toxin-induced disease."  *Benoit*, 959 F.3d at 501 (brackets omitted) (citation omitted).[31]  Unlike the mere presence of toxins in the plaintiff's body, determining whether each member of the Medical Monitoring Class currently has a toxin-induced disease requires intensely individual inquiries, especially given the wide range of alleged injuries and individual risk factors even among putative class representatives, as set forth above (*supra* pp. 8-9), and below (*infra* pp. 32-33).

Moreover, not every plaintiff with a pre-existing tort claim—including a present physical injury—can obtain "consequential damages" to cover the costs of medical monitoring for future

---

[30] *See Caronia,* 22 N.Y.3d at 446 ("A threat of future harm is insufficient to impose liability against a defendant in a tort context."); *Benoit v. Saint Gobain Performance Plastics Corp.*, 959 F.3d 491, 501 (2d Cir. 2020) ("[A]n action for personal injury cannot be maintained 'absent allegation of any physical injury'" (emphasis omitted) (citation omitted)).

[31] *See, e.g, Rittenhouse v. St. Regis Hotel Joint Venture*, 149 Misc. 2d 452, 455 (N.Y. Sup. Ct. 1990), *rev'd on other grounds*, 180 A.D.2d 523, 579 (N.Y. App. Div. 1992) (offering "pleural or parenchymal scarring" as example of "physical indication of [asbestos-induced] disease").

illnesses.   *Caronia*, 22 N.Y.3d at 452.[32]   Consequential damages are "[d]amages for the prospective consequences of a tortious injury . . . ."   *Askey v. Occidental Chem. Corp.*, 102 A.D.2d 130, 136 (N.Y. App. Div. 1984).   "In order to recover for apprehended consequences not presently manifest, there must be such a degree of probability of their occurrence as to amount to a reasonable certainty that they will result."   *Id*. (citing *Strohm v. New York, Lake Erie & W. R.R. Co.*, 96 N.Y. 305, 305-306 (N.Y. 1884)).   "The term 'reasonable certainty' is generally accepted to mean more likely than not—greater than a 50% chance—that the risk will occur or, stated another way, a statistical likelihood that the disease will result."   *Burdick v. Tonoga, Inc.*, 60 Misc.3d 1212(A), at *11 (N.Y. Sup. Ct. 2018), *aff'd*, 179 A.D.3d 53 (N.Y. App. Div. 2019) (citing cases).   Thus, each putative class member must offer individual proof to demonstrate this entitlement.

**Exposure.**   When, as here, a plaintiff's claim turns on exposure to contaminants, he must show that he was personally "exposed to sufficient levels of the toxin to cause such injuries."   *Matter of New York City Asbestos Litig.*, 148 A.D.3d 233, 235-240 (N.Y. App. Div. 2017), *aff'd*, 32 N.Y.3d 1116 (N.Y. 2018).   This will require individualized inquiries into each class member's exposures.   *See, e.g., Gates*, 655 F.3d at 266.   Plaintiffs' own putative experts admitted that individuals' exposure levels will vary.   *See* Ex. 36 at 147:2-9; Ex. 18 at 126:3-15. Guidotti offered several relevant factors: "[b]reathing rate point, the resident's use of personal protection . . . time spent in an automobile with the windows up and not exposed to outside air." Ex. 36 at 147:5-9.   One could "spin off a whole bunch of factors," he emphasized.   *Id*. at 147:9-10.   Rosenfeld agreed that "residents within [the] proposed class boundary . . . are not all necessarily exposed to a greater than three in one million cancer risk from [CrVI]."   Ex. 18 at

---

[32] A plaintiff who proves a pre-existing tort can, of course, also seek compensatory damages for his present physical injury.   But Plaintiffs only seek compensatory damages for themselves; they limit the Medical Monitoring Class to consequential damages for future medical monitoring costs.

126:3-8.  Instead, he explained, "we would more likely than not have to evaluate the various Plaintiffs and their duration of residency to determine whether or not they qualify as a class – whether or not they should be entitled to the medical monitoring." *Id*. at 126:10-15.  Guidotti confirmed that Rosenfeld's air emissions modeling cannot prove an individual's "real world" exposure:  "One of the assumptions that is implicit in all of these models is uniform exposure.  In the real world, exposure tends to be in pockets or one individual may be more heavily exposed than another, so the risk does not fall on everyone equally." Ex. 36 at 70:2-9.

Plaintiffs nonetheless argue that they can use the combined testimony of Bost, Rosenfeld, and Guidotti to show that "all class members have been exposed to [CrVI and TCE] at levels sufficient to cause the Diseases of Concern."  MOL at 45.  Not so.  As an initial matter, Plaintiffs' putative expert evidence says nothing about putative class members who moved to Bethpage after 1994 because Rosenfeld's air emissions modeling ends in 1994.  Rosenfeld Rep. at 16.  Rosenfeld also admitted that individuals within the class boundary would not have been exposed to levels of TCE, even at the one in a million excess cancer risk level that the EPA deems safe.  *See* Ex. 18 at 128:1-7 (admitting TCE risk estimates do not meet his proposed threshold for class membership); Rosenfeld Rep. Exhibit T (Rosenfeld's TCE dispersion maps showing majority of proposed class area faced 0.5 in a million to zero chance of increased risk from TCE).  So there is no common evidence to show that all class members were exposed to sufficient TCE to cause diseases that Plaintiffs claim are related to TCE (not CrVI), like kidney, liver, and breast cancer, and non-Hodgkin lymphoma.  Guidotti Rep. at 11.  Similarly, Guidotti conceded that he performed no quantitative analysis of whether Rosenfeld's modeled exposure levels were sufficient to cause any of the non-cancer diseases Plaintiffs include in their list of Diseases of Concern.  *See* Ex. 36 at 118:10-13.

More fundamentally, Plaintiffs' putative expert testimony cannot do what they say because Rosenfeld modeled *hypothetical* exposures, not the exposures of any class members. Far from reflecting class members' actual exposure levels, Rosenfeld's air dispersion modeling is unanchored to any plausible reality at all. Defs.' Mot. to Exclude the Expert Opinion of Paul Rosenfeld ("Rosenfeld *Daubert* Br.") at 10-18. The model relies on patently absurd assumptions designed to support a litigation outcome, including that alleged emissions vastly exceeded what the available evidence demonstrated, that concentrations of relevant substances in the air remained the same for several years at a time (even when production levels and chemical usage decreased), that all class members were exposed to the equivalent of outdoor air 24 hours per day, 350 days per year, that no one worked outside of town, or vacationed for more than two-weeks a year, and that everyone breathed heavily all the time. Rosenfeld *Daubert* Br. at 10-18. Many of those assumptions are contrary to the actual evidence for the named Plaintiffs—just as they would be for absent class members too. *See, e.g.,* Ex. 28 at 89:15-90:18, 93:20-95:3, 98:9-100:22, 123:20-124:8, 126:10-127:19 (testifying that he left Bethpage for work in the Bronx at 6:00 a.m. and did not return until 5:00 p.m. or later). Rosenfeld's modeling thus does not show that a single member of the class experienced the exposure levels on which Guidotti relied, let alone that each and every one did. *See* Rosenfeld *Daubert* Br. at 6-10, 13-15 (Rosenfeld's model is unreliable because it fails to show actual exposure).

As noted in *Gates*, in which similar modeling was rejected as "common proof" at class certification, "[p]laintiffs cannot substitute evidence of exposure of actual class members with evidence of hypothetical, composite persons in order to gain class certification." *Gates*, 655 F.3d at 266.[33] The reason for that is clear: "[p]ermitting the use of [a] sample in a class action" that

---

[33] *See also Prantil*, 986 F.3d at 579-80 ("An assumption about the movement of persons throughout the class area cannot relieve Plaintiffs of their burden to '*affirmatively demonstrate* their compliance with [] Rule 23.'") (citation

could not have "been used to establish liability in an individual action" "would . . . violate[] the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *See Tyson Foods*, 577 U.S. at 458.  A plaintiff in an individual action could not use the exposures of hypothetical citizens to prove his own exposure level.[34]  So a class cannot do so either.  *See id.*

**Injury.**  Whether every member of the class has a present physical injury will also require individualized inquiries.[35]  As explained above, Plaintiffs concede that there is no common method of proving a clinically demonstrable presence of the substances at issue in each class member's body.  Ex. 36 at 130:10-13, 180:16-21 (admitting that putative class members cannot be tested CrVI and TCE exposure because "it's not amenable after the fact to laboratory tests").[36]  So each class member would instead have to prove that she experienced "some indication of [toxin]-induced disease, *i.e.*, some physical manifestation of [toxin] contamination."  *Benoit*, 959 F.3d at 501 (citation omitted).  This necessarily requires individual evidence for every putative class member.  *See In re World Trade Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 213-14 (2d Cir. 2014) (remanding for district court to "assess plaintiffs' submissions *individually* before deciding" whether "no genuine issues of material fact

---

and brackets omitted.)

[34] *See, e.g., Parker v. Mobil Oil Corp.*, 7 N.Y.3d 434, 449 (N.Y. 2006) ("[E]xposure can be estimated through the use of mathematical modeling by *taking a plaintiff's work history into account* to estimate the exposure to a toxin" or by "[c]omparison to the exposure levels of subjects of other studies . . . *provided that the expert made a specific comparison sufficient to show how the plaintiff's exposure level related to those of the other subjects.*" (emphasis added)); *Nemeth v. Brenntag N. Am.*, No. 24,  -- N.E.3d --, 2022 WL 1217464, at *5 (N.Y. Apr. 26, 2022) (reversing jury verdict for plaintiff because plaintiff's expert failed to estimate decedent's actual "inhalation levels" of asbestos).

[35] A New York state court suggested that plaintiffs may also seek medical monitoring by proving that the defendant's conduct caused present property damage (rather than present physical injury).  *See Ivory,* 116 A.D.3d at 131. The Second Circuit has called that into question.  *Benoit*, 959 F.3d at 508.  This court need not wade into that tension, however, because the proposed Medical Monitoring Class is not limited to property owners and Plaintiffs offer no common method of proving that every member of the Medical Monitoring Class suffered property damage. Boyle, on whom Plaintiffs otherwise rely, limits his opinion on stigma damages to the boundaries of Laton's groundwater contamination map.  *See* Boyle Rep. at 4-5 & Fig. 1.

[36] This concession also puts the lie to any suggestion of ongoing risk of exposure to alleged air emissions at the legacy Navy/Grumman Site, which ceased operations decades ago.

exist as to whether a plaintiff sustained a legally cognizable injury under New York law" to support medical monitoring (emphasis added)).   Plaintiffs do not even propose a common method of proving each class member's present injury.  They ignore the issue completely.

**Causation**.  Individualized inquiries would also be necessary to determine whether Northrop Grumman caused any present injury each class member might show.  As the Second Circuit has recognized, a causation "determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (*e.g.* state of health, lifestyle) and the nature of their exposure."  *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 165-66 (2d Cir. 1987) (affirming certification of class for exposure to Agent Orange during Vietnam War, but warning that "[w]ere this an action by civilians based on exposure to dioxin in the course of civilian affairs, we believe certification of a class action would have been error").[37]  For example, proposed class representative Jacob Kholodny has significant potential alternative sources of exposure because he worked in factories in the Soviet Union and United States for nearly three decades before retiring in 1986.  Ex. 26 at 54:17-63:22.  Many other class representatives acknowledged family histories of cancer.[38]  Some representatives have a childhood history of seasonal allergies, others dyed their hair, or used baby powder, fertilizers, weed killers, or paint varnish.[39]  Whether these Plaintiffs' injuries were caused by Northrop Grumman's conduct, as they are required to prove, rather than alternative exposures, genetic factors, or lifestyles will require individualized inquiries, as even Plaintiffs admit.  MOL at 46. The same goes for the other 48,000 individuals who allegedly compose this class.  *Id.* at 22.

---

[37] *See also, e.g., Steering Comm. v. Exxon Mobil Corp*, 461 F.3d 598, 603 (5th Cir. 2006) ("[E]ach individual plaintiff must meet his or her own burden of medical causation, which in turn will depend on any number of the factors enumerated by the experts who testified at the class certification hearing.").

[38] Ex. 29 at 245:5-16, 246:22-247:4, 253:17-20, 256:7-257:12 (family history of lymphoma, ovarian cancer, brain tumor); Ex. 22 at 20:9-16, 29:5-8, 55:10-56:12, 57:5-11 (family history of breast, brain, and lung cancer); Ex. 27 at 209:18-210:6 (family history of skin cancer).

[39] Ex. 28 at 48:7-16; Ex. 42 at 72:6-15; Ex. 22 at 198:16-199:7; Ex. 43 at 110:22-112:2; Ex. 27 at 253:14-22.

Indeed, Guidotti conceded that he had not conducted a causation analysis:  "I was not asked to do a causation analysis on the individuals that have been identified."  Ex. 36 at 73:9-25; *see also id.* at 83:16-84:23 ("[C]ausation analysis refers to establishing the most probable cause or chain of causation in the past.  That['s] not what we're doing here.").

     **Likelihood of Future Illness**.  Because Plaintiffs seek "consequential damages" to cover medical monitoring costs for future illnesses, they must also prove that the "prospective consequences" they want to monitor for "may with reasonable probability be expected to flow from the past harm."  *Askey*, 102 A.D.2d at 136.  This too is not susceptible to common proof.  The likelihood that an individual will contract a future illness due to a current exposure-induced injury requires examination of not only the individual's exposure level but the individual's characteristics too.  This point is not credibly in dispute, as Plaintiffs own experts concur.  Guidotti himself admitted that an "individual's susceptibility to cancer," "past life-style habits," "a whole variety of other things" including age would go into that estimation.  Ex. 36 at 147:2-148:10.  Rosenfeld agreed that "the nature of the individual, their genotype, their DNA, [and] their childhood predisposition to various exposures" would have to be considered.  Ex. 18 at 150:21-24.

     **Standing, Statute of Limitations, And Nuisance**.  As with the Property Damage Classes, the Medical Monitoring Class's claims present individualized issues of standing, timeliness, and nuisance.  *Supra* pp. 21-26.

     **c)   The Alternate Medical Monitoring Subclass Presents The Same Individualized Issues**

In the alternative, Plaintiffs seek to certify a class of:

> all current owners of residential real property in the Bethpage Area, whose real property has been damaged and reduced in value by the invasion of the contaminated water plumes, and/or the stigma of being located near the Site, and who have been exposed to the Contaminants discharged by Defendants for a

period of one year, or more, to establish medical monitoring as 'reasonably anticipated' consequential damages resulting from their exposure to the aforementioned toxins.

MOL at 6.  Plaintiffs' seek to certify this subclass on the assumption that "[u]nder *Caronia*, evidence of tortiously caused damage to real property permits the property owner to recover medical monitoring as a consequential damage." *Id*. at 46-47.[40]  Plaintiffs' theory makes no sense:  this subclass includes individuals whose only alleged "property damage" is "stigma" to property due to perceived (not actual) contamination, but how could stigma arising from the perception of contamination alone create a need to monitor for physical injury?

Regardless, the Alternate Medical Monitoring only compounds the individualized issues presented by the Medical Monitoring Class and Property Damage Classes.  Plaintiffs admit the class would need to prove that Northrop Grumman "tortiously caused damage to real property . . . ."  MOL at 46-47.  As explained, Plaintiffs cannot prove contamination of the classes' properties on a class-wide basis. *Supra* pp. 17-20.  Instead, Plaintiffs hope to prove that all class members suffered a diminution of property values due to the stigma of perceived contamination.  That, too, cannot be proved on a class-wide basis. *Supra* p. 20-21.  But even if it could be, it would not be enough.  As explained, stigma damages are merely a kind of consequential damages potentially available when a plaintiff proves actual or imminent contamination of his property, which requires individualized proof.  And since membership in the Alternate Medical Monitoring Subclass also requires proof of exposure for a year or more, proving such exposures for each class member would require individualized inquiries too. *Supra* pp. 28-31.  So Plaintiffs are right back where they started—with individual claims for tortiously-caused injury that they have no way of proving on a class-wide basis.  As with the Medical

---

[40] *But see Benoit*, 959 F.3d at 508 (finding it "hardly clear . . . that *Caronia* . . . envisioned authorizing an award of medical monitoring to a plaintiff who has no cognizable claim for personal injury but succeeds on a claim for property damage.").

Monitoring Class and Property Damage Classes, litigation of the Alternate Medical Monitoring Class's claims would thus be overwhelmed by individualized inquiries into class members' exposure, actual or imminent contamination of class members' properties, causation of such contamination, the availability of consequential damages, standing, statutes of limitations defenses, and the elements of trespass and nuisance.  *Supra* pp. 15-33.

### 2.   The Proposed Classes Fail To Satisfy Commonality, Typicality, Predominance, Or Superiority

Because the Proposed Classes assert individualized claims for relief, they cannot satisfy Rule 23's commonality, typicality, predominance, or superiority requirements.   Start with commonality.  "Commonality requires the plaintiffs to demonstrate that the class members 'have suffered the same injury.'"  *Dukes*, 564 U.S. at 350 (citation omitted).  That is not the case here. The Medical Monitoring Class includes (1) individuals who allege present physical injuries, and (2) individuals who, even by Plaintiffs' estimates, will never have a physical injury and complain only of "exposure" to TCE or CrVI.  The Property Damage Classes and the Alternate Medical Monitoring Subclass are likewise divided.  They include (1) individuals whose sole putative injury is alleged diminution in property values, and (2) individuals alleging actual contamination of their land.

Plaintiffs' allegedly "common" questions (MOL at 24-25) are not common at all because they lack "common answers." *Dukes*, 564 U.S. at 350 (citation omitted).  For instance, "whether Grumman is liable to injured class members for the torts of negligence, nuisance, trespass, and abnormally dangerous activity" (MOL at 24-25) cannot be answered for all class members "in one stroke" because the answer depends on whether Northrop Grumman caused a present injury to each class member's person or property.  *Dukes*, 564 U.S. at 350; *see supra* pp. 15-35.  The same goes for whether medical monitoring and stigma damages are available remedies for the

35

classes.  MOL at 24-25.  Because the availability of such damages hinges on a class member's ability to prove present physical injury or contamination, respectively, the question is not "of such a nature that it is capable of classwide resolution . . . ."  *Dukes*, 564 U.S. at 350.  Even the question whether Northrop Grumman owed a "duty" to putative class members is not common (*contra* MOL 24-25) because the answer to that question depends on whether the putative class member experienced purely economic loss or something more.  *Supra* pp. 22-23.  Even if these issues were common, they would be overwhelmed by the individualized issues discussed above. *Supra* pp. 15-35.

Typicality is lacking too.  To satisfy typicality, "each class member [must] make[] similar legal arguments to prove the defendant's liability," *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (citation omitted), and must not be "subject to unique defenses which threaten to become the focus of the litigation."  *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (citation omitted).  As demonstrated above, however, the putative class members would make very different arguments to prove their claims.  *See, e.g., Henke v. Arco Midcon, L.L.C.,* No. 4:10CV86 HEA, 2014 WL 982777, at *10 (E.D. Mo. Mar. 12, 2014) (plaintiffs "fail[ed] the typicality requirement because the nature and extent of the potential contamination alleged for each putative class member would be unique."); *In re Fosamax*, 248 F.R.D. at 401 ("[b]ecause each class member must offer highly individualized proof to establish most elements of a medical monitoring claim, the claims of the named plaintiffs, or any individual [absent class member] for that matter, are not typical . . . .").  And the Property Damage Classes' representatives' claims will center on unique defenses since they either have negative soil test results or failed to test their properties at all.

The Proposed Classes likewise fail Rule 23(b)(3)'s predominance requirement. "Mass environmental tort cases seldom satisfy the predominance requirement of Rule 23(b)(3)." *Lloyd v. Covanta Plymouth Renewable Energy, LLC*, No. CV 20-4330, 2022 WL 407377, at *6 (E.D. Pa. Feb. 10, 2022). This case is no different. The predominance requirement is satisfied only "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (citation omitted). But the individual issues presented by the Proposed Classes are far more substantial than any common ones. The Property Damage Classes, for instance, raise substantial individualized issues related to the existence and likelihood of any contamination, causation of such contamination, and the availability, fact of, and amount of damages. *See, e.g.*, *Gates*, 655 F.3d at 271 (agreeing that individual "questions relating to causation of contamination, extent of contamination, fact of damages, and amount of damages" predominated). The Medical Monitoring Class, meanwhile, presents substantial individualized issues including exposure, injury, medical causation, and the availability of consequential damages for medical monitoring.[41] And the Alternate Medical Monitoring Subclass combines the individualized inquiries of the other classes. *Supra* pp. 15-35.

For similar reasons, the Plaintiffs cannot show that class litigation is superior to individual actions. "[M]anageability 'is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.'" *Sykes v. Mel S. Harris & Assocs.*

---

[41] *See, e.g., Gates,* 655 F.3d at 270 (aff'g denial of certification of a medical monitoring class because "the inquiries into whether class members were exposed above background levels, whether class members face a significantly increased risk of developing a serious latent disease, and whether a medical monitoring regime is reasonably medically necessary all require considering individual proof of class members' specific characteristics."); *Steering Comm.*, 461 F.3d at 602 (agreeing that "the individualized medical causation, injury, and damages issues were the predominant issues" for a medical monitoring class and "that a class action was [therefore] an inappropriate vehicle for resolution.").

*LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (citation omitted).  Even if the Proposed Classes were certified, litigation of their claims would inevitably devolve into individualized trials on exposure, physical injury, contamination, causation, and damages.  *Supra* pp. 15-35.  *See, e.g., Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 295-96 (N.D. Ohio 2007) (finding no superiority in diesel exhaust exposure case where "individual trials would still be left with the issues of whether the diesel fume actually caused harm to individual plaintiffs and to what extent, which cannot be adjudicated as a class").

Plaintiffs fail to cite even a single case that has certified classes in like circumstances, and fail to show why this should be the first.  *Burdick v. Tonoga, Inc.*, 179 A.D.3d 53 (N.Y. App. Div. 2019) is not such a case.  *Contra* MOL at 38-39.  In that case, certification would avoid "multiple lawsuits involving claims duplicative of those asserted in [*Burdick*] . . . ."  *Burdick*, 179 A.D.3d at 60.  That ship has sailed here.  Plaintiffs' counsel has continuously filed duplicative individual actions for potential class members, filing 11 actions covering 111 individual plaintiffs just since the instant motion was filed.[42]  And critical to certification in *Burdick* was evidence that is lacking here—all class members could present "demonstrable evidence of PFOA blood levels far in excess of average levels . . . ."  *Id.* at 59.  That meant that, unlike here, both exposure and present injury could be determined en masse.  *Id.* at 60.[43]

On reply, Plaintiffs may reach for *O'Connor v. Boeing North American, Inc.,* 184 F.R.D. 311 (C.D. Cal. 1998), but that would be a mistake.  In *O'Connor*, the district court certified medical monitoring and property damage classes based on TCE and CrVI releases.  But the court

---

[42] Another seven individual actions were filed before Plaintiffs moved for class certification.  Plaintiffs are thus wrong that "[n]o other similar litigation has been filed by . . . the class members."  MOL at 48.

[43] *Burdick* also applied New York procedural law on class actions, which is "intended to be a liberal remedy and given a broad construction."  *Id.* at 58.  New York state courts "are not constrained to follow the restrictive views of the Federal courts (or the Federal Advisory Committee), with respect to the use of class actions in mass tort cases." *Osarczuk*, 82 A.D.3d at 855.

later *decertified* those classes, admitting that it had "underestimated the difficulty of applying the individualized factors required" to decide medical monitoring claims and had since developed a "more realistic appreciation of the effect of individualized questions" on the property damage claims too. *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 413 n.6, 418 (C.D. Cal. 2000) (*O'Connor II*). Even had its classes not been decertified, *O'Connor* would provide no support for certifying the Proposed Classes here. Unlike New York law, California law does not require proof of present injury for medical monitoring—and so the California medical monitoring class in *O'Connor* did not require inquiries "into the individual causation issues." *O'Connor*, 184 F.R.D. at 338. What's more, the *O'Connor* court only agreed to certify the medical monitoring class after the plaintiffs *excluded* individuals with present injuries from the class. *Id.* at 335-36. Before that modification, the *O'Connor* court found the class uncertifiable because (as here) class members with present injuries would have conflicts with class members without them. *Id.*

The *O'Connor* court's certification of property damage claims also provides no support for certification. The court certified such claims only because it "accepted Plaintiffs' representation that they would 'establish on a class-wide basis the extent to which the . . . real property surrounding the Rocketdyne Facilities was exposed to Defendants' releases of Contaminants.'" *O'Connor II*, 197 F.R.D. at 417 (citation omitted). Courts may no longer certify classes based on plaintiffs' "representations" about what they will be able to prove through common evidence. As the Supreme Court has since clarified, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). And regardless, unlike the plaintiffs in *O'Connor*, Plaintiffs here do not even pretend "they can establish the extent of each property's contamination on a class-wide

basis." *O'Connor II*, 197 F.R.D. at 418.  Plaintiffs' putative expert admitted that determining the existence and extent of any soil vapor intrusion at any class member's property would require individualized inquiries.  Ex. 30 at 74:25-76:11, 161:22-162:21.

### B.    The Proposed Class Representatives And Class Counsel Are Inadequate

Because class judgments bind not only the named plaintiffs, but absent class members too, due process requires adequate representation for the class.  This requirement is also built into Rule 23.  Under Rule 23(a)(4), to certify any kind of class, plaintiffs must establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Similarly, under Rule 23(g), proposed class counsel must be able to "fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  Because the proposed representatives and counsel cannot adequately represent the Proposed Classes, certification should be denied.

### 1.    The Property Damage Classes And Alternate Medical Monitoring Subclass Representatives Have Conflicts With The Classes

The proposed class representatives of the Property Damage Classes and the Alternate Medical Monitoring Subclass are inadequate.  It is axiomatic that "[t]he named plaintiffs . . . can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class."  *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (citation omitted).  Yet the proposed class representatives do not share the classes' interests.  In particular, they seek to represent classes asserting claims requiring present property damage, but none of them have contaminated property.   All of the putative representatives have either received negative soil test results or have failed to test their properties at all.  Ex. 44.[44]  Their interests are adverse to putative class members who might be able to show contamination (although none

---

[44]  Rosalie Romano, Patricia Glueckert, the Kholodnys, and the Meadows tested their soil, while Mary Ellen Ginty, Christopher Blades, and Laurie Franks did not.

have come forward to date), because the latter would focus on different arguments and seek different relief than the putative representatives.  *See In re MTBE*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002) (finding inadequacy where proposed representatives' primary injury was bad-tasting water from MTBE contamination when others may have suffered personal injury).

**2.   The Medical Monitoring Class Representatives Cannot Represent The Class Because It Includes Exposure-Only Members**

The proposed class representatives for the Medical Monitoring Class present a different problem.  They all have current physical injuries (MOL at 5), but they seek to represent a class that includes people who they contend were only exposed to contaminants but have not manifested any disease.  MOL at 4.  Yet it is well-established that "a presently injured plaintiff has a conflict of interest with regard to a class of uninjured, exposure-only, individuals." *Wall v. Sunoco, Inc.*, 211 F.R.D. 272, 280 (M.D. Pa. 2002).  In *Amchem*, the Supreme Court rejected an asbestos settlement class in part because plaintiffs with present injuries were not adequate representatives for class members with potential future damage claims.  521 U.S. at 626.  There, as here, inherent conflicts of interest between the class representative and the "exposure-only" class members they sought to represent precluded certification of the class: "for the currently injured, the critical goal is generous immediate payments . . . [which] tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Id.*  Nor can the litigation strategies of the class representatives and exposure-only class members be expected to align: "While one can reasonably anticipate the named Plaintiffs' proof at trial progressing from their proof of injury to the need for monitoring against other possible harms, to say that the not-yet-injured plaintiffs would employ the same or consistent theories is speculation at best." *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 663 (M.D. Fla. 2001).

### 3. The Medical Monitoring Classes Representatives And Proposed Class Counsel's Litigation Choices Show They Are Not Adequate

The Medical Monitoring Classes' representatives' litigation choices also show that their interests are antagonistic to absent proposed class members. *See In re MTBE*, 209 F.R.D. at 338. The proposed class representatives seek both compensatory damages and medical monitoring for themselves, but only medical monitoring for the classes. Ex. 4 at ¶¶ 16, 572 (seeking compensatory damages for named plaintiffs). In doing so, they have "split" the absent putative class member claims, potentially precluding such putative class members from ever recovering compensatory damages. Under New York law, compensatory damages and medical monitoring consequential damages are different types of relief for a single claim. *See Caronia*, 22 N.Y.3d at 452. And "[u]nder New York's transactional approach to res judicata, once a claim is brought to final conclusion, all other claims arising out of the same transactions are barred, even if based on a different theory or *seeking a different remedy*." *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 11 (N.Y. App. Div. 1998) (emphasis added) (citation omitted). By seeking only medical monitoring damages for those who must already have present injuries, the class representatives would effectively relinquish absent class members' opportunities to seek compensatory damages—an opportunity Plaintiffs are not willing to relinquish for themselves.

As numerous courts have recognized, this type of maneuvering strongly signals inadequacy. *See, e.g.*, *In re Fosamax,* 248 F.R.D. at 401 (finding inadequacy because class representatives' "decisions to seek monetary damages for themselves but only medical monitoring for the class . . . may preclude class members from later litigating personal injury claims . . ."); *Foster v. St. Jude Med., Inc.*, 229 F.R.D. 599, 604 (D. Minn. 2005) (finding inadequacy because "Plaintiffs' efforts to claim compensatory damages only for themselves may,

42

in fact, jeopardize the class members' rights to bring such claims in a subsequent case").[45]  A representative who would jeopardize absent class members' ability to seek other remedies—particularly remedies he considers too valuable to relinquish himself—is not an adequate one.[46]

Similarly, proposed class counsel cannot adequately represent the Proposed Classes. They have filed numerous individual actions for other clients asserting the very claims Plaintiffs seek to force into a class action here.[47]  This presents clear conflicts: "potential class members are at risk that counsel will trade off the interests of certain of its clients to the detriment of other clients." *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678–679 (S.D. Ohio 1995).

### C.    The Proposed Classes Are Not Ascertainable

To be ascertainable, a class must be "defined by objective criteria that [make] the class's membership sufficiently definite . . . ." *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017) (citation omitted).  Here, membership is "fundamentally indeterminate." *Id.* at 270.

The membership of the Medical Monitoring Classes cannot be ascertained because they are defined to include "current and former" residents who have "been exposed to the Contaminants discharged by Defendants" through any exposure pathway "for a period of one year or more."  MOL at 4-6.  But Rosenfeld's air emissions boundary does not address any

---

[45] *In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 358, 367 (S.D. Iowa 2008) (representatives' decision to seek only economic loss from purchases of products "risk[ed] a future waiver" of absent class members' claims for personal injury and medical monitoring); *In re MTBE*, 209 F.R.D. at 328 (requesting only injunctive relief created "risk that subsequent courts would preclude absent class members from bringing personal injury claims"); *Thompson v. Am. Tobacco Co., Inc.*, 189 F.R.D. 544, 550 (D. Minn. 1999) ("the named Plaintiffs' efforts to reserve personal injury and damage claims may, in fact, jeopardize the class members' rights to bring such claims in a subsequent case").

[46] Cases that have declined to find inadequacy in the face of claim-splitting are distinguishable because they generally rely on the fact that the state law at issue permitted such conduct—*e.g.* Pennsylvania law permits personal injury claims and medical monitoring claims to be brought in separate actions. *See Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 480 (E.D. Pa. 1997) (applying Pennsylvania law).  In New York, medical monitoring is not a separate claim; it is a type of relief for an existing personal injury claim. *See supra* pp. 26-28.

[47] Although Plaintiffs' Rule 23(b)(3) classes would permit opt-out, their Rule 23(b)(2) class would not.  *See* Rule 23(b)(2).  If the Rule 23(b)(2) class were certified and its claims resolved, the plaintiffs in the other actions filed by Plaintiffs' counsel would then be precluded from obtaining the compensatory damages they seek.  *Supra* pp. 42-43; *Dukes*, 564 U.S. at 364 (noting class representatives' "perverse incentives" to sacrifice "compensatory damages claims" to attempt to manufacture a Rule 23(b)(2) class).

NY-2379558.52

exposure pathways except air emissions or any exposures after 1994 (even though the classes include both residents exposed through non-air-emissions pathways and those who moved to Bethpage after 1994).  The limitation to individuals exposed for "a period of one year or more" does not help because it says nothing about when that year (or more) must have occurred.  And because the class includes "current" residents exposed "for a period of one year or more," membership is not static: the group who qualify as residents who claim to be exposed for a year or more could theoretically change day-by-day.  *See Brecher v. Republic of* Arg., 806 F.3d 22, 25 n.3 (2d Cir. 2015) (finding class unascertainable because "the identity of class members will remain fluid even following entry of judgment, since nothing in the [] class definition freezes the class composition at any designated time").

The Property Damage Classes and Alternate Medical Monitoring Subclass have a similar problem.  They are defined as "current" owners of real property "which has been impacted by Defendants' Contaminants . . . *due to diminution of value due to the known or perceived contamination . . . .*"  MOL at 7 (emphasis added); *see* MOL at 6 (similar).  An individual who purchased property after the contamination allegedly caused the property's value to diminish has suffered no damages at all.  Neither has an individual who both buys and sells his property before the drop occurs.  *See, e.g.*, *Cannon*, 2013 WL 5514284, at *9.  Determining the drop date is thus essential to determining who has supposedly suffered a diminution.  But Boyle could not specify when it had occurred or would occur.[48]  So there is no way to tell which "current owners of residential property" (MOL at 7) did or will suffer a diminution in value.  Because Plaintiffs' putative property valuation expert cannot even say whether the diminution has yet occurred, the membership of these classes is indefinite.

_____

[48] Ex. 37 at 132:11–16, 134:4-135:6 (suggesting diminution in property values has already occurred, but could not specify when), 131:5-14, 135:8-136:8, 210:5-15 (suggesting drop would only occur if the market were fully informed and that it presently is not, but could not say when it would become so informed).

### D.     The Liability-Only Class Cannot Be Certified Under Rule 23(c)(4)

Plaintiffs did not offer a single expert to opine that groundwater contamination hundreds of feet below the surface poses a risk to health or property.  Given the results of their own property tests, that is no surprise.  So Plaintiffs instead seek certification "only [on] the issue of whether Grumman *is liable* to the class for the torts of negligence, nuisance, trespass, and abnormally dangerous activities" under Rule 23(c)(4).  MOL. at 7-8.  Plaintiffs fail to otherwise address the propriety of certifying this subclass under Rule 23(c)(4) in their motion and thus have waived the issue.[49]

Regardless, the Liability-Only Property Damage Class does not "meaningfully further efficient issue resolution . . . ."  *Packard v. City of New York*, 15 Civ. 7130 (AT) (SDA), 2020 WL 1467127, at *3 (S.D.N.Y. Mar. 25, 2020).  Although "courts may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)," *In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006), certification is "not appropriate" under Rule 23(c)(4) "if, despite the presence of a common issue, certification would not make the case more manageable or serve the varied interests Rule 23 seeks to advance."  *In re Amla Litig.*, 282 F. Supp. 3d 751, 765 (S.D.N.Y. 2017) (citation omitted).  Here, the questions necessary to determine liability are themselves highly individualized.[50]  As explained above, the following *liability* issues require individualized inquiries: (1) whether each class member's property faces actual or imminent contamination; (2) whether such contamination was caused by Northrop Grumman's conduct; (3) whether Northrop Grumman owed and breached a duty to each class member, (4) whether Northrop Grumman caused a trespass or a substantial and

---

[49] *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) (Issues "adverted to in a perfunctory manner" are waived. (internal quotation marks and citation omitted)).

[50] *See, e.g., Fisher*, 238 F.R.D. at 315 ("To the extent plaintiffs would ask the Court to simply sever the damages portion of the case from the liability portion and certify the latter, such a maneuver would not overcome the Rule 23(b)(3) predominance problems because many of the individual-specific issues discussed above go to liability, not damages.").

unreasonable interference with each class member's property, (5) whether each class member has standing, and (6) whether each class member's claims are timely. *Supra* pp. 15-26. Certification therefore will not increase manageability, violating the purposes of Rule 23(c)(4).[51]

**E.    The Medical Monitoring Classes Cannot Be Certified Under Rule 23(b)(2) Because They Do Not Seek Unitary Injunctive Relief**

Likely realizing that common issues do not predominate and certification under Rule 23(b)(3) is not available, Plaintiffs add a fallback seeking certification of the Medical Monitoring Classes under Rule 23(b)(2). That effort also fails. Plaintiffs cannot dress up a damages class as an "injunctive relief" class to obtain certification. "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. For example, Rule 23(b)(2) certification is often used in civil rights actions where the class seeks only to enjoin continuing discriminatory policies.[52] In the environmental context, a Rule 23(b)(2) class might seek only to stop ongoing pollution or compel remediation. *See, e.g., Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 486 (S.D. Ohio 2004). But Plaintiffs' Medical Monitoring Classes do not seek to enjoin or compel any conduct by Northrop Grumman at all. Instead, they seek "consequential damages" for future medical monitoring costs. MOL at 4, 6. But Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.* at 32.

**1.    The Medical Monitoring Classes Seek Consequential Damages, So Rule 23(b)(2) Is Inapplicable**

For Rule 23(b)(2) to apply, the putative class must, *inter alia*, (1) seek injunctive or declaratory relief; *and* (2) not seek individualized monetary relief. *See Dukes*, 564 U.S. at 360-

---

[51] Rule 23(c)(4) certification would also fail to alleviate the class's commonality, adequacy, typicality, and ascertainability problems, so it would be inappropriate for those reasons as well.

[52] *See, e.g., Comer v. Cisneros*, 37 F.3d 775, 796 (2d Cir. 1994) ("[R]acial discrimination cases for injunctions against state or local officials are the 'paradigm' of Fed. R. Civ. P. 23(b)(2) class action cases.") (citation omitted).

46

61.  Neither requirement is satisfied here.

*First*, the Medical Monitoring Classes do not seek injunctive or declaratory relief at all. The only medical monitoring remedy New York law recognizes—and the only one the Medical Monitoring Classes seek—is "consequential damages."  *Caronia*, 22 N.Y.3d at 452; MOL at 4, 6.[53]  "[M]oney damages are, of course, the classic form of *legal* relief."  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (citation omitted).  The only "injunction" Plaintiffs purport to seek is an "injunction ordering Grumman to *fund* the Medical Monitoring Program."  MOL at 32 (emphasis added).[54]  But "[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979).

*Second*, and regardless, the Medical Monitoring Classes cannot be certified under Rule 23(b)(2) because the monetary relief they seek is individualized.  Consequential damages are individualized monetary relief: they are "compensation for future damages" that "will inevitably and necessarily result from the [plaintiff's] injury."  *Ayres v. Delaware, Lackawanna & W. R.R. Co.*, 158 N.Y. 254, 263 (N.Y. 1899) (citation omitted).  As courts have recognized, medical monitoring classes that seek such compensation cannot be certified under Rule 23(b)(2).[55]

Plaintiffs repeatedly concede that they seek damages (MOL at 3-6, 25, 44-45), but try to

---

[53] *See also Benoit*, 959 F.3d at 501 ("We conclude that under *Caronia II*, allegations of the physical manifestation of or clinically demonstrable presence of toxins in the plaintiff's body are sufficient to ground a claim for personal injury and that for such a claim, if proven, the plaintiff may be awarded, *as consequential damages for such injury, the costs of medical monitoring*." (emphasis added)).

[54] Plaintiffs at one point suggest that they are seeking "an injunction to compel Grumman to establish a medical monitoring program,"  (MOL at 31) but the reports of Guidotti and Garretson, on which Plaintiffs rely, make clear that Plaintiffs are only asking Northrop Grumman to fund the program, not to run it.

[55] *See, e.g., Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1196 (9th Cir. 2001) ("proposed medical monitoring subclass [was] not appropriate for certification pursuant to Rule 23(b)(2)" where it sought "establishment of a reserve fund for past and *future damages*, compensation for future medical treatment, plus other compensatory and punitive damages." (emphasis added)); *Thomas v. FAG Bearings Corp., Inc.*, 846 F. Supp. 1400, 1404 (W.D. Mo. 1994) (recognizing that "the future costs of medical monitoring" "are nothing more than 'compensation for necessary medical expenses reasonably anticipated to be incurred in the future'" and thus "cannot form the basis of a class under Rule 23(b)(2)") (citations omitted).

47

characterize the relief as merely "incidental" to an injunction.  MOL at 31.  That does not work because there is no injunction to which the damages could be incidental.  In any event, *Dukes* held that individualized monetary relief—like the consequential damages sought here—is not incidental.  *Dukes*, 564 U.S. at 360-61.  And what's more, Plaintiffs make no attempt to quantify this supposedly "incidental" monetary relief or to show—as they would have to—that such damages "flow[] directly from liability to the class as a whole from claims forming the basis of . . . injunctive or declaratory relief."  *Amara v. CIGNA Corp.*, 775 F.3d 510, 519-20 (2d Cir. 2014) (internal quotation marks and citation omitted).  They could not do so because even a plaintiff who shows liability is not entitled to medical monitoring unless he also proves a "reasonable certainty" that the future illnesses he wants to monitor for are likely to result.  *Askey*, 102 A.D.2d at 136.

To be sure, some district courts have treated requests for court-supervised medical monitoring programs as requests for injunctive relief on the theory that a court uses its "equitable powers" in overseeing such programs.  *Arch*, 175 F.R.D. at 483 (collecting cases).[56]  It is doubtful that these cases remain good law after *Dukes*, which emphasized that Rule 23(b)(2) "does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments," *Dukes*, 564 U.S. at 365, because an order requiring a defendant to pay money—even for a court-supervised program—is neither an injunction nor declaratory relief.  *See Gates*, 655 F.3d at 263 ("question[ing] whether the kind of medical monitoring sought here can be certified under Rule 23(b)(2)" "[i]n light of the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*").  Regardless, those cases have no application here.  None involved requests for consequential damages—which takes the Medical Monitoring Classes outside the scope of Rule 23(b)(2).  And

---

[56] *But see Bldgs. & Constr. Dept. v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1490-92 (10th Cir. 1993) (request for "a court supervised fund to finance a program of medical monitoring" was "essentially a suit for damages").

NY-2379558.52

none addressed *Caronia*, which rejected the notion that courts applying New York law should administer medical monitoring programs.  *See Caronia*, 22 N.Y.3d at 452 ("Courts generally lack the technical expertise necessary to effectively administer a program heavily dependent on scientific disciplines such as medicine, chemistry, and environmental science.").

### 2.    The Medical Monitoring Classes Are Insufficiently Cohesive

There is another independent reason the Medical Monitoring Classes do not satisfy Rule 23(b)(2): no single injunction would be appropriate for the class as a whole.  As *Dukes* recognized, "Rule 23(b)(2) applies only when a *single* injunction . . . would provide relief to each member of the class," not "when each individual class member would be entitled to a *different* injunction . . . ."  *Dukes*, 564 U.S. at 360 (emphasis added.).  In other words, "the class claims must be cohesive."  *Gates*, 655 F.3d at 263-64 (citation omitted).  "Proposed medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes."  *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005).

Plaintiffs' Medical Monitoring Classes have the same "cohesion difficulties" courts have repeatedly recognized.  *Id.*  Whether and how an individual should be monitored depends on such highly individual factors that no single "injunction" could be appropriate.  As in *Gates*, where the Third Circuit held a putative medical monitoring class lacked cohesion, Plaintiffs cannot "prove the medical necessity of plaintiffs' proposed monitoring regime without further individual proceedings to consider class members' individual characteristics and medical histories and to weigh the benefits and safety of a monitoring program." 655 F.3d at 269.

Plaintiff's putative expert Guidotti conceded that medical monitoring would not be recommended—or even medically available—for all members of the Medical Monitoring Classes.  Guidotti would instead task an advisory committee with referring people to local facilities that would ultimately decide if a class member should participate in the monitoring

49

program.  Ex. 36 at 216:23-217:19; Guidotti Rep. at 15-16 (describing the panel of experts who would oversee the program, review individual cases for referral, and recommend modifications to the monitoring protocol).  And Guidotti admitted that there are *no* screening procedures for several of the ailments Plaintiffs allege.  *Id*. at 202:14-204:1.  Where, as here, a clinician or advisory panel can determine that certain class members would not be entitled to participate, the class lacks the cohesion Rule 23(b)(2) requires.[57]

## II.     PLAINTIFFS' PUTATIVE EXPERT EVIDENCE IS INADMISSIBLE

To support class certification, putative expert evidence must satisfy Federal Rule of Evidence 702 and *Daubert*.  *Supra* p. 14.  Plaintiffs' motion should thus also be denied for the independent reason that it depends on putative expert evidence that, as explained in Northrop Grumman's *Daubert* motions, does not pass muster.

## CONCLUSION

For the foregoing reasons, Northrop Grumman respectfully requests that the Court deny Plaintiffs' motion for class certification.

---

[57] *See In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 75 (S.D.N.Y. 2002) ("individual issues . . . undermined" plaintiffs' claims of cohesion under Rule 23(b)(2) where "one of plaintiffs' experts testified that 'it's up to each clinician to decide whether he wants to put his patients through a monitoring program or not.'").

NY-2379558.52

Dated:  June 10, 2022

Mark A. Miller (*pro hac vice*)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 898-5800
Facsimile:  (202) 682-1639
Email: mmiller@hollingsworthllp.com

  */s/ Grant J. Esposito*
Grant J. Esposito
David J. Fioccola
Jessica Kaufman
Katie L. Viggiani
Robert J. Baehr

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Email: gesposito@mofo.com;
dfioccola@mofo.com;
jkaufman@mofo.com;
kviggiani@mofo.com;
rbaehr@mofo.com;

William Tarantino (*pro hac vice*)

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
Email: wtarantino@mofo.com

Krista deBoer (*pro hac vice*)

MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego CA 92130-2040
Telephone: (858) 720-5100
Facsimile: (858) 720-5125
Email: kdeboer@mofo.com

*Attorneys for Defendants Northrop Grumman*
*Corporation and Northrop Grumman Systems*
*Corporation*

NY-2379558.52