**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROSALIE ROMANO; PATRICIA GLUECKERT, individually and on behalf of the Estate of WILLIAM G. GLUECKERT; WILLIAM P. GLUECKERT; JAYNE MANN; ROSS MEADOW and ARLENE MEADOW; JACOB KHOLODNY and BELLA KHOLODNY; FLO RAUCCI, individually and on behalf of the Estate of SALVATORE RAUCCI; DANIEL GALLANTE and JENNIFER GALLANTE; TERESA MEADE, DONALD LAGOMARSINO, SCOTT RUST, LAURIE FRANK, THOMAS NUCCI, CHRISTOPHER BLADES, DAWN CIRINO-SAMBADE, MARY ELLEN GINTY, JOHN SCHLOSSER, individually and on behalf of all others similarly situated; and DENISE FLORIO; MARYANN HERBERT; CHRISTINA ANDREWS-SALES; CHRISTOPHER CAGNA; JACKIE LIEBERMAN; CATHERINE LEWONKA; EUGENE CONNOLLY; VIVIANE BLICKENSDERFER; DANA BLICKENSDERFER; GLENN FALINO and MARCIA FALINO; individually,<br><br>    Plaintiffs,<br><br>              *v.*<br><br>NORTHROP GRUMMAN CORPORATION; and NORTHROP GRUMMAN SYSTEMS CORPORATION.,<br><br>    Defendants. | Case No: 2:16-cv-05760-GRB-ST |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM**
**OF LAW IN SUPPORT OF RULE 23 MOTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. (iii)

BACKGROUND OF THE LITIGATION................................................................................ (1)

THE MEDIATION ................................................................................................................ (3)

NEW DISCOVERIES OF CRVI IN THE SOIL AND
CONTAMINATION IN 11 PUBLIC WATER SUPPLY WELLS......................................... (10)

ARGUMENT ......................................................................................................................... (12)

    I.   THE PLAINTIFFS REQUEST THE COURT TO CERTIFY THE CrVI AND
        TCE CONTAMINATION PROPERTY DAMAGE SUBCLASS DEFINED
        BELOW ................................................................................................................. (12)

    II.  THE SUBCLASS SATISFIES ALL REQUIREMENTS FOR CLASS
        CERTIFICATION OF FED. R. CIV. P. 23(a) ....................................................... (14)

        A.  THE SUBCLASS SATISFIES THE NUMEROSITY
            REQUIREMENTS OF FED. R. CIV. P. 23(A)(1) ......................................... (14)

        B.  THE SUBCLASS SATISFIES THE COMMON QUESTIONS
            REQUIREMENTS OF FED. R. CIV. P. 23(A)(2) ......................................... (14)

        C.  THE SUBCLASS SATISFIES THE TYPICALITY
            REQUIREMENT OF FED. R. CIV. P. 23(A)(3) ........................................... (16)

        D.  THE CLASS REPRESENTATIVES AND CLASS COUNSEL WILL
            FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF
            THE SUBCLASS...................................................................................... (18)

            1.  CLASS REPRESENTATIVES ................................................... (18)

            2.  CLASS COUNSEL...................................................................... (19)

        E.  THE SUBCLASS IS ASCERTAINABLE AND THE SUBCLASS
            REPRESENTATIVES HAVE ARTICLE III STANDING TO
            RECOVER DAMAGES ........................................................................... (20)

    III.  THE SUBCLASS SATISFIES ALL REQUIREMENTS FOR CLASS
         CERTIFICATION OF FED. R. CIV. P. 23(b)(3) ................................................. (22)

A.  BOTH PREDOMINANCE AND SUPERIORITY ARE
ESTABLISHED WITH RESPECT TO THE TRESPASS CLAIM................. (22)

B.  BOTH PREDOMINANCE AND SUPERIORITY ARE
ESTABLISHED WITH RESPECT TO THE NEGLIGENCE CLAIM........... (27)

IV.  IN THE ALTERNATIVE, THE PLAINTIFFS REQUEST THE COURT
TO CERTIFY THE SPECIFIED CRVI ISSUECLASSES..................................... (30)

V.  BECAUSE THE RULE 26 REPORTS REBUT THE DEFENDANTS'
OBJECTIONS TO CERTIFICATION OF THE PROPERTY DAMAGE
CLASSES, THE PLAINTIFFS REITERATE THEIR REQUEST THAT
THESE CLASSES BE CERTIFIED......................................................................... (33)

CONCLUSION............................................................................................................. (36)

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325 (1981) ...................................................... (27)

*Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111 (2d Cir. 2000) ................................................ (27)

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................... (18)

*Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D. N.Y. 2017),
    <u>aff'd in part</u>, 959 F.3d 70 (2d Cir. 2018) ........................................................................ (28)

*Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144 (S.D.N.Y. 2002) ........................... (17)

*Brown v. St.-Gobain Performance Plastics*, Civil 16-cv-242-JL,
    Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023) ..................................... (15, 26, 28, 29)

*Candelaria v. Conopco, Inc.*, 21-CV-06760 (NCM) (TAM) (E.D.N.Y. Jul 02, 2025) ........... (31)

*Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283 (2nd Cir. 1999) ................................ (19)

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177 (4th Cir. 1993) ................................. (30)

*Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221 (S.D.N.Y. 2010) .................................. (31)

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ................................. (14)

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) .................................................. (18)

*In re Nassau County Strip Search Cases*, 461 F.3d 219 (2nd Cir. 2006) ............................... (30)

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ....................... (18)

*Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) .................................................................... (19)

*Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 983 N.Y.S.2d 110 (2014),
    review denied, 23 N.Y.3d 903 (2014) ......................................................................... (22)

*Jianmin Jin v. Shanghai Original, Inc.*,  990 F.3d 251 (2nd Cir. 2021) .................................. (14)

*Kurtz v. Costco Wholesale Corp.* (2nd Cir. 2020) .................................................................. (18)

*Langan v. Johnson & Johnson Consumer Cos.,* 897 F.3d 88 (2nd Cir. 2018) ........................ (20)

*Li v. NY Capri Nails & Spa, Inc.*, 20-cv-06296 (KAM) (ST) (E.D.N.Y. Jan 17, 2024) .......... (17)

iii

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) .............................................. (16)

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2nd Cir. 2001) .............................. (30)

*Shrage v. Con Edison Co.*, 216 A.D.3d 1023, 188 N.Y.S.3d 691 ( 2023) ............................. (23)

*Transunion LLC v. Ramirez*, 141 S.Ct. 2190 (2021) ................................................................ (21)

*Universities Superannuation Scheme Ltd. v.  Petrobras*, 862 F.3d 250 (2nd Cir. 2017) ........ (20)

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................................ (27)

**Statutes and Other Authorities**

Fed. R. Civ. P. 23(a) ....................................................................................................... (22, 31)

Fed. R. Civ. P. 23(a)(1)........................................................................................................... (14)

Fed. R. Civ. P. 23(a)(2)..................................................................................................... (14, 15)

Fed. R. Civ. P. 23(a)(3)..................................................................................................... (16, 18)

Fed. R. Civ. P. 23(a)(4)..................................................................................................... (18, 19)

Fed. R. Civ. P. 23(b)(3)........................................................................... (10, 22, 25, 27, 30, 32)

Fed. R. Civ. P. 23(c)(4)........................................................................................ (10, 30, 31, 32)

Pursuant to the Court's <u>Order</u> of April 9, 2025, ECF No. 178, the Plaintiffs hereby serve this <u>Supplemental Memorandum of Law in Support of Rule 23 Motion.</u> The Plaintiffs have also served the attached supplemental <u>Fed. R. Civ. P.</u> 26 reports for the Plaintiffs' risk assessment and air modeling expert, Paul E. Rosenfeld, Ph. D, and property damages expert, Dr. Kevin J. Boyle.

## BACKGROUND OF THE LITIGATION

In the <u>Plaintiffs' Motion for Class Certification</u>, the Plaintiffs asked the Court to certify the following Property Damage Class:

> All current owners of residential real property in the Bethpage Area, which has been impacted by Defendants' Contaminants in the air, dust, soil, groundwater, drinking water, soil vapor or any other environmental medium for damages due to the diminution of value due to the known or perceived contamination in the area, and/or stigmatization of property (the "Property Damage Class")

> The "Bethpage Area" for this subclass is defined as the residential real property within the boundaries of the Groundwater Contamination Map prepared by Dr. Laton.

> <u>Plaintiffs' Memorandum of Law in Support of Motion for Class Certification</u> at 7 (ECF No. 156).

With respect to this class, the <u>Third Amended Class Action Complaint</u> defined "Contaminants" as including, *inter alia*, hexavalent chromium ("CrVI") and trichloroethylene ("TCE"). The Plaintiffs further asked the Court to certify a "Liability Only" Property Damage Class with the same class definition and class area. The Plaintiffs supported the <u>Motion for Class Certification</u> with expert reports from seven experts, including Dr. Rosenfeld and Dr. Boyle.

Following the service of his expert reports, Dr. Rosenfeld continued to study the voluminous record of contamination traceable to the Defendants' facilities. He discovered that in 2009 researchers for a human health risk assessment took 176 chromium samples at Bethpage

Community Park, located within the Property Damage class area. The researchers tested 41 of the samples for CrVI. This testing disclosed CrVI in five of the samples as well as total chromium exceeding New York state clean-up levels:

> A total of 176 soluble chromium samples were taken at the BCP for Arcadis's 2009 Human Health Risk Assessment. Five (5) of the forty-one (41) samples analyzed for hexavalent chromium (Cr(VI)) indicated a presence of the metal ranging from 6.28-560 mg/kg for Cr-VI and 1.1-124,000 mg/kg for trivalent chromium (CR-III). As discussed above in Section 4.1, NYSDEC uses a background chromium concentration of 30 mg/kg when developing SCOs. The levels of chromium detected in the BCP and presented in the 2009 HHRA are clearly elevated compared to background.   These elevated chromium levels are attributable to Grumman as they are responsible for the cleanup.

> *See* Pls. Ex. 27 (Report on March and May 2023 Attic Dust Sampling for Chromium in the Community Surrounding the Former Grumman Aerospace Corporation and Naval Weapons Industrial Reserve Plant Facilities in Bethpage, Nassau County, New York at 13) (footnotes omitted) [hereafter Rosenfeld July 7, 2025 Rule 26 Report].

In March and May of 2023, Dr. Rosenfeld traveled to New York and collected attic dust samples from 14 homes within the Property Damage Class air dispersion boundary. *Id.* at 3. Dr. Rosenfeld collected the samples using the methodology set forth in a peer-reviewed publication entitled "Methods for Assessing Dioxins and Other Environmental Contaminants in Attic Dust: A Review." *Id.* at 5.

Dr. Rosenfeld submitted the attic dust samples with completed Chain of Custody forms to Enthalpy Analytical, Inc., to analyze the samples and report results for CrIII and CrVI. *Id.* at 5. The laboratory detected CrVI in 12 of the attic dust samples and CrIII in all of the samples. These chromium levels largely exceeded the NYSDEC Rural Soil Background Concentration (RSBC) of 30 mg/kg. *Id.* at 9. In Dr. Rosenfeld's opinion, the attic dust chromium detections likely underestimate the concentration of CrVI in the homes due to the reduction of CrVI to CrIII. These

low levels are unsurprising given the 28-plus years time-span between the attic dust sampling and the last day of emissions at Northrop Grumman's facilities. *Id.* at 10-11.

Did the attic dust CrVI detected come from Northrop Grumman's emissions? To make this determination, Dr. Rosenfeld compared the ratio of total chromium to the amount of CrVI found in the park and the ratio of total chromium to the amount of CrVI found in the attic dust. These ratios were remarkably similar. In Dr. Rosenfeld's opinion, the similarity of the ratios means that Northrop Grumman is the cause of the chromium contamination in Bethpage. *Id.* at 14-15.

The Defendants opposed the Plaintiffs' Motion for Class Certification. They also filed *Daubert* motions to exclude the testimony of the Plaintiffs' experts and opposed the Plaintiffs' *Daubert* motions. The Plaintiffs filed the Motion for Class Certification, the Defendants' opposition to the motion, the Plaintiffs' Reply Brief, and the parties' *Daubert* motions, oppositions, and replies on June 6, 2023, pursuant to the Court's "bundle" rule. ECF No. 156.

## THE MEDIATION

In early 2024, the parties engaged in mediation of the Plaintiffs' claims. Per agreement, the Plaintiffs served the Defendants with a May 30, 2023 affidavit from Dr. Rosenfeld that summarizes the results of his attic dust sampling. The Plaintiffs also served Northrop Grumman with two additional mediation affidavits prepared by Dr. Boyle – his Mediation Draft Attorney Work Product Expert Report  dated July 19, 2024,  and his Hexavalent Chromium Property Value Damage Draft Affidavit dated August 6, 2024. These affidavits were served subject to mediation privilege.

3

Dr. Rosenfeld has now updated his May 30, 2023 affidavit to provide a more complete and formal assessment of his attic dust sampling and to comply with the Court's Order to provide a Fed. R. Civ. P. 26 report. *See* Pls. Ex. 27. Dr. Boyle has also updated both mediation affidavits to comply with the Court's Order and to account for changed economic conditions. His July 22, 2025 Fed. R. Civ. P. 26 report entitled Groundwater Property-Value Damages Expert Report is attached as Pls. Ex. 28. His July 22, 2025 report entitled Hexavalent Chromium Property − Value Damages Expert Report is attached as Pls. Ex. 29.

In the Groundwater Property-Value Damages Expert Report, Dr. Boyle updated his earlier expert reports to identify the "monetary damages that accrue to 30 randomly selected properties located over the TCE groundwater plume emanating from the Northrop Grumman site in Bethpage New York." *See* Pls. Ex. 28 at 2. He determined that residential real properties located over the TCE ground water plume experience **a common property value diminution of 18.3 percent** plus an individual distance diminution based on their proximity to the Northrop Grumman site:

> Properties experience a common property value diminution from their current values of 18.3 percent plus a distance diminution, ranging from 0.2 to 2.4 percent, based on proximity to the Northrop Grumman facility. Properties located adjacent to the facility experience the greatest distance diminution.

> *Id.* at 2.

Dr. Boyle also determined that the likely primary source of property value diminution associated with the Grumman site is contamination stigma:

> Conversely, when there are clean-up activities and actions to stem the spatial spread of the contamination people fear the actions were incomplete or imperfect. In addition, people do not desire to live next to or near an area that has a known history of contamination. These later two pathways give

4

rise to contamination stigma, and this is the likely primary source of property value diminution associated with the Northrop site.

*Id.* at 10.

Applying a hedonic regression model and a meta-analysis of the results from the hedonic models, Dr. Boyle determined that each property would have a higher value but for the TCE groundwater contamination plume caused by Northrop Grumman. In other words, considering the 18.3% common value diminution plus the .3% average distance diminution, current residential real properties in the area are selling for 18.6% less than they would be but for the contamination:

> The distance diminution effect is added to the common diminution effect from Table 2 (18.3%) to get the total diminution effect for each property (5th, 6th, and 7th columns in Table 3). The average across the 30 properties is 18.6 percent, which means that **properties are selling at a diminution of 18.6 percent on average for what they would sell for in the absence of the TCE groundwater contamination plume.**
>
> Since property values are diminished by the long-standing and well-known TCE groundwater contamination plume, each property would have a higher value but for the contamination. Thus, current values are 18.6 percent less, on average, than they would be but for the contamination….

*Id.* at 23 (emphasis in original).

Dr. Boyle further explained that in order for "environmental contamination to impact property values, there must be information that documents the contamination, and the information must be available to and known by people selling and buying properties in the affected market area." *Id.* at 24. In regards to TCE, Dr. Boyle opines, this occurred in February of 2020 when broad public knowledge of the water contamination was established through the media following the publication of the December 2019 Amended Record of Decision:

> Broad public knowledge of groundwater contamination was established through the media in February 2020 by LaRocco and Schwartz…. A more recent announcement of a previously unknown source contamination from the Northrop Grumman facility by Governor Hochul and Attorney General James…has maintained the contamination in the public domain.
>
> It takes time for knowledge of environmental contamination to disseminate and affect real estate markets. Thus, for purposes of assessing damages, I would use 2020 as the transition year where property values prior to 2020 are not affected by groundwater contamination. Current property values are diminished as shown by the examples in Table 3.

*Id.* at 24 (footnotes omitted).

In other words, Dr. Boyle believes that residential property owner values in the class area were not reduced by the water contamination **until** February 2020. From that point forward, residential property owner values in the class area were reduced a common 18.3 percent plus an individual 0.2 to 2.4 percent individual distance diminution.

In his Hexavalent Chromium Property − Value Damages Expert Report, Dr. Boyle determined the common property value diminutions of the residential real property contaminated by hexavalent chromium attributable to Northrop Grumman. Relying on the Annual CrVI Deposition Blanketing the Proposed Class Boundaries for Medical Monitoring and Property Damage map prepared by Dr. Rosenfeld using results of the air modeling as documented in his expert report, Dr. Boyle explained that Dr. Rosenfeld's modeling shows that CrVI has contaminated the real property shaded in pink:

6



*See* Pls. Ex. 29 at 6.

Dr. Boyle noted that "[t]he presence of hexavalent chromium is confirmed by test results from attic dust samples taken from residential properties (Expert Report, P.E. Rosenfeld, PhD, 2025)." *Id.* at 4.

The "boundary of the hexavalent chromium class extends approximately 1.5 miles in a south westerly direction from the Northrup Grumman site towards Levittown and about 1.6 miles in a northeasterly direction toward Plainview. Properties within the air-deposition plume experience value damages like properties located over the groundwater-contamination plume." *Id.* at 5. The hexavalent chromium Subclass area partially overlaps with the northern section of the groundwater contamination plume shaded in dark red on the map, although there are properties uniquely contaminated by CrVI to the west, north, and east of the Northrop Grumman facilities. *Id.* at 5, 6.

Applying a hedonic regression model to this Subclass area and the Property Damage Class Area, Dr. Boyle determined there are three classes of damaged residential real property. Each class has experienced **a common diminution in value** of the specified amount plus a modest diminution in value based on proximity to the Grumman site. He has summarized his findings in four opinions:

> There are three classes of damaged residential properties due to environmental contamination released from the Northrop Grumman facilities in Bethpage, New York. I will refer to these as Class 1, 2 and 3 properties:
>
> 1. Class 1 properties that are located over the groundwater contamination plume, but not within the hexavalent chromium air-deposition plume.
>
> 2. Class 2 properties that are located over the groundwater contamination plume and are within the boundary of the hexavalent chromium air-deposition plume.

3. Class 3 properties that are not located over the groundwater contamination plume but are within the hexavalent chromium air-deposition plume.

Property-value diminution damages for each of the three classes of properties are as follows:

Opinion 1 – Class 1 properties experience a common property-value diminution of 18.3%.

Opinion 2 – Class 2 properties experience a common property-value diminution of 27.4% that includes an additional 9.1% diminution due to hexavalent-chromium contamination.

Opinion 3 – Class 3 properties experience a common property-value diminution of 18.9% that excludes 8.5% due to groundwater contamination.

Opinion 4 – All properties experience an additional, modest, diminution in value based on proximity to the Northrop Grumman site that ranges from 0.2% to 2.4% with properties adjacent to the site experiencing the greatest distance diminution.

*Id.* at 2.

Dr. Boyle opines that broad public knowledge of the CrVI contamination occurred in August of 2023. Hence property values prior to this date are not affected by the CrVI contamination:

News of the hexavalent chromium air-deposition plume became known in an August 2023 new story. …Using the same logic applied for the groundwater contamination plume with the public release of the Amended Record of Decision… in December 2019, where property values were adjusting to the contamination information during 2020, property values prior to August 2023 are not affected by the hexavalent chromium contamination. Current values of properties that are wholly or partially located within the hexavalent air-deposition plume are diminished by this contamination.

*Id.* at 17 (footnotes omitted).

In light of the foregoing evidence of historical CrVI contamination **in addition to the TCE water plume contamination**, the Plaintiffs now ask the Court to certify a CrVI and TCE

9

Contamination Property Damage Subclass under Fed. R. Civ. P. 23(b)(3), in addition to the Property Damage classes specified in the Motion for Class Certification. The Plaintiffs respectfully submit that this Subclass complies with Fed. R. Civ. P. 23 as set forth below. In the alternative, the Plaintiffs ask the Court to certify the specified CrVI issue classes pursuant to Fed. R. Civ. P. 23(c)(4). The Plaintiffs further reiterate their request for the Court to certify the original Property Damage classes insofar as the Rule 26 reports rebut most of the objections to class certification raised by the Defendants.

### NEW DISCOVERIES OF CRVI IN THE SOIL AND CONTAMINATION IN ELEVEN PUBLIC WATER SUPPLY WELLS

On July 18, 2025, the Town of Oyster Bay filed a Second Amended Complaint in *Town of Oyster Bay v. Northrop Grumman Systems Corporation*, CA 2:23-cv-07146-NJC-AYS (ECF 62)*See* Pls. Ex. 30. In this pleading, the Town of Oyster Bay alleged that alarming levels of CrVI had been detected in soil samples taken in the Bethpage Community Park in March and April of 2024:

> 3. The Town initially commenced this action on September 26, 2023. Six months later, …contractors working at the Park inadvertently uncovered over twenty 55-gallon drums that decades earlier Gruman had encased in concrete and buried beneath the Park. Some of the drums contained unidentified yellow-green and blue- green sludge that subsequent testing revealed contained hazardous heavy metals and industrial solvents. **Testing of the soil surrounding the drums**, conducted by the Town at its own expense, **revealed the presence of toxic and highly carcinogenic hexavalent chromium**….
>
> 9…..[T]he Town's own sampling has detected **alarming levels of highly toxic hexavalent chromium**, also known as Chrome-6.
>
> Second Amended Complaint para. 3 & 9 (emphasis added).

The Town alleged the CrVI is "starkly visible" in the soil and that Northrop Grumman still refuses to test for it:

4. Northrop Grumman is deliberately ignoring excavated Park soil with starkly visible metals contamination in order to avoid creating sampling data showing detections of hexavalent chromium. Instead, Northrop Grumman is creating a false investigation record that minimizes detections of hexavalent chromium because Northrop Grumman is intentionally excluding yellow-green and blue-green substances indicative of metals contamination in the soil from sampling and analysis.

9…Notably...Northrop Grumman has refused to test adequately for hexavalent chromium and has repeated the now obvious falsehood that it did not dispose of hexavalent chromium at the Park… [e]ven though substances and materials containing chromium are plainly apparent to the naked eye in some excavated Park soil…

*Id.* at para. 4 & 9.

The Town provided photographs of yellow-green and blue-green CrVI rocks found in the soil. *See* Pls. Ex. 31. By letter dated November 7, 2024, the NYSDEC confirmed the presence of CrVI in the soil and ordered Northrop Grumman to begin testing selected soil samples for CrVI. Second Amended Complaint, para. 190("On or about November 27, 2024, DEC finally informed Northrop Grumman that it would require sampling for hexavalent chromium at the Community Park"). Despite this directive , Northrop Grumman has simply reburied much of the soil that contains CrVI and insisted that no CrVI testing is needed because there purportedly is no CrVI in the soil. *Id.* para. 200 ("As of July 18, 2025, the Town's preliminary sampling results show that the yellow- green and blue-green colored substances re-buried by Northrop Grumman contain elevated levels of hexavalent chromium, total chromium, cadmium, and arsenic.").

Finally, in addition to the CrVI found in the soil, the Town has alleged that:

11

> 56. Contaminants in the Navy Grumman Groundwater Plume have contaminated the groundwater intakes at 11 public water supply wells, and the continued expansion of the plume threatens to contaminate groundwater intakes at additional public water supply wells in the Town.

*Id.* para. 56.

The Plaintiffs' experts are in the process of reviewing this new information and the on-going testing of CrVI soil samples. The experts will evaluate if the tangible CrVI found in the park has migrated off-site and into the Subclass area. They also will evaluate if the contamination in the eleven water supply wells reached the residential real property in the Property Damage Class area. Dr. Boyle will also determine if these new discoveries have caused an additional reduction in value of the residential real property in the class areas. Plaintiffs reserve the right to submit updated Rule 26 reports based on this newly discovered information.

## **ARGUMENT**

The Plaintiffs incorporate by reference the <u>Memorandum of Law in Support of Motion for Class Certification</u>.

**I.     THE PLAINTIFFS REQUEST THE COURT TO CERTIFY THE CRVI AND TCE CONTAMINATION PROPERTY DAMAGE SUBCLASS DEFINED BELOW.**

The class definition for the CrVI and TCE Contamination Property Damage Subclass is set forth below:

> All owners at the time of class certification of residential real property located within the CrVI and TCE Contamination Property Subclass area.

The Class Representatives for this Subclass are Rosalie Romano, Mary E. Ginty, Christopher Blades, Jacob Kholodny, Bella Kholodny, Patricia Glueckert, Laurie Franks, Ross Meadow, Arlene Meadow, and Laurie Franks. Dr. Rosenfeld has plotted the location of the

12

residence of each Class Representative in his original expert report attached to the <u>Memorandum in Support of Class Certification</u>. *See* Pls. Ex. 32.

Plaintiffs seek certification for this Subclass under the theories of trespass and negligence.

1.      For purposes of this Subclass, the CrVI and TCE Contamination Property Subclass Class Area is the area identified by Dr. Boyle in his <u>Hexavalent Chromium Property − Value Damages Expert Report</u>. This area partially overlaps with the TCE water contamination plume but also includes CrVI contamination-only areas.

2.      "Residential real property" is defined as all property zoned residential, or mixed use residential within this area, including single family homes, condominiums, townhouses, and apartments.

3.      An "owner" is defined as any individual, or entity, holding title in whole, or part, to the property.

4.      Excluded from the Subclass are the following:

a. Residential real property owned by the Defendants, or any employee of the Defendants, at the time of class certification;

b. Residential real property owned by the judge, or magistrate, assigned to this action at the time of class certification;

c. Mortgagors, or other holders solely of security interests in the residential real property;

d. Lessees, remainder men, or other holders of short term or future interests in the residential real property; and

e. All owners of residential real property who purchased the property after July 31 of 2023, the date by which the CrVI contamination became widely known in the Bethpage community.

**II.   THE SUBCLASS SATISFIES ALL REQUIREMENTS FOR CLASS CERTIFICATION OF FED. R. CIV. P. 23(a).**

**A.   <u>The Subclass Satisfies the Numerosity Requirements of Fed. R. Civ. P. 23(a)(1).</u>**

<u>Fed. R. Civ. P.</u> 23(a)(1) requires the movant to prove that "the class is so numerous that joinder of all members is impracticable." Although "there is no magic number of class members needed to satisfy numerosity…, numerosity is generally 'presumed at a level of 40 [or more] members.'" *Jianmin Jin v. Shanghai Original, Inc*., 990 F.3d 251, 263 note 20 (2nd Cir. 2021) <u>quoting</u> *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

The CrVI and TCE Contamination Property Damage Subclass Class Area currently contains residential properties owned by over 40 different property owners who purchased before August 1, 2023. There are also more than 40 purchasers of residential property in the Property Damage Class area as well. *See* Pls. Ex. 33 & 34. The Subclass accordingly passes the numerosity test. The joinder of all members of the Subclass – as well as the joinder of all members of the Property Damage Class - would be impracticable.

**B.   <u>The Subclass Satisfies the Common Questions Requirements of Fed. R. Civ. P. 23(a)(2).</u>**

<u>Fed. R. Civ. P.</u> 23(a)(2) requires the movant to prove that "there are questions of law or fact common to the class." The Supreme Court has emphasized this provision requires a plaintiff to prove there are "common answers" to a common contention that is central to each claim.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Nonetheless, the Supreme Court has been clear that it only takes one "common question" of this nature to satisfy this requirement − "We quite agree for purposes of Rule 23(a)(2) that 'even a single common question will do….'" *Id.* at 359.

Whether Northrop Grumman discharged the CrVI and TCE that migrated into the Subclass area; whether the chemicals pose dangers to human health and real property; whether the chemicals in tangible form contaminated each Subclass member's residential real property; and whether the stigma of being located near the CrVI and TCE contaminated areas caused each class member to suffer common property damage in the form of the loss of the full appreciation of the property are central common factual questions underlying both the trespass claim and the negligence claim asserted by the  Subclass Plaintiffs. These common questions of fact can be answered with class-wide proof – the  Plaintiffs' experts in their expert reports have provided compelling opinions that Northrop Grumman is responsible for the CrVI and TCE discharges; that both chemicals are toxic; that the discharges did deposit on the residential real property in tangible form; and that the resulting contamination has caused a diminution in value in the form of the loss of the full appreciation of the real property. There are also many common questions of law as discussed below.

Directly on point is the  recent decision in *Brown v. St.-Gobain Performance Plastics*, Civil 16-cv-242-JL, Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023) *See* Pls. Ex. 35. There, in the course of certifying a trespass and negligence class − and subclasses − in a PFOA water contamination class action, the court noted that the plaintiffs had proven almost the same Rule 23(a)(2) common issues:

The commonality requirement is satisfied here. Saint-Gobain's actions with respect to the release of PFOA and subsequent warnings and mitigation efforts; the geographical scope of contamination from Saint-Gobain's emissions; and the toxic nature of PFOA are common issues that can be determined on a class-wide basis. These issues are also central to-and will thus meaningfully advance resolution of-each of the claims.

*Id.* (applying New Hampshire law). See also *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) (noting, in a class action concerning a factory's release of toxic chemicals into surrounding groundwater, that "[t]he question[] . . . whether the [chemical] reached the soil and groundwater beneath the homes of the class members [is] common to all the class members" and, since "[t]he class members' homes occupy a contiguous area the boundaries of which are known precisely," the relevant inquiry "is whether this area or some part of it overlaps the area of contamination").

**C.    The Subclass Satisfies the Typicality Requirement of Fed. R. Civ. P. 23(a)(3).**

Rule 23(a)(3) requires the movant to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." As this Court recently explained:

"The typicality analysis focuses on whether the named plaintiff's interests align with the interests of the rest of the class." …"The purpose of this analysis is to ensure that, by prosecuting its own case, the named plaintiff simultaneously advances the interests of the absent class members." Id. (internal quotations and citations omitted). "The typicality criterion does not require complete symmetry between the class representative's claims and those of the absent class members." (internal quotations and citations omitted). "Rather, the named plaintiff must simply raise claims that 'arise from the same course of events' as the class claims and make 'similar legal arguments to prove the defendant's liability.'"

*Li v. NY Capri Nails & Spa, Inc.*, 20-cv-06296 (KAM)(ST) (E.D.N.Y. Jan 17, 2024)(citations omitted)(Report and Recommendation by United States Magistrate Steven Tiscione).

The typicality requirement is not highly demanding since the claims need only "share the same essential characteristics, and need not be identical…." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002).

The claims of the CrVI and TCE Contamination Property Damage Subclass Class Representatives are typical to the claims of the putative members of this subclass. Proposed Class Representatives Rosalie Romano, Mary E. Ginty, Christopher Blades, Jacob Kholodny, Bella Kholodny, Patricia Glueckert, Laurie Franks, Ross Meadow, Arlene Meadow, and Laurie Franks own and live in single family homes within the Subclass Area. They all purchased before July 31, 2023. According to Dr. Boyle, they all have suffered a common diminution in value as have the members of the putative class. The Plaintiffs incorporate by reference the section of the Memorandum of Law in Support of Class Certification that lists the specifics as to each class representative and the attached exhibits.

Although the common diminution percentage differs slightly depending on whether the class member owns residential real property in the "overlap" zone (27.4%) and the "CrVI only" contamination zone (18.3%), this minor difference does not destroy typicality. Again, as the Court stated in *Li v. NY Capri Nails & Spa, Inc.*,  the "typicality criterion does not require complete symmetry between the class representative's claims and those of the absent class members." 20-cv-06296 (KAM)(ST) (E.D.N.Y. Jan 17, 2024). All that is required is that the class representatives' interests align with those of the putative class and that the named plaintiff has raised claims that "arise from the same course of events' as the class claims and ….[has made] similar legal arguments to prove the defendant's liability." That is certainly true here.

17

Both the claims of the Class Representatives and the putative Subclass derive from the same exact conduct - the release by the Defendants of toxic contaminants, including CrVI and TCE, into the environment that migrated into the Bethpage Community and caused a diminution in the value of their property in the form of the loss of full market appreciation. There are no defenses that Northrop Grumman has with respect to any Class Representative that are not also applicable to the entire class. The Plaintiffs submit that Rule 23(a)(3) typicality is easily satisfied with respect to the Subclass.

**D.     The Class Representatives and Class Counsel will fairly and adequately protect the interests of the Subclass.**

**1.     Class Representatives**

Rule 23(a)(4) requires the movant to show that "the representative parties will fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). In considering Rule 23(a)(4)'s adequacy requirement, the Second Circuit has advised the primary factors are whether the class representatives have any "interests antagonistic to the interests of other class members" and whether the representatives "have an interest in vigorously pursuing the claims of the class." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Even if some degree of conflict exists, however, the conflict does not "necessarily defeat class certification—the conflict must be 'fundamental.'" *Denney*, 443 F.3d at 268 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)). See also *Kurtz v. Costco Wholesale Corp.* (2nd Cir. 2020)("[w]hile a conflict of interest between the named plaintiff and absent class members can

18

render the former an inadequate representative under certain circumstances, the "conflict must be 'fundamental' to violate Rule 23(a)(4)").

Moreover, "[t]his criterion does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact "occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 293 (2nd Cir. 1999).

Nonetheless, there are a few black letter rules. First, "[t]he named plaintiffs in a class action cannot represent a class of whom they are not a part…." *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019). Second, the named plaintiffs "can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class." *Id.*

In the instant, the CrVI and TCE Contamination Property Damage Subclass Class Representatives are members of this Subclass, as discussed above, and have the exact same interests as the members of the putative class − viz., obtaining compensation for the diminution in value of their real property caused by the Defendants' trespass on their real property and negligence in contaminating their real property. They have no fundamental conflicts of interest – or any conflicts of interest − with the putative Subclass.

### 2.       Class Counsel

The Plaintiffs incorporate by reference the <u>Declaration of Paul Napoli</u> and the <u>Declaration of Gregory A. Cade</u> filed with the <u>Motion for Class Certification</u>. These declarations show that class counsel is eminently qualified to represent the Subclass.

**E.**    **The Subclass is Ascertainable, and the Subclass Representatives have Article III Standing to Recover Damages.**

In the Second Circuit, **a class need only be defined by objective criteria** to meet the

implied ascertainability requirement:

> We take this opportunity to clarify the ascertainability doctrine's substance and purpose. We conclude that a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23, joining four of our sister circuits in declining to adopt such a requirement. **The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries.**
>
> *Universities Superannuation Scheme Ltd. v. Petrobras*, 862 F.3d 250, 264 (2nd Cir. 2017)(emphasis added).

Classes "identified by subject matter, timing, and location" are *per se* deemed to satisfy

this requirement. *Langan v. Johnson & Johnson Consumer Cos.,* 897 F.3d 88, 95 (2nd Cir.

2018)("Since the class at issue here is identified by subject matter (purchasers of the two products),

timing (before November 2012 and 2013 respectively), and location (the eighteen identified

states), it is likewise 'clearly objective' and 'sufficiently definite' such that determining who

purchased the products is undoubtedly 'objectively possible'"). Further, the Second Circuit

permits putative class members to submit "sworn affidavits" to establish class membership. *Id.*

at 93, note 2.

Here Dr. Boyle defined the geographical boundary of the Subclass and the Nassau County

on-line zoning map identifies the real properties zoned residential and mixed-use residential. The

county real property records establish the ownership, the date of purchase, and the address of each

parcel of land that comprise the properties within the Subclass. Each Subclass Representative at

the time of class certification will file an affidavit certifying that he, or she, still owns the real

property in question. Following class certification, putative class members who do not opt out will

20

file claim forms after receiving notice to attest to their timely ownership of real property in the Subclass area. The Plaintiffs respectively submit that the Subclass is ascertainable.

"Every class member must have Article III standing in order to recover individual damages." *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021). At the time of class certification, however, only the class representatives must show Article III standing. This means that each class member must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id*. at 2203.

Monetary harm to real property has long been recognized as a type of concrete harm sufficient to confer Article III standing on the landowner. Indeed, the Supreme Court in *Transunion* expressly recognized that a landowner whose real property has been damaged by factory pollution has Article III standing to sue the factory. *Id.* at 2206-07.

Although the residential real property owned by the Subclass Representatives and the putative Subclass has appreciated in value in recent years, Dr. Boyle in his Rule 26 Reports explained that, but for the Defendants' tortious conduct, the residential real property in the CrVI and TCE Contamination Property Damage Subclass Class area would have appreciated more – 27.4% more where the CrVI contamination and the TCE water contamination overlap and 18.3% more where only CrVI deposited (plus the individual distance diminution). An award of damages, of course, will remedy these injuries. Any objection that recent purchasers of residential real

21

property in the class have not suffered injury because they have already benefited from the diminution is meritless, since the Subclass definition excludes post-July 31, 2023 purchasers.[1]

## III.    THE SUBCLASS SATISFIES ALL REQUIREMENTS FOR CLASS CERTIFICATION OF FED. R. CIV. P. 23(b)(3).

With the requirements of <u>Fed. R. Civ. P.</u> 23(a) thus easily met, the only question remaining is whether the Subclass complies with <u>Fed. R. Civ. P.</u> 23(b)(3). Rule 23(b)(3) permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### A.    <u>Both predominance and superiority are established with respect to the trespass claim.</u>

Under New York law, a plaintiff seeking to recover for trespass based on the deposit of toxic chemicals must prove the defendant intentionally caused the entry of toxic chemicals onto his property, or had good reason to know or expect the chemicals would migrate to the plaintiff's land:

> On the merits, a trespass claim represents an injury to the right of possession ...and the elements of a trespass cause of action are an intentional entry onto the land of another without permission ... Regarding intent, the defendant "must intend the act which amounts to or produces the unlawful invasion, and the intrusion must at least be the immediate or inevitable consequence of what he [or she] willfully does, or which he [or she] does so negligently as to amount to willfulness" ...For a trespass claim involving toxic chemicals, a defendant is liable only if "he [or she] had good reason to know or expect that subterranean and other conditions were such that there would be passage [of the toxins] from [the] defendant's to [the] plaintiff's land."
>
> *Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 983 N.Y.S.2d 110, 116 (2014), <u>review denied</u>, 23 N.Y.3d 903 (2014).

---

[1] To the extent the Defendants contend that an earlier trigger point should be used, that contention goes to the merits and not to class certification.

"An invasion of another's property or airspace need not be more than de minimis in order to constitute a trespass." *Standard Realty Assoc., Inc. v. Chelsea Gardens Corp.*, 105 A.D.3d 510, 510, 964 N.Y.S.2d 94; *Shrage v. Con Edison Co.*, 216 A.D.3d 1023. 188 N.Y.S.3d 691, 694 (2023). Only tangible intrusions, however, constitute an actionable trespass:

> As relevant to the vapor intrusion and air emissions, however, courts have precluded trespass claims where the entry or intrusion was intangible, such as the occurrence of vibrations …shading of a plaintiff's property … or a permeating odor or vapors of gasoline … "Generally, intangible intrusions, such as by noise, odor, or light alone, are treated as nuisances, not trespass [because] they interfere with nearby property owners' use and enjoyment of their land, not with their exclusive possession of it" (75 Am. Jur. 2d, Trespass § 27). Thus, plaintiffs have no valid trespass claims based on vapor intrusion or air emissions, as those caused only intangible intrusions.

> *Ivory,* 983 N.Y.S.2d at 117.

The New York law of trespass applies to every member of the putative Subclass. New York law as to the recovery of stigma damages in class actions likewise applies to every member of the putative Subclass. Common issues of law thus clearly predominate.

In this case, the single **predominate factual issue** that governs class certification of the trespass cause of action is whether the Plaintiffs can present class-wide proof that Northrop Grumman discharged tangible amounts of wet particle CrVI into the subclass area. Dr. Rosenfeld's CrVI air modeling and CrVI deposition modeling answer this question affirmatively. The wet particle CrVI invaded both the air space of each class member **and** deposited on the ground owned by each class member. In his July 7, 2025 Rule 26 Report, Dr. Rosenfeld confirmed the CrVI deposited in tangible form:

> there are multiple lines of evidence that demonstrate the chromium contamination in the Bethpage homes are "tangible" including but not limited to: (1) measured levels of chromium above background in the attic dust of the Bethpage community, (2) evidence of significant onsite chromium contamination at the Facility above NY clean up levels, (3)

23

evidence of significant groundwater contamination resulting from facility releases, (4) permits showing Northrop Grumman emitted thousands of pounds of hexavalent chromium into the community, (5) numerous news stories, (6) numerous government and consultant documents proving the significance of the chrome contamination throughout the community, and (7) finally when all the evidence is evaluated together the chromium contamination is real, significant, above background, tangible.

Pls. Ex. 27 at 15.

Finally, the "starkly visible" yellow-green and blue-green CrVI rocks found in the soil in 2024 and 2025 in the Bethpage Community Park conclusively show that the CrVI deposited in tangible form and did not all reduce to CrIII. To the extent that Northrop Grumman contends that the historical modeling is merely theoretical and that the CrVI would have degraded to CrIII before it hit the ground, Dr. Rosenfeld's July 7, 2025 Rule 26 Report and the CrVI rocks show otherwise.

The second predominate factual issue is whether the Plaintiffs can present class- wide proof that Northrop Grumman intentionally released the CrVI and TCE, or at least had good reason to know, or expect, that the CrVI and TCE emissions would migrate to the Plaintiffs' airspace and land. Dr. Laton and Dr. Rosenfeld in their expert reports have answered this question affirmatively. Their opinions are quoted in the  Memorandum of Law in Support of Class Certification.

The foregoing class-wide proof of applicable law and facts establishes all elements of a New York trespass and would entitle each Subclass member to at least nominal damages. Dr. Boyle, however, has offered class-wide proof that each Subclass member suffered significant **common** diminutions in the value of his or her real property as a result of the stigma of being located above, or near, the CrVI contamination as well as the TCE water plume contamination. Northrop Grumman's argument that stigma damages are not recoverable in the absence of actual contamination fails at this juncture because Dr. Rosenfeld's attic dust affidavit in conjunction with

24

his CrVI deposition modeling provides class-wide proof  that the class **properties have been actually contaminated by tangible amounts of CrVI.** While some of the CrVI may have converted to CrIII, that does not change the fact that Northrop Grumman trespassed on the residential real property of each Subclass member.

The only individual issue that must be litigated is the additional diminution that each residential real property owner experiences due to the property's distance from the CrVI deposits and the TCE water contamination plume. No credible argument can be made that this minor additional inquiry overwhelms the common issues affecting the Subclass. The Plaintiffs respectfully submit that common issues of fact and law predominate for the Subclass.

With predominance thus established, the only question remaining is whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Factors bearing on whether a class action is superior to other methods to adjudicate a controversy include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

The <u>Memorandum of Law in Support of Motion for Class Certification</u> at 47-48 argues superiority in great detail. The Plaintiffs incorporate by reference this argument and supporting evidence.

*Brown v. St.-Gobain Performance Plastics* again is directly on point. Civil 16-cv-242-JL, Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023). There, on virtually identical class-wide proof, the court certified a PFOA trespass invasion liability[2] class finding that class-wide issues predominated and that a class action was superior to other methods of adjudication:

> [T]he plaintiffs have shown that the geographic scope of contamination is suitable for class-wide determination."
>
> Saint-Gobain's intent during the 2003-2006 time period can be established through common proof of Saint-Gobain's knowledge of (1) the occurrence and volume of PFOA emissions from its facility; (2) the toxic nature of PFOA; and (3) the science showing that PFOA travels from the air, to the land, and then to the groundwater on an area-wide basis.
>
> The predominance element is accordingly satisfied with respect to Saint-Gobain's liability for trespass."
> …
> Absent the class action vehicle, individual plaintiffs would be forced to prove the same factual issues concerning, for example, the presence of contamination on their property, Saint-Gobain's actions with respect to emissions and mitigation, and the hazards associated with PFOA. This would be both inefficient and costly, given that these issues are suitable to class-wide proof and require multiple expert opinions and extensive expert analysis. Thus, in this case, a class action "achieve[s] economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons

---

[2] The court declined to certify the class for damages because "the plaintiffs lack a common or manageable method for allocating damages to individual class members, precluding certification as to damages." *Brown v. St.-Gobain Performance Plastics*, Civil 16-cv-242-JL, Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023). In the instant case, by contrast, Dr. Boyle *has* provided a common and manageable method for allocating damages to individual class members with respect to the common diminution in value in the Subclass area. Assuming *arguendo* that the Court finds otherwise, the Plaintiffs submit that the Subclass should still be certified for liability only.

similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

*Brown*, Civil 16-cv-242-JL, Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023).

The Plaintiffs accordingly submit the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3) are easily met with respect to the trespass claims of the Subclass.

**B.      Both predominance and superiority are established with respect to the negligence claim**

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '( 1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000), quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981).

The New York law of negligence applies to every member of the putative Subclass. New York law as to the recovery of stigma damages in class actions likewise applies to every member of the putative Subclass.

The single predominate question of law is whether Northrop Grumman owed a duty of care to members of the putative Subclass.  Whether Grumman owes a duty to the members of the Subclass is a question of law which is based on class-wide proof − the relationship between Grumman and the community members, the foreseeability of harm to class members, and the nature of the harm caused.

As one court recently explained:

"However a party's duty is ultimately defined in pollution cases, this policy determination must include a duty not to pollute a plaintiff's drinking water. Society has a reasonable expectation that manufacturers avoid contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply."

27

*Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233 (N.D. N.Y. 2017)(emphasis added), aff'd in part, 959 F.3d 70 (2d Cir. 2018).

More recently, in *Brown v. St.-Gobain Performance Plastics*, the court found a class-wide duty based on the affirmative action doctrine:

> "In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act." …Importantly, "not every risk that might be foreseen gives rise to a duty to avoid a course of conduct; a duty arises because the likelihood and magnitude of the risk perceived is such that the conduct is unreasonably dangerous." …

> The existence of a duty, then, turns on two issues that are susceptible to class-wide proof: the foreseeability and magnitude of risk of harm to the class resulting from Saint-Gobain's emissions.

> *Brown,* Civil 16-cv-242-JL, Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023).

The expert reports of Dr. Rosenfeld, Dr. Laton, and Mr. Bost provide compelling class-wide expert evidence of facts from which the Court can conclude that Northrop Grumman owed the Subclass members a duty to exercise reasonable care to avoid contaminating their properties. Common issues of law thus clearly predominate with respect to Rule 26(b)(3) certification of the Subclass.

Common issues of fact likewise predominate. As with the trespass claim, the single predominate factual issue is whether the Plaintiffs can present class-wide proof that Northrop Grumman discharged tangible amounts of wet particle CrVI into the subclass area. Here the class-wide evidence is the same for both torts − Dr. Rosenfeld's CrVI air modeling and CrVI deposition modeling answer this question affirmatively. The wet particle CrVI invaded both the air space of each class member and deposited on the ground owned by each class member. To the extent that Northrop Grumman contends that the historical modeling is merely theoretical and that the CrVI

would have degraded to CrIII before it hit the ground, Dr. Rosenfeld's July 7, 2025 Rule 26 report shows otherwise, as discussed above.

The second predominate factual issue is whether Northrop Grumman breached the duty owed by class members by failing to exercise reasonable care to prevent CrVI emissions from migrating to and contaminating their land. Again, the expert reports of Dr. Rosenfeld, Dr. Laton, and Mr. Bost provide compelling class-wide expert evidence of negligence by Northrop Grumman in failing to control CrVI emissions.

The third predominate factual issue is whether Northrop Grumman's negligence was the cause in fact of the Plaintiffs' injuries. In the *Brown* PFOA contamination case, the court easily found that cause in fact could be proven with class-wide proof:

> To establish that the defendant's conduct is the cause-in-fact, "[t]he plaintiff 'must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed.'" Est. of Joshua T., 150 N.H. at 407-08 (2003). The plaintiffs assert that they can prove causation on a class-wide basis through their experts' opinions that Saint-Gobain's emissions contributed to groundwater contamination where present across the class areas. …Thus, the issue of whether Saint-Gobain is the cause-in-fact of the harm to the class members is susceptible to class-wide resolution.

Civil 16-cv-242-JL, Opinion 2023 DNH 156 (D. N.H. Dec 29, 2023).

The same is true in this case. Northrup Grumman may contend that the CrVI found in the park and the attic dust is traceable to other sources that requires a property-by-property evaluation. But, as the *Brown* court ruled, "even if individual inquiries concerning causation arise, they would not overwhelm the common issues concerning duty and breach. The court concludes that the predominance element is satisfied with respect to Saint-Gobain's liability for the torts of negligence and negligent failure to warn." *Id.*

29

As discussed above, this conclusion is further buttressed by the evidence of class-wide damages provided by Dr. Boyle. Dr. Boyle offered class-wide proof that each class member suffered significant common diminution in the value of his, or her, real property as a result of the stigma of being located above, or near, the CrVI contamination as well as the TCE water plume contamination. The Plaintiffs accordingly respectfully submit that common issues of law and fact predominate over individual issues for the negligence claim and – for the reasons set forth *supra* in regard to the trespass claim – that a class action is the superior vehicle to litigate this case. The Court therefore should certify the CrVI and TCE Contamination Property Damage Subclass.

## IV.     IN THE ALTERNATIVE, THE PLAINTIFFS REQUEST THE COURT TO CERTIFY THE SPECIFIED CRVI ISSUE CLASSES.

Fed. R. Civ. P. 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The Second Circuit has emphasized that "[d]istrict courts should `take full advantage of th[is] provision" to certify separate issues 'in order... to reduce the range of disputed issues' in complex litigation' and achieve judicial efficiencies." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 167-68 (2nd Cir. 2001) quoting in part *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993).

The classic scenario where issue certification is appropriate is where the plaintiff seeks to separate liability from damages and seeks certification of liability only. *In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2nd Cir. 2006)("the District Court exceeded its allowable discretion in denying Rule 23(b)(3) and (c)(4)(A) class certification on the issue of liability in its decisions...")."For particular issues to be certified pursuant to Rule 23(c)(4), the requirements of Rules 23(a) and (b) must be satisfied only with respect to those issues.") ..."

30

*Candelaria v. Conopco, Inc.*, 21-CV-06760 (NCM) (TAM) (E.D.N.Y. Jul 02, 2025) quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 239 (S.D.N.Y. 2010).

As the Honorable Natasha C. Merle, United States District Judge, recently explained, a plaintiff must also show that issue certification will materially advance a disposition of the litigation:

> Still, the purpose of Rule 23(c)(4) is to "make the case more manageable." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("MTBE"), 209 F.R.D. 323, 351 (S.D.N.Y. 2002). "Thus, issue certification must materially advance a disposition of the litigation as a whole to be warranted." Benner v. Becton Dickinson & Co., 214 F.R.D. 157, 169 (S.D.N.Y. 2003); see also MTBE, 209 F.R.D. at 351 ("[I]ssue certification is not appropriate if, despite the presence of a common issue, certification would not make the case more manageable."). Plaintiff bears the burden of demonstrating that issue certification will in fact "materially advance a disposition of the litigation." MTBE, 209 F.R.D. at 351 (quoting Robinson, 267 F.3d at 167 n.12).
>
> *Candelaria v. Conopco, Inc.*, 21-CV-06760 (NCM)(TAM) (E.D.N.Y. Jul 02, 2025).

If the Court declines to certify the CrVI and TCE Contamination Property Damage Subclass as requested, the Plaintiffs alternatively request the Court to certify for class treatment the following two issues:

1. whether Northrop Grumman is liable to the Plaintiffs for trespass within the Subclass area under New York law; and

2. whether Northrop Grumman is liable to the Plaintiffs for negligence within the subclass area under New York law.

The foregoing discussion in parts I and II shows that all requirements of Rule 23(a) are satisfied with respect to Northrop Grumman's liability to the Plaintiffs for both torts. The foregoing discussion also shows that the elements *of liability* for both trespass and negligence can be established with class proof – or that, at the very least, common issues predominate over individual issues with respect to liability for both torts. Indeed, because the Plaintiffs seek

> to "limit class certification only to certain common issues, those issues necessarily" satisfy the predominance requirement. Pelman, 272 F.R.D. At 98; see also Charron, 269 F.R.D. at 241 ("Naturally, when a Court chooses to limit class certification only to certain common issues under Rule 23(c)(4), those issues necessarily predominate and satisfy the first element of Rule 23(b)(3)."); accord. 2 Newberg on Class Actions § 4:23 ("When a court decides to limit a class action with respect to particular common issues only, such limitation will necessarily afford predominance as to those issues."). Thus, plaintiff is correct that her Proposed Class satisfies Rule 23(b)(3)'s predominance requirement. See Reply 13.

*Candelaria*, 21-CV-06760 (NCM) (TAM) (E.D.N.Y. Jul 02, 2025).

Accordingly, the only real issue is superiority, which is not really an issue at all.  Having a class trial on the elements of trespass and negligence would obviously be superior to hundreds of individual trials. Experts for both sides would have to testify only one time. The costs for both sides would be substantially reduced. The amount of judicial time and resources would likewise be substantially reduced. There would be no danger of inconsistent results. If the Plaintiffs prevail, the Court can hold bellwether trials on damages and Plaintiffs can be grouped according to their distance from the Northrop Grumman facilities. The Plaintiffs accordingly respectfully the Court to certify the two CrVI issue classes if the Court is not inclined  to certify the proposed Subclass.

32

**V.    BECAUSE THE RULE 26 REPORTS REBUT THE DEFENDANTS' OBJECTIONS TO CERTIFICATION OF THE PROPERTY DAMAGE CLASSES, THE PLAINTIFFS REITERATE THEIR REQUEST THAT THESE CLASSES BE CERTIFIED.**

The Rule 26 reports also rebut the objections the Defendants made to certification of the Property Damage Class. With respect to the original motion to certify the Property Damage classes, the Defendants argued that the motion should be denied because, *inter alia*, the Plaintiffs purportedly had offered no evidence of CrVI, TCE, or any other contamination:

> To date, Plaintiffs have offered no evidence that even a single class member's property is contaminated with the substances at issue. The results of testing at individual Plaintiff residences is to the contrary, yielding non-detects of TCE, the chemical the regulators have found to be the main one associated with the legacy Navy/Grumman Site and the very chemical for which Plaintiffs seek to certify a class…. The other chemical about which Plaintiffs seek to certify a class—CrVI—was not found, or even tested for at all.[3]
>
> Northrop Grumman Corporation's and Northrop Grumman Systems Corporation's Opposition to Plaintiffs' Motion for Class Certification at 17-18 [hereinafter cited as Opposition to Plaintiffs' Motion for Class Certification](ECF No. 156).

The foregoing supposed failure, in the defense view, was fatal to the Plaintiffs' attempt to provide class-wide evidence of a trespass because Dr. Rosenfeld purportedly had modeled only CrVI dispersion in the air and had not modeled actual deposits:

> Plaintiffs alternatively suggest that they can prove a common trespass through Rosenfeld's historical air modeling that supposedly showed that the CrVI particles "naturally fell to the earth and deposited onto the class members property." MOL at 41. Not so. Rosenfeld only modeled dispersion of CrVI in the air (he did not model actual deposits), and only between 1950 and 1994.
>
> *Id.* at 24.

---

[3] If the allegations in the Second Amended Complaint are true, the reason CrVI was not found or "even tested for," is because the Defendants refused to test for CrVI in the soil until the NYSDEC ordered them to do so.

The supposed failure to present evidence of actual, or imminent, CrVI, or other contamination, in the defense view, was also fatal to all claims seeking stigma damages. *Id.* 24. ("[t]he Property Damage Classes also request individualized relief - damages for the 'stigmatization of property due to the known or perceived contamination in the area.'… Such 'stigma damages' are recoverable under New York law only in connection with the 'actual' or perhaps 'imminent' contamination of a plaintiff's property").

The foregoing assertions ignored that Dr. Rosenfeld *had in fact conducted CrVI deposition modeling* using AERMOD and had disclosed the results in his Expert Report.  As Dr. Rosenfeld explained in his Rebuttal Report, "[i]n my Expert Report, AERMOD was run for deposition which determined that CrVI particles deposited throughout the Proposed Class Boundaries." (Expert Rebuttal Report of Paul E. Rosenfeld, Ph. D. at 15)(Exhibit 25 to Plaintiffs' Motion for Class Certification). The deposition modeling showed that large wet, tangible particles[4] of CrVI greater than 125 ug per square meter had been deposited uniformly over the class areas each year from 1974 to 1984.

> Exhibit 8 portrays the annual deposition of CrVI for Base Case emissions from 1974 to 1984. As shown in yellow, CrVI blanketed both the Proposed Class Boundary for Medical Monitoring and the Proposed Class Boundary for Property Damage and the Alternate Subclass with levels higher than 125 µg per square meter proving that emissions of CrVI were not only present in the ambient air, but also trespassed on and into the properties of Bethpage community members. Exhibit 9 portrays hourly averaged plumes of CrVI deposition based on Base Case emissions of CrVI from 1974 to 1984. The green plumes were selected to illustrate how deposition occurred in all directions at varying times throughout a representative year. The plumes are all hourly averages from 12:00 – 1:00 PM …

---

[4] (Rebuttal Report at 16)("The wet CrVI particle data considers that paint solvents are present on the CrVI particle, while the dry CrVI  particle data considers that the solvents volatized off of the CrVI particle. To be more conservative for modeling….SWAPE used the wet particle data in the Expert Report and this Rebuttal Report, as the particle sizes are larger and undergo more depletion").

Rebuttal Report at 16.

Dr. Rosenfeld also provided a map[5] showing that the deposition occurred throughout the class boundaries and, in fact, extended beyond those boundaries. *Id.* Exhibit 8. In Dr. Rosenfeld's July 7, 2025 Rule 26 Report at 1, he has confirmed that "[a]mbient air concentrations of Cr-VI deposited in soil as well as inside residential dwellings."

In addition to ignoring the deposition modeling,  the Defendants dismissed this air modeling as being merely theoretical and further argued that any such deposition would have persisted for days at most:

> While Rosenfeld postulates that historical air emissions deposited CrVI particles onto the class members' properties, any CrVI particles would have persisted for days, at most.

Opposition to Plaintiffs' Motion for Class Certification at 19.

While it is true that CrVI chemically transforms to CrIII over time, Dr. Rosenfeld's July 7, 2025 Rule 26 Report shows that this is not true when the CrVI is in a protected environment such as in an attic. The CrVI rocks found in the park in 2024 and 2025 – and the alarming high levels of CrVI detected in the soil - also conclusively show that the defense assertions are meritless. More importantly, the low readings of CrVI found in the attic do not mean that little or no CrVI was deposited in the Subclass area. Dr. Rosenfeld has explained that these amounts are not representative of the higher amounts that were actually deposited:

> The analytical results for the attic dust samples largely indicate low estimated concentrations (largely below the reporting limit) of hexavalent chromium (Cr-VI). However, these Cr-VI concentrations in the attic dust samples are not likely to be representative of environmental levels that existed years to decades in the past, because Cr-VI chemically transforms to trivalent chromium (Cr-III) through chemical reduction. Chemical reduction

---

[5] Dr. Boyle has reproduced this map in his CrVI expert report.

in soils (i.e., and house dust) depletes Cr-VI concentrations as discussed further below.

Trivalent chromium (Cr-III) and hexavalent chromium (Cr-VI) are the primary states found in the environment. In most soils, chromium is primarily present as trivalent chromium (Cr-III), which has low reactivity and low mobility. In this case, attic dust containing chromium derived from historical air pollutants from the Facilities has likely degraded over time, resulting in lower Cr-VI measurements.

Pls. Ex. 27 at 10-11.

The Defendants also argued Dr. Rosenfeld's modeling did not provide evidence of class-wide economic loss because Dr. Boyle had based his diminution in value opinions solely on the proximity of the class area to the water contamination plumes:

To the extent Plaintiffs' rely on Rosenfeld's modeling for alleged class-wide contamination they have offered no evidence that such alleged contamination caused class-wide economic loss. Boyle's testimony estimates diminution in property values based on their proximity to the groundwater plumes (Boyle Rep. at 4), not Rosenfeld's modeling.

Opposition to Plaintiffs' Motion for Class Certification at 20, note 23.

But, using Dr. Rosenfeld's modeling, Dr. Boyle has now supplemented his earlier opinion to show that proximity to the TCE and CrVI contamination also caused a common diminution in residential property values.

## CONCLUSION

For the reasons stated, the Plaintiffs request the Court to certify the CrVI and TCE Contamination Property Damage Subclass in addition to the original TCE Property Damage Class. In the alternative, the Plaintiffs request the Court to certify the specified issue classes. Finally, if the case does not settle, the Plaintiffs reserve their right on motion to file a Fed. R. Civ. P. 15(d) supplemental pleading to update their pleading with the new information disclosed in the Town of Oyster Bay lawsuit and the results of the on-going CrVI soil testing ordered by the NYSDEC.

36

Dated:  July 25, 2025

Respectfully submitted,


By: */s/ Gregory A. Cade*
Gregory A. Cade, Esq.
Gary Anderson , Esq.
Kevin B. McKie, Esq.
**ENVIRONMENTAL LITIGATION GROUP, PC**
2160 Highland Avenue South
Birmingham, AL  35205
Tel: (205) 328-9200


By: */s/ Robert Gitelman*
Robert Gitelman, Esq.
**NAPOLI SHKOLNIK PLLC**
400 Broadhollow Road
Melville, NY  11747
Tel: (212) 397-1000
rgitelman@napolilaw.com

Paul J. Napoli, Esq.
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de Leon
San Juan PR  00907-3982
Tel. (787) 493-5088
PNapoli@NSPRLaw.com

*Counsel for Plaintiffs*

37

## CERTIFICATE OF SERVICE

I, Robert Gitelman, hereby certify that on this 25th day of July, 2025, I caused a copy of the annexed to be served by e-mail upon the counsel for defendants.

_____

Robert Gitelman, Esq.